In the Matter of:

GRAHAM

vs

BRISTOL HOSPICE HOLDINGS, INC.


BRISTOL HOSPICE HOLDINGS, INC. (DEBRA WERTZ V.1)

January 09, 2024



P.O. BOX 3265
SALT LAKE CITY, UT 84110
385.707.7254

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION


ELIZABETH GRAHAM,              )
                               )
      Plaintiff,               )
                               )
vs.                            )  Case No. 2:21-cv-00754
                               )
BRISTOL HOSPICE                )
HOLDINGS. INC.,                )
                               )  Hon. Ted Stewart
      Defendant.               )



      Zoom Videoconference 30(b)(6) Deposition of:

            BRISTOL HOSPICE HOLDINGS, INC.

                    By:  DEBRA WERTZ
                         Volume 1

                    -and-

      Zoom Videoconference Deposition of:

                    DEBRA WERTZ
                    Volume 1



            January 9, 2024 * 9:02 a.m.


                Witness Location:

            1465 West 2500 South
                Syracuse, Utah


      Reporter:  Susette M. Snider, CSR, CRR, RPR

```
 1              A P P E A R A N C E S

 2  FOR THE PLAINTIFF:

 3              HOLLINGSWORTH LAW OFFICE, L.L.C.
                April L. Hollingsworth
 4              Whitney Nelson
                Attorneys at Law
 5              1881 South 1100 East
                Salt Lake City, Utah 84105
 6              Tel:  801.415.9909
                april@aprilhollingsworthlaw.com
 7
    FOR THE DEFENDANT:
 8
                KIRTON & MCCONKIE
 9              Ryan Frazier
                Attorney at Law
10              50 East South Temple, Suite 400
                Salt Lake City, Utah 84111
11              Tel:  801.328.3600
                rfrazier@kmlaw.com
12
    ALSO PRESENT:
13
                Elizabeth Graham
14              Oghenetega Euveyan

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2  DEBRA WERTZ:                                        PAGE

3     Examination by Ms. Hollingsworth..............   4

4

5                     E X H I B I T S

6  NUMBER                DESCRIPTION                   PAGE

7     1    Human Resources Manual corrective action .  60
           guideline, GRAHAM 710-713
8
      2    Human Resources Manual ...................... 74
9          complaint/grievance process guideline,
           BH 141-143
10
      3    Bristol Hospice guideline for presenting .  81
11         discrimination and sexual harassment,
           BH 523-525
12
      4    Excerpt from employee handbook including .  93
13         performance improvement, corrective
           action, and problem resolution,
14         GRAHAM 344-345

15    5    Excerpt from employee handbook including .  99
           nondiscrimination and sexual harassment,
16         GRAHAM 304-307

17    6    Excerpt from employee handbook including  .102
           rest breaks, GRAHAM 317
18
      7    Human Resources Manual involuntary ........105
19         termination guideline, GRAHAM 715-716

20

21

22

23

24

25

1      P R O C E E D I N G S

2

3              DEBRA WERTZ,

4        having been first duly sworn,

5      was examined and testified as follows:

6                  EXAMINATION

7    BY MS. HOLLINGSWORTH:

8        Q.    Okay.  Ms. Wertz, can you state and spell

9    your full name for the record, please?

10       A.    Yes.   My name is Debra Wertz, D-e-b-r-a,

11   W-e-r-t-z.

12       Q.    And, Ms. Wertz, have you ever had your

13   deposition taken before?

14       A.    Yes.

15       Q.    How many times and when?

16       A.    Twice.  The exact dates I -- I don't

17   remember what the exact dates are.

18       Q.    Okay.  And were those work related?

19       A.    Yes.

20       Q.    Okay.  So, like, were they two years ago?

21   Five years ago?  Ten years ago?  When generally?

22       A.    I would say one was -- and this is just a

23   guess.  I would say that one was about five years

24   ago, and one was three years ago.

25       Q.    Okay.  And were they -- were you

1  testifying on behalf of Bristol?

2      A.    Yes.

3      Q.    Okay.   When -- and you're retired now,

4  right?

5      A.    That's correct.

6      Q.    Okay.  Well -- so let me just start by

7  going over some of the rules of depositions to

8  refresh your recollection and make sure that we're

9  clear.

10           Even though this is on Zoom, we'll have a

11  transcript made of this.   We have a court reporter

12  here.   And so for that reason make sure you say yes

13  or no as opposed to uh-huh or unh-uh.   And try and

14  let me answer the -- or finish the question before

15  you start to answer, again, so we get a clear

16  transcript.

17           If there are any -- if you have any

18  questions about what I've asked, then please ask me

19  to restate, because if you answer the question, I'll

20  assume that you've understood it.

21           And we can take breaks today whenever you

22  need it.   Just make sure that you answer a question

23  that's pending before you take a break.

24           And your counsel may make some objections

25  today to preserve them for the record, but unless

1   it's -- he instructs you not to answer because of a

2   privilege, you'll need to go ahead and answer a

3   question.

4                Is all that clear?

5       A.    Yes.

6       Q.    Okay. When -- what were the situations

7   that you testified for three and five years ago, ish?

8       A.    They were both lawsuits that had been

9   filed against Bristol.

10       Q.    Okay.  And were they employment cases?

11       A.    Yes.

12       Q.    Okay.  Who were the plaintiffs in those

13   cases?

14       A.    I don't remember.

15       Q.    What was the resolution of those cases?

16       A.    I don't remember on that, either.

17       Q.    Did you have to testify at a trial or just

18   depositions?

19       A.    Just depositions.

20       Q.    Okay. Were there allegations against you?

21       A.    As far as the depositions?

22       Q.    The claims that were made in the cases,

23   did they contain allegations about something you had

24   done?

25       A.    No.

1        Q.      Okay.  So what was your role in

2   testifying?

3        A.      I was the executive vice president of HR

4   for Bristol.

5        Q.      Okay.  Is that the role that you were in

6   when you retired from Bristol?

7        A.      Yes.

8        Q.      So how long were you at Bristol?

9        A.      Nine years.

10        Q.      And were you the executive vice president

11   of HR the entire time?

12        A.      No.

13        Q.      Tell me your roles leading up to when you

14   left.

15        A.      I was an HR manager.   Then I moved to HR

16   director.   Then I went to vice president and then

17   executive vice president.

18        Q.      Okay.  So what year did you start with

19   Bristol?

20        A.      I know I was there nine years when I

21   retired, which was two years ago, so my guess would

22   be two thousand -- around -- jeez, I don't know off

23   the top of my head, honestly.   Say around 2012.

24        Q.      Okay.  And did you put the company's

25   policies in place?  Did you have a role in writing

1    them and basically coming up with the policies that

2    governed employment practices?

3         A.    Yes.

4         Q.    Okay.

5              MR. FRAZIER:  April, can I just jump in

6    really quickly?

7              MS. HOLLINGSWORTH: Sure.

8              MR. FRAZIER:  So I just want to make

9    something clear on the record.    So today's deposition

10   is a Rule 30(b)(6) deposition of Bristol.    We have

11   designated Ms. Wertz as that designee.

12              MS. HOLLINGSWORTH: Right.

13              MR. FRAZIER:  I wasn't sure if you had

14   intended to depose Debbie Wertz separately or if

15   we're just going to go ahead today.    Part of the

16   reason why I raise that is, you know, I think that

17   Ms. Wertz would prefer to appear once for deposition.

18   If so, I'm happy to expand the deposition beyond the

19   scope of the topics.

20              And I realize the question you asked was

21   within the topics.    I'm not suggesting that.    But if

22   we do start to stray, I would object unless we're

23   going to agree and this will count as Ms. Wertz's

24   deposition as well, in which case I'm happy to let

25   you also ask her questions outside the topics that

1   would be within her personal knowledge.

2           MS. HOLLINGSWORTH: Okay.

3           MR. FRAZIER: So I'd like to know how

4   you'd like to proceed on that.

5           MS. HOLLINGSWORTH: Well, yes, that makes

6   sense.   We've had a hard time scheduling, so we'll

7   let this count as the one and only deposition, as her

8   personal deposition as well.

9           MR. FRAZIER: Okay.   And I'm okay with

10  that.

11          And we'll just -- and the only thing,

12  Debbie, I would say is to the extent you're

13  testifying on behalf of the company at times make,

14  say, where it's really the company, just make it

15  clear, and then, if it's you personally, tend to make

16  it clear.   You don't have to be overly careful there,

17  but clearly to the extent maybe something would only

18  be within the company's purview, make that clear,

19  that you're testifying for the company. And, then,

20  within your knowledge, make that clear.

21          And, then, otherwise, I won't object if we

22  go outside the topics.

23          So, thanks.   I just wanted to get that

24  clear for the record.

25          MS. HOLLINGSWORTH: Okay.   Yeah, I

1    appreciate that.

2         Q.    (By Ms. Hollingsworth)    And given that,

3    let me get a little more background on you.

4              So let's start with are you from Utah?

5         A.    No, but I've been here the majority of my

6    adult life.

7         Q.    Okay.

8         A.    Actually, the whole of my adult life.

9         Q.    Where are you originally from?

10        A.    I was born in Los Angeles, California.

11        Q.    And when did you come to Utah?

12        A.    I came to Utah when I was 15 and then left

13   and came back when I was 17.

14        Q.    Okay.  And what -- did you go to college

15   here?

16        A.    Yes.

17        Q.    Where did you go?

18        A.    I went to -- the majority of the time was

19   at the University of Phoenix, but I also attended

20   Weber State University for a short period.

21        Q.    Okay.  And let me back up.   Did you

22   graduate from high school in --

23        A.    Yes.

24        Q.    Where did you graduate from and when?

25        A.    Davis High School.    Goodness gracious.    It

1  would have been when I was 19, so 1972.    And Davis

2  High School is in Davis County, Utah.

3          Q.     Okay.  And where did you go between 15 and

4  17?

5          A.     England.

6          Q.     Okay.

7          A.     My dad was stationed there in the Air

8  Force.

9          Q.     Okay.  So what did you do immediately

10 after high school?

11         A.     I was married when I came back, so I had

12 children and raised a family.

13         Q.     Okay.  So -- and that was in Utah?

14         A.     Yes.

15         Q.     When did you start taking classes

16 post-high school?

17         A.     My children were raised.    Hum.  I don't

18 know the exact dates.    I don't have --

19         Q.     Did you --

20         A.     I'm sorry?

21         Q.     Did you get a degree?

22         A.     I did.    I got a bachelor's degree and a

23 master's.

24         Q.     From where?

25         A.     University of Phoenix.

1      Q.     Do you know -- what was your bachelor's

2  in?

3      A.     Business management.

4      Q.     What year did you get that degree?

5      A.     I couldn't tell you right off the top of

6  my head.  I'd have to go down and look at my diploma.

7  I believe it was around -- I want to say it was

8  around 53.

9      Q.     Okay.  And then where did you get your

10  master's?

11      A.     University of Phoenix.

12      Q.     What year was that?

13      A.     That would have been about a year later.

14  I believe I was 55 when I received my master's, so --

15      Q.     And what was that in?

16      A.     -- that would have been 15 years ago.

17      Q.     What year was -- sorry.

18             What was your master's in?

19      A.     It was in HR management.

20      Q.     And who were you working for at the time?

21      A.     That I got my master's?

22      Q.     Right.

23      A.     I was working for Ogden-Weber Community

24  Action.

25      Q.     Okay.  When -- after you or while you were

1  raising  your  children,  when  did  you  start  a  career

2  outside  the  home?

3          A.      I would say 1983.

4          Q.      Okay.  And what did you start doing?

5          A.      I was a key punch operator out at Hill Air

6  Force Base.

7          Q.      How long did you do that?

8          A.      I don't know.  I would guess about a year,

9  year and a half.

10          Q.      Then what did you do after that?

11          A.      I went -- I stayed with Hill Air Force

12  Base and moved as a -- that was so long ago.   I

13  moved -- I don't know what the job title was.  I was

14  in a tool crib for a while.  I don't know how long I

15  was there.

16          Q.      What did you do after that?

17          A.      Then I went, still at Hill Air Force Base,

18  and was a customer liaison.

19          Q.      How long did you do that?

20          A.      I don't  know.  Three or four years.   I'm

21  just guessing at these dates.   I have no idea.

22          Q.      What does that get us up to, like, what

23  year-ish?

24          A.      I would say that got us up to 19- --

25  goodness -- -83, maybe.

1    Q.    Okay.  And what did you do after you were

2  a customer liaison?

3    A.    So then I moved over into the tool crib.

4    Q.    Back to the tool crib?

5    A.    Well, let me go back.   I had one other

6  position before that.   So I worked in aircraft

7  instruments.   I was there for probably about nine

8  months.  Then I went to the tool crib, and I was

9  there probably about a year.   And then I was let go

10 in a reduction of force that Hill Air Force Base was

11 going through.

12   Q.    And do you remember when that was?

13   A.    That would have been around 198- -- golly.

14 I want to say it was around 1983, 1984.   I really

15 hesitate to give you dates because I just don't

16 remember exactly.

17   Q.    Sure.   Sure.

18         What did you do after Hill Air Force Base?

19   A.    I got a job with Ogden-Weber Community

20 Action.

21   Q.    And what is that organization?

22   A.    They are an organization that manages

23 Headstart.   They managed a food pantry and other

24 types of grant-type programs.

25   Q.    Okay.  And what did you do for them?

1        A.      I was -- I was an administrative assistant

2    and then moved into -- they started including

3    HR-related responsibilities in it, but I was an

4    administrative assistant.

5        Q.      How long were you there?

6        A.      Six or seven years.    I want to say seven

7    years.

8        Q.      And what were your responsibilities at the

9    time that you left?

10       A.      Well, I was an administrative assistant to

11   the -- the person that was over it, the director, and

12   then I would do things like new employee orientation.

13   I would take care of the W-4s, made sure that people

14   were able to work in the United States, the typical,

15   standard HR responsibilities.    And then it moved more

16   into employer relations and those kind of things.

17       Q.      Okay. Did you receive any training to do

18   these HR functions?

19       A.      No.  I pretty much had to learn it myself.

20   But as I said before, when I was at community action,

21   I started going back to higher education to get my

22   degrees.

23       Q.      So did you take classes that taught about

24   HR functions?

25       A.      Yes.

1      Q.     Like what?

2      A.     Well, there were particular courses in the

3   degree such as organization management, employment

4   law, those kind of things.   I also went to seminars

5   and workshops and those kind of courses.

6      Q.     Okay.  So are you, then, familiar with,

7   like, various HR laws that cover employees?

8      A.     I would say so, yes.

9      Q.     Title VII, FMLA, that kind of thing?

10     A.     Yes.

11     Q.     And did you learn about those laws on the

12  job or through school?

13     A.     Both.

14     Q.     So why did you leave the Ogden-Weber

15  Community Action program?

16     A.     I left because there was a change in the

17  leadership there, and I didn't feel that it was an

18  effective way to manage.   And so I felt like it was

19  in my best interest and the company's best interest

20  to -- to find other employment.

21     Q.     And when you say you didn't feel like it

22  was an effective way to manage, what do you mean by

23  that?

24     A.     I felt like that there were decisions that

25  were being made that I didn't feel comfortable from

1    an HR perspective that I could -- that I could

2    support.

3         Q.    Like what?

4         A.    Well, one example is that we had received

5    a complaint that one of our employees was illegal to

6    work in the United States, and so when I did further

7    research -- we had gone through all of the parts for,

8    you know, doing the I-9, and they had an ID that

9    appeared valid.    But as we did more research, we had

10   INS come in, and it was apparently the ID of a

11   12-year-old boy, the social security number was.    So

12   I felt like it was necessary to let that person go

13   because they were not legal to work in the United

14   States.

15             I was told by my supervisor at the time

16   that if that employee left, I would be leaving

17   shortly behind her, and I felt that was unethical.    I

18   felt like it was illegal, and I told him that.    And

19   he did back off and let me go ahead and move forward

20   with terminating their employment.    But it was

21   decisions like that and comments like that that I

22   felt like put me in a bad situation from a legal

23   speculative --

24        Q.    Um-hum.

25        A.    -- so I chose to leave.

1          Q.      Who was your supervisor?

2          A.      At that time it was John Ulibarri.

3          Q.      John who?

4          A.      John Ulibarri, U-l-i-b-a-r-r-i.

5          Q.      So were you terminated, or did you leave

6     that organization?

7          A.      No. I resigned.  I left.

8          Q.      Do you remember what year that was?

9          A.      That would have been probably -- I don't

10    know. Just guessing, 2011.

11         Q.      And did you have another job before you

12    went to Bristol Hospice?

13         A.      No, I did not -- oh, I take that back.

14    Yes, I actually had two other jobs between that one

15    and Bristol Hospice.

16         Q.      Okay.   What were they?

17         A.      The first one was a temporary position

18    with a company called The Management and Training

19    Center.   I was hired to hire ex-pats and employees to

20    work and build schools in Iraq.   And I was there for

21    about -- no.   Sorry.   I'm getting two things mixed up

22    here.

23                 Yeah.  So that one lasted a few months,

24    maybe three, four months.   And then I got a job with

25    a company called Living Scriptures.   I was their HR

1    manager, and I was there about a year.

2        Q.    Okay.  What was your position with the

3    prior company that was hiring ex-pats?

4        A.    Are you asking about Living Scriptures?

5        Q.    No, the one before that.

6        A.    I'm sorry.

7        Q.    What was the name of the company before

8    Living Scriptures?

9        A.    Management and Training Center.  I was an

10   HR generalist.

11       Q.    And you said they were hiring ex-pats to

12   do something in Iraq?

13       A.    Iraq.

14       Q.    And what were they doing out there?

15       A.    They were building schools, and so we

16   would hire individuals to go over there and work to

17   help build the schools and to actually help the

18   people there.

19       Q.    And so you were -- your role was to hire

20   people?

21       A.    Yes.

22       Q.    Anything else?

23       A.    Let me -- let me go back and clarify that

24   question.  It was my responsibility to find

25   candidates.  I didn't actually do the hiring.  I

1   would recommend the candidates, and then they would
2   be interviewed by the individual managers over that
3   particular program.
4        Q.    Okay.  And you did that for about a year?
5        A.    No.  That one I only did for probably --
6   maybe three  months.
7        Q.    And why so short?
8        A.    Because I was looking for full-time
9   employment and it was a temporary position.
10       Q.    Okay.  And did you go from there to Living
11  Scriptures?
12       A.    Yes.
13       Q.    Was that a full-time position at Living
14  Scriptures?
15       A.    Yes.
16       Q.    What was your position there?
17       A.    I was HR manager.
18       Q.    And what did you do as an HR manager?
19       A.    I did anything that had to do with HR.  I
20  did organization development. I did training. I did
21  hiring. I did firing, although there wasn't a lot of
22  firing. I did FMLA. I did ADA. I did workers' comp
23  benefits.
24       Q.    Starting with I think you said
25  organizational -- did you say management?

1       A.      Development.

2       Q.      Development?   What does that mean?

3       A.      They were looking at -- they just hired a

4  chief operating officer, and they were looking at

5  reorganizing and streamlining processes, so I was

6  responsible for helping to make that happen.

7       Q.      What kind of processes were you

8  streamlining?

9       A.      Any type.   It would depend on the

10  department.

11      Q.      Can you give me some examples?

12      A.      So an example might be the shipping

13  department and the individual steps that they took

14  through the shipping process and where we could

15  streamline some of their processes, maybe eliminate

16  some of them, speed them up, enhance what tools and

17  things that they may use and -- and then determine

18  exactly how many personnel were necessary for that

19  particular job or department.

20      Q.      What did -- what does Living Scriptures

21  do?

22      A.      Living Scriptures, they started out

23  recording Latter-Day Saints scriptures, so the Book

24  of Mormon, the Old Testament, New Testament, and they

25  made audible tapes.   As they grew, they started

1   developing more entertainment.   They developed

2   bible-type stories and other uplifting-type stories

3   in animation specifically for -- for children.

4   And -- and then in the later years they actually did

5   more movies and that with actual live actors.

6          Q.    So when you're talking about shipping,

7   what kind of things were being shipped?

8          A.    The videos, the videos or the tapes.   They

9   were done on cassette tapes at the time and VHS

10  videos.   That shows how long ago it was.   So people

11  would order them.   They would have subscriptions on a

12  monthly basis, and so they would ship those products

13  out.

14         Q.    And how long were you there at Living

15  Scriptures?

16         A.    I was there either a year or a little bit

17  over a year.

18         Q.    Until  when?

19         A.    I don't  know.  Probably two thousand -- I

20  honestly  don't  know.  I don't  want  to  try  to  guess.

21         Q.    Was that your last job before you went to

22  Bristol  Hospice?

23         A.    No.  I worked for a company called Tybrin.

24         Q.    Tybrin, T-y-b- --

25         A.    T-y-b-r-i-n, Tybrin Corporation.   Tybrin

1    Corporation, their business was government contracts.

2    They did mission planning for the pilots and the

3    individual types of missions that were -- were held

4    and --

5           Q.      What kind of --

6           A.      Pardon?

7           Q.      What kind of missions are we talking

8    about?

9           A.      We're talking about missions, so, if a

10   pilot was going to go bomb somewhere else, we would

11   plan those missions.   We didn't actually plan the

12   missions.   They developed the software for planning

13   the missions.

14          Q.      And what years was this that you were at

15   Tybrin?

16          A.      It would have been until the year before I

17   came to work for Bristol.

18          Q.      So roughly, like, 2010?

19          A.      Yeah, maybe close around there.   I -- I'm

20   sorry.   I don't have my résumé or anything in front

21   of me that I can tell you exact dates.

22          Q.      Okay.   But who was being bombed in 2010?

23          A.      Those types of -- I would not know that

24   because I was from the HR perspective.   I didn't get

25   involved with the actual mission planning themselves.

1    Mission planning was top secret.    I only had a secret

2    security clearance, and I wasn't involved with any of

3    the missions.    That was -- that was the company's

4    responsibility, to manage the software.    I don't even

5    know if the company actually was involved in the

6    mission or just taking care of the software.

7            Q.    What was your title at that -- at Tybrin?

8            A.    HR manager.

9            Q.    And you -- did you say you got a security

10    clearance for that job?

11            A.    Well, I already had a security clearance

12    when I worked out at Hill Air Force Base, but yes,

13    they had to renew my security clearance when I worked

14    at that job.

15                    (Interruption in the Zoom feed.)

16                    (A discussion was held off the record.)

17                    (The record was read as follows:

18            "Question:    And you -- did you say you got

19        a security clearance for that job?

20            "Answer:  Well, I already had a security

21        clearance when I worked out at Hill Air Force

22        Base, but yes, they had to renew my security

23        clearance when I worked at that job.")

24            Q.    (By Ms. Hollingsworth)    Okay.    And why did

25    you need security clearance for that job?

1          A.      Everyone that worked for Tybrin in that

2    particular mission planning had to have a security

3    clearance because of the kind of information that we

4    may have had access to, and so all of us were

5    required to have one.

6          Q.      So why did you leave Living Scriptures?

7          A.      When we were going through the

8    organization development process, we were looking at

9    how we could make HR more efficient as well.    We were

10   also looking at a platform on what would be the best

11   way of helping our -- our employees with insurance.

12   And so they decided to go with another platform where

13   they  actually  included  HR.   The employees were moved

14   under that particular company so they could be in a

15   bigger pool of people for their benefits.

16              And because they had their HR component

17   and they were trying to conserve on money, I left.     I

18   did not resign.   I was laid off because of the

19   movement they made.

20         Q.      Okay.  I think you told me this, but what

21   was your title at Living Scriptures?

22         A.      I was the HR manager.

23         Q.      And who was your supervisor there?

24         A.      It was the chief operating officer.    His

25   name was Tim Nickerson.

1      Q.    And did you have employees working for

2  you?

3      A.    No.

4      Q.    Were there other HR managers?

5      A.    No.

6      Q.    Okay.  So when you left Living Scriptures,

7  what was the gap between when you went to work for

8  Tybrin?  Was that -- the next position you had after

9  Living Scriptures was Tybrin?

10     A.    Yes.  Tybrin was the next one.

11     Q.    What was the gap between them?

12     A.    I don't -- I don't remember.

13     Q.    Was it, like, years or months or days?

14     A.    No.  I would say it was months.

15     Q.    Okay.  Do you know when you were hired on

16  at Tybrin?

17     A.    No.  That would have -- like I said, I

18  don't know exactly what the date was.  It was August.

19  I know it was in August, but I don't remember the

20  year for sure.

21     Q.    How long was that before you went to

22  Bristol  Hospice?

23     A.    Eleven months between when I left there

24  and went to Bristol.

25     Q.    And why did you leave Tybrin?

1          A.      I left Tybrin because Tybrin was purchased

2    by Jacob -- Jacob Technology and they lost the

3    contract that I was working with because they'd

4    become a big company and that particular contract was

5    for small companies.   And so because we lost the

6    contract, there was no need for my position, and the

7    new company that had purchased them already had quite

8    a bit of HR people.

9          Q.      At Tybrin, how many HR people were there?

10         A.      Well, there were several HR managers in

11   different   locations.     The corporate company was in

12   Florida and -- Fort Walton Beach, and they had -- I

13   can't even guess how many people they had in their HR

14   department. I reported directly to the director that

15   was over HR.

16         Q.      And -- but you worked out of Utah?

17         A.      Yes, I worked out of Utah.   But I also

18   covered California, some of the bases in California

19   that had our platform.

20         Q.      And what did you do -- what were your

21   duties at Tybrin?

22         A.      They were exactly the same.   I was

23   responsible for workers' comp, ADA, employee

24   relations, training, helped -- I helped to build

25   policies.   I didn't write them and all of that, but I

1    helped with those, your basic HR functions, new hire

2    orientation.    I managed one employee and -- actually,

3    I managed two employees, one in California and one

4    here in Utah.

5         Q.    What was their positions?

6         A.    The one in Utah was an HR assistant; the

7    one in California, I believe he was an HR generalist.

8         Q.    Who was the HR assistant?

9         A.    I can't -- I can't even remember her name.

10   I don't remember her name.

11        Q.    And who did you report to?

12        A.    I reported to Kathy Starnik.    She was at

13   the corporate office.

14        Q.    In Florida?

15        A.    Yes.

16        Q.    And why did you leave that company?

17        A.    Tybrin?

18        Q.    Yes.

19        A.    I left Tybrin because they lost the

20   contract.

21        Q.    Oh, that's right.

22              So you said you were in charge of FMLA and

23   ADA?

24        A.    Um-hum    (affirmative).

25        Q.    Does that mean that you approved, like,

1  employees' FMLA or ADA accommodations?

2       A.    I made the recommendation. I didn't do

3  the final approval.   The corporate office did.

4       Q.    Did you provide training to employees

5  about these laws?

6       A.    Yes.

7       Q.    And did you receive training on these --

8  on these kind of laws?

9       A.    Yes.

10       Q.    In what context can you receive training?

11  Like, did the company provide training for you to go

12  to?

13       A.    So there was internal training that the

14  corporate office put out.   There was workshops I

15  attended.   There were conferences that I attended.

16  And then, of course, just -- those -- those would be

17  the classes.

18       Q.    Did you have training on Title VII?

19       A.    Yes.

20       Q.    And what is your understanding of what

21  Title VII is -- does?

22       A.    Well, Title VII is -- essentially is part

23  of the Civil Rights Act, and it protects people based

24  on certain classes such as gender and race,

25  nationality.   Of course, later it was expanded to

1   sexual orientation.   Age discrimination was a part of

2   that, too, even though it had its own law.   Those

3   kind of things.   It protected certain rights for

4   people.

5        Q.   And does it protect employees from

6   retaliation?

7             MR. FRAZIER: Objection.   Calls for a

8   legal conclusion.

9        Q.   (By Ms. Hollingsworth)   You can answer.

10        A.   I would say yes, it does protect people

11   from retaliating based on that.

12        Q.   And where did you get your understanding

13   of Title VII?

14        A.   Just through years of experience and --

15   and --

16        Q.   Sorry.   I missed the first part of that

17   answer.   Can you repeat?

18        A.   Well, I would say, first of all,

19   on-the-job experience, personal experience, plus the

20   trainings that I had had.

21        Q.   Okay.  So was your next job after -- after

22   Tybrin, Bristol Hospice?

23        A.   Yes.

24        Q.   And who hired you at Bristol Hospice?

25        A.   Gol, I don't know why things are skipping

1  my mind.  Christie  Franklin.

2          Q.      And what was her position?

3          A.      She was the CEO over Bristol at that time.

4          Q.      And is there a different CEO, or was there

5  a different CEO during your tenure there?

6          A.      Yes.  There were several different CEOs

7  while I was there.

8          Q.      And who were they?

9          A.      Christie Franklin was first.    Then they

10  hired Stephen Leedy, Dr. Leedy.  Then they hired -- I

11  can't remember his name.  And then after him was

12  Hyrum Kirton.

13          Q.      And who was the CEO when you left?

14          A.      Hyrum Kirton.

15          Q.      And why did you leave?

16          A.      To retire.

17          Q.      So take me through your duties starting

18  from when you started at Bristol Hospice and moving

19  through your various positions.    And so, for

20  starters, what was your title when you started?

21          A.      HR manager.

22          Q.      Okay.  What were your duties as HR

23  manager?

24          A.      It was anything that had to do with HR.  I

25  developed policies and procedures because at that

1  time the company only had a draft.   I was responsible
2  for benefits, workers' comp, ADA, FMLA, employee
3  relations, training, orientation.   New hire
4  orientation, essentially that had to do with HR.
5           And as time -- as time went on, we started
6  getting a little bit bigger, and so we added some
7  people, which is essentially the reason why my job
8  title was changed.   However, the general
9  responsibilities under all of my titles were the
10  same.  The only thing that was different was the
11  amount of people that I managed, and -- and some of
12  those responsibilities were designated.   So even
13  though I had the general oversight over them, the --
14  the actual day-to-day responsibilities would fall
15  under some of my employees.
16       Q.    So when you started as an HR manager, did
17  you have any employees working for you?
18       A.    One.
19       Q.    And who was that?
20       A.    Her name was Shannon Higgins.   She was a
21  recruiter.
22       Q.    Okay.  And what's the difference between
23  an HR manager and an HR generalist?
24       A.    It depends on the company.
25            MR. FRAZIER:  April is your question at

1  Bristol or generally?

2          MS. HOLLINGSWORTH: At Bristol.

3          THE WITNESS:  So at Bristol, an HR

4  generalist might have certain responsibilities

5  attached to them, but they didn't -- they generalized

6  in a certain area.   Managers managed all of those

7  people and ensured that those responsibilities were

8  taken care of.

9          Q.    (By Ms. Hollingsworth)   Okay.  When you

10  say the generalists had -- how did you phrase it?

11  They had general responsibilities?

12          A.    They may have general responsibilities

13  over certain -- a certain part of HR.  Now, other --

14          Q.    Such as what?

15          A.    -- companies might have them responsible

16  for all of HR, but for the ones that I had in place,

17  they usually would have a certain aspect.

18          Q.    Like what?

19          A.    So just as -- well, I guess an example

20  would be if someone was over benefits or made sure --

21  the day-to-day responsibilities of benefits, they

22  might be considered a generalist.   Or they could be a

23  specialist.   It just -- it just depended on what the

24  position was.

25          Q.    Okay.  So Bristol hired generalists and

1    specialists?

2            A.    They could at any given time.

3            Q.    Did they while you were there?

4            A.    I honestly don't remember all of the

5    different job titles that we had.  But, yeah, I would

6    say that we hired generalists and specialists.

7            Q.    Okay.

8            A.    But I couldn't tell you exactly what those

9    job titles were.

10           Q.    Okay.  When you were hired as a manager,

11   you said you had one report, and who did you report

12   to?

13           A.    Well, I kind of had a dual reporting

14   system.  At that time Bristol Hospice was owned by

15   Avalon, and Avalon had a VP of HR.  And so I reported

16   to her for part of it, and then I reported to

17   Christie Franklin for the things that were

18   specifically for Bristol.

19           Q.    Who was the Avalon person that you

20   reported to?

21           A.    Goodness.  She was only there for a few

22   months after I started being hired.  Jeez, it's been

23   12 years.  I have no idea.  I don't know. I can't

24   tell you.

25           Q.    Okay.  How long were you in the HR manager

1    role?

2         A.    I don't know exact time frame.

3         Q.    I don't need exact time frame, but

4    generally.

5         A.    Probably a year, maybe two.

6         Q.    And then what role were you moved into?

7         A.    Then I was a director --

8         Q.    Director of --

9         A.    -- and I had that position for probably

10   about a year.

11        Q.    What was your title?   Director of HR?

12        A.    Yeah.

13        Q.    And how did that change come about?

14        A.    As the company started growing, the

15   department had to start growing, and because of the

16   extra responsibilities with more people to manage, I

17   requested a promotion and received it.

18        Q.    And how did you go about getting the

19   promotion?  Did you have to apply for it?

20        A.    No.

21        Q.    Who did you request the promotion from?

22        A.    Christie Franklin.

23        Q.    And so --

24        A.    And at that time I reported just to her.

25        Q.    Okay.

1          A.     I was no longer affiliated with Avalon.

2          Q.     Okay.  So Christie Franklin, she promoted

3    you to --

4          A.     Yes.

5          Q.     -- the HR director position?

6          A.     Yes.

7          Q.     Do you remember when this was?

8          A.     Probably -- maybe a year after the

9    director position.

10         Q.     I thought this was --

11         A.     Or after the -- sorry.  Yeah, it was

12   probably a year or two after I started there.

13         Q.     Okay.  What does Bristol Hospice do?

14         A.     They provide hospice services for terminal

15   patients that are thought to be dying within six

16   months.

17         Q.     And how do they provide that -- those

18   services?  Do they have a facility?    Do they go into

19   people's homes?  How does that work?

20         A.     They go into people's homes.  They are

21   hired in some facilities if patients need them and

22   they're in a nursing home or an assisted living.

23   They would be referred to our company, and then they

24   would go in.   They would assess whether that patient

25   really did qualify for hospice services, and at that

1    point they would put them on a treatment plan.

2         Q.    And when you started at Bristol, how many

3    employees were there?

4         A.    Around 300.

5         Q.    And by the time you left, how many

6    employees?

7         A.    4500.

8         Q.    So -- and you left in what year?

9         A.    It was two years ago in July, so 2021.

10        Q.    Okay.  And are all the employees in Utah?

11        A.    No.

12        Q.    Where are they?

13        A.    I don't know where they are today.   At the

14   time I worked there, they were in California, Oregon,

15   Texas, Utah, Colorado, Florida, Alabama, Hawaii --

16   not Alabama, sorry -- Georgia; and then they were

17   looking at opening some back east in Michigan.

18        Q.    And is the company headquartered in Utah?

19        A.    Yes.

20        Q.    Where in Utah?

21        A.    Salt Lake City.

22        Q.    So did you work out of the corporate

23   office?

24        A.    Yes.

25        Q.    And where was that?

1      A.      It was out by the airport in
2   Salt Lake City.   I don't know the exact address.
3      Q.      And were all -- all the HR employees
4   located at that office?
5      A.      They -- they were until COVID, and then we
6   started letting employees work from home.   So there
7   were a few employees that continued to work from home
8   once COVID wasn't as big a deal.
9      Q.      Okay.  But up until then, everyone worked
10  out of this one corporate office?
11     A.      Until about 2018.   And in 2018 we acquired
12  a company, and that company had some HR people.   And
13  I hired those HR people.
14     Q.      And where did they work out of?
15     A.      They worked out of Bakersfield,
16  California.
17     Q.      Okay.   What company was acquired?
18     A.      Optimal.
19     Q.      And how many HR employees were hired on?
20     A.      Originally we hired on four, but that's
21  not all that -- we were going to hire four.   We ended
22  up hiring three.
23     Q.      And who were those three?
24     A.      Kelly Beninger was one.   She was their VP
25  of HR.  Faith Myers, who did the benefits.    There was

1    Amber -- I don't know her last name -- that did

2    recruiting.    And then there was Mia, who was a

3    generalist.

4        Q.    So which one of those did you end up not

5    hiring?

6        A.    Kelly Beninger.

7        Q.    Okay.  And the other three became Bristol

8    employees in 2018; is that right?

9        A.    I think it was 2018, yeah.

10        Q.    Okay.  And they were located in

11    Bakersfield, California?

12        A.    Yes.

13        Q.    So going back to -- you talked about

14    becoming the HR director.    Were you the HR director

15    or an HR director?

16        A.    The.

17        Q.    Okay.  And that -- that was a year or two

18    into your tenure --

19        A.    Yes.

20        Q.    -- with Bristol?

21              How long were you doing that role?

22        A.    I would probably say another year, year

23    and a half.

24        Q.    And then what was your next role?

25        A.    Vice president of HR.

1      Q.      And how did -- how did you come to be vice

2   president of HR?

3      A.      We -- I don't know.  It just happened.  I

4   don't remember whether it was Christie or whether it

5   was Dr. Leedy, but because the role had now become a

6   national format, they felt like it was appropriate to

7   move me to that position.

8      Q.      And when you say the role had become a

9   national format, what do you mean?

10      A.      I mean that instead of managing just a

11   small amount of people that were more local, we were

12   now spread across the United States, and we -- I

13   think just hiring Optimal, we more than doubled in

14   size just with that.   And then, of course, as we

15   acquired more companies, the roles -- the

16   responsibilities just kept getting bigger and bigger.

17      Q.      So when did you become the VP of HR?

18      A.      I would say probably -- I want to say

19   2017, maybe 2017.

20      Q.      And Bristol didn't acquire Optimal until

21   2018, right?

22      A.      Yeah.  I think that's right.   I actually

23   might have been made VP before that happened, and

24   then afterwards I was made executive VP.

25      Q.      So did you have to apply for the VP

1    position?

2         A.    No.   No.

3         Q.    It just came with the -- how did that

4    work?  You just one day got a title change?

5         A.    Got a title change and a pay increase.

6         Q.    And who made that --

7         A.    Essentially -- essentially, yes.   They

8    just kept promoting me.

9         Q.    Who specifically kept promoting you?

10        A.    Well, Christie promoted me a couple of

11   times.  Dr. Leedy promoted me.  I don't remember for

12   sure which CEO promoted me to executive.   I don't

13   know.

14        Q.    Do you know which one promoted you to a

15   VP?

16        A.    So I want to say it was Christie, but

17   it -- but it could have been Dr. Leedy.  I don't

18   know.

19        Q.    And how did your duties change when you

20   went from HR manager to a VP?

21        A.    The job responsibilities really didn't

22   change other than I had people who worked for me.   So

23   instead of doing all the hands-on on the day-to-day

24   level, I was -- I did more of the oversight of those

25   responsibilities, if that makes sense.

1    Q.    It does.

2          I wish my connection was better.

3          (A discussion was held off the record.)

4          (Recess from 11:05 a.m. to 11:32 a.m.)

5          MR. FRAZIER: So just so you're aware,

6    Debbie advised me during the break that she feels

7    like sometimes her sugar level drops.    And she's fine

8    right now, but if that happens, she'll just let us

9    know. Mostly likely, she thinks that will be around

10   the noon hour, 12:15, 12:30, somewhere in there.    I

11   don't know how long you plan to go.    She doesn't want

12   to stop it.    She's going to let it go.    But if

13   something happens, then she'll probably let us know.

14          Also, we probably ought to think about

15   taking a break at that point to allow her to grab

16   something to eat.    I don't know how long you're

17   planning on going today.    You know, if it looks like,

18   hey, we should take a lunch hour, great.    If not,

19   plow ahead, fine.    But she probably will need to grab

20   something.    I just wanted to let you know.

21          MS. HOLLINGSWORTH: Okay.    That    sounds

22   good.

23          MR. FRAZIER:    And, Debbie, feel free to

24   let me know if you need a break.    That's fine.

25          THE WITNESS:    Okay.    Okay.

1       Q.      (By Ms. Hollingsworth)    Okay.  So let's go

2   back to when you were an HR manager for Bristol, did

3   you only have one report?

4       A.      Yes.

5       Q.      And then when you became the VP, how many

6   reports did you have?

7       A.      When I became a VP, I don't know, but when

8   I was a VP, I had an HR generalist that did benefits,

9   I had the director over payroll and her reports; I

10  had a recruiting manager and one -- one recruiter.

11  So I believe I had five director reports and then

12  some indirect reports.

13      Q.      And who were those people?

14      A.      The director over payroll was Sandy

15  Dayton.  The HR specialist, whatever the title was, I

16  want to say that was Eric Payne.   And then Lisa Payne

17  was over recruiting.    I had -- Annette Beisinger was

18  a recruiter.    And Kathy McDonald was the

19  receptionist, and she was under me as well.    Those

20  were the five direct reports.

21              Now, the HR specialist or generalist,

22  whatever I called it, they also reported -- they

23  reported to Sandy Dayton as far as benefits and they

24  reported to me as far as workers' comp, ADA, anything

25  that had to do with the employees' health, with the

1    exception of benefits, so ADA, workman's comp, FMLA,

2    those sort of things.

3         Q.    How does that work when someone reports

4    to, for instance, Sandy for benefits but you for

5    everything else?

6         A.    So Sandy was ultimately responsible for

7    the program that we used for benefits.   She also did

8    benefits in the case of any absences.   And so the

9    person, if they had a benefits question, if they

10   needed benefits training, if they had any questions,

11   they should go to Sandy.

12             And then **if it** had to do with ADA, FMLA or

13   those kind of questions, the employee would come to

14   me.  So the employee, if they wanted to **talk** about

15   benefits, they would go to Sandy **first**, and then, if

16   Sandy had questions or if the two of them couldn't

17   agree, they would have come to me.   So that's

18   essentially how **it** worked.

19        Q.    Okay.  And when did that start?

20        A.    I don't know. I'd have to be able to look

21   at Sandy's personnel file to see when she was

22   promoted to that director position.

23        Q.    When did Sandy start working for Bristol?

24        A.    I don't know for sure.   Sandy worked for

25   Bristol before I got there, so I think --

1    Q.    Oh.

2    A.    -- she had been there quite a while, a

3  couple of years before I got there.

4    Q.    What was her position when you got there?

5    A.    She was a payroll manager.

6    Q.    And did you know her before you started

7  working at Bristol?

8    A.    No.

9    Q.    So when you started working at Bristol,

10  was she -- was she your report, or what was your

11  position when you started at Bristol?

12    A.    When I started working at Bristol, she

13  worked for the CFO because payroll was under finance

14  at the time.   And then over time it was decided that

15  payroll, because it was so integral with other things

16  like FMLA and all those other kind of things, the

17  workers' comp and the benefits, the payment of the

18  premiums, those things all went through there, that

19  it was determined that she would move under my

20  supervision.   That happened, I want to say, six to

21  nine months after I started working there.

22    Q.    And when you were still an HR manager?

23    A.    Yes.

24    Q.    So when you were an HR manager, Sandy

25  Dayton started working for you, and did any of these

1   other people work underneath you?

2          A.     No.  Shannon Higgins was the only one that

3   still worked under me.

4          Q.     So Shannon and then -- and Sandy worked

5   for you?

6          A.     Yeah, after a period of time.

7          Q.     Okay.  And then when did Eric Payne start

8   working for you?

9          A.     I -- I don't know.

10          Q.     And what was he in charge of?

11          A.     He was -- was in benefits, workers' comp,

12   those kind of things.   He was in the HR generalist,

13   whatever, position.

14          Q.     Okay.  And was Lisa Payne a generalist as

15   well?

16          A.     So Lisa Payne was a recruiter.    She

17   started as a recruiter and was later promoted to the

18   recruiting  manager.

19          Q.     So was Eric Payne the only HR generalist

20   who worked for you?

21          A.     Yes.

22          Q.     And so you said benefit questions would go

23   to Sandy, and was it everything else was -- would be

24   under your purview?

25          A.     Yeah.  So anything that had to do with

1  benefits would go through Sandy.  So the HR

2  generalist would go to Sandy, discussion the issues,

3  and then, like I said, if they didn't agree or if

4  Sandy didn't know the answers, then they would come

5  to me.  Everything else would come directly to me.

6        Q.    And who were these HR generalists you're

7  talking about?

8        A.    So that would have been, like, Eric -- it

9  would have been Eric Payne, it would have been Lisa

10  Graham, it would have been two of the individuals

11  that were hired after those two employees left.

12        Q.    Which were who?

13        A.    One of them was Alison.  Again, I don't

14  remember last names.  Alison was there, and then the

15  next one was Natalie.

16        Q.    What's Natalie's last name?

17        A.    I don't remember. Sorry.  I'm not great

18  with the names.

19        Q.    She was an HR generalist?

20        A.    Yeah.  And then she was promoted to a

21  supervisor.

22        Q.    Supervisor of what?

23        A.    Over benefits, workers' comp, ADA, those

24  kind of things, but she had -- she had people

25  reporting to her at that time.  We had grown enough

1    that we had more staff.

2        Q.    And when was that that Natalie came on

3    board?

4        A.    She came on board probably a year, maybe a

5    year and a half before I retired, so it would have

6    been in 20- -- I want to say 2020.

7        Q.    And was Natalie still with the company

8    when you left?

9        A.    Yes.

10       Q.    Was Sandy Dayton still at the company when

11   you left?

12       A.    Yes.

13       Q.    Was Eric Payne?

14       A.    No.   He was gone.

15       Q.    When did he leave?

16       A.    He would have left probably around two

17   thousand -- oh, I don't want to guess.   I don't know

18   for sure.

19       Q.    Why did he leave?

20       A.    He left because I let him go.

21       Q.    Why did you let him go?

22       A.    I let him go because I felt like he was

23   disrespectful and that he was causing some contention

24   throughout the company. I just -- I just felt like

25   he wasn't happy because I wouldn't promote him to a

1   management position, and he also didn't like the fact

2   that he had to travel as much as he did.   And I told

3   him it was part of his job description.   And he had

4   not signed his job description, so I asked him to

5   sign it.   But he refused to sign it.

6            And then he started telling me I was

7   unprofessional and -- and so I just thought this just

8   isn't a good fit, and I let him go.

9       Q.     How long had he been with the company?

10      A.     I'd say probably about six or nine months.

11  I don't think he'd been there quite a year.

12      Q.     So when you said he was disrespectful,

13  what -- what do you mean by that?

14      A.     Well, he felt like that I was talking to a

15  coworker about him, and he felt like that that was

16  unprofessional.  And I tried to explain to him that

17  the reason why I was talking to that employee is

18  because he had gone to that employee and was upset

19  because I wouldn't promote him and, if I didn't

20  promote him, then he was going to quit.

21           And -- and so she contacted me.  I was in

22  Hawaii on a case out there, and she contacted me and

23  told me that -- that he was saying all this -- this

24  stuff.   So -- and he had sent me an email saying he

25  wanted a raise and a promotion to manager.   And --

1   but the reason why I was talking to the employee is

2   because she had called me to tell me what he was

3   saying and what her concern was.   There wasn't --

4           Q.     And who was that that called you?

5           A.     Lisa Payne.  And there was --

6           Q.     Is Lisa Payne still with the company?

7           A.     No.  And he also -- he also expressed

8   issues with Mekelle Andrezzi, who wasn't even in our

9   department.   She was a different person with the

10  company.

11          And so I had received those calls when I

12  was in Hawaii.  I told him I would talk to him about

13  it when I first came back.   And when I came back,

14  there was a lot going on in the morning, and he was

15  upset because I didn't get with him right away to

16  discuss the issue.   So, anyway...

17          Q.     When was this?

18          A.     When was this t  at this  happened?

19          Q.     Right.

20          A.     I don't know.  I don't know the exact

21  dates.

22          Q.     Was it before   after Lisa Graham was

23  terminated?

24          A.     Before.

25          Q.     And when did Lisa Payne leave the company?

1        A.      She left the company in 2021.

2        Q.      Why did she leave?

3        A.      She -- she resigned her position.   She

4   didn't -- she said the reason why is because she

5   couldn't get her employees raises, and I told her,

6   Well, when we go through the next budgeting season

7   that I would put in for raises for her people, and

8   she didn't like that.   And so I told her that -- she

9   said she felt like she needed to leave.

10              And I said, Well, you know, I don't want

11  you to leave.   Really think about it before you

12  decide to do that.

13              And she came back to me about three days

14  later and resigned her position.

15       Q.      And what about Annette, is she still with

16  the company?

17       A.      I don't know whether she's still with the

18  company or not.

19       Q.      Was she still there when you left?

20       A.      Yes.

21       Q.      Still as a recruiter?

22       A.      Yes.

23       Q.      And what about Kathy McDonald?

24       A.      As far as I know, she's still there today.

25       Q.      Okay.   So when you were an HR manager, did

1    you draft the policies?

2         A.    Yes.

3         Q.    Okay. Did Bristol follow, like, a

4    progressive discipline policy?

5         A.    It would depend on the situation.    In some

6    cases, then yes; in other cases, no.

7         Q.    And what determined whether you followed

8    the progressive discipline policy?

9         A.    Whether it was in the best interest of

10   Bristol.    Also, if it was something that was

11   egregious, if it was something that we didn't feel

12   that it was in the best interest.    Normally -- for

13   instance, let's say that somebody -- let's say a

14   marketer -- this is just an example, not something

15   that happened.  But a marketer goes out to a facility

16   and is supposed to be there to try to build business

17   for Bristol, which is what marketers do.    So a

18   marketer goes in, and instead of trying to build

19   business, the marketer complains about things that

20   they don't like as far as the company is concerned.

21   To the company that would be pretty egregious because

22   our sole purpose was to sell the company.

23             Or a case of blatant sexual harassment, or

24   there were different -- different things, things that

25   were absolutely blatant that we didn't feel could be

1    remedied through a progressive discipline process.

2        Q.    Okay.   How many different types of

3    employees did Bristol have there?

4        A.    Oh, my goodness.   Probably -- I don't

5    know.  I'd say probably 70 different types of

6    positions.

7        Q.    Well, I understand there would be the HR

8    function and then there would be the clinical

9    providers, people that actually saw the patients.

10        A.    Yes.

11        Q.    And were those, like, nurses, or were they

12    CNAs, or what?   What were they?

13        A.    So we had CNAs.   We had LPNs.   We had RNs.

14    We had nurse practitioners.    We had social workers.

15    We had chaplains.    We had administrative staff, so

16    office type of staff.    We had marketers.   We had

17    executive directors in the different locations.    We

18    had assistant directors -- that wasn't their title.

19    I don't remember their title, but essentially the

20    next in charge.   We had clinical managers.   We had

21    all kinds of different positions.

22        Q.    Okay.

23        A.    We also had -- just because you're

24    bringing up about the HR perspectives, so we had HR

25    admins, which would do all the on-porting, making

1    sure all of the documentation was together.    We

2    had -- by the time I left, there was benefits people.

3    We had billers.    We had compliance individuals.    We

4    had -- obviously, we had executives.    That's pretty

5    much the main type of positions we had.

6            Q.    Okay.    And what was Lisa Graham hired to

7    do?

8            A.    As far as her responsibilities or her job

9    title?

10           Q.    Both.

11           A.    As far as her job title, she would have

12   been either an HR generalist or a specialist.    I

13   don't remember what her job title was.    Her

14   responsibilities were to make sure that people were

15   enrolled in benefits, follow-up with the employees,

16   make sure that those benefits went through the

17   system.

18           She was responsible for ADA anytime we had

19   an ADA claim come in.    She was responsible for

20   workers' compensation.    She was responsible for FMLA,

21   so essentially anything that pertained to the health

22   side of an employee.    So she would have recommended

23   people to the employee assistance program.    She

24   worked with the emergency preparedness team.    And so

25   those were her main job responsibilities.

1        Q.    Okay.   And who hired her?

2        A.    I did.

3        Q.    And what year was that?    Do you remember?

4        A.    I want to say somewhere around 2016,

5    maybe.

6        Q.    I want to --

7        A.    Now, just to be clear, when she was

8    originally hired, she was hired as a temporary staff,

9    and then she moved into a full-time position.    So I'm

10   not sure exactly what dates both of those things took

11   place.

12       Q.    Okay.

13       A.    Okay?

14       Q.    So when she was a temporary employee, I

15   assume you didn't have anything to do with putting

16   her in that position?

17       A.    No, I did.   I --

18       Q.    Oh, you did?

19       A.    Even though she was temporary, I

20   interviewed her for the position.

21       Q.    Okay.  And then you hired her as a

22   full-time   employee?

23       A.    I did.

24       Q.    So presumably she had performed well as a

25   temporary  employee?

1          A.     I felt like for the first 30 days after

2     her employment that she was successful.

3          Q.     Okay.  I want to ask you about some

4     policies, so I'm going to see if I can share my

5     screen here.

6               And this was a set of policies that was

7     produced to us, and did you write these policies?

8          A.     I drafted them, yes.

9          Q.     And the date on here that says date

10    implemented is December 1, 2015.   Did Bristol Hospice

11    have policies prior to 2015?

12         A.     Well, they had an employee handbook.

13    These guidelines weren't created until later, but

14    there was an employee handbook.

15         Q.     Okay.  Did the -- was the employee

16    handbook changed at any point?

17         A.     It was changed every year for some reason

18    or another.   Some -- some reasons might have been

19    just a typo or to make something more clear, but the

20    basic content pretty much stayed in place.

21         Q.     And was the employee handbook online, or

22    were employees given it in a hard copy?

23         A.     In 2015 -- I'm trying to remember.  They

24    were developed and put into place with the -- the

25    hospice core policies, and it was managed -- these

1   individual ones were managed through a different

2   process.    And every employee was required to go in

3   and review the individual guidelines.    I'm not sure

4   exactly -- I'm not sure exactly how that took place

5   in 2015.

6            Q.    What was the difference between the

7   employee handbook and, for instance, this human

8   resources manual that we -- that I have here on the

9   screen?

10           A.    Okay.   So the HR manual essentially was

11  just individual policies that were written to support

12  the core policies for the -- for hospice.    And so we

13  would connect them -- if you notice where it says

14  "guideline number," it actually puts the support of

15  the core policy because they required that.    So this

16  would have been put in with the core policy.

17           Q.    So where do you find the core policy?

18           A.    I don't know where you would find them

19  today.

20           Q.    Where were they at the time?

21           A.    At the time they were given to -- I want

22  to say -- and this is just a vague memory -- to Erin

23  Starr.   She was the vice president over quality.    And

24  she would go through and look at the core policies

25  and identify anything that was missing, or she would

1   send me the HR part and make sure that what we had in

2   place was what we were doing.

3          Then they were later managed in a

4   particular system through Mekelle Andrezzi and her

5   department, and I don't know the process that they

6   used to attach these documents.

7          Q.    So the core policy, is that -- what

8   document does it come from?

9          A.    I believe that the core policy was a set

10  of policies that were purchased from NHPCO, which is

11  the certification for hospice, the national

12  organization.    And they adopted these core policies.

13  And then we would put in -- whether it's my

14  department or whatever department, we would put in

15  what the actual guidelines were.

16         Q.    So can you give me an example of what the

17  core policy would be that these were supporting?

18         A.    I would say that a core policy might be

19  that the company would -- and this is just an

20  example -- that the company would ensure that there

21  was diversity in their hiring practices.    That would

22  be a core policy.    An HR policy, an HR guideline,

23  would be what that process would be under that

24  guideline.

25         Does that make sense?

1       Q.      Yeah.

2               So these core policies come from where?

3       A.      I believe they came from NHPCO, who

4    is -- which is a national hospice association or

5    organization.

6       Q.      Okay.  And do you have to -- is there

7    some, like, accreditation process or something where

8    you have to adopt these core policies?

9       A.      Well, we certainly were accredited through

10   the NHPCO. They would come through and do audits to

11   make sure that we were following our policies.

12      Q.      And what kind of policies did they want

13   to, you know, make sure that you were following?

14      A.      They would review all the policies.

15      Q.      So whether it's patient care or HR?

16      A.      Correct.

17      Q.      Okay.  And that's the NH -- what is it?

18      A.      NH -- National Hospice -- let's see.

19   NHP -- yeah.  It's the national hospice organization.

20   I don't know what the acronym is for sure.

21      Q.      Okay.  So this document that I've got on

22   the screen from the corrective action policy -- and

23   just for the record, I'll label this as Exhibit 1.

24   GRAHAM 710 to 713 -- you said this is a policy you

25   wrote; is that right?

1      A.      Yeah, it's one I drafted.

2              (EXHIBIT 1 WAS IDENTIFIED.)

3      Q.      (By Ms. Hollingsworth)    Okay.

4      A.      So -- so if you mean write from the

5   perspective I actually typed it in, then yes, but it

6   did go through an approval policy.

7      Q.      And how does it -- how does it get

8   approved?

9      A.      So I submit the guideline to the executive

10  committee, the executive team.    They would review it.

11  They would ask questions or make recommendations, and

12  then they would approve it.

13     Q.      Who was on the executive team?

14     A.      All of the executive officers.    So it

15  would have been our CEO or CFO, our COO, our

16  executive VP of clinical and quality.    It would have

17  been all of those individuals.

18     Q.      And did they meet periodically to approve,

19  for instance, policies?

20     A.      Generally, I would just send it to them.

21  If, for some reason, I didn't get a response from

22  them, then I would bring it up in our weekly

23  meetings.    We had weekly meetings.

24     Q.      Okay.    "We" meaning?

25     A.      The executive team.

1        Q.     Okay.  So at the time --

2              MR. FRAZIER:  April, did you give an

3    exhibit number for this particular document?  I don't

4    recall having it labeled as an exhibit.

5              MS. HOLLINGSWORTH: I'm  sorry?

6              MR. FRAZIER:  I don't recall having it

7    labeled as an exhibit.

8              MS. HOLLINGSWORTH: No, it's not.   I just

9    said we would call it Exhibit 1, unless you want to

10   keep numbering from where you left off.

11             MR. FRAZIER:  A lot of times I'll do that,

12   but I don't know where we left off.   I don't recall.

13   I just didn't remember you saying Exhibit 1.    But

14   that's fine as long as we know what it is.

15             MS. HOLLINGSWORTH: Yeah.  So I'll -- this

16   will be Exhibit 1.

17        Q.     (By Ms. Hollingsworth)    So at the time

18   that you wrote this policy, you were part of the

19   executive team; is that correct?

20        A.     In 2015 I would not -- I was attending the

21   executive meetings just because I was over HR, but I

22   wasn't part of the executive team in 2015.

23        Q.     Okay.  What was your role in 2015?

24        A.     I was probably HR director at that time.

25        Q.     Okay.  And did anyone else help write

1  these policies with you, or did you do this solely on

2  your own?

3        A.     Nobody else helped me develop the draft.

4  There was multiple people who would have had input on

5  the final project.

6               Another person that I failed to mention

7  was our compliance officer.    She -- I would have run

8  it past her as well.

9        Q.     Who was that?

10       A.     That's Mary Nester.

11       Q.     And was she -- what kind of compliance was

12  she in charge of ensuring?

13       A.     She was responsible for ensuring

14  compliance with any of our policies, but she worked

15  mostly with the clinical side.   She -- she was a

16  nurse as well as an attorney.    In 2015 I also believe

17  that we had an in-house attorney, and I would have

18  run it past him as well.

19       Q.     Okay.

20       A.     I'm not positive on that, though.

21       Q.     So these -- so this says -- in that first

22  paragraph that I've highlighted, it says:

23               Although Bristol is an at-will employer,

24          it attempts to correct problems or improve job

25          performance by applying a consistent approach of

1        counseling and warning procedures.

2              Is that something that would -- that

3  needed to be in your compliance to comply with Core

4  Policy C111?  Is that what that is, CIII?    C3.

5        A.    No, that isn't -- I don't remember what

6  the other read, but this would have been more

7  specific than what the core policy would have been.

8  They don't -- they don't tell companies --

9        Q.    They don't tell companies what?

10        A.    What they have to write.

11        Q.    What is Core Policy C3?

12        A.    It's the human resources portion of core

13  policy.

14        Q.    From the NHPCO?

15        A.    NHPCO, yes.    That would be the core

16  policy,  and then this would be the specific one.

17        Q.    Okay.  And so this would have been

18  implemented  after going through this approval process

19  with the executive team that you discussed?

20        A.    Yes.

21        Q.    All right.   And were you -- did you

22  receive training at any point on doing, like,

23  investigations?

24        A.    Yes.

25              MR. FRAZIER:  Objection.    Vague.

1      Q.     (By Ms. Hollingsworth)     And what -- where
2  and what form did you receive training on
3  investigations?
4      A.     It would have been --
5             MR. FRAZIER: Objection.    Vague.
6      Q.     (By Ms. Hollingsworth)     Go ahead.
7      A.     So it would have been pretty much the same
8  way that I received any of my training, either
9  through schooling, personal experience, seminars, my
10 own personal reading.   There were -- there's all kind
11 of websites and articles that are written.   It would
12 have been any of those particular areas.
13     Q.     So at this point in 2015, did you have a
14 lot of experience in doing investigations?
15     A.     Yes.
16     Q.     So this guideline about interviewing
17 employee, where it says the employee should be given
18 an opportunity to explain his or her actions, why did
19 you include that as policy?
20     A.     Because I -- I felt like that everybody
21 should have an opportunity to answer questions in --
22 in any way, whether it was an interview in person,
23 whether it was in writing, whether it was questions
24 that they were asked in an email.   I just felt like
25 they should have the opportunity to -- to give their

1    side of the story.

2          Q.    Why?

3          A.    I just -- I don't know.  I just -- I just

4    felt like it was a good course of action.

5          Q.    And the next sentence says:

6                The employee's explanation should be

7          verified and taken into consideration before

8          corrective action is taken.

9                How would you go about verifying an

10   employee's explanations?

11         A.    So if they mentioned another individual

12   that either observed what happened or had evidence or

13   was brought up by that particular employee, I would

14   have gone back to research whether what they had said

15   could be verified.

16         Q.    And were you the person who actually did

17   that for Bristol, or did you have people working for

18   you who did those -- you know, the verification

19   process?

20         A.    In 2015 it would have been me, or, for

21   some reason, it was -- well, essentially I'll say it

22   was probably me.

23         Q.    And did that change, like, by 2018?  Was

24   it still you?

25         A.    I don't remember.  I know that I hired a

1    couple of HR people to -- to manage -- to do these

2    investigations and stuff, but I don't remember what

3    year I hired them.

4         Q.    Who did you hire --

5         A.    We just -- we were just too big, so I

6    couldn't -- I couldn't be everywhere at once, so we

7    hired individuals who could go out and assist.

8         Q.    Who did you hire to assist?

9         A.    I actually had three people, and whether I

10   can -- one was Tammy Hazen.  She's the first one I

11   hired.

12              The next one was Nikki, and I don't

13   remember her last name.  And the third gal, she

14   hadn't worked for me very long when I left, and I --

15   I just don't remember her name off the top of my

16   head.

17        Q.    What was Tammy Hazen's job?

18        A.    Her name was Dani.   I don't remember her

19   last name, but her name was Dani.

20        Q.    And what was Tammy Hazen's job?

21        A.    She was an HR -- I don't know if she was a

22   generalist or a specialist.   I'd have to look at her

23   job title.

24        Q.    What about Nikki?

25        A.    Same thing.

1          Q.     And Dani?

2          A.     Same thing.

3          Q.     So these three helped you do

4    investigations?

5          A.     They did.

6          Q.     When you wrote these policies, did you

7    have a template that you went from, or did you just

8    come up with them?

9          A.     I definitely had some -- some books that

10   had some writings in them, some policies in them, so

11   I probably would have taken some of the grammar from

12   those.   A lot of these probably were areas that I had

13   already used before; so...

14         Q.     Okay.  So the progressive form of

15   discipline I've got up on the screen now, it starts

16   on GRAHAM 711.   Why did -- well, first all, before

17   2015 when this policy was implemented, did Bristol

18   have a progressive discipline policy?

19         A.     Yeah.  It would have been similar to this.

20         Q.     And did they continue using the

21   progressive discipline policy throughout your tenure

22   at the company?

23         A.     We did in cases that warranted progressive

24   discipline.

25         Q.     And what do you mean by that?

1          A.     We did not use progressive discipline in

2    every -- in every case.

3          Q.     And there's -- on the screen it says:

4               There's times when the seriousness of the

5          violation may not fall within a progressive

6          discipline process.

7               Is that what you're talking about?

8          A.     Yes.

9          Q.     Okay. So, generally, the progressive

10   discipline process supplies a verbal warning and then

11   a counseling and then a written warning and then a

12   suspension or final warning and then termination,

13   right?

14         A.     Yes, for the most part.

15         Q.     And were there forms that you would use,

16   like, that the company had in a -- as part of its HR

17   forms, or whatever, where you'd give counseling for

18   these written warnings, et cetera?

19         A.     We had performance improvement plans that

20   they could put into place.  If they didn't feel like

21   it was egregious enough to do a disciplinary action

22   and put it in their file, they would do a performance

23   improvement plan.   We did have documents for final

24   warnings and things like that.   Verbal warnings, the

25   manager would just keep a record of when that would

1  have happened, but it didn't go in the personnel

2  file.   Nothing went in the personnel file unless it

3  was in writing.

4      Q.   Okay.  So would a counseling -- would some

5  record of a counseling be put in the personnel file?

6      A.    Not unless it was in writing.   So if they

7  developed, like I said, a PIP, performance

8  improvement plan, or some kind of documentation, it

9  would have been put in the personnel file.

10     Q.   Okay.  And then a written warning goes in

11 the personnel file?

12     A.   It would.

13     Q.   And where -- if a supervisor wants to

14 issue a written warning, where do they get the form

15 for that?

16     A.    We had all of our forms on one of the

17 drives.   But they could have just called HR, and we

18 would have sent them the form.

19     Q.   Okay.  And was the same form of the

20 written warning used for all types of employees,

21 whether they were clinical or marketing or HR?

22     A.   Yeah.  Yes.  So it would have been the

23 same form.

24     Q.    And is that the same for a suspension or a

25 final  warning?

1          A.     Yes.  It would be the same -- well, they

2     would use the same form, but there were cases when --

3     when managers might just write a document instead of

4     using the form.  As long as it had the right -- you

5     know, the right information in it, then we would go

6     ahead and use it even if it wasn't the exact form.

7          Q.     And did managers have to go through HR

8     when they were disciplining an employee?

9          A.     If it got to the point of a written

10    warning, anything that was going into their personnel

11    file, they'd have to go through HR, or they should.

12         Q.     When you say "go through HR," does that

13    mean HR would approve it or work with them on

14    language, or exactly what function did HR provide?

15         A.     So HR would look at it.   They would look

16    at it from a perspective of, you know, is this a red

17    flag; could this get the company in trouble; is this

18    really a valid reason to be writing someone up.   And

19    if they had suggestions, they would send the

20    suggestions back to the supervisor so they could make

21    any corrections.   If the supervisor didn't agree with

22    HR, then a discussion would happen, and they would

23    come to an agreement on what should be in it and what

24    shouldn't.

25         Q.     And who specifically in HR would fulfill

1    that role of reviewing and determining whether it was

2    an appropriate reason for writing someone up?

3         A.    Until -- until I hired the two -- three

4    specialists, it would have been me.

5         Q.    Okay.  And how did you know what -- like,

6    what constituted an appropriate reason for writing

7    someone up?

8         A.    Well, obviously, if they had a lack of

9    performance, if they had done something that was

10   not -- what's the right word for it? -- was not a

11   standard that the company felt represented the

12   company in a good light.    Obviously, if it was a

13   legal situation, even though I'm not an attorney, I

14   could recognize red flags as far as potential

15   discrimination, harassment, retaliation, those kind

16   of things.   Those are the main things that I would

17   look for.

18              And then, of course, as far as job

19   performance, it would be, okay, what in their job

20   were they not doing?  And I would look at their job

21   descriptions to see, okay, was that really their job

22   to do that, was that their responsibility.

23        Q.    Okay.

24        A.    So essentially I just looked at them for,

25   you know, those type of things.

1      Q.      And so you mentioned harassment,

2   retaliation.      Did the company -- did you look for

3   harassment of any type, or were you only concerned

4   about harassment if it rose to the level of, like,

5   being illegal under Title VII?

6      A.      Well, I would look for any kind of

7   behavior that would not fall in line with what

8   Bristol would want to happen.  It didn't necessarily

9   have to fall under Title VII or the ADEA or those

10  kind of things.    You know, it might be something as

11  simple as trying to train someone how to communicate

12  in a more effective manner, those kind of things.

13     Q.      Okay.  Can you give any examples of --

14  like, did you ever handle a situation by training

15  someone to communicate in a more effective manner?

16     A.      I actually provided supervisor training to

17  all the new supervisors, and one of the sections --

18  actually, I would say at least a half a day was about

19  performance, how to communicate effectively, and

20  those kind of things.

21     Q.      Okay.  And can you think of any times when

22  you handled a complaint by talking to someone about

23  the way they communicated?

24     A.      I did that quite a few times.    Could I

25  just give you one in particular?    No, not really.

1      Q.     Okay.   And what about retaliation?     Did

2   the company prohibit retaliation only if it was, you

3   know, for engaging in conduct that would be protected

4   under Title VII or the ADEA or, you know, a federal

5   law, or did it prohibit any kind of retaliation?

6      A.     It would -- I would say that we prohibited

7   any type of retaliation.

8      Q.     And why is that?

9             MR. FRAZIER: Objection.     Vague.

10  Ambiguous.  Overly broad.

11     Q.     (By Ms. Hollingsworth)     You can answer.

12     A.     Well, first of all, we wanted to have more

13  effective communication in the company, and our goal

14  for the company is always to help people be

15  successful, whether that's a manager, an employee, an

16  executive.   And sometimes it was difficult for some

17  supervisors to overcome feelings when things

18  happened, and so we would discuss those things.     But,

19  essentially, we wanted people to be able to speak

20  freely without felling like they were going to be

21  retaliated against.

22     Q.     Okay.   And I've seen different versions of

23  the policies.    Why did you create so many different

24  versions of policies?

25     A.     Well, as I said before, sometimes the

1    verbiage wouldn't make a clear statement, and so **it**

2    might change the verbiage a **little bit** to make **it**

3    clear.    Sometimes/ we found that out by an employee

4    calling and saying, Well, I read this in the policy;

5    does **it** mean this.

6              And I would say, No, this is what **it**

7    means.

8              So as **I'd** go to review the policy the

9    following year, I'm going, All right.    I need to make

10   this more clear because, obviously, there's some

11   confusion in the minds of the employees.    And so

12   that's why we would make changes.

13             Q.    Okay.

14             A.    Or if a law changed or the verbiage was a

15   **little bit** different, we would try to correct that as

16   well.

17             Q.    Okay.  I'm going to share my screen with

18   you again, and I've got a different policy up now.

19   This **is** -- again, **it** says support for 3 -- C3.

20             MR. FRAZIER:  Are you marking this one as

21   Exhibit 2?

22             MS. HOLLINGSWORTH: Yeah.    **I'll** mark **it** as

23   Exhibit 2.    So this is -- for the record, this is

24   labeled BH.  This will be Exhibit 2.

25             (EXHIBIT 2 WAS IDENTIFIED.)

1    Q.    (By Ms. Hollingsworth)   And I assume you

2  wrote this policy as well.

3    A.    Yes.

4    Q.    Okay.  And it starts here saying:

5          Employees have the responsibility to

6    immediately bring any form of unwelcome

7    discrimination, retaliation, harassment, or

8    other workplace-related issues to Bristol's

9    attention.

10         Why did -- why did you want employees to

11   bring unwelcome behavior to Bristol's attention?

12   A.    So we could investigate it and correct it

13  if necessary.

14   Q.    And at this point in 2015, you were the

15  person who would investigate, right?

16   A.    Yes --

17   Q.    And so --

18   A.    -- with one exception.

19   Q.    Uh-huh.

20   A.    If, for some reason, the complaint or

21  grievance was against me, I would send this to the

22  compliance officer for investigation.

23   Q.    Okay.  Which was who?

24   A.    Mary Nester.

25   Q.    And how -- how many times did that happen?

1          A.     Once.

2          Q.     And who complained about you?

3          A.     Lisa Graham.

4          Q.     She was the only person who complained

5    about you?

6          A.     Yes.

7          Q.     And what about if there were complaints

8    about Sandy Dayton?  Did you handle those?

9          A.     I did.

10          Q.     And were there -- how many complaints do

11    you remember about Sandy Dayton?

12          A.     Well, if you're talking about the formal

13    complaints, I had one formal complaint from Lisa

14    Graham, and I would get emails every once in a while

15    because someone might think that Sandy was a little

16    harsh in an email or something like that.   But I

17    never -- well, I won't say "never."   That's not a

18    good word.   I don't remember having any other formal

19    complaints against Sandy.

20          Q.     And what do you mean when you say a

21    "formal complaint"?

22          A.     So a formal complaint would be something

23    that somebody came in and said, I want to file a

24    complaint against So-and-So, or if they sent their

25    concerns in writing, that would be a formal

1    complaint.   Or if they went to the UALD or the EEOC,

2    Department of Labor, any of those entities, those

3    would all be considered formal complaints.

4          Q.    Did you treat formal complaints

5    differently than complaints that weren't formal?

6          A.    Even if they weren't formal, I still

7    investigated them.  I would get the -- their side of

8    the story, and I would get the other side of the

9    story.

10         Q.    Okay.

11         A.    And if there were any witnesses to the

12   situation, I would have interviewed them as well.

13         Q.    Okay.  So the second paragraph here in the

14   middle of the page that says, The supervisor may

15   request that the employee place his or her concerns

16   in writing; however, employee is not required to do

17   so, under that policy, you would investigate whether

18   or not their concerns were put in writing; is that

19   right?

20         A.    That's correct.

21         Q.    And on number three, it says:

22               If the supervisor feels the situation

23          warrants, he or she may forward the concern to

24          the vice president of human resources.

25               That was you at the time, right?

1      A.     Yes.

2      Q.     And this investigation procedure that I'm

3   scrolling to where it says Bristol will look into any

4   claims promptly and without bias, how did Bristol

5   ensure that it would look into claims without bias?

6      A.     Well, I think the key to that is not

7   having any preconceived ideas of what may or may not

8   happen.  If, for some reason, it appears that there

9   was some kind of bias, or sometimes a supervisor

10  might say to me, I just don't think that I could

11  handle this without being biased, then I would assign

12  someone, which, of course, was usually me at this

13  point, to investigate it.

14     Q.     Okay.  And did all these policies go

15  through the same process you talked about before

16  where you wrote them and then they got reviewed and

17  approved by the executive team?

18     A.     Yes.

19            MR. FRAZIER: Objection.    Overly broad.

20     Q.     (By Ms. Hollingsworth)    And so did the

21  company actually follow these policies?

22            MR. FRAZIER: Objection.    Overly broad.

23            Are you talking about in every single

24  instance?

25     Q.     (By Ms. Hollingsworth)    Was the company's

1   goal to follow these policies?

2        A.    To be honest, it just depended on the

3   situation.    They wouldn't have followed this policy

4   if there was an egregious situation or --

5        Q.    Can you give me some examples of an

6   egregious situation?

7        A.    Okay.   We had a concern come in because it

8   was reported that an employee had a romantic

9   relationship with their supervisor, who was an

10  executive director over one of our locations.    And --

11  and so in that particular case, number one, he

12  wouldn't even talk about the situation, so the only

13  evidence we had was against him.   And because --

14  there were several things:    He had given her a pay

15  increase because of their relationship and then he --

16  he was directly responsible for her valuations, her

17  promotions, basically the conditions of her work.

18  And because of that, that would be egregious, and we

19  would have terminated him.

20           Now, in this case he resigned because he

21  pretty much knew what was coming.   But we would -- we

22  would not have gone through this process with him.

23       Q.    So it sounds like that was a real --

24  that's a real example that happened.

25       A.    Yes, it was.

1      Q.      And did you investigate that concern --

2      A.      I did.

3      Q.      -- before he resigned?

4      A.      Yes.

5      Q.      And how did you go about investigating?

6      A.      Well, first of all, I started with the

7  employee who had filed the complaint, and it was not

8  the person who was in the relationship.   After that I

9  talked to the person who was in the relationship, and

10 she told me what the situation was.   Then I went to

11 the executive director and asked him whether he was

12 in a romantic relationship with this person, and

13 he -- he refused to answer.  He essentially said,

14 What did she tell you?  I'm not going to say anything

15 except for what the allegations are.

16         I said, The allegation is you're in a

17 romantic relationship with this employee who is under

18 your leadership.

19         He refused to answer the question.

20         And I said, You understand that if you

21 don't give me your side of the story, Bristol has to

22 base their decision on the information that we have.

23         And he still refused, and then the next

24 day he came in and resigned.

25     Q.      When was that?

1          A.     Oh, goodness.    That would have been

2     probably 2018, 2019, in there somewhere.  It could

3     have been later, though.

4          Q.     Okay.  So this retaliation provision that

5     I've got up here on the screen, does this comport

6     with your understanding of Bristol's policies that

7     employees were protected from retaliation from any

8     type of complaint for assisting in an investigation?

9          A.     Yes.

10          Q.     And did this policy stay in place

11     throughout your tenure?

12          A.     Yes.  It may not be exactly word for word,

13     but --

14          Q.     Right.

15          A.     -- the retaliation policy would have been

16     in effect.

17               MS. HOLLINGSWORTH: Okay.  I'm going to

18     share my screen again, and we'll call this Exhibit 3.

19               (EXHIBIT 3 WAS IDENTIFIED.)

20               MS. HOLLINGSWORTH: And this is -- it's

21     got two dates on it, this Bristol Hospice Guideline.

22     Let's see.   This one, for the record, is labeled BH

23     523 to 525, and this was -- it looks like the

24     original date is September 4, 2012.   And then it was

25     revised and implemented in July of 2016.

1        Q.    (By Ms. Hollingsworth)    Did you write the

2   original in 2012?

3        A.    Yes.

4        Q.    And do you know why it was revised in

5   2016?

6        A.    I don't.

7        Q.    Okay.

8        A.    It could have been for any of the reasons

9   that I mentioned before.

10        Q.    Okay. So in these guidelines for sexual

11   harassment, do you know where you got these

12   definitions of sexual harassment, or examples?

13        A.    I don't know off the top of my head

14   exactly where I got them.

15        Q.    Okay.

16        A.    Obviously, part of it would have been from

17   laws or articles about laws, definitions of things.

18        Q.    And did you -- during your tenure, did you

19   receive complaints of sexual harassment?

20        A.    As far as the company?

21        Q.    Yeah.  I mean, did you receive complaints

22   of employees sexually harassing others?

23        A.    Yes.

24        Q.    How many would you say you received?

25        A.    I couldn't even tell you.

1          Q.      Didn't somebody complain about the kind of

2    sexually charged language that Sandy Dayton used in

3    the workplace?

4                        MR. FRAZIER: Objection.    Overly broad.

5                        MS. HOLLINGSWORTH: You can answer.

6                        THE WITNESS: I don't -- I don't remember

7    anyone complaining about sexual harassment with

8    Sandy.

9                        (A discussion was held off the record.)

10         Q.      (By Ms. Hollingsworth)    But you don't

11   remember a complaint about that?

12         A.      Not sexually charged, no.

13         Q.      What about inappropriate language on

14   Sandy?  Do you remember any complaints about that?

15                       MR. FRAZIER: Objection.    Vague and

16   ambiguous.

17                       THE WITNESS: No.   Inappropriate  language?

18   No, I don't remember.

19         Q.      (By Ms. Hollingsworth)    So would you say

20   that Bristol was -- would take any complaint of

21   sexually inappropriate behavior seriously, or did you

22   weigh whether or not it rose to the level of what you

23   would consider a violation of Title VII before taking

24   it seriously?

25         A.      We took any concern regarding sexual

1  harassment or inappropriate behavior -- any concern

2  we took seriously.    Now, whether we found that it

3  rose to the level of violating Title VII, that would

4  be different, but we always took it seriously.    We

5  always -- well, I will say this:    I always took it

6  seriously.

7         Q.    Okay.   And how would you determine whether

8  it rose to the level of a violation of Title VII, or

9  would you?   Was that your benchmark?

10        A.    Yeah.   I would look at what was said, what

11  would be considered -- to a reasonable person, what

12  would be sexual harassment.   I would look at how

13  egregious it was.   I would look at how pervasive or

14  consistent or -- you know, I would look at those

15  particular things before I identified whether I

16  thought it was actually sexual harassment.   If I felt

17  like it bordered on that, I would contact our

18  in-house attorneys or our outside attorneys if need

19  be.

20        Q.    Okay.   And what about if someone feels

21  that they're just being harassed by a worker or

22  supervisor, but maybe that -- maybe they're not

23  complaining that it's because of their being in a

24  protected  category?    What would the company do with

25  that  sort  of  complaint?

1      A.     I would **still** look into **it**.   I would

2   listen to that person, and then I would go to the

3   person that was being accused to see what their side

4   of the situation was.   Again, if there was witnesses,

5   then I would talk with the witnesses as well.

6      Q.     And would you document your -- this

7   investigation?

8      A.     I wouldn't say that I did **it** a

9   hundred percent of the time.   I think -- I wouldn't

10   say that I documented everything that I ever

11   investigated.

12      Q.     Would you document, for instance, these

13   interviews with other employees that you mentioned?

14           MR. FRAZIER: Objection.    Overly broad.

15   Asked and answered.

16      Q.     (By Ms. Hollingsworth)    You can answer.

17      A.     **I** -- **I** would write myself notes **if it**

18   was -- **if it** was a formal complaint, I would

19   always -- I would most of the time, I guess, respond

20   in writing.    But I would -- I would keep notes.    I

21   had a particular file in my -- on my computer that

22   had that kind of information in **it**.

23      Q.     A file on -- on your computer like your --

24      A.     So -- so at the end of the day, I would

25   sit down, and I would write notes regarding who I

1    talked to about what.  Not all the time --

2         Q.    Every day?

3         A.    -- but a lot of the time.  And I would

4    just put it as a note into my computer in my personal

5    file so that, if something else occurred, I could

6    bring it up and see what happened.

7         Q.    Was this like a -- sort of a daily journal

8    you kept about everything in the office, or did you

9    categorize it by employee or subject?   Or how did --

10   how did this work?

11        A.    Well, I didn't do it every day.  Usually,

12   if I did do it, it was just a continuous document,

13   and it would say:   Notes, December 31st or

14   January 2nd, or whatever.   And then I would just

15   write notes of what was going on.

16        Q.    And --

17        A.    And some days there wasn't anything that I

18   was particularly concerned about.   Some days there

19   were.

20        Q.    And did you preserve those notes for this

21   lawsuit?

22        A.    No.  I wasn't -- there was no -- I mean, I

23   didn't even know about this lawsuit until after I was

24   gone; so...

25        Q.    And at the time --

1          A.      At the time I left, it was an EEOC claim.

2          Q.      When did you leave, again?

3          A.      I left in 2021, July of 2021.

4          Q.      And you were unaware of this lawsuit then?

5          A.      Not a lawsuit.   No, I didn't know about a

6    lawsuit.   Not that I remember, anyway.

7          Q.      Okay.  So what --

8          A.      The last I -- the last I heard, Lisa --

9    the EEOC sent Lisa a right-to-sue letter because they

10   couldn't find -- there was no findings on their part.

11   That was the last I heard.   I knew about -- I knew

12   about her claim to the Department of Labor, the UALD,

13   the EEOC.

14         Q.      So what happened to these notes that

15   you're referring to?

16         A.      I have no idea.

17         Q.      Did --

18         A.      I didn't -- I didn't bring them with me

19   because, to me, that was Bristol property, so I

20   didn't keep any of those notes.

21         Q.      So they stayed on your -- on your

22   computer?

23         A.      It's possible.

24         Q.      And that computer stayed with the company

25   when you left?

1          A.    Yes.

2          Q.    And did you ever delete those notes?

3          A.    I don't remember deleting the notes.

4                MS. HOLLINGSWORTH: Ryan, to the extent we

5    haven't received those notes, can you do a search of

6    her computer?

7                MR. FRAZIER: I have no idea if the

8    computer's there, not there.   I couldn't even speak

9    to that.   But we'll see what we can find out.   I

10   don't have any idea what the status of that is.

11               MS. HOLLINGSWORTH: Okay.

12               THE WITNESS: I will -- I will say it was

13   standard practice when every -- whenever anybody left

14   the company that their computers were wiped, so I'm

15   not sure whether those notes are -- still exist.

16         Q.    (By Ms. Hollingsworth)    And are we talking

17   about a desktop computer or laptop?

18         A.    I had both.

19         Q.    And were these notes on both?

20         A.    Well, they would have been -- they would

21   have been in a specific drive with the company, so it

22   would have been like -- it would have been on both

23   computers if you went to that particular drive.

24         Q.    Okay.  And it would be housed, then, on,

25   like, a company server?

1      A.    Yeah, that's possible, unless they just

2   wiped everything out.   I don't know what the -- I

3   don't know what the person who took my place did with

4   any of my files or if there was anything still on the

5   computer when he got there, so I have no idea what

6   would have happened to any of those things.

7      Q.    Who took your place?

8      A.    I think his name --

9            MR. FRAZIER: Lack of foundation.

10     Q.    (By Ms. Hollingsworth)    You can answer.

11           MR. FRAZIER: Go ahead, Debbie.

12           THE WITNESS: I think his name was, I want

13   to say, Brian Jackson.   He's no longer with Bristol.

14     Q.    (By Ms. Hollingsworth)    And did you

15   train -- did you train him?

16     A.    I talked to him about some cases that we

17   had open.   He was already experienced.   I didn't have

18   to train him in anything in particular.    He said he

19   already knew the system that we worked on, and so the

20   only thing I talked to him about were particular

21   cases that we had open.

22     Q.    What kind of cases did you have open?

23     A.    Oh, we had a lawsuit in California, and

24   there were a few little EEOC kind of claims around

25   the company, not at the corporate office, but at

1   other places.   I talked to him about the people who

2   worked for me, but that was about all.   As far as

3   training, I didn't feel like he really needed

4   training, per se.

5           Q.    Did you talk to him about this case?

6           A.    No -- I don't know.  I don't remember.

7           Q.    Going back to these policies that we were

8   looking at in Exhibit 3, on the page that I have up

9   on the screen, which is page 3 of the exhibit, it

10  says:

11              Whenever an employee observes or is aware

12          of an instance of harassment or discrimination,

13          he or she should report the incident immediately

14          in accordance with Bristol's complaint

15          procedure.

16              What's Bristol's complaint procedure?

17          A.    It would have been the procedures that you

18  showed me before this one.

19          Q.    Okay.

20          A.    Also, in the employee handbook, I believe

21  there is a complaint process in there, I believe.

22          Q.    Okay.  So that would -- so this employee

23  handbook would have separate policies in addition to

24  what we're seeing here?

25          A.    No.  They would -- they would be probably

1  pretty close to the same.  They just -- they just

2  might not be as much in detail.   They may -- in the

3  handbook they may have referenced one of these

4  policies and said, HR Policy blah-blah-blah.   But if

5  they were word for word, I'm not sure about that.

6      Q.    Okay.  And where would these policies be

7  located, like, for the -- where would the employees

8  find them?

9      A.    Well, again, these were in with the core

10  policies, and all employees were required to read the

11  core policies.   And then they're also in the employee

12  handbook, and all employees were required to sign for

13  the employee handbook.   Now, whether they did it or

14  not was a whole other story, but --

15      Q.    So they signed for a hard copy, or this

16  was online?

17      A.    It was online.   Both of them were online,

18  but they could have printed them out if they wanted

19  to.   We also had hard copies in all the locations in

20  their -- their common areas so people could look at

21  their policies.

22      Q.    And if an employee had a question about a

23  policy, where would they access the policies, like,

24  for instance, this one on my screen?

25      A.    Okay.  So if they asked for a copy of it,

1  I would have just sent them a copy of the policy.    I

2  wouldn't have made them go and try to search for it.

3       Q.    Okay.  If they wanted the company to

4  search for it, did the company have, like, an

5  Internet or something where they could find policies?

6       A.    So we had a system that was put into place

7  called Paylocity.  And all of the policies were put

8  in Paylocity, and they could have accessed them

9  there.  There's also a drive that's specifically for

10  policies -- I can't remember which drive it was --

11  for Bristol, and they would have been there as well.

12       Q.    Okay. So what -- Paylocity is a program?

13       A.    Paylocity is an HR information system.

14       Q.    And what --

15       A.    That's where all the employee -- employee

16  documents were kept there, their evaluations.    Their

17  payroll was run through Paylocity.    Policies  and

18  procedures were posted there, that kind of thing.

19       Q.    So does each employee have a -- like a

20  Paylocity login where they can get to their own

21  documents?

22       A.    Yes.

23       Q.    And these policies would be accessible

24  through Paylocity?

25       A.    Yes.  At least -- at least the employee

1 handbook would have been.
2    Q.    And is the employee handbook different
3 from the policies that we were just looking at?
4    A.    Possibly.
5         MR. FRAZIER: Hey, we've been going now
6 for an hour and a half again since we resumed, or
7 even a little longer.  It's a little after one.  I
8 don't know if we want to take a break.  I don't know.
9 She seems to be doing okay, but just to make sure we
10 don't have Debbie's blood sugar drop.
11         MS. HOLLINGSWORTH: Yeah.  Why don't we
12 take, like, a 45-minute lunch break.
13         MR. FRAZIER: That works.  We'll just drop
14 off the Zoom and then pick back up, come back on the
15 link later about 1:45 or so?
16         MS. HOLLINGSWORTH: That works.
17         (Recess from 1:02 p.m. to 1:59 p.m.)
18    Q.    (By Ms. Hollingsworth)  I think before the
19 break we were talking about policies, and I was just
20 about to bring up Exhibit 4, which I will do now.
21         (EXHIBIT 4 WAS IDENTIFIED.)
22    Q.    (By Ms. Hollingsworth)  So this
23 Exhibit 4 -- let me get the Bates numbers for the
24 record.  It's GRAHAM 344 to 345.
25         (A discussion was held off the record.)

1      Q.      (By Ms. Hollingsworth)      And **it's** dated

2  June 1, 2017.  Did you -- is this part of, like, the

3  same type of policies that we were looking at before

4  from 2015?

5      A.      This looks like a portion of the employee

6  handbook.

7      Q.      Did you write these?

8      A.      (No audible response.)

9      Q.      Did you write these, Ms. Wertz?

10     A.      Yes.

11     Q.      Okay.  And were these policies kept on

12  the -- in the -- what was the system that you told me

13  about earlier?

14     A.      Paylocity?

15     Q.      Yeah.  Were these kept in the Paylocity

16  system as well?

17     A.      They were.

18     Q.      Okay.  And were these some of the policies

19  that employees were -- had to sign off that they had

20  received or read?

21     A.      Well, this looks like **it** was part of the

22  employee handbook.  So they wouldn't have signed off

23  on specific policies; they would have signed off on

24  the handbook itself.

25     Q.      Oh, okay.  So this handbook, is there an

1    actual book, or are these just online?

2        A.    Both.

3        Q.    So this section, Performance Improvement,

4    Corrective Action, and Problem Resolution, talks

5    about performance reviews, and was this company-wide,

6    that reviews -- you got a 90-day review at the end of

7    an introductory period, then after your transfer, and

8    then a yearly review?

9        A.    Yes.

10       Q.    And what's the purpose of performance

11   reviews?

12       A.    It's to provide the employee with -- with

13   an idea of how his or her supervisor viewed their job

14   performance, their -- specifically their job

15   performance.

16       Q.    And, then, where are the performance

17   reviews kept?

18       A.    Initially they were kept in their

19   personnel file, and then after we went to Paylocity,

20   they were kept in the employee's file in the system.

21       Q.    Okay.  And, then, this talks about --

22   Section 7.2 talks about corrective action and

23   discipline, and is this policy to be read in

24   conjunction with, like, the disciplinary process that

25   we went over earlier?

1          A.    Yes.   So this would have been read as far

2     as the employee handbook was concerned.

3          Q.    Okay.  Both policies apply?

4          A.    Yes.

5          Q.    Okay.

6          A.    If there -- if there is a discrepancy

7     between the two policies, the newest one would be the

8     one to be followed.

9          Q.    Okay.  And this policy breaks down on this

10    page I'm looking at conduct that we expect from -- as

11    far as clinical practices.   So do these clinical

12    practices apply to everyone or just the clinicians?

13         A.    The clinicians.

14         Q.    Okay.  And did you come up with these

15    policies for the -- for instance, what we're looking

16    at here on the screen that talks about the hospice,

17    or did you do those in connection with -- or in

18    consultations with clinicians?

19         A.    Yeah.  I would have gotten feedback from

20    the executive vice president of clinical and quality.

21    They would have also been part of --

22         Q.    Okay.

23         A.    -- the core policies.

24         Q.    I'm having a problem with my WiFi again.

25    I'm sorry.   Say that again.

1          A.     They would have probably been out -- also

2    outlined, some of them, in the core policies.

3          Q.     Okay.  And were these core policies

4    available to employees as well?

5          A.     Yes.

6          Q.     Through the Paylocity system?

7          A.     No.

8          Q.     How were they available to employees?

9          A.     There was a specific system that they had

10   set up for the core policies.   It was managed by

11   Mekelle Andrezzi.   I don't know what the name of that

12   system was.

13         Q.     Why were those on a separate system?

14         A.     I don't know.

15         Q.     So -- and -- here on this page -- I don't

16   have it on the screen anymore, do I?   This page I've

17   got on the screen, 345, it says:

18              In Subsection A below, we've identified

19              the minimum conduct and behavior that is

20              expected of every employee.  Repeated failure to

21              meet these expectations, failure to meet several

22              of them over time may lead to disciplinary

23              action up to and including termination of

24              employment.

25              Did you write that policy?

1        A.      Yes.

2        Q.      So where it says repeated failure to meet

3    these expectations may lead to disciplinary action,

4    is the way you would handle repeated violations by

5    going through that progressive disciplinary process

6    that we looked at earlier?

7        A.      Well, as I said, it would depend on what

8    the particular situation was whether we would go

9    through the progressive discipline or go to a

10   specific step in the progressive discipline.

11       Q.      Okay.  Was there any policy or practice

12   employed that was, like, you know, three written

13   warnings and you're fired, or anything like that?

14       A.      There was no written policy in place, no.

15       Q.      Was there a practice that was followed

16   generally?

17       A.      Generally.   Like I said, it would depend

18   on the situation.

19       Q.      So generally how many written warnings

20   would someone get before they'd get terminated?

21       A.      They'd probably have one written warning.

22   And then they would have a final warning, and then

23   they would be terminated.

24       Q.      Okay.  So I'm going to pull up another

25   policy here that I'll call Exhibit 6 -- I mean,

1    sorry -- 5.

2                   (EXHIBIT 5 WAS IDENTIFIED.)

3         Q.    (By Ms. Hollingsworth)    And so is this

4    nondiscrimination and harassment prevention another

5    policy that was included in the handbook?

6         A.    Yes.

7                MS. HOLLINGSWORTH: Okay.   So this -- for

8    the record, Exhibit 5 is GRAHAM 304 to 307.

9         Q.    (By Ms. Hollingsworth)    And did you train

10   the employees on these policies?

11        A.    The employees took sexual harassment

12   training through a system called Suncoast when they

13   were hired, and then they were annually to take the

14   same training.   It was not -- it was not specific to

15   this policy.   It was a general sexual harassment

16   training.

17        Q.    Okay.  And were they taught how to

18   complain about sexual harassment?

19        A.    I don't think they were taught how to

20   complain, but I think they were encouraged to report

21   any incidences that they felt occurred.

22        Q.    And how were they encouraged to report?

23        A.    I'm not sure what you mean by that

24   question.

25        Q.    Was that, like, in the training, or did

1  you encourage them?   Or were they handed memos that
2  told them to report?
3       A.    So they would sign the sexual harassment
4  policy every year, and they took the training.    And
5  it indicated that they should report those incidences
6  in both places.   I never had an employee training
7  where all employees were told, This is exactly what
8  you have to do.
9       Q.    Okay.  So a lot of these policies, the one
10 we just looked at and this one, are dated June 1,
11 2017.   Was this just a change you made to the
12 handbook in 2017?
13      A.    Yeah, it would have been a change I made
14 in the handbook, but not necessarily to this policy.
15 Without -- without seeing the previous handbook and
16 looking at this one, I can't tell you what was
17 changed in the handbook.
18      Q.    Okay.  So -- but if it has June 1, 2017,
19 like this one does, then all of these policies were
20 at least in place as of June 2017, right?
21      A.    Correct.
22            MR. FRAZIER: Objection.    Overly broad.
23            THE WITNESS: Unless they were changed at
24 a later date, like in 2018 or 2019, you know.
25      Q.    (By Ms. Hollingsworth)    Okay.   And do you

1  know whether any of these policies were changed in
2  2018?
3       A.   I couldn't tell you if those particular
4  policies were changed.
5       Q.   Okay.  So here what -- on the page I have
6  on the screen, which is GRAHAM 305, there's some
7  examples provided of sexual harassment, and that
8  includes -- I've highlighted here talking about your
9  own or someone else's sex life.
10           Why is that included in the examples of a
11 hostile work environment based on sexual harassment?
12      A.   I think there's different -- it does not
13 indicate that there is unless it's repetitive or
14 egregious, that it would be a hostile work
15 environment, but it could be applied to sexual
16 harassment itself.   And so, obviously, we didn't want
17 people to -- to walk into that particular area.
18      Q.   What do you mean "walk into that
19 particular area"?
20      A.   I mean we don't want someone at work to
21 talk about their own sex life or anyone else's sex
22 life at work.
23      Q.   Okay.  And what would you do to ensure
24 that people weren't doing that?
25      A.   Well, I couldn't watch 4500 employees, so

1   I would have to rely on somebody coming to me and

2   stating that there might be an issue.

3        Q.   So if someone did come to you, then you

4   follow the process that we talked about earlier where

5   you investigate the complaint?

6        A.   Yes.

7        Q.   So this -- on this page that I now have on

8   the screen, GRAHAM 306, it talks about the complaint

9   procedure can be found in the HR manual.   Is that

10  complaint procedure what we just talked about, or is

11  there a different complaint procedure that we

12  haven't --

13       A.   No.  It would --

14            MR. FRAZIER: Objection.   Vague.

15       Q.   (By Ms. Hollingsworth)   Go ahead.

16       A.   In my opinion, it would be the same one

17  unless, for some reason, I edited the HHR0008 between

18  2015 and 2017.

19       Q.   Okay.

20       A.   So it may or may not be the exact same

21  procedure we looked at before.

22       Q.   Okay.  I'm going to pull up another

23  policy.   We'll call this Exhibit 6.

24            (EXHIBIT 6 WAS IDENTIFIED.)

25       Q.   (By Ms. Hollingsworth)   And Exhibit 6 is

1    the page marked GRAHAM 317.    And  this  talks  about

2    rest breaks, and this is another one that's got

3    June 1, 2017 at the bottom.    It talks about a

4    15-minute paid rest break for every four hours

5    workday.

6               And were employees supposed to clock in

7    and out when they take their rest break?

8         A.    So -- no.  They didn't have to clock in

9    and  out  for  rest  brakes.

10        Q.    Okay.

11        A.    They  did  for  lunch  breaks  but  not  for  rest

12   breaks.

13        Q.    Okay.  When an employee's taking a rest

14   break, is there a certain place that they have to be,

15   or can they kind of do whatever they want during that

16   period?

17        A.    During  the  rest  break  they  can  pretty  much

18   do whatever they want, but they probably shouldn't

19   leave the premises because the chances of them

20   getting back in that 15-minute break would be

21   difficult.

22        Q.    Okay.  And were employees encouraged to

23   take  rest  breaks  or  discouraged?

24        A.    Well, they weren't discouraged.   I

25   think -- I don't think we ever really had to

1   encourage anybody to take rest breaks.   In some

2   states we were more -- California specifically, we

3   were more observant of lunches and things like that

4   because of state laws that require them.   In Utah

5   there is no state law that requires lunches or

6   breaks, but we did encourage them to take it.

7            We also encouraged those that were hourly

8   employees to step away from their desks during their

9   lunch period, but they could -- they could take a

10  break at their desk if they wanted to eat a sandwich,

11  or whatever.

12           Q.    Can you say that again?   Sorry.   My -- I

13  think since we came back from lunch, I'm getting the

14  same issues I was having before.   I think I need to

15  reconnect to my -- to my hotspot.   Can you repeat

16  that?   And then I'm going to take a minute, and to

17  see if I can fix it again.

18           A.    So for the employees who were in the --

19  that were hourly employees that worked in the office,

20  we didn't tell them they had to step away from the

21  desk or there was any particular place that they

22  could go, other than we asked that they did not leave

23  the premises because it was paid time.   But they

24  could have gone into the break room.   They could have

25  gone around, walked in the building, whatever.

1      As far as lunch is concerned, we did

2  instruct them that they need to step away from the

3  desk, and the reason we did that was we were

4  concerned that employes, when the phone rang, would

5  want to pick up.  Or if they saw an email come

6  through on their computer while they were having

7  lunch, they would go to answer it.    So we encouraged

8  them to get away from their desks.

9          MS. HOLLINGSWORTH: Sorry for this.    I'm

10  going to take just a couple minutes here and try and

11  get back on my hotspot so it doesn't keep on doing

12  what it's doing.   So hang on.   Give me just a minute.

13          (Recess from 2:22 p.m. to 2:39 p.m.)

14      Q.   (By Ms. Hollingsworth)    Let's look at

15  Exhibit 7, which is labeled GRAHAM 715 to 716, this

16  policy is dated -- implemented December 1, 2015.

17          (EXHIBIT 7 WAS IDENTIFIED.)

18      Q.   (By Ms. Hollingsworth)    I assume this is

19  another one that you wrote.

20      A.   Yes.

21      Q.   Okay.  And so you write here:

22          This guideline will be followed unless the

23          severity or urgency of the termination requires

24          other actions to take place.

25          What do you mean by that?

1      A.     Well, that's the same thing as I've

2   described before when you've asked that question.    It

3   depends on how egregious the case is or the situation

4   is.

5      Q.    Okay. And this -- so the first guideline

6   says:

7             When an incident occurs that warrants

8             possible termination, the supervisor will review

9             the situation, meet with the employee and any

10            witnesses to the situation and will determine a

11            course of action.

12            And so is that something that's followed

13   even in severe or urgent terminations?

14      A.    Not always.    With the company being a

15   national company, it's sometimes difficult to meet

16   with the employee, because they may be in Georgia and

17   the supervisor may be at the corporate office.

18      Q.    Okay.

19      A.    So sometimes they'll talk to them on the

20   phone or they'll send them an email asking about the

21   situation.    So it wasn't always followed to the T.

22      Q.    Okay.  So you wouldn't necessarily be able

23   to meet with them in person, but you could at least

24   correspond by email or phone to get information; is

25   that right?

1        A.      Right.   Correct.

2        Q.      And it's -- uses this term "ED."

3                If the ED determines the employee should

4        be discharged, the ED will contact human

5        resources.

6                What's "ED" stand for?

7        A.      Executive director.    Each of the locations

8    had an executive director that was responsible for

9    the program.

10       Q.      Okay.   And in Utah, who was the ED?

11       A.      The ED would be over the hospice office.

12   That would have been Valerie -- I can't remember her

13   last name.  Valerie's her first name.  She would have

14   been the ED.  However, she would have been

15   responsible for any corporate employees.

16       Q.      Who was responsible for the corporate

17   employees?

18       A.      Their individual supervisors.

19       Q.      Okay.   And in Lisa Graham's case, that was

20   you?

21       A.      That would have been me.

22               MR. FRAZIER:  April, we're not hearing

23   you.

24               MS. HOLLINGSWORTH: I don't know what to

25   do.   Can you guys hear me how?

1          MR. FRAZIER:  Kind of.  It's still choppy.
2   We can hear you better.

3          MS. HOLLINGSWORTH: Huh.  Well, I'll just
4   try again.

5      Q.   (By Ms. Hollingsworth)   I'm looking at the
6   guideline.   Are you able to hear me?

7      A.   I heard you just then.   Then you said
8   something about guidelines, and I didn't hear the
9   rest.

10     Q.   Okay.   On number 3, the third guideline
11  talks about if there's a risk to --

12          THE REPORTER: April, I didn't get that.
13  You were breaking up.   I got "talks about if there's
14  a risk to..."

15          (A discussion was held off the record.)

16          MS. HOLLINGSWORTH: I don't know.  We'll
17  just try again.   Can you hear me now.

18          MR. FRAZIER:  Choppy, but we can hear you.

19          MS. HOLLINGSWORTH: I'll just try again.

20     Q.   (By Ms. Hollingsworth)    On Guideline
21  number 3 --

22          MR. FRAZIER:  Are you speaking April?
23  Because you completely froze.

24          MS. HOLLINGSWORTH: Yeah.   It says my
25  connection's unstable again.

1          THE WITNESS:  So would **it** be possible for

2    us to reschedule the balance of this?    I have a

3    husband that's got cancer that I'm trying to take

4    care of, and this is taking an awful lot of my time.

5    And I don't mind coming on another day, but **it's**

6    getting to the point where he has needs that I need

7    to help him with.

8          MS. HOLLINGSWORTH: Well, I -- yeah.   I

9    know we've had such a hard time scheduling this up to

10   this point, and my understanding was, you know, today

11   would work, but Friday wouldn't.    So are there other

12   days that we can make work?

13         THE WITNESS:  I can do tomorrow.   I cannot

14   do Friday.   He has his treatments on Friday.

15   Probably Thursday afternoon I could after 2:00.

16         MS. HOLLINGSWORTH: Okay.   Do you need to

17   go right now, or should we try and go for another

18   hour or what's --

19         THE WITNESS:  Well, I guess my problem is

20   that we're spending half the time waiting for your

21   system to work --

22         MS. HOLLINGSWORTH: Yeah.

23         THE WITNESS: -- so **it's** not productive

24   time.

25         MS. HOLLINGSWORTH: Right.

1          THE WITNESS: And I feel like, if we

2    reschedule it, you can get your technology to work a

3    little bit better for you, and then it will be a lot

4    faster process.

5          MS. HOLLINGSWORTH: Yeah, that would be

6    ideal.   All right.   Let me check with something here.

7    One sec.

8          MR. FRAZIER: Let me ask you this, April:

9    How long do you have left?   I mean, what are you

10   anticipating.

11         MS. HOLLINGSWORTH: I mean, we have the

12   rest of the afternoon.

13         MR. FRAZIER: I understand how long you've

14   got it scheduled.  I'm just wondering.

15         MS. HOLLINGSWORTH: No, and what I was

16   saying is I would expect it to take the rest of the

17   afternoon.   And I agree that if my technology was

18   working better --

19          (Zoom feed was lost.)

20          (A discussion was held off the record.)

21          (The deposition adjourned at 2:49 p.m.)

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3

4              I, Susette M. Snider, Certified Shorthand
   Reporter, Certified Shorthand Reporter and Registered
5  Professional Reporter do hereby certify:

6              That prior to being examined, the witness,
   Debra Wertz, was by me duly sworn to tell the truth,
7  the whole truth, and nothing but the truth;

8              That said deposition was taken down by me
   in stenotype on January 9, 2024, via Zoom
9  videoconference and was thereafter transcribed and
   that a true and correct transcription of said
10 testimony is set forth in the preceding pages in
   accordance with my ability to hear and understand the
11 Zoom videoconference audio;

12             I further certify that a reading copy was
   sent to Ryan Frazier, Attorney at Law, for the
13 witness to read and sign and then return to me for
   filing with April L. Hollingsworth, Attorney at Law.

14
               I further certify that I am not kin or
15 otherwise associated with any of the parties to said
   cause of action and that I am not interested in the
16 outcome thereof.

17             WITNESS MY HAND this 16th day of January,
   2024.

18

19

20

21

22     _____
       Susette M. Snider, CSR, CRR, RPR
23

24

25

1  Case:  Graham v. Bristol Hospice Holdings, Inc.
   Case No.:  2:21-cv-00754
2  Reporter:  Susette M. Snider
   Date taken:  January 9, 2024
3
                    WITNESS CERTIFICATE
4
          I, DEBRA WERTZ, HEREBY DECLARE:
5          That I am the witness in the foregoing
   transcript; that I have read the transcript and know
6  the contents thereof; that with these corrections I
   have noted this transcript truly and accurately
7  reflects my testimony.

8  PAGE-LINE        CHANGE/CORRECTION              REASON
9  _____        _____      _____
   _____        _____      _____
10 _____        _____      _____
   _____        _____      _____
11 _____        _____      _____
   _____        _____      _____
12 _____        _____      _____
   _____        _____      _____
13 _____        _____      _____
   _____        _____      _____
14 _____        _____      _____
   _____        _____      _____
15 _____        _____      _____
   _____        _____      _____
16 _____        _____      _____
   _____        _____      _____
17 _____        _____      _____
   _____        _____      _____
18 _____        _____      _____

19
            _____    No corrections were made.
20

21       I, Debra Wertz, hereby declare under the
   penalties of perjury of the laws of the United States
22 of America and the laws of the State of Utah that the
   foregoing is true and correct.
23

24                        _____
                          Debra Wertz
25            Date:  _____

**Exhibits**

**Exhibit 01** 59:23 60:2 61:9,13,16
**Exhibit 02** 74:21,23,24, 25
**Exhibit 03** 81:18,19 90:8
**Exhibit 04** 93:20,21,23
**Exhibit 05** 99:2,8
**Exhibit 06** 98:25 102:23,24,25
**Exhibit 07** 105:15,17

**-**

**-83** 13:25

**1**

**1** 56:10 59:23 60:2 61:9,13,16 94:2 100:10, 18 103:3 105:16
**11:05** 42:4
**11:32** 42:4
**12** 34:23
**12-year-old** 17:11
**12:15** 42:10
**12:30** 42:10
**15** 10:12 11:3 12:16
**15-minute** 103:4,20
**17** 10:13 11:4
**19** 11:1
**19-** 13:24
**1972** 11:1
**198-** 14:13
**1983** 13:3 14:14
**1984** 14:14
**1:02** 93:17
**1:45** 93:15
**1:59** 93:17

**2**

**2** 74:21,23,24,25
**20-** 48:6
**2010** 23:18,22
**2011** 18:10
**2012** 7:23 81:24 82:2

**2015** 56:10,11,23 57:5 61:20,22,23 62:16 64:13 65:20 67:17 75:14 94:4 102:18 105:16
**2016** 55:4 81:25 82:5
**2017** 40:19 94:2 100:11,12,18,20 102:18 103:3
**2018** 38:11 39:8,9 40:21 65:23 81:2 100:24 101:2
**2019** 81:2 100:24
**2020** 48:6
**2021** 37:9 51:1 87:3
**2:00** 109:15
**2:22** 105:13
**2:39** 105:13
**2:49** 110:21
**2nd** 86:14

**3**

**3** 74:19 81:18,19 90:8,9 108:10,21
**30** 56:1
**30(b)(6)** 8:10
**300** 37:4
**304** 99:8
**305** 101:6
**306** 102:8
**307** 99:8
**317** 103:1
**31st** 86:13
**344** 93:24
**345** 93:24 97:17

**4**

**4** 81:24 93:20,21,23
**45-minute** 93:12
**4500** 37:7 101:25

**5**

**5** 99:1,2,8
**523** 81:23
**525** 81:23
**53** 12:8
**55** 12:14

**6**

**6** 98:25 102:23,24,25

**7**

**7** 105:15,17
**7.2** 95:22
**70** 53:5
**710** 59:24
**711** 67:16
**713** 59:24
**715** 105:15
**716** 105:15

**9**

**90-day** 95:6

**A**

**a.m.** 42:4
**absences** 44:8
**absolutely** 52:25
**access** 25:4 91:23
**accessed** 92:8
**accessible** 92:23
**accommodations** 29:1
**accordance** 90:14
**accreditation** 59:7
**accredited** 59:9
**accused** 85:3
**acquire** 40:20
**acquired** 38:11,17 40:15
**acronym** 59:20
**Act** 29:23
**action** 12:24 14:20 15:20 16:15 59:22 65:4, 8 68:21 95:4,22 97:23 98:3 106:11
**actions** 64:18 105:24
**actors** 22:5
**actual** 22:5 23:25 32:14 58:15 95:1
**ADA** 20:22 27:23 28:23 29:1 32:2 43:24 44:1,12 47:23 54:18,19
**added** 32:6
**addition** 90:23

**address** 38:2
**ADEA** 72:9 73:4
**adjourned** 110:21
**administrative** 15:1,4, 10 53:15
**admins** 53:25
**adopt** 59:8
**adopted** 58:12
**adult** 10:6,8
**advised** 42:6
**affiliated** 36:1
**affirmative** 28:24
**afternoon** 109:15 110:12,17
**Age** 30:1
**agree** 8:23 44:17 47:3 70:21 110:17
**agreement** 70:23
**ahead** 6:2 8:15 17:19 42:19 64:6 70:6 89:11 102:15
**Air** 11:7 13:5,11,17 14:10,18 24:12,21
**aircraft** 14:6
**airport** 38:1
**Alabama** 37:15,16
**Alison** 47:13,14
**allegation** 80:16
**allegations** 6:20,23 80:15
**Amber** 39:1
**ambiguous** 73:10 83:16
**amount** 32:11 40:11
**Andrezzi** 50:8 58:4 97:11
**Angeles** 10:10
**animation** 22:3
**Annette** 43:17 51:15
**annually** 99:13
**answers** 47:4
**anticipating** 110:10
**anymore** 97:16
**anytime** 54:18
**apparently** 17:10
**appeared** 17:9
**appears** 78:8
**applied** 101:15

**apply** 35:19 40:25 96:3, 12
**applying** 62:25
**approach** 62:25
**approval** 29:3 60:6 63:18
**approve** 60:12,18 70:13
**approved** 28:25 60:8 78:17
**April** 8:5 32:25 61:2 107:22 108:12,22 110:8
**area** 33:6 101:17,19
**areas** 64:12 67:12 91:20
**articles** 64:11 82:17
**aspect** 33:17
**assess** 36:24
**assign** 78:11
**assist** 66:7,8
**assistance** 54:23
**assistant** 15:1,4,10 28:6,8 53:18
**assisted** 36:22
**assisting** 81:8
**association** 59:4
**assume** 5:20 55:15 75:1 105:18
**at-will** 62:23
**attach** 58:6
**attached** 33:5
**attempts** 62:24
**attended** 10:19 29:15
**attending** 61:20
**attention** 75:9,11
**attorney** 62:16,17 71:13
**attorneys** 84:18
**audible** 21:25 94:8
**audits** 59:10
**August** 26:18,19
**Avalon** 34:15,19 36:1
**aware** 42:5 90:11
**awful** 109:4

**B**

**bachelor's** 11:22 12:1
**back** 10:13,21 11:11 14:4,5 15:21 17:19
18:13 19:23 37:17 39:13 43:2 50:13 51:13 65:14 70:20 90:7 93:14 103:20 104:13 105:11
**background** 10:3
**bad** 17:22
**Bakersfield** 38:15 39:11
**balance** 109:2
**base** 13:6,12,17 14:10, 18 24:12,22 80:22
**based** 29:23 30:11 101:11
**bases** 27:18
**basic** 28:1 56:20
**basically** 8:1 79:17
**basis** 22:12
**Bates** 93:23
**Beach** 27:12
**behalf** 5:1 9:13
**behavior** 72:7 75:11 83:21 84:1 97:19
**Beisinger** 43:17
**benchmark** 84:9
**benefit** 46:22
**benefits** 20:23 25:15 32:2 33:20,21 38:25 43:8,23 44:1,4,7,8,9,10, 15 45:17 46:11 47:1,23 54:2,15,16
**Beninger** 38:24 39:6
**BH** 74:24 81:22
**bias** 78:4,5,9
**biased** 78:11
**bible-type** 22:2
**big** 27:4 38:8 66:5
**bigger** 25:15 32:6 40:16
**billers** 54:3
**bit** 22:16 27:8 32:6 74:2,15 110:3
**blah-blah-blah** 91:4
**blatant** 52:23,25
**blood** 93:10
**board** 48:3,4
**bomb** 23:10
**bombed** 23:22
**book** 21:23 95:1
**books** 67:9
**bordered** 84:17
**born** 10:10
**bottom** 103:3
**boy** 17:11
**brakes** 103:9
**break** 5:23 42:6,15,24 93:8,12,19 103:4,7,14, 17,20 104:10,24
**breaking** 108:13
**breaks** 5:21 96:9 103:2,11,12,23 104:1,6
**Brian** 89:13
**bring** 60:22 75:6,11 86:6 87:18 93:20
**bringing** 53:24
**Bristol** 5:1 6:9 7:4,6,8, 19 8:10 18:12,15 22:22 23:17 26:22,24 30:22, 24 31:3,18 33:1,2,3,25 34:14,18 36:13 37:2 39:7,20 40:20 43:2 44:23,25 45:7,9,11,12 52:3,10,17 53:3 56:10 62:23 65:17 67:17 72:8 78:3,4 80:21 81:21 83:20 87:19 89:13 92:11
**Bristol's** 75:8,11 81:6 90:14,16
**broad** 73:10 78:19,22 83:4 85:14 100:22
**brought** 65:13
**budgeting** 51:6
**build** 18:20 19:17 27:24 52:16,18
**building** 19:15 104:25
**business** 12:3 23:1 52:16,19

**C**

**C111** 63:4
**C3** 63:4,11 74:19
**California** 10:10 27:18 28:3,7 37:14 38:16 39:11 89:23 104:2
**call** 61:9 81:18 98:25 102:23
**called** 18:18,25 22:23 43:22 50:2,4 69:17 92:7 99:12
**calling** 74:4
**calls** 30:7 50:11
**cancer** 109:3
**candidates** 19:25 20:1
**care** 15:13 24:6 33:8 59:15 109:4
**career** 13:1
**careful** 9:16
**case** 8:24 44:8 49:22 52:23 68:2 79:11,20 90:5 106:3 107:19
**cases** 6:10,13,15,22 52:6 67:23 70:2 89:16, 21,22
**cassette** 22:9
**categorize** 86:9
**category** 84:24
**causing** 48:23
**Center** 18:19 19:9
**CEO** 31:3,4,5,13 41:12 60:15
**CEOS** 31:6
**certification** 58:11
**cetera** 68:18
**CFO** 45:13 60:15
**chances** 103:19
**change** 16:16 35:13 41:4,5,19,22 65:23 74:2 100:11,13
**changed** 32:8 56:16,17 74:14 100:17,23 101:1, 4
**chaplains** 53:15
**charge** 28:22 46:10 53:20 62:12
**charged** 83:2,12
**check** 110:6
**chief** 21:4 25:24
**children** 11:12,17 13:1 22:3
**choppy** 108:1,18
**chose** 17:25
**Christie** 31:1,9 34:17 35:22 36:2 40:4 41:10, 16
**CIII** 63:4
**City** 37:21 38:2
**Civil** 29:23
**claim** 54:19 87:1,12

**claims** 6:22 78:4,5 89:24
**clarify** 19:23
**classes** 11:15 15:23 29:17,24
**clear** 5:9,15 6:4 8:9 9:15,16,18,20,24 55:7 56:19 74:1,3,10
**clearance** 24:2,10,11, 13,19,21,23,25 25:3
**clinical** 53:8,20 60:16 62:15 69:21 96:11,20
**clinicians** 96:12,13,18
**clock** 103:6,8
**close** 23:19 91:1
**CNAS** 53:12,13
**college** 10:14
**Colorado** 37:15
**comfortable** 16:25
**comments** 17:21
**committee** 60:10
**common** 91:20
**communicate** 72:11, 15,19
**communicated** 72:23
**communication** 73:13
**community** 12:23 14:19 15:20 16:15
**comp** 20:22 27:23 32:2 43:24 44:1 45:17 46:11 47:23
**companies** 27:5 33:15 40:15 63:8,9
**company** 9:13,14,19 18:18,25 19:3,7 22:23 24:5 25:14 27:4,7,11 28:16 29:11 32:1,24 35:14 36:23 37:18 38:12,17 48:7,10,24 49:9 50:6,10,25 51:1, 16,18 52:20,21,22 58:19,20 67:22 68:16 70:17 71:11,12 72:2 73:2,13,14 78:21 82:20 84:24 87:24 88:14,21, 25 89:25 92:3,4 106:14, 15
**company's** 7:24 9:18 16:19 24:3 78:25
**company-wide** 95:5
**compensation** 54:20

**complain** 83:1 99:18, 20
**complained** 76:2,4
**complaining** 83:7 84:23
**complains** 52:19
**complaint** 17:5 72:22 75:20 76:13,21,22,24 77:1 80:7 81:8 83:11,20 84:25 85:18 90:14,16, 21 102:5,8,10,11
**complaints** 76:7,10,13, 19 77:3,4,5 82:19,21 83:14
**completely** 108:23
**compliance** 54:3 62:7, 11,14 63:3 75:22
**comply** 63:3
**component** 25:16
**comport** 81:5
**computer** 85:21,23 86:4 87:22,24 88:6,17 89:5 105:6
**computer's** 88:8
**computers** 88:14,23
**concern** 50:3 77:23 79:7 80:1 83:25 84:1
**concerned** 52:20 72:3 86:18 96:2 105:1,4
**concerns** 76:25 77:15, 18
**conclusion** 30:8
**conditions** 79:17
**conduct** 73:3 96:10 97:19
**conferences** 29:15
**confusion** 74:11
**conjunction** 95:24
**connect** 57:13
**connection** 42:2 96:17
**connection's** 108:25
**conserve** 25:17
**consideration** 65:7
**considered** 33:22 77:3 84:11
**consistent** 62:25 84:14
**constituted** 71:6
**consultations** 96:18
**contact** 84:17 107:4

**contacted** 49:21,22
**content** 56:20
**contention** 48:23
**context** 29:10
**continue** 67:20
**continued** 38:7
**continuous** 86:12
**contract** 27:3,4,6 28:20
**contracts** 23:1
**COO** 60:15
**copies** 91:19
**copy** 56:22 91:15,25 92:1
**core** 56:25 57:12,15, 16,17,24 58:7,9,12,17, 18,22 59:2,8 63:3,7,11, 12,15 91:9,11 96:23 97:2,3,10
**corporate** 27:11 28:13 29:3,14 37:22 38:10 89:25 106:17 107:15,16
**Corporation** 22:25 23:1
**correct** 5:5 59:16 61:19 62:24 74:15 75:12 77:20 100:21 107:1
**corrections** 70:21
**corrective** 59:22 65:8 95:4,22
**correspond** 106:24
**counsel** 5:24
**counseling** 63:1 68:11, 17 69:4,5
**count** 8:23 9:7
**County** 11:2
**couple** 41:10 45:3 66:1 105:10
**courses** 16:2,5
**court** 5:11
**cover** 16:7
**covered** 27:18
**COVID** 38:5,8
**coworker** 49:15
**create** 73:23
**created** 56:13
**crib** 13:14 14:3,4,8
**customer** 13:18 14:2

**D**

**D-E-B-R-A** 4:10
**dad** 11:7
**daily** 86:7
**Dani** 66:18,19 67:1
**date** 26:18 56:9 81:24 100:24
**dated** 94:1 100:10 105:16
**dates** 4:16,17 11:18 13:21 14:15 23:21 50:21 55:10 81:21
**Davis** 10:25 11:1,2
**day** 41:4 72:18 80:24 85:24 86:2,11 109:5
**day-to-day** 32:14 33:21 41:23
**days** 26:13 51:13 56:1 86:17,18 109:12
**Dayton** 43:15,23 45:25 48:10 76:8,11 83:2
**deal** 38:8
**Debbie** 8:14 9:12 42:6, 23 89:11
**Debbie's** 93:10
**Debra** 4:3,10
**December** 56:10 86:13 105:16
**decide** 51:12
**decided** 25:12 45:14
**decision** 80:22
**decisions** 16:24 17:21
**definitions** 82:12,17
**degree** 11:21,22 12:4 16:3
**degrees** 15:22
**delete** 88:2
**deleting** 88:3
**department** 21:10,13, 19 27:14 35:15 50:9 58:5,14 77:2 87:12
**depend** 21:9 52:5 98:7, 17
**depended** 33:23 79:2
**depends** 32:24 106:3
**depose** 8:14
**deposition** 4:13 8:9,10, 17,18,24 9:7,8 110:21

depositions 5:7 6:18, 19,21
description 49:3,4
descriptions 71:21
designated 8:11 32:12
designee 8:11
desk 104:10,21 105:3
desks 104:8 105:8
desktop 88:17
detail 91:2
determine 21:17 84:7 106:10
determined 45:19 52:7
determines 107:3
determining 71:1
develop 62:3
developed 22:1 23:12 31:25 56:24 69:7
developing 22:1
development 20:20 21:1,2 25:8
difference 32:22 57:6
differently 77:5
difficult 73:16 103:21 106:15
diploma 12:6
direct 43:20
directly 27:14 47:5 79:16
director 7:16 15:11 27:14 35:7,8,11 36:5,9 39:14,15 43:9,11,14 44:22 61:24 79:10 80:11 107:7,8
directors 53:17,18
discharged 107:4
disciplinary 68:21 95:24 97:22 98:3,5
discipline 52:4,8 53:1 67:15,18,21,24 68:1,6, 10 95:23 98:9,10
disciplining 70:8
discouraged 103:23,24
discrepancy 96:6
discrimination 30:1 71:15 75:7 90:12
discuss 50:16 73:18
discussed 63:19
discussion 24:16 42:3 47:2 70:22 83:9 93:25

108:15 110:20
disrespectful 48:23 49:12
diversity 58:21
document 58:8 59:21 61:3 70:3 85:6,12 86:12
documentation 54:1 69:8
documented 85:10
documents 58:6 68:23 92:16,21
doubled 40:13
draft 32:1 52:1 62:3
drafted 56:8 60:1
drive 88:21,23 92:9,10
drives 69:17
drop 93:10,13
drops 42:7
dual 34:13
duly 4:4
duties 27:21 31:17,22 41:19
dying 36:15

**E**

earlier 94:13 95:25 98:6 102:4
east 37:17
eat 42:16 104:10
ED 107:2,3,4,6,10,11, 14
edited 102:17
education 15:21
EEOC 77:1 87:1,9,13 89:24
effect 81:16
effective 16:18,22 72:12,15 73:13
effectively 72:19
efficient 25:9
egregious 52:11,21 68:21 79:4,6,18 84:13 101:14 106:3
Eleven 26:23
eliminate 21:15
else's 101:9,21
email 49:24 64:24 76:16 105:5 106:20,24

emails 76:14
emergency 54:24
employed 98:12
employee 15:12 17:16 27:23 28:2 32:2 44:13, 14 49:17,18 50:1 54:22, 23 55:14,22,25 56:12, 14,15,21 57:2,7 64:17 65:13 70:8 73:15 74:3 77:15,16 79:8 80:7,17 86:9 90:11,20,22 91:11, 13,22 92:15,19,25 93:2 94:5,22 95:12 96:2 97:20 100:6 106:9,16 107:3
employee's 65:6,10 95:20 103:13
employees 16:7 17:5 18:19 25:11,13 26:1 28:3 29:4 30:5 32:15,17 37:3,6,10 38:3,6,7,19 39:8 47:11 51:5 53:3 54:15 56:22 69:20 74:11 75:5,10 81:7 82:22 85:13 91:7,10,12 94:19 97:4,8 99:10,11 100:7 101:25 103:6,22 104:8,18,19 107:15,17
employees' 29:1 43:25
employer 15:16 62:23
employes 105:4
employment 6:10 8:2 16:3,20 17:20 20:9 56:2 97:24
encourage 100:1 104:1,6
encouraged 99:20,22 103:22 104:7 105:7
end 39:4 85:24 95:6
ended 38:21
engaging 73:3
England 11:5
enhance 21:16
enrolled 54:15
ensure 58:20 78:5 101:23
ensured 33:7
ensuring 62:12,13
entertainment 22:1
entire 7:11
entities 77:2

environment 101:11, 15
Eric 43:16 46:7,19 47:8,9 48:13
Erin 57:22
essentially 29:22 32:4, 7 41:7 44:18 53:19 54:21 57:10 65:21 71:24 73:19 80:13
evaluations 92:16
evidence 65:12 79:13
ex-pats 18:19 19:3,11
exact 4:16,17 11:18 23:21 35:2,3 38:2 50:20 70:6 102:20
EXAMINATION 4:6
examined 4:5
examples 21:11 72:13 79:5 82:12 101:7,10
exception 44:1 75:18
executive 7:3,10,17 40:24 41:12 53:17 60:9, 10,13,14,16,25 61:19, 21,22 63:19 73:16 78:17 79:10 80:11 96:20 107:7,8
executives 54:4
exhibit 59:23 60:2 61:3,4,7,9,13,16 74:21, 23,24,25 81:18,19 90:8, 9 93:20,21,23 98:25 99:2,8 102:23,24,25 105:15,17
exist 88:15
expand 8:18
expanded 29:25
expect 96:10 110:16
expectations 97:21 98:3
expected 97:20
experience 30:14,19 64:9,14
experienced 89:17
explain 49:16 64:18
explanation 65:6
explanations 65:10
expressed 50:7
extent 9:12,17 88:4
extra 35:16

**F**

facilities 36:21
facility 36:18 52:15
fact 49:1
failed 62:6
failure 97:20,21 98:2
Faith 38:25
fall 32:14 68:5 72:7,9
familiar 16:6
family 11:12
faster 110:4
federal 73:4
feed 24:15 110:19
feedback 96:19
feel 16:17,21,25 42:23
  52:11,25 68:20 90:3
  110:1
feelings 73:17
feels 42:6 77:22 84:20
felling 73:20
felt 16:18,24 17:12,17,
  18,22 40:6 48:22,24
  49:14,15 51:9 56:1
  64:20,24 65:4 71:11
  84:16 99:21
file 44:21 68:22 69:2,5,
  9,11 70:11 76:23 85:21,
  23 86:5 95:19,20
filed 6:9 80:7
files 89:4
final 29:3 62:5 68:12,23
  69:25 98:22
finance 45:13
find 16:20 19:24 57:17,
  18 87:10 88:9 91:8 92:5
findings 87:10
fine 42:7,19,24 61:14
finish 5:14
fired 98:13
firing 20:21,22
fit 49:8
fix 104:17
flag 70:17
flags 71:14
Florida 27:12 28:14
  37:15
FMLA 16:9 20:22 28:22
  29:1 32:2 44:1,12 45:16

54:20
follow 52:3 78:21 79:1
  102:4
follow-up 54:15
food 14:23
force 11:8 13:6,11,17
  14:10,18 24:12,21
form 64:2 67:14 69:14,
  18,19,23 70:2,4,6 75:6
formal 76:12,13,18,21,
  22,25 77:3,4,5,6 85:18
format 40:6,9
forms 68:15,17 69:16
Fort 27:12
forward 17:19 77:23
found 74:3 84:2 102:9
foundation 89:9
frame 35:2,3
Franklin 31:1,9 34:17
  35:22 36:2
FRAZIER 8:5,8,13 9:3,
  9 30:7 32:25 42:5,23
  61:2,6,11 63:25 64:5
  73:9 74:20 78:19,22
  83:4,15 85:14 88:7
  89:9,11 93:5,13 100:22
  102:14 107:22 108:1,
  18,22 110:8,13
free 42:23
freely 73:20
Friday 109:11,14
front 23:20
froze 108:23
fulfill 70:25
full 4:9
full-time 20:8,13 55:9,
  22
function 53:8 70:14
functions 15:18,24
  28:1

**G**

gal 66:13
gap 26:7,11
gender 29:24
general 32:8,13 33:11,
  12 99:15
generalist 19:10 28:7
  32:23 33:4,22 39:3
  43:8,21 46:12,14,19

47:2,19 54:12 66:22
generalists 33:10,25
  34:6 47:6
generalized 33:5
generally 4:21 33:1
  35:4 60:20 68:9 98:16,
  17,19
Georgia 37:16 106:16
give 14:15 21:11 58:16
  61:2 64:25 68:17 72:13,
  25 79:5 80:21 105:12
goal 73:13 79:1
Gol 30:25
golly 14:13
good 42:22 49:8 65:4
  71:12 76:18
goodness 10:25 13:25
  34:21 53:4 81:1
governed 8:2
government 23:1
grab 42:15,19
gracious 10:25
graduate 10:22,24
Graham 47:10 50:22
  54:6 59:24 67:16 76:3,
  14 93:24 99:8 101:6
  102:8 103:1 105:15
Graham's 107:19
grammar 67:11
grant-type 14:24
great 42:18 47:17
grew 21:25
grievance 75:21
growing 35:14,15
grown 47:25
guess 4:23 7:21 13:8
  22:20 27:13 33:19
  48:17 85:19 109:19
guessing 13:21 18:10
guideline 57:14 58:22,
  24 60:9 64:16 81:21
  105:22 106:5 108:6,10,
  20
guidelines 56:13 57:3
  58:15 82:10 108:8
guys 107:25

**H**

half 13:9 39:23 48:5
  72:18 93:6 109:20

handbook 56:12,14,16,
  21 57:7 90:20,23 91:3,
  12,13 93:1,2 94:6,22,
  24,25 96:2 99:5 100:12,
  14,15,17
handed 100:1
handle 72:14 76:8
  78:11 98:4
handled 72:22
hands-on 41:23
hang 105:12
happen 21:6 70:22
  72:8 75:25 78:8
happened 40:3,23
  45:20 50:18 52:15
  65:12 69:1 73:18 79:24
  86:6 87:14 89:6
happy 8:18,24 48:25
harassed 84:21
harassing 82:22
harassment 52:23
  71:15 72:1,3,4 75:7
  82:11,12,19 83:7 84:1,
  12,16 90:12 99:4,11,15,
  18 100:3 101:7,11,16
hard 9:6 56:22 91:15,
  19 109:9
harsh 76:16
Hawaii 37:15 49:22
  50:12
Hazen 66:10
Hazen's 66:17,20
head 7:23 12:6 66:16
  82:13
headquartered 37:18
Headstart 14:23
health 43:25 54:21
hear 107:25 108:2,6,8,
  17,18
heard 87:8,11 108:7
hearing 107:22
held 23:3 24:16 42:3
  83:9 93:25 108:15
  110:20
helped 27:24 28:1 62:3
  67:3
helping 21:6 25:11
hesitate 14:15
hey 42:18 93:5
HHR0008 102:17

**Higgins** 32:20 46:2
**high** 10:22,25 11:2,10
**higher** 15:21
**highlighted** 62:22
   101:8
**Hill** 13:5,11,17 14:10,
   18 24:12,21
**hire** 18:19 19:16,19
   28:1 32:3 38:21 66:4,8
**hired** 18:19 21:3 26:15
   30:24 31:10 33:25 34:6,
   10,22 36:21 38:13,19,
   20 47:11 54:6 55:1,8,21
   65:25 66:3,7,11 71:3
   99:13
**hiring** 19:3,11,25 20:21
   38:22 39:5 40:13 58:21
**Hollingsworth** 4:7 8:7,
   12 9:2,5,25 10:2 24:24
   30:9 33:2,9 42:21 43:1
   60:3 61:5,8,15,17 64:1,
   6 73:11 74:22 75:1
   78:20,25 81:17,20 82:1
   83:5,10,19 85:16 88:4,
   11,16 89:10,14 93:11,
   16,18,22 94:1 99:3,7,9
   100:25 102:15,25
   105:9,14,18 107:24
   108:3,5,16,19,20,24
   109:8,16,22,25 110:5,
   11,15
**home** 13:2 36:22 38:6,
   7
**homes** 36:19,20
**honest** 79:2
**honestly** 7:23 22:20
   34:4
**hospice** 18:12,15
   22:22 26:22 30:22,24
   31:18 34:14 36:13,14,
   25 56:10,25 57:12
   58:11 59:4,18,19 81:21
   96:16 107:11
**hostile** 101:11,14
**hotspot** 104:15 105:11
**hour** 42:10,18 93:6
   109:18
**hourly** 104:7,19
**hours** 103:4
**housed** 88:24
**HR** 7:3,11,15 12:19
   15:15,18,24 16:7 17:1

   18:25 19:10 20:17,18,
   19 23:24 24:8 25:9,13,
   16,22 26:4 27:8,9,10,
   13,15 28:1,6,7,8 31:21,
   22,24 32:4,16,23 33:3,
   13,16 34:15,25 35:11
   36:5 38:3,12,13,19,25
   39:14,15,25 40:2,17
   41:20 43:2,8,15,21
   45:22,24 46:12,19 47:1,
   6,19 51:25 53:7,24
   54:12 57:10 58:1,22
   59:15 61:21,24 66:1,21
   68:16 69:17,21 70:7,11,
   12,13,14,15,22,25 91:4
   92:13 102:9
**HR-RELATED** 15:3
**human** 57:7 63:12
   77:24 107:4
**hundred** 85:9
**husband** 109:3
**Hyrum** 31:12,14

                 I

**I-9** 17:8
**ID** 17:8,10
**idea** 13:21 34:23 87:16
   88:7,10 89:5 95:13
**ideal** 110:6
**ideas** 78:7
**identified** 60:2 74:25
   81:19 84:15 93:21
   97:18 99:2 102:24
   105:17
**identify** 57:25
**illegal** 17:5,18 72:5
**immediately** 11:9 75:6
   90:13
**implemented** 56:10
   63:18 67:17 81:25
   105:16
**improve** 62:24
**improvement** 68:19,23
   69:8 95:3
**in-house** 62:17 84:18
**inappropriate** 83:13,
   17,21 84:1
**incidences** 99:21
   100:5
**incident** 90:13 106:7

**include** 64:19
**included** 25:13 99:5
   101:10
**includes** 101:8
**including** 15:2 97:23
**increase** 41:5 79:15
**indirect** 43:12
**individual** 20:2 21:13
   23:3 57:1,3,11 65:11
   107:18
**individuals** 19:16
   47:10 54:3 60:17 66:7
**information** 25:3 70:5
   80:22 85:22 92:13
   106:24
**Initially** 95:18
**input** 62:4
**INS** 17:10
**instance** 44:4 52:13
   57:7 60:19 78:24 85:12
   90:12 91:24 96:15
**instruct** 105:2
**instructs** 6:1
**instruments** 14:7
**insurance** 25:11
**integral** 45:15
**intended** 8:14
**interest** 16:19 52:9,12
**internal** 29:13
**Internet** 92:5
**interruption** 24:15
**interview** 64:22
**interviewed** 20:2 55:20
   77:12
**interviewing** 64:16
**interviews** 85:13
**introductory** 95:7
**investigate** 75:12,15
   77:17 78:13 80:1 102:5
**investigated** 77:7
   85:11
**investigating** 80:5
**investigation** 75:22
   78:2 81:8 85:7
**investigations** 63:23
   64:3,14 66:2 67:4
**involved** 23:25 24:2,5
**Iraq** 18:20 19:12,13
**ish** 6:7

**issue** 50:16 69:14
   102:2
**issues** 47:2 50:8 75:8
   104:14

                 J

**Jackson** 89:13
**Jacob** 27:2
**January** 86:14
**jeez** 7:22 34:22
**job** 13:13 14:19 16:12
   18:11,24 21:19 22:21
   24:10,14,19,23,25
   30:21 32:7 34:5,9 41:21
   49:3,4 54:8,11,13,25
   62:24 66:17,20,23
   71:18,19,20,21 95:13,
   14
**jobs** 18:14
**John** 18:2,3,4
**journal** 86:7
**July** 37:9 81:25 87:3
**jump** 8:5
**June** 94:2 100:10,18,20
   103:3

                 K

**Kathy** 28:12 43:18
   51:23
**Kelly** 38:24 39:6
**key** 13:5 78:6
**kind** 15:16 16:4,5,9
   21:7 22:7 23:5,7 25:3
   29:8 30:3 34:13 44:13
   45:16 46:12 47:24
   59:12 62:11 64:10 69:8
   71:15 72:6,10,12,20
   73:5 78:9 83:1 85:22
   89:22,24 92:18 103:15
   108:1
**kinds** 53:21
**Kirton** 31:12,14
**knew** 79:21 87:11
   89:19
**knowledge** 9:1,20

                 L

**label** 59:23
**labeled** 61:4,7 74:24
   81:22 105:15

**Labor** 77:2 87:12
**lack** 71:8 89:9
**laid** 25:18
**Lake** 37:21 38:2
**language** 70:14 83:2, 13,17
**laptop** 88:17
**lasted** 18:23
**Latter-day** 21:23
**law** 16:4 30:2 73:5 74:14 104:5
**laws** 16:7,11 29:5,8 82:17 104:4
**lawsuit** 86:21,23 87:4, 5,6 89:23
**lawsuits** 6:8
**lead** 97:22 98:3
**leadership** 16:17 80:18
**leading** 7:13
**learn** 15:19 16:11
**leave** 16:14 17:25 18:5 25:6 26:25 28:16 31:15 48:15,19 50:25 51:2,9, 11 87:2 103:19 104:22
**leaving** 17:16
**Leedy** 31:10 40:5 41:11,17
**left** 7:14 10:12 15:9 16:16 17:16 18:7 25:17 26:6,23 27:1 28:19 31:13 37:5,8 47:11 48:8,11,16,20 51:1,19 54:2 61:10,12 66:14 87:1,3,25 88:13 110:9
**legal** 17:13,22 30:8 71:13
**letter** 87:9
**letting** 38:6
**level** 41:24 42:7 72:4 83:22 84:3,8
**liaison** 13:18 14:2
**life** 10:6,8 101:9,21,22
**light** 71:12
**link** 93:15
**Lisa** 43:16 46:14,16 47:9 50:5,6,22,25 54:6 76:3,13 87:8,9 107:19
**listen** 85:2
**live** 22:5
**living** 18:25 19:4,8

20:10,13 21:20,22 22:14 25:6,21 26:6,9 36:22
**local** 40:11
**located** 38:4 39:10 91:7
**locations** 27:11 53:17 79:10 91:19 107:7
**login** 92:20
**long** 7:8 13:7,12,14,19 15:5 22:10,14 26:21 34:25 39:21 42:11,16 49:9 61:14 66:14 70:4 110:9,13
**longer** 36:1 89:13 93:7
**looked** 71:24 98:6 100:10 102:21
**Los** 10:10
**lost** 27:2,5 28:19 110:19
**lot** 20:21 50:14 61:11 64:14 67:12 86:3 100:9 109:4 110:3
**LPNS** 53:13
**lunch** 42:18 93:12 103:11 104:9,13 105:1, 7
**lunches** 104:3,5

___

## M

**made** 5:11 6:22 15:13 16:25 21:25 25:19 29:2 33:20 40:23,24 41:6 92:2 100:11,13
**main** 54:5,25 71:16
**majority** 10:5,18
**make** 5:8,12,22,24 8:8 9:13,14,15,18,20 21:6 25:9 54:14,16 56:19 58:1,25 59:11,13 60:11 70:20 74:1,2,9,12 93:9 109:12
**makes** 9:5 41:25
**making** 53:25
**manage** 16:18,22 24:4 35:16 66:1
**managed** 14:23 28:2,3 32:11 33:6 56:25 57:1 58:3 97:10
**management** 12:3,19 16:3 18:18 19:9 20:25

49:1
**manager** 7:15 19:1 20:17,18 24:8 25:22 31:21,23 32:16,23 34:10,25 41:20 43:2,10 45:5,22,24 46:18 49:25 51:25 68:25 73:15
**managers** 20:2 26:4 27:10 33:6 53:20 70:3,7
**manages** 14:22
**managing** 40:10
**manner** 72:12,15
**manual** 57:8,10 102:9
**mark** 74:22
**marked** 103:1
**marketer** 52:14,15,18, 19
**marketers** 52:17 53:16
**marketing** 69:21
**marking** 74:20
**married** 11:11
**Mary** 62:10 75:24
**master's** 11:23 12:10, 14,18,21
**Mcdonald** 43:18 51:23
**meaning** 60:24
**means** 74:7
**meet** 60:18 97:21 98:2 106:9,15,23
**meetings** 60:23 61:21
**Mekelle** 50:8 58:4 97:11
**memory** 57:22
**memos** 100:1
**mention** 62:6
**mentioned** 65:11 72:1 82:9 85:13
**Mia** 39:2
**Michigan** 37:17
**middle** 77:14
**mind** 31:1 109:5
**minds** 74:11
**minimum** 97:19
**minute** 104:16 105:12
**minutes** 105:10
**missed** 30:16
**missing** 57:25
**mission** 23:2,25 24:1,6 25:2

**missions** 23:3,7,9,11, 12,13 24:3
**mixed** 18:21
**money** 25:17
**monthly** 22:12
**months** 14:8 18:23,24 20:6 26:13,14,23 34:22 36:16 45:21 49:10
**Mormon** 21:24
**morning** 50:14
**move** 17:19 40:7 45:19
**moved** 7:15 13:12,13 14:3 15:2,15 25:13 35:6 55:9
**movement** 25:19
**movies** 22:5
**moving** 31:18
**multiple** 62:4
**Myers** 38:25

___

## N

**names** 47:14,18
**Natalie** 47:15 48:2,7
**Natalie's** 47:16
**national** 40:6,9 58:11 59:4,18,19 106:15
**nationality** 29:25
**necessarily** 72:8 100:14 106:22
**needed** 44:10 51:9 63:3 90:3
**Nester** 62:10 75:24
**newest** 96:7
**NH** 59:17,18
**NHP** 59:19
**NHPCO** 58:10 59:3,10 63:14,15
**Nickerson** 25:25
**Nikki** 66:12,24
**nondiscrimination** 99:4
**noon** 42:10
**note** 86:4
**notes** 85:17,20,25 86:13,15,20 87:14,20 88:2,3,5,15,19
**notice** 57:13
**number** 17:11 57:14 61:3 77:21 79:11

108:10,21
**numbering** 61:10
**numbers** 93:23
**nurse** 53:14 62:16
**nurses** 53:11
**nursing** 36:22

**O**

**object** 8:22 9:21
**Objection** 30:7 63:25
64:5 73:9 78:19,22
83:4,15 85:14 100:22
102:14
**objections** 5:24
**observant** 104:3
**observed** 65:12
**observes** 90:11
**occurred** 86:5 99:21
**occurs** 106:7
**office** 28:13 29:3,14
37:23 38:4,10 53:16
86:8 89:25 104:19
106:17 107:11
**officer** 21:4 25:24 62:7
75:22
**officers** 60:14
**Ogden-weber** 12:23
14:19 16:14
**on-porting** 53:25
**on-the-job** 30:19
**online** 56:21 91:16,17
95:1
**open** 89:17,21,22
**opening** 37:17
**operating** 21:4 25:24
**operator** 13:5
**opinion** 102:16
**opportunity** 64:18,21,
25
**opposed** 5:13
**Optimal** 38:18 40:13,20
**order** 22:11
**Oregon** 37:14
**organization** 14:21,22
16:3 18:6 20:20 25:8
58:12 59:5,19
**organizational** 20:25
**orientation** 15:12 28:2
30:1 32:3,4

**original** 81:24 82:2
**originally** 10:9 38:20
55:8
**outlined** 97:2
**overcome** 73:17
**overly** 9:16 73:10
78:19,22 83:4 85:14
100:22
**oversight** 32:13 41:24
**owned** 34:14

**P**

**p.m.** 93:17 105:13
110:21
**paid** 103:4 104:23
**pantry** 14:23
**paragraph** 62:22 77:13
**Pardon** 23:6
**part** 8:15 29:22 30:1,16
33:13 34:16 49:3 58:1
61:18,22 68:14,16
82:16 87:10 94:2,21
96:21
**parts** 17:7
**past** 62:8,18
**patient** 36:24 59:15
**patients** 36:15,21 53:9
**pay** 41:5 79:14
**Paylocity** 92:7,8,12,13,
17,20,24 94:14,15
95:19 97:6
**payment** 45:17
**Payne** 43:16 46:7,14,
16,19 47:9 48:13 50:5,
6,25
**payroll** 43:9,14 45:5,
13,15 92:17
**pending** 5:23
**people** 15:13 19:18,20
22:10 25:15 27:8,9,13
29:23 30:4,10 32:7,11
33:7 35:16 38:12,13
40:11 41:22 43:13 46:1
47:24 51:7 53:9 54:2,
14,23 62:4 65:17 66:1,9
73:14,19 90:1 91:20
101:17,24
**people's** 36:19,20
**percent** 85:9
**performance** 62:25

68:19,22 69:7 71:9,19
72:19 95:3,5,10,14,15,
16
**performed** 55:24
**period** 10:20 46:6 95:7
103:16 104:9
**periodically** 60:18
**person** 15:11 17:12
34:19 44:9 50:9 62:6
64:22 65:16 75:15 76:4
80:8,9,12 84:11 85:2,3
89:3 106:23
**personal** 9:1,8 30:19
64:9,10 86:4
**personally** 9:15
**personnel** 21:18 44:21
69:1,2,5,9,11 70:10
95:19
**perspective** 17:1 23:24
60:5 70:16
**perspectives** 53:24
**pertained** 54:21
**pervasive** 84:13
**Phoenix** 10:19 11:25
12:11
**phone** 105:4 106:20,24
**phrase** 33:10
**pick** 93:14 105:5
**pilot** 23:10
**pilots** 23:2
**PIP** 69:7
**place** 7:25 33:16 55:11
56:20,24 57:4 58:2
68:20 77:15 81:10 89:3,
7 92:6 98:14 100:20
103:14 104:21 105:24
**places** 90:1 100:6
**plaintiffs** 6:12
**plan** 23:11 37:1 42:11
68:23 69:8
**planning** 23:2,12,25
24:1 25:2 42:17
**plans** 68:19
**platform** 25:10,12
27:19
**plow** 42:19
**point** 37:1 42:15 56:16
63:22 64:13 70:9 75:14
78:13 109:6,10
**policies** 7:25 8:1 27:25
31:25 52:1 56:4,6,7,11,

25 57:11,12,24 58:10,
12 59:2,8,11,12,14
60:19 62:1,14 67:6,10
73:23,24 78:14,21 79:1
81:6 90:7,23 91:4,6,10,
11,21,23 92:5,7,10,17,
23 93:3,19 94:3,11,18,
23 96:3,7,15,23 97:2,3,
10 99:10 100:9,19
101:1,4
**policy** 52:4,8 57:15,16,
17 58:7,9,17,18,22
59:22,24 60:6 61:18
63:4,7,11,13,16 64:19
67:17,18,21 74:4,8,18
75:2 77:17 79:3 81:10,
15 91:4,23 92:1 95:23
96:9 97:25 98:11,14,25
99:5,15 100:4,14
102:23 105:16
**pool** 25:15
**portion** 63:12 94:5
**position** 14:6 18:17
19:2 20:9,13,16 26:8
27:6 31:2 33:24 35:9
36:5,9 40:7 41:1 44:22
45:4,11 46:13 49:1
51:3,14 55:9,16,20
**positions** 28:5 31:19
53:6,21 54:5
**positive** 62:20
**Possibly** 93:4
**post-high** 11:16
**posted** 92:18
**potential** 71:14
**practice** 88:13 98:11,
15
**practices** 8:2 58:21
96:11,12
**practitioners** 53:14
**preconceived** 78:7
**prefer** 8:17
**premises** 103:19
104:23
**premiums** 45:18
**preparedness** 54:24
**preserve** 5:25 86:20
**president** 7:3,10,16,17
39:25 40:2 57:23 77:24
96:20
**pretty** 15:19 52:21 54:4
56:20 64:7 79:21 91:1

103:17
**prevention** 99:4
**previous** 100:15
**printed** 91:18
**prior** 19:3 56:11
**privilege** 6:2
**problem** 95:4 96:24 109:19
**problems** 62:24
**procedure** 78:2 90:15, 16 102:9,10,11,21
**procedures** 31:25 63:1 90:17 92:18
**proceed** 9:4
**process** 21:14 25:8 53:1 57:2 58:5,23 59:7 63:18 65:19 68:6,10 78:15 79:22 90:21 95:24 98:5 102:4 110:4
**processes** 21:5,7,15
**produced** 56:7
**productive** 109:23
**products** 22:12
**program** 16:15 20:3 44:7 54:23 92:12 107:9
**programs** 14:24
**progressive** 52:4,8 53:1 67:14,18,21,23 68:1,5,9 98:5,9,10
**prohibit** 73:2,5
**prohibited** 73:6
**project** 62:5
**promote** 48:25 49:19, 20
**promoted** 36:2 41:10, 11,12,14 44:22 46:17 47:20
**promoting** 41:8,9
**promotion** 35:17,19,21 49:25
**promotions** 79:17
**promptly** 78:4
**property** 87:19
**protect** 30:5,10
**protected** 30:3 73:3 81:7 84:24
**protects** 29:23
**provide** 29:4,11 36:14, 17 70:14 95:12

**provided** 72:16 101:7
**providers** 53:9
**provision** 81:4
**pull** 98:24 102:22
**punch** 13:5
**purchased** 27:1,7 58:10
**purpose** 52:22 95:10
**purview** 9:18 46:24
**put** 7:24 17:22 29:14 37:1 51:7 56:24 57:16 58:13,14 68:20,22 69:5, 9 77:18 86:4 92:6,7
**puts** 57:14
**putting** 55:15

---

## Q

**qualify** 36:25
**quality** 57:23 60:16 96:20
**question** 5:14,19,22 6:3 8:20 19:24 24:18 32:25 44:9 80:19 91:22 99:24 106:2
**questions** 5:18 8:25 44:10,13,16 46:22 60:11 64:21,23
**quickly** 8:6
**quit** 49:20

---

## R

**race** 29:24
**raise** 8:16 49:25
**raised** 11:12,17
**raises** 51:5,7
**raising** 13:1
**rang** 105:4
**read** 24:17 63:6 74:4 91:10 94:20 95:23 96:1
**reading** 64:10
**real** 79:23,24
**realize** 8:20
**reason** 5:12 8:16 32:7 49:17 50:1 51:4 56:17 60:21 65:21 70:18 71:2, 6 75:20 78:8 102:17 105:3
**reasonable** 84:11

**reasons** 56:18 82:8
**recall** 61:4,6,12
**receive** 15:17 29:7,10 63:22 64:2 82:19,21
**received** 12:14 17:4 35:17 50:11 64:8 82:24 88:5 94:20
**receptionist** 43:19
**recess** 42:4 93:17 105:13
**recognize** 71:14
**recollection** 5:8
**recommend** 20:1
**recommendation** 29:2
**recommendations** 60:11
**recommended** 54:22
**reconnect** 104:15
**record** 4:9 5:25 8:9 9:24 24:16,17 42:3 59:23 68:25 69:5 74:23 81:22 83:9 93:24,25 99:8 108:15 110:20
**recording** 21:23
**recruiter** 32:21 43:10, 18 46:16,17 51:21
**recruiting** 39:2 43:10, 17 46:18
**red** 70:16 71:14
**reduction** 14:10
**referenced** 91:3
**referred** 36:23
**referring** 87:15
**refresh** 5:8
**refused** 49:5 80:13,19, 23
**related** 4:18
**relations** 15:16 27:24 32:3
**relationship** 79:9,15 80:8,9,12,17
**rely** 102:1
**remedied** 53:1
**remember** 4:17 6:14,16 14:12,16 18:8 26:12,19 28:9,10 31:11 34:4 36:7 40:4 41:11 47:14,17 53:19 54:13 55:3 56:23 61:13 63:5 65:25 66:2, 13,15,18 76:11,18 83:6, 11,14,18 87:6 88:3 90:6

92:10 107:12
**renew** 24:13,22
**reorganizing** 21:5
**repeat** 30:17 104:15
**repeated** 97:20 98:2,4
**repetitive** 101:13
**report** 28:11 34:11 43:3 45:10 90:13 99:20,22 100:2,5
**reported** 27:14 28:12 34:15,16,20 35:24 43:22,23,24 79:8
**reporter** 5:11 108:12
**reporting** 34:13 47:25
**reports** 43:6,9,11,12,20 44:3
**represented** 71:11
**request** 35:21 77:15
**requested** 35:17
**require** 104:4
**required** 25:5 57:2,15 77:16 91:10,12
**requires** 104:5 105:23
**reschedule** 109:2 110:2
**research** 17:7,9 65:14
**resign** 25:18
**resigned** 18:7 51:3,14 79:20 80:3,24
**resolution** 6:15 95:4
**resources** 57:8 63:12 77:24 107:5
**respond** 85:19
**response** 60:21 94:8
**responsibilities** 15:3,8, 15 32:9,12,14 33:4,7, 11,12,21 35:16 40:16 41:21,25 54:8,14,25
**responsibility** 19:24 24:4 71:22 75:5
**responsible** 21:6 27:23 32:1 33:15 44:6 54:18, 19,20 62:13 79:16 107:8,15,16
**rest** 103:2,4,7,9,11,13, 17,23 104:1 108:9 110:12,16
**restate** 5:19
**resumed** 93:6
**retaliated** 73:21

**retaliating** 30:11
**retaliation** 30:6 71:15 72:2 73:1,2,5,7 75:7 81:4,7,15
**retire** 31:16
**retired** 5:3 7:6,21 48:5
**review** 57:3 59:14 60:10 74:8 95:6,8 106:8
**reviewed** 78:16
**reviewing** 71:1
**reviews** 95:5,6,11,17
**revised** 81:25 82:4
**right-to-sue** 87:9
**rights** 29:23 30:3
**risk** 108:11,14
**RNS** 53:13
**role** 7:1,5,25 19:19 35:1,6 39:21,24 40:5,8 61:23 71:1
**roles** 7:13 40:15
**romantic** 79:8 80:12,17
**room** 104:24
**rose** 72:4 83:22 84:3,8
**roughly** 23:18
**Rule** 8:10
**rules** 5:7
**run** 62:7,18 92:17
**Ryan** 88:4
**résumé** 23:20

**S**

**Saints** 21:23
**Salt** 37:21 38:2
**sandwich** 104:10
**Sandy** 43:14,23 44:4,6, 11,15,16,23,24 45:24 46:4,23 47:1,2,4 48:10 76:8,11,15,19 83:2,8,14
**Sandy's** 44:21
**scheduled** 110:14
**scheduling** 9:6 109:9
**school** 10:22,25 11:2, 10,16 16:12
**schooling** 64:9
**schools** 18:20 19:15, 17
**scope** 8:19
**screen** 56:5 57:9 59:22 67:15 68:3 74:17 81:5,

18 90:9 91:24 96:16 97:16,17 101:6 102:8
**scriptures** 18:25 19:4,8 20:11,14 21:20,22,23 22:15 25:6,21 26:6,9
**scrolling** 78:3
**search** 88:5 92:2,4
**season** 51:6
**sec** 110:7
**secret** 24:1
**section** 95:3,22
**sections** 72:17
**security** 17:11 24:2,9, 11,13,19,20,22,25 25:2
**sell** 52:22
**seminars** 16:4 64:9
**send** 58:1 60:20 70:19 75:21 106:20
**sense** 9:6 41:25 58:25
**sentence** 65:5
**separate** 90:23 97:13
**separately** 8:14
**September** 81:24
**seriousness** 68:4
**server** 88:25
**services** 36:14,18,25
**set** 56:6 58:9 97:10
**severe** 106:13
**severity** 105:23
**sex** 101:9,21
**sexual** 30:1 52:23 82:10,12,19 83:7,25 84:12,16 99:11,15,18 100:3 101:7,11,15
**sexually** 82:22 83:2,12, 21
**Shannon** 32:20 46:2,4
**share** 56:4 74:17 81:18
**she'll** 42:8,13
**ship** 22:12
**shipped** 22:7
**shipping** 21:12,14 22:6
**short** 10:20 20:7
**shortly** 17:17
**showed** 90:18
**shows** 22:10
**side** 54:22 62:15 65:1 77:7,8 80:21 85:3
**sign** 49:5 91:12 94:19

100:3
**signed** 49:4 91:15 94:22,23
**similar** 67:19
**simple** 72:11
**single** 78:23
**sit** 85:25
**situation** 17:22 52:5 71:13 72:14 77:12,22 79:3,4,6,12 80:10 85:4 98:8,18 106:3,9,10,21
**situations** 6:6
**size** 40:14
**skipping** 30:25
**small** 27:5 40:11
**So-and-so** 76:24
**social** 17:11 53:14
**software** 23:12 24:4,6
**sole** 52:22
**solely** 62:1
**sort** 44:2 84:25 86:7
**sounds** 42:21 79:23
**speak** 73:19 88:8
**speaking** 108:22
**specialist** 33:23 43:15, 21 54:12 66:22
**specialists** 34:1,6 71:4
**specific** 63:7,16 88:21 94:23 97:9 98:10 99:14
**specifically** 22:3 34:18 41:9 70:25 92:9 95:14 104:2
**speculative** 17:23
**speed** 21:16
**spell** 4:8
**spending** 109:20
**spread** 40:12
**staff** 48:1 53:15,16 55:8
**stand** 107:6
**standard** 15:15 71:11 88:13
**Starnik** 28:12
**Starr** 57:23
**start** 5:6,15 7:18 8:22 10:4 11:15 13:1,4 35:15 44:19,23 46:7
**started** 15:2,21 21:22, 25 31:18,20 32:5,16 34:22 35:14 36:12 37:2

38:6 45:6,9,11,12,21,25 46:17 49:6 80:6
**starters** 31:20
**starting** 20:24 31:17
**starts** 67:15 75:4
**state** 4:8 10:20 104:4,5
**statement** 74:1
**states** 15:14 17:6,14 40:12 104:2
**stating** 102:2
**stationed** 11:7
**status** 88:10
**stay** 81:10
**stayed** 13:11 56:20 87:21,24
**step** 98:10 104:8,20 105:2
**Stephen** 31:10
**steps** 21:13
**stop** 42:12
**stories** 22:2
**story** 65:1 77:8,9 80:21 91:14
**stray** 8:22
**streamline** 21:15
**streamlining** 21:5,8
**stuff** 49:24 66:2
**subject** 86:9
**submit** 60:9
**subscriptions** 22:11
**Subsection** 97:18
**successful** 56:2 73:15
**sugar** 42:7 93:10
**suggesting** 8:21
**suggestions** 70:19,20
**Suncoast** 99:12
**supervision** 45:20
**supervisor** 17:15 18:1 25:23 47:21,22 69:13 70:20,21 72:16 77:14, 22 78:9 79:9 84:22 95:13 106:8,17
**supervisors** 72:17 73:17 107:18
**supplies** 68:10
**support** 17:2 57:11,14 74:19
**supporting** 58:17
**supposed** 52:16 103:6

**suspension** 68:12
69:24
**sworn** 4:4
**system** 34:14 54:17
58:4 89:19 92:6,13
94:12,16 95:20 97:6,9,
12,13 99:12 109:21

---

**T**

**T-Y-B-** 22:24
**T-Y-B-R-I-N** 22:25
**taking** 11:15 24:6
42:15 83:23 103:13
109:4
**talk** 44:14 50:12 79:12
85:5 90:5 101:21
106:19
**talked** 39:13 78:15 80:9
86:1 89:16,20 90:1
102:4,10
**talking** 22:6 23:7,9
47:7 49:14,17 50:1 68:7
72:22 76:12 78:23
88:16 93:19 101:8
**talks** 95:4,21,22 96:16
102:8 103:1,3 108:11,
13
**Tammy** 66:10,17,20
**tapes** 21:25 22:8,9
**taught** 15:23 99:17,19
**team** 54:24 60:10,13,25
61:19,22 63:19 78:17
**technology** 27:2 110:2,
17
**telling** 49:6
**template** 67:7
**temporary** 18:17 20:9
55:8,14,19,25
**Ten** 4:21
**tend** 9:15
**tenure** 31:5 39:18
67:21 81:11 82:18
**term** 107:2
**terminal** 36:14
**terminated** 18:5 50:23
79:19 98:20,23
**terminating** 17:20
**termination** 68:12
97:23 105:23 106:8
**terminations** 106:13

**Testament** 21:24
**testified** 4:5 6:7
**testify** 6:17
**testifying** 5:1 7:2 9:13,
19
**Texas** 37:15
**thing** 9:11 16:9 32:10
66:25 67:2 89:20 92:18
106:1
**things** 15:12,16 16:4
18:21 21:17 22:7 30:3,
25 34:17 44:2 45:15,16,
18 46:12 47:24 52:19,
24 55:10 68:24 71:16,
25 72:10,12,20 73:17,
18 79:14 82:17 84:15
89:6 104:3
**thinks** 42:9
**thought** 36:10,15 49:7
84:16
**thousand** 7:22 22:19
48:17
**Thursday** 109:15
**Tim** 25:25
**time** 7:11 9:6 10:18
12:20 15:9 17:15 18:2
22:9 31:3 32:1,5 34:2,
14 35:2,3,24 37:5,14
45:14 46:6 47:25 54:2
57:20,21 61:1,17,24
77:25 85:9,19 86:1,3,25
87:1 97:22 104:23
109:4,9,20,24
**times** 4:15 9:13 41:11
61:11 68:4 72:21,24
75:25
**title** 13:13 16:9 24:7
25:21 29:18,21,22
30:13 31:20 32:8 35:11
41:4,5 43:15 53:18,19
54:9,11,13 66:23 72:5,9
73:4 83:23 84:3,8
**titles** 32:9 34:5,9
**today** 5:21,25 8:15
37:13 42:17 51:24
57:19 109:10
**today's** 8:9
**told** 17:15,18 25:20
49:2,23 50:12 51:5,8
80:10 94:12 100:2,7
**tomorrow** 109:13

**tool** 13:14 14:3,4,8
**tools** 21:16
**top** 7:23 12:5 24:1
66:15 82:13
**topics** 8:19,21,25 9:22
**train** 72:11 89:15,18
99:9
**training** 15:17 18:18
19:9 20:20 27:24 29:4,
7,10,11,13,18 32:3
44:10 63:22 64:2,8
72:14,16 90:3,4 99:12,
14,16,25 100:4,6
**trainings** 30:20
**transcript** 5:11,16
**transfer** 95:7
**travel** 49:2
**treat** 77:4
**treatment** 37:1
**treatments** 109:14
**trial** 6:17
**trouble** 70:17
**Tybrin** 22:23,24,25
23:15 24:7 25:1 26:8,9,
10,16,25 27:1,9,21
28:17,19 30:22
**type** 21:9 53:16 54:5
71:25 72:3 73:7 81:8
94:3
**typed** 60:5
**types** 14:24 23:3,23
53:2,5 69:20
**typical** 15:14
**typo** 56:19

---

**U**

**U-L-I-B-A-R-R-I** 18:4
**UALD** 77:1 87:12
**uh-huh** 5:13 75:19
**Ulibarri** 18:2,4
**ultimately** 44:6
**Um-hum** 17:24 28:24
**unaware** 87:4
**underneath** 46:1
**understand** 53:7 80:20
110:13
**understanding** 29:20
30:12 81:6 109:10
**understood** 5:20

**unethical** 17:17
**unh-uh** 5:13
**United** 15:14 17:6,13
40:12
**University** 10:19,20
11:25 12:11
**unprofessional** 49:7,
16
**unstable** 108:25
**unwelcome** 75:6,11
**uplifting-type** 22:2
**upset** 49:18 50:15
**urgency** 105:23
**urgent** 106:13
**Utah** 10:4,11,12 11:2,
13 27:16,17 28:4,6
37:10,15,18,20 104:4
107:10

---

**V**

**vague** 57:22 63:25 64:5
73:9 83:15 102:14
**Valerie** 107:12
**Valerie's** 107:13
**valid** 17:9 70:18
**valuations** 79:16
**verbal** 68:10,24
**verbiage** 74:1,2,14
**verification** 65:18
**verified** 65:7,15
**verifying** 65:9
**versions** 73:22,24
**VHS** 22:9
**vice** 7:3,10,16,17 39:25
40:1 57:23 77:24 96:20
**videos** 22:8,10
**viewed** 95:13
**VII** 16:9 29:18,21,22
30:13 72:5,9 73:4 83:23
84:3,8
**violating** 84:3
**violation** 68:5 83:23
84:8
**violations** 98:4
**VP** 34:15 38:24 40:17,
23,24,25 41:15,20 43:5,
7,8 60:16

## W

**W-4S** 15:13
**W-E-R-T-Z** 4:11
**waiting** 109:20
**walk** 101:17,18
**walked** 104:25
**Walton** 27:12
**wanted** 9:23 42:20 44:14 49:25 73:12,19 91:18 92:3 104:10
**warning** 63:1 68:10,11, 12 69:10,14,20,25 70:10 98:21,22
**warnings** 68:18,24 98:13,19
**warranted** 67:23
**warrants** 77:23 106:7
**watch** 101:25
**Weber** 10:20
**websites** 64:11
**weekly** 60:22,23
**weigh** 83:22
**Wertz** 4:3,8,10,12 8:11, 14,17 94:9
**Wertz's** 8:23
**Wifi** 96:24
**wiped** 88:14 89:2
**witnesses** 77:11 85:4,5 106:10
**wondering** 110:14
**word** 71:10 76:18 81:12 91:5
**work** 4:18 15:14 17:6, 13 18:20 19:16 23:17 26:7 36:19 37:22 38:6, 7,14 41:4 44:3 46:1 70:13 79:17 86:10 101:11,14,20,22 109:11,12,21 110:2
**workday** 103:5
**worked** 14:6 22:23 24:12,13,21,23 25:1 27:16,17 37:14 38:9,15 41:22 44:18,24 45:13 46:3,4,20 54:24 62:14 66:14 89:19 90:2 104:19
**worker** 84:21
**workers** 53:14

**workers'** 20:22 27:23 32:2 43:24 45:17 46:11 47:23 54:20
**working** 12:20,23 26:1 27:3 32:17 44:23 45:7, 9,12,21,25 46:8 65:17 110:18
**workman's** 44:1
**workplace** 83:3
**workplace-related** 75:8
**works** 93:13,16
**workshops** 16:5 29:14
**write** 27:25 56:7 60:4 61:25 63:10 70:3 82:1 85:17,25 86:15 94:7,9 97:25 105:21
**writing** 7:25 64:23 69:3,6 70:18 71:2,6 76:25 77:16,18 85:20
**writings** 67:10
**written** 57:11 64:11 68:11,18 69:10,14,20 70:9 98:12,14,19,21
**wrote** 59:25 61:18 67:6 75:2 78:16 105:19

## Y

**year** 7:18 12:4,12,13,17 13:8,9 14:9 18:8 19:1 20:4 22:16,17 23:16 26:20 35:5,10 36:8,12 37:8 39:17,22 48:4,5 49:11 55:3 56:17 66:3 74:9 100:4
**year-ish** 13:23
**yearly** 95:8
**years** 4:20,21,23,24 6:7 7:9,20,21 12:16 13:20 15:6,7 22:4 23:14 26:13 30:14 34:23 37:9 45:3

## Z

**zoom** 5:10 24:15 93:14 110:19

In the Matter of:

GRAHAM

vs

BRISTOL HOSPICE HOLDINGS, INC.


BRISTOL HOSPICE HOLDINGS, LLC (DEBRA WERTZ V.2)

January 10, 2024



P.O. BOX 3265
SALT LAKE CITY, UT 84110
385.707.7254

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION


ELIZABETH GRAHAM,        )
                         )
     Plaintiff,          )
                         )
vs.                      )   Case No. 2:21-cv-00754
                         )
BRISTOL HOSPICE          )
HOLDINGS, INC.,          )
                         )   Hon. Ted Stewart
     Defendant.          )



     Zoom Videoconference 30(b)(6) Deposition of:

          BRISTOL HOSPICE HOLDINGS, INC.

               By:  DEBRA WERTZ
                    Volume 2

                    -and-

     Zoom Videoconference Deposition of:

                    DEBRA WERTZ
                    Volume 2



          January 10, 2024 * 1:01 p.m.


               Witness Location:

          1465 West 2500 South
               Syracuse, Utah


     Reporter:  Susette M. Snider, CSR, CRR, RPR

1               A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3               HOLLINGSWORTH LAW OFFICE, L.L.C.
                April L. Hollingsworth
4               Whitney Nelson
                Attorneys at Law
5               1881 South 1100 East
                Salt Lake City, Utah 84105
6               Tel:  801.415.9909
                april@aprilhollingsworthlaw.com
7
     FOR THE DEFENDANT:
8
                KIRTON & MCCONKIE
9               Ryan Frazier
                Attorney at Law
10              50 East South Temple, Suite 400
                Salt Lake City, Utah 84111
11              Tel:  801.328.3600
                rfrazier@kmlaw.com
12
     ALSO PRESENT:
13
                Elizabeth Graham
14              Oghenetega Euveyan

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2  DEBRA WERTZ:                                    PAGE

3    Examination by Ms. Hollingsworth............... 117

4    Examination By Mr. Frazier..................... 229

5


6                  E X H I B I T S

7  NUMBER              DESCRIPTION                  PAGE

8       8  Offer Letter, BH 52. ....................... 120

9       9  Position Description, BH 82-84.......... 122

10     10  Performance Evaluation, BH 85-88........ 125

11     11  Performance Evaluation, BH 89 to 92...... 127

12     12  Matter of Record, BH 31-44.............. 129

13     13  February 14, 2017, email from Lisa ...... 157
           Graham to Rich Dahlquist, GRAHAM
14         152-153

15     14  UALD Employment Discrimination Intake ... 167
           Questionnaire, GRAHAM 164-173
16
       15  Charge of Discrimination, GRAHAM 232..... 180
17
       16  Charge of Discrimination, Bates ........ 181
18         unreadable

19     17  UALD Employment Discrimination Intake ... 185
           Questionnaire, GRAHAM 1223-1229
20
       18  Request for Withdrawal of Charge of ...... 193
21         Discrimination, GRAHAM 664

22     19  July 5, 2018 email from Debra Wertz to.... 194
           Kelly Binninger, GRAHAM 697
23
       20  Job Description, BH 383-384............... 197
24
       21  August 10, 2018, offer letter, BH 382. .... 198

25

```
 1              E X H I B I T S (Continued)

 2    NUMBER              DESCRIPTION                    PAGE

 3       22   July 12, 2018 email from Debra Wertz to . 202
             Lisa Graham, GRAHAM 695
 4
         23   Document titled "Meeting with Faith ....... 204
 5           Myers: Christie Franklin s Office:
             Tuesday, July 10, 2018 1:45pm
 6           4:00pm:," GRAHAM 690-693

 7       24   July 13, 2018, Termination letter, BH ..... 205
             353 to 354
 8
         25   Hearing transcript, GRAHAM 1-41. ......... 217
 9
         26   (not identified)........................ --
10
      27   November 28, 2018 letter from Melany
11         Zoumadakis to To Whom it May Concern,
             GRAHAM 740................................111
12
         28   Document entitled "Complaint...............223
13           Investigation February 2018 Summary,"
             GRAHAM 458
14
         29   February 15, 2017 email from Debra ........225
15           Wertz to Rich Dahlquist, BH 960-962

16       30   February 10, 2017, email from Lisa .......227
             Payne to Debra Wertz, BH 971
17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3                    DEBRA WERTZ,

4            having been first duly sworn,

5        was examined and testified as follows:

6

7                    EXAMINATION

8    BY MS. HOLLINGSWORTH:

9        Q.    Okay.  I think yesterday we ended off

10   talking about Exhibit 7, which is Graham 17 -- 715

11   and 716.

12            And there was a paragraph I was -- I think

13   I was trying to talk about when we kept losing

14   connection where it talks about putting employees on

15   administrative leave with pay when there's a risk to

16   patients, families and coworkers.

17            Do you remember that?

18       A.    Yes.

19       Q.    So have you ever put employees on

20   administrative leave with pay pending an

21   investigation?

22       A.    Yes.

23       Q.    In what situations?

24       A.    Well, any situations where we felt like

25   either it would be too uncomfortable for the employee

1    themselves, the one that was being investigated, or

2    **if it** would have been difficult for the person who

3    filed the claim.  If there was any kind of risk as

4    far as physical risk to patients or other employees,

5    then we would have put them on administrative leave.

6         Q.    Okay.

7         A.    We might have also done **it if** we felt like

8    the investigation was going to take a long period of

9    time, and so **it** would have just been too

10   uncomfortable for the employee, meaning the --

11        Q.    Okay.

12        A.    -- person who was accused.

13        Q.    Okay.  And why do you put them on leave

14   with pay?

15        A.    Why do I put them on leave with pay?

16        Q.    Right.

17        A.    Because at that point they are not -- we

18   haven't found more likely than not whatever happened

19   happened, and so we keep them -- and because we're

20   having them leave the workplace, we pay them during

21   that time.

22        Q.    Okay.  And can you give me some examples

23   of situations where you've put employees on leave

24   with pay while an investigation was pending?

25        A.    I couldn't give you an exact example

1  because I just don't remember that far back.  I would
2  say -- I'm trying to -- sorry.  I'm trying to think
3  back on some possible examples of when that might
4  have happened.
5              There was an incident in California where
6  a gentleman was accused of sexual harassment towards
7  employees of a facility.  It wasn't towards our own
8  employees.  And so we put him on administrative leave
9  with pay so that we could do the investigation and he
10 wouldn't be in the same area as those individuals
11 that had filed the claim.
12      Q.    Okay.  And what was the ultimate
13 resolution of that situation?
14      A.    He was terminated.
15      Q.    Okay.  How long did the investigation
16 take?
17      A.    Oh, I'd say it probably took about four
18 days.
19      Q.    Okay.  All right.  So you were -- so I
20 think we've covered the policies.  You were
21 designated as a 30(b)(6) witness to talk about
22 policies, Lisa Graham's job duties, her performance,
23 her reasons for termination and complaints made to
24 the UALD and -- about -- and complaints about you and
25 Sandy Dayton.

1              Are you qualified, then, and educated
2    enough to discuss all of those topics?
3         A.    As far as I remember, yes.
4         Q.    Okay.  All right.   So let's talk about
5    Lisa Graham's job duties.   And I've got an example,
6    so this will be Exhibit 8.
7              (EXHIBIT 8 WAS IDENTIFIED.)
8              MS. HOLLINGSWORTH: I don't know that it's
9    letting me share my screen.   Is there anything that
10   you have to do, anything on your end, Susette?
11             THE REPORTER:   No.
12             (A discussion was held off the record.)
13        Q.    (By Ms. Hollingsworth)    You sent
14   Ms. Graham an offer in February of 2016, correct?
15        A.    I don't know the exact date, but I would
16   have given her a letter of offer, yes.
17        Q.    Okay.  And she was going from a temp
18   employee to permanent employee, right?
19        A.    Yes.
20        Q.    And so as a temp employee, had she worked
21   for -- was she an employee of Bristol Hospice or was
22   she an employee of a temp agency?
23        A.    She was an employee of a temp agency.
24        Q.    Okay.  So then in February -- so starting
25   February 2016, she became an employee of Bristol

1    Hospice; is that correct?

2         A.    As far as I know, yes.

3         Q.    Okay.  Actually,  in  the  offer  letter  which

4    I can't show you right now, it says her start date

5    would be April 1, 2016.  Does that sound right?

6         A.    That sounds about right.

7               (A discussion was held off the record.)

8         Q.    (By Ms. Hollingsworth)    Okay.   So we have

9    this  offer  letter  from  you.   This is Exhibit 8.   And

10   as I said, it talks about the start date being

11   April 1, 2016, and the benefits and everything.

12              And  at  what  point  do  you  give  employees,

13   like,  a  job  description  that  tells  them  what  they're

14   going  to  be  doing?   Is  that  with  an  offer  letter  or

15   once  they  start  working  full-time?

16        A.    During  new  hire  orientation,  they're

17   always  provided  a  copy  of  their  job  description.

18        Q.    Okay.   And  I  assume,  even  though  she'd

19   been  working  as  a  temp,  she  had  to  go  through  new

20   hire  orientation  once  she  started  working?

21        A.    She  did.

22        Q.    And  what  --  other  than  the  job

23   description,  what  document's  do  you  provide  new

24   employees  during  their  new  hire  orientation?

25        A.    She  would  have  all  of  the  major  policies

1   that we would have.    She would have the employee
2   handbook, the I-9, the W-4.    And I think that's about
3   **it.**
4          Q.    Okay.
5          A.    There might be more.    There was probably
6   20-something documents.
7          Q.    Okay.  All right.    So now I'm going to
8   show you what I've marked as Exhibit 9.
9                (EXHIBIT 9 WAS IDENTIFIED.)
10         Q.    (By Ms. Hollingsworth)    And this is -- we
11  have this as the position description for an HR
12  benefits generalist.    Did you write this document?
13         A.    Yes.
14               MS. HOLLINGSWORTH: So this **is,** for the
15  record, a three-page document.  **It's** BH 82 to BH 84.
16         Q.    (By Ms. Hollingsworth)    And so where do
17  you come up with, like, the requirements for the job
18  summary and the requirements for the job?
19         A.    Well, I would determine before we even
20  posted the job what the responsibilities were going
21  to be.  So in this particular case, I designed the
22  job description so that the individual would have the
23  day-to-day responsibilities of those areas that
24  applied to employee health.
25         Q.    Okay.  And the employee generalist that --

1  I think you mentioned yesterday that sometimes the

2  generalists are actually focused on a particular

3  area; is that right?

4       A.   Right.   And that would -- that would have

5  been the case in this particular one because the

6  focus, like I said, was on the overall health of an

7  employee -- or of the employees.

8       Q.   Okay.  So is this position description

9  specific to Lisa Graham or just specific to what

10  someone in her role would be doing at the time?

11      A.   It would have been towards what someone

12  was doing at the time.

13      Q.   And I think you said yesterday that you

14  look at position descriptions when you're determining

15  whether someone should be disciplined; is that

16  correct?

17      A.   I look at their job description when it

18  comes to performance, so their performance

19  evaluations, and then, if they are not performing the

20  functions of their job, it could result in

21  disciplinary action.

22      Q.   Okay. And did -- this position

23  description for this HR benefits generalist, was

24  this, like, the same position that whoever was hired

25  to replace Lisa did?

1          A.      Yes.

2          Q.      Okay.  And how would you characterize

3    Ms. Graham's performance when she worked for you?

4          A.      When she was working for us as a

5    temporary, she was starting to learn the position, I

6    felt like she was where she should be for the period

7    of time that she was -- was there.   She -- I would

8    say probably for the first year, maybe a little bit

9    longer, she performed at an acceptable level, or even

10   sometimes she may have exceeded expectations.

11          Then in the end of 2017, we changed our

12   human resources information system, and at that time

13   Lisa started struggling with some of the

14   responsibilities.   She had a hard time learning the

15   system.  She came to me and felt like --

16          Q.      What system are you talking about?

17          A.      The HR -- Paylocity.

18          Q.      Okay.

19          A.      So she was having a hard time with that.

20   She was also kind of struggling with getting her job

21   responsibilities  done.  She didn't feel like she had

22   enough time to do that.   And so I was concerned about

23   her performance.

24          Also during that time we had met -- we had

25   gone to a mediation at the UALD, and we discussed

1    that I had concerns about her performance.   And so

2    when we went back, I sat with her, I sat with her

3    supervisor.    I developed a calendar of what her

4    responsibilities would be, the days she should do

5    them, how much time it should take her.   I based that

6    on how much time it would have taken me or taken her

7    supervisor to do it.

8            She did seem to improve at that time, and

9    at the time we were at the mediation, I told her that

10   I had put off giving her evaluation because I felt

11   like I wanted her to get -- to give her sufficient

12   time to learn the system and to improve before I

13   actually put some concerns in writing.

14           And so she said thank you.   And like I

15   said, when we came back, I gave her that calendar,

16   and she did seem to start to improve after a while.

17      Q.    Okay.

18      A.    She still wasn't quite where she needed to

19   be, but she was improving.

20           MS. HOLLINGSWORTH: Okay.   So I'm going to

21   introduce Exhibit 10.   And this is a job performance

22   evaluation for Ms. Graham for December 2015 to June

23   2016, and this is from -- this is BH 85 to 88.

24           (EXHIBIT 10 WAS IDENTIFIED.)

25      Q.    (By Ms. Hollingsworth)    Is this your

1    signature at the end of it?

2         A.    Yes.

3         Q.    And how often are these performance

4    evaluations  done?

5         A.    They're usually done after their

6    introductory  period,  about  90  days.    Sometimes

7    they're  delayed.    And then they're done on an annual

8    basis from their anniversary date --

9         Q.    Okay.

10        A.    -- after that time.

11        Q.    Okay.  So in this case we saw her first

12   day as a permanent employee was April 1, 2016, so

13   this was her first evaluation, then, right?

14        A.    Yes.

15        Q.    And it looks like you gave her --

16             (A discussion was held off the record.)

17        Q.    (By Ms. Hollingsworth)    76  percent,  and

18   you said that's a meets expectations, right?

19        A.    Correct.

20        Q.    And these comments that are filled in

21   here,  are  these  yours,  your  comments?

22        A.    Yes.

23        Q.    Okay.  So can I assume you agreed with all

24   these comments you put in this evaluation at the

25   time?

1        A.     Yes.

2              MS. HOLLINGSWORTH: Okay.   Okay.   Now let

3    me pull up another performance evaluation.    This is

4    Exhibit 11, and this is BH 89 to 92.

5              (EXHIBIT 11 WAS IDENTIFIED.)

6        Q.     (By Ms. Hollingsworth)    And is that your

7    signature at the end on this as well?

8        A.     Yes.

9        Q.     And this is for 6/16 to 4/2017, and your

10   evaluation of her performance had gone up at this

11   point, right?

12       A.     Yes.

13       Q.     So let's scroll down.   So now she got an

14   84 percent, which is an exceeds expectations,

15   correct?

16       A.     Yes.

17       Q.     And, again, can I assume you agreed with

18   all the comments that are in this comments section

19   here?

20       A.     Yes.

21       Q.     And those are your -- did you input them?

22       A.     Yes.

23       Q.     And so when -- so this was July 2017.

24   When is it you maintain that her performance changed?

25       A.     It would have been in the late fall,

1    early -- early December time frame when we moved from

2    the Kronos HR system and moved over to Paylocity.

3        Q.    Okay.  And you started keeping notes about

4    her performance at that point, correct?

5        A.    Well, I kept notes about just about

6    everything, so I would have kept -- the one thing I

7    would have kept would have been any emails I sent her

8    regarding her performance.   There would have been

9    other emails from her supervisor over benefits asking

10   her to do certain things.   I would be cc'd on those.

11   And so -- but as far as sitting down and saying --

12   you know, and writing a note saying she had poor

13   performance, I wouldn't say that I did that.

14       Q.    Okay.

15       A.    I may have, but I don't remember.  I

16   remember being concerned and talking to her about how

17   long things were taking.   And, like I said, she was

18   concerned because she didn't feel like she had enough

19   time in a week to do all of her job responsibilities,

20   which is why I ended up developing the calendar for

21   her, to try to help her.   And that did seem to help.

22       Q.    Okay.  And is that generally what you'll

23   try and do if you see someone is struggling, is you

24   try and find ways to help them improve?

25       A.    Yes, I would say I would.

1      Q.    Okay.  All right.    Let's look at what I've

2  marked as Exhibit 12.

3                (EXHIBIT 12 WAS MARKED.)

4      Q.    (By Ms. Hollingsworth)    And is this

5  something you wrote?

6      A.    It -- sorry.   I need to read through it.

7      Q.    Sure.

8                MS. HOLLINGSWORTH: Just for the record,

9  this is a 14-page document titled "Matter of Record"

10  to personal journal regarding Lisa Graham from Debra

11  Wertz, and it's labeled BH 31 to -- to BH 44.

12      Q.    (By Ms. Hollingsworth)    So let me know

13  when you want me to scroll down, or whatever.

14                But while you're looking, let me ask you,

15  did you review any documents to prepare for this

16  deposition?

17      A.    No.

18      Q.    Okay.

19      A.    Well, I'll take that back.    The only

20  document that I saw was the claims that she's made

21  right now.

22      Q.    The Complaint filed in court?

23      A.    The complaints of what she is accusing

24  Bristol of doing or me of doing, or whatever, in this

25  particular lawsuit.   But I haven't reviewed -- I

1 didn't have documents that I could review, so no, I

2 haven't.

3     Q.    Okay. All right.  So take whatever time

4 you need to read over this and tell me when you need

5 me to scroll down.

6     A.    Okay.

7     Q.    I can make it bigger, too, if you need it.

8     A.    Okay.  You can go to the next page.

9     Q.    Okay.

10     A.    You can move on.

11     (A discussion was held off the record.)

12     Q.    (By Ms. Hollingsworth)  Okay.  So starting

13 on the last page, there's talk about -- and just

14 above it, it's talking about training Lisa in

15 Paylocity.

16     I didn't see any concerns expressed about

17 her using Paylocity like you mentioned a while ago.

18 Why is that?

19     A.    I couldn't -- I don't know how to explain

20 this.  She had been asked -- this wasn't the first

21 time she was asked to go through the trainings.

22 There was a couple of times that Sandy had asked her

23 to go through them, and Sandy never got a response.

24 And she didn't get it completed, so I followed up

25 with it.

1          It was also obviously -- obvious with the
2    timelines -- we talked about the amount of time that
3    it was taking to do things -- that either she was
4    struggling with Paylocity or struggling in another
5    area.   And I felt like, for her own best interests,
6    that she should complete the training at Paylocity.
7    So that's why.
8          Q.    Okay.  So going back to the beginning of
9    this -- so it ends on February 23, 2018, and starts
10   on November 27th.    And is this all your document that
11   you wrote?
12         A.    If you're asking me if I wrote this
13   document, then yes.
14         Q.    Okay.  Why did you start it on
15   November 27, 2017?
16         A.    I think I got -- I'm not sure exactly, but
17   I believe it was because I was concerned about this
18   conversation that I had with -- with Lisa about her
19   feeling like I was dismissive towards her, the fact
20   that she thought I thought -- she thought I thought
21   she was repugnant and disgusting.    That really took
22   me back quite a bit, because that thought never even
23   entered my mind.  So I felt like, with those kind of
24   accusations, that I should try to start keeping some
25   kind of a record.

1          Now, if you notice, I didn't put something

2    in there every single day, but if it was something of

3    note that I felt I should think about or consider,

4    then I wanted to write it down.

5          Q.    At some point before you started this

6    document, Lisa had made a complaint about Sandy

7    Dayton, correct?

8          A.    I'm not sure exactly when she made the

9    complaint about Sandy Dayton.   I wouldn't be able to

10   tell you if it was before this or after this.

11         Q.    Let me see if I can find it.

12         So this is the third page of the document

13   where she says here -- let me highlight it.

14         Lisa expressed concern that I was treating

15         her differently since she filed the complaint

16         against Sandy and then, later, me.

17         What do you remember about the complaint

18   against Sandy Dayton first?

19         A.    I -- if it's the one I recall, there was

20   an incident early in the morning on one day.   Sandy

21   was over by her cubicle and was talking to her about

22   something.  Her voice was low enough that I couldn't

23   hear what she said.

24         All of a sudden, I heard Lisa yell at her,

25   being Lisa Graham, yell at Sandy saying, You're not

1    going to bully me like other people do.    And then
2    Sandy responded that she wasn't trying to bully her.

3              Then the conversation got low again, and
4    Sandy went back to her office.    A little while later
5    Lisa came in, and she felt like Sandy was creating a
6    hostile work environment.

7              And I said, Well, I'm concerned, because I
8    was sitting right here.    And her cubicle was right
9    outside of my office.    And the first time I heard a
10   voice that was raised, it was actually Lisa's voice.
11   It wasn't Sandy's voice.

12             So I thought, Well, it's kind of across
13   the hallway, so I -- I felt like I needed to find out
14   from others who may have overheard the conversation
15   more of what went on.    And so I talked to Lisa Payne,
16   who -- her office was kind of kitty-corner; I talked
17   with Lisa Anderson, whose cubicle was right next to
18   Lisa's cubicle; and then I talked to Annette -- was
19   it Annette? -- yeah, Annette Beisinger, who was on
20   the other side of the cubicle.

21             So when I got their information, none of
22   them really heard the entire conversation.    They just
23   heard voices raised.    One of the individuals said
24   she -- she felt like that Sandy was being bullying in
25   nature, and -- but the other two said that they were

1   both equally at fault as far as the altercation, that

2   both of them had raised their voices and that Lisa

3   was the first one to raise her voice.

4           And so my findings, as far as the

5   complaint against Sandy, is I couldn't find evidence

6   that I felt like put Sandy in a bullying nature or a

7   hostile work environment.

8           And I did talk to -- I did talk to Sandy

9   after the conversation, told her that it was

10  inappropriate for her to talk to her out in front of

11  other people and -- and that they all needed to keep

12  their voices down and talk in a professional manner.

13          I did explain to her, to Lisa, because --

14  Lisa thought, like I said here, that I was treating

15  her different, and I wasn't.  I never -- and I will

16  say "never" -- have gotten upset when somebody filed

17  a complaint.  As a matter of fact, when Lisa came in

18  and said that I thought she was disgusting and

19  repugnant, I actually requested an investigation on

20  myself.  I had the compliance officer come out and do

21  an investigation to see if the staff felt like that I

22  was being that way and asking if they had any

23  problems with me and things like that.

24          When -- when the compliance officer asked

25  to speak to Lisa, Lisa refused to respond to any of

1  her questions, said that she had never filed a

2  complaint and that she didn't have anything to say.

3          The outcome -- the outcome of that

4  investigation was that the only concerns any of the

5  employees had about me is sometimes they didn't know

6  where I was.  So, like, if I was in a meeting or if I

7  had traveled somewhere, they didn't know -- one of

8  them didn't know where I was.

9          So -- I took those kind of things

10 seriously.  And --

11         Q.    And --

12         A.    -- obviously, I couldn't investigate

13 myself, so that's why I asked the compliance officer

14 to do the investigation.

15         Q.    And who was the compliance officer?

16         A.    Mary Nester.

17         Q.    And so are you -- I think we talked about

18 this yesterday.   Are you aware of any other

19 complaints about you from any employees other than

20 Lisa?

21         A.    About me?

22         Q.    Yes.

23         A.    I don't remember any.

24         Q.    And what about Sandy Dayton other than

25 what was -- what Lisa Graham expressed to you?

1      A.      I had had some concerns come in about

2   Sandy as far as her emails.    Sandy was very concise

3   and precise when she spoke in her emails, which could

4   sometimes come across as curt, and people could take

5   offense to it.    So I -- I was working with her on

6   that, on her communication.

7            I don't -- I don't remember any formal

8   complaints, and when I mean "formal," I mean

9   submitted in writing.    That doesn't mean there wasn't

10  any.    I just don't remember.

11      Q.      What is your understanding of the

12  complaint discussed here on this page on the screen,

13  the third page of Exhibit 12, where it says:

14            Lisa expressed concern that I was treating

15            her differently since she filed the complaint

16            against Sandy and, then, later, me.

17            What was the complaint about you?

18      A.      So the -- what I meant in that particular

19  case was that I was being dismissive and that I

20  thought she was repugnant and that I thought she was

21  disgusting, those kind of -- those kind of

22  allegations.    And it resulted in an investigation,

23  but I'm the one that called the investigation.

24      Q.      Okay.  And is that -- and what was the

25  ultimate outcome of that investigation?

1      A.     Well, the outcome was -- from what I

2  understand from the compliance officer is that Lisa

3  refused to participate in the investigation, and

4  she -- she told her -- and I know -- I'm just telling

5  you what was reported to me -- that she hadn't filed

6  a complaint and she didn't have anything to say.

7           So there was -- I mean, there's a Matter

8  of Record probably in my personnel file or in a -- in

9  a separate file, as long as those records haven't

10 been moved by my predecessors [sic], but the

11 compliance officer probably would have had a copy as

12 well.

13     Q.     Uh-huh.

14     A.     But there was no -- we didn't have any

15 complaints.

16     Q.     So this -- I'm looking at the second

17 paragraph from the bottom where it says:

18           All of a sudden, she broke down crying.

19     A.     Um-hum     (affirmative).

20     Q.     She said that I felt that she was

21        disgusting and repugnant.   I was stunned and

22        told her so.

23     A.     Um-hum     (affirmative).

24     Q.     Is that what you're talking about?

25     A.     Yes.

1    Q.    So that was something that happened in

2    this meeting -- where are we?  This is all about a --

3    a conversation November 16th, right?

4    A.    Yeah.  Yeah.  I was really -- I have to

5    say I really was blown out of the water on that, and

6    that's when she said she thought that I was

7    dismissive.

8          And I kind of explained to her that I was

9    always working on multiple projects at a time.   And

10   she might walk in and just start a conversation in

11   the middle of the conversation, and I never would

12   have an opportunity to check out of what I was

13   working on.

14         So I said, Why don't we, instead of just

15   do these impromptus, actually set up a time so I can

16   make sure that you've got my full attention?   And so

17   we tried that, and it was working pretty good, I

18   felt, in the future.

19         And then as far as the eating food -- she

20   didn't like that I would eat in front of her, so I

21   explained to her that when -- kind of like what I

22   explained yesterday during the deposition, that when

23   my blood sugars drop out, it's not a good thing.   So

24   she would -- she kind of had a habit of always coming

25   in right around lunchtime.  I think she might have

1    thought, That's probably the best time to get her

2    because other people are at lunch, right?    So I would

3    have lunch sitting out or I would grab a snack or

4    something to eat so that -- because, when I get too

5    shaky, I can't think straight.

6              I don't know if any of you have sugar

7    problems, but --

8         Q.    No.   But let me -- let me stop you there

9    and talk about something different.

10             She -- okay.  So in this conversation

11   November 16th is when she breaks down crying and says

12   that you felt -- that she felt that you felt she was

13   disgusting and repugnant, right?

14        A.    Right.

15        Q.    Is that the first time you had heard that?

16        A.    Very first time.

17        Q.    All right.   So let me direct your

18   attention back up to the top of the page to the

19   sentence I've highlighted.   In the same conversation

20   she expressed concern that you were treating her

21   differently since she filed the complaint against

22   Sandy and then, later, me.

23             So this complaint against you had already

24   happened as of this November 16th conversation, so

25   can you tell me what that complaint about you

1    concerned?

2         A.    I have no idea.

3         Q.    Okay.

4         A.    As I was reading this, to me it was the

5    same -- it was the same day that the rest of it broke

6    down.  And I don't know -- I'd have to go -- I mean,

7    I just pretty much scanned it, but, you know, I

8    don't -- I don't know whether the other conversation

9    took place later.   I don't think so, though.  I might

10   have referenced the previous one in this one.

11        Q.    Okay.  So -- and then the next day, a day

12   or two later, you had a conversation with her when --

13   in which you asked her or you told her she should

14   start looking for another job, right?

15        A.    No, I did not say that.   What I asked her

16   is did she think she should start looking for another

17   job --

18        Q.    Well, here --

19        A.    -- because she was consistently coming in

20   and complaining and she was unhappy, and so I

21   asked --

22        Q.    Well, let me -- let me stop you.  I'm just

23   trying to get through this.

24              If you look at the first sentence that I

25   highlighted in the second paragraph from the bottom,

1    you say here -- well, **I'll** read the whole paragraph:

2                    The next day we had another conversation,

3            I don't remember the specifics, but she was

4            complaining again.    I had finally had enough and

5            told her that I thought she should start looking

6            for another job.

7                    So are you telling me now you **didn't tell**

8    her she should start looking for another job?

9            A.    I don't think I said **it** in those exact

10   words.  I think I would have asked **it** in more of a

11   question, whether she thought she should start

12   looking for another job.

13           Q.    So what was your purpose of writing these

14   conversations in this memo?

15           A.    Because I know over time that things can

16   be forgotten and things can be twisted, and **if** you

17   try to remember something, kind of like I'm doing

18   now, five years **later,** you may not remember **it**

19   exactly as you thought **it** happened at that moment.

20   So I would write them while I could -- while **it** was

21   fresh on my mind.

22           Q.    Okay.  So you feel like what you wrote in

23   this Matter of Record was probably a better

24   representation of what actually was said in those

25   conversations?

1        A.      Well, it wouldn't have been word for word,

2    but yeah.

3        Q.      Okay.  And before I leave this page, in

4    the middle where I highlighted, it says:

5               I told her she needed to let go of the

6               past and move forward.

7               What were you referring to there?

8        A.      She was really upset because we were

9    starting to put Paylocity in place, and she felt like

10   she should have been more involved when it came to

11   Paylocity.   Her -- her manager that was over

12   benefits, Sandy -- Sandy was the director, and I felt

13   like the director was more qualified to be involved

14   in the implementation.   Her -- Sandy was also the

15   person who would be responsible for that particular

16   software, so she -- she was the most qualified to be

17   involved with that.

18              Lisa felt like she should have been more

19   involved since she was responsible for the benefits.

20   I reminded her that she was responsible for the

21   day-to-day but that Sandy was responsible for the

22   oversight of benefits from a director level.

23              I didn't want to have 15 people trying to

24   get one piece of software implemented, so I involved

25   the people that I felt like were the most qualified,

1  which would have been, like, Lisa Payne, who was the

2  director over the administrative side and the -- and

3  of recruiting.    She was also responsible for

4  on-boarding.    And all of those systems were going to

5  be in that software.    So she was on the team; Sandy

6  Dayton was on the team, who was director; and then I

7  was on the team.

8       Q.    So was this team receiving training on the

9  Paylocity system?

10       A.    Well, we would -- we would receive basic

11  training, but we were responsible for building the

12  system.    And then we were going to train -- we would

13  train our employees on how to use it once it was all

14  set up.

15       Q.    Okay. So at this point the employees like

16  Lisa had not been trained on the Paylocity system; is

17  that right?

18       A.    No.  It was a brand-new system.    We were

19  just learning it together and building it together.

20       Q.    Okay.  So your answer was a little

21  confusing.    Are you saying the employees had not been

22  trained on the Paylocity system?

23       A.    Okay.  So at the time that she was upset,

24  the Paylocity system wasn't right -- implemented

25  right then.    We were building it, okay?    After it was

1    built, then we provided training to the staff.

2         Q.    Okay.  And so on the -- you have this

3    entry for Monday, November 27, and you said Lisa's

4    evaluation was coming up so you sought feedback from

5    the other -- the EDs are executive directors,

6    correct?

7         A.    Correct.

8         Q.    And why were you seeking feedback from the

9    other -- the EDs on Lisa's --

10        A.    Because Lisa -- because Lisa would have

11   interacted directly with the executive directors as

12   well as the other employees, so she --

13        Q.    Did you -- did you generally seek feedback

14   on [sic] the executive directors --

15        A.    I did.

16        Q.    -- for the reviews of employees who worked

17   for you?

18        A.    I did.

19        Q.    Okay.  And here it says at the bottom

20   here -- here, I'm highlighting that the majority of

21   EDs feels she is helpful and works well with them.

22        A.    Yes.

23        Q.    So did you -- did you ever give Lisa any

24   performance evaluation that expressed any concerns

25   about her performance?

1    A.    No.  She knew I had concerns about her

2  performance because we talked about her not

3  responding in a timely manner and why some of her

4  tasks were taking so long.   That's when she expressed

5  that she had too much to do and that's the reason why

6  things weren't always done right on time.   Her

7  evaluation -- her evaluation was due in April, and I

8  didn't really start seeing --

9    Q.    2018?

10    A.    It would have been April of 2018, yes.

11    Q.    Okay.

12    A.    And so, anyway -- I'm sorry.  I lost my

13  thought.

14    Q.    So when you said Lisa's evaluation was

15  coming up, you were talking about April of the

16  following year?

17    A.    April 1st, right.

18    Q.    Okay.  And by then you had had the

19  mediation after which you gave her a calendar, and

20  that improved her getting tasks done on time; is that

21  correct?

22    A.    The mediation took place in -- I think it

23  was March or April.   And -- and so at that time I

24  told her that I had held off on giving her her

25  evaluation because I wanted to give her more of an

1    opportunity to get to know the Paylocity system

2    better and the process better.

3        Q.    Okay.  And so I'm looking here on the

4    January 3rd entry about a discussion between

5    Melany -- is that Melany -- is it Melany Zoumadakis?

6        A.    Yes.

7        Q.    And she said -- it says:

8            Melany feels she's entitled to the pay

9        because the way she has been treated.

10            What was Melany referencing here about how

11   she had been treated.

12       A.    Melany had some performance-related

13   issues.   I'm not sure what this has to do with what

14   we're here for.   But Melany had lost a daughter who

15   had committed -- committed suicide in jail, and she

16   started to exhibit -- the stress and the grief really

17   caused her to exhibit some -- what would you call

18   them?  She was a nurse, and she wasn't as patient or

19   considering.   She would blow up easy.   She would

20   swear at people.   She had a lot of things going on.

21            And then she had to have a couple of

22   surgeries on top of it, and they were just one after

23   another.   And so she felt like that -- because they

24   still addressed her performance, even though she was

25   going through all of these issues with her daughter,

1    she felt that was unfair and that Bristol wasn't

2    being fair to her.

3            A clear picture of this lady is when you

4    talk about Rich -- Rich was the CEO at the time, and

5    he had played baseball with Melany's brother when

6    they were in high school or something.   So Melany

7    sent him a lot of pictures with her daughter in her

8    casket, her daughter laying on the table at the

9    mortuary, all kind of things that were just not the

10   kind of pictures you would normally expect someone to

11   send.

12           And so -- another one -- one place I would

13   really give --

14       Q.    Let me -- let me stop you there.

15           So you've talked a lot about how Melany

16   was acting.   What you documented here on this

17   January 3rd conversation is she feels she's entitled

18   to pay while on FMLA because of the way she's been

19   treated, so it suggests that she felt like she was

20   being mistreated somehow by the company.

21           So can you talk to me about what you

22   understand her feelings were about being mistreated,

23   why she felt she was being -- not being treated well?

24       A.    She --

25           MR. FRAZIER: Objection.   Calls for

1    speculation.   Lack of foundation.   I don't know she

2    knows how Melany felt, and I think she was explaining

3    what had been going on.

4                      But anyway, you can answer.

5                      THE WITNESS:  When I talked about the

6    concerns Melany had, is she felt like her supervisors

7    were being unfair in disciplinary actions because of

8    her behavior.

9             Q.    (By Ms. Hollingsworth)    Okay.

10            A.    And so then, when she had to go on FMLA,

11   she had asked to be paid for it, which we don't pay

12   people on FMLA. And so --

13            Q.    Okay.   Let me -- I'm trying to move this

14   along a little bit.

15                   So, then, I've just highlighted the

16   sentence where it says, Melany responded that she was

17   going to go to the EEOC.

18                   Did she go to the EEOC?

19            A.    Yes, she did.

20            Q.    And what was her complaint that she took

21   to the EEOC?

22            A.     I can't remember what her -- the exact

23   complaint was.   I don't want to venture a guess on

24   that.

25            Q.    Okay.   Do you remember if Lisa Graham

1  supported Melany's complaint to the EEOC?

2          A.     I don't know whether Lisa would have

3  provided an opinion on whether she should go to the

4  EEOC. I never got -- from what I can remember, I

5  never thought that Lisa was trying to get her to go

6  to the EEOC. I felt like Lisa was trying to help a

7  traumatized person through a process.

8          Q.     I want to ask you a little bit about this

9  entry on January 24th.   You said you met with Lisa

10  Graham to go over her report for FMLA, and is that

11  workers' comp claims?

12          A.     Yes.

13          Q.     And the report went well.   And you said

14  you also talked with her about a complaint that had

15  come in from Michelle Lowe regarding Lisa's

16  timeliness.

17               Who is Michelle Lowe?

18          A.     Michelle Lowe is an executive director in

19  one of our Texas programs.

20          Q.     And did you ever -- let's see.   So she

21  says here:

22               Lisa said she was surprised that Michelle

23               complained about her.   She brought up that she

24               had not had any complaints in the two years she

25               had worked at Bristol.

1              And was that true, to your understanding?

2       A.    No.

3       Q.    What --

4       A.    I had -- I had had some concerns come in,

5    but -- I usually look into concerns, but if they're

6    one-offs, if they're something that's unusual, I

7    usually don't make a real big deal out of it.    When

8    Michelle had complained before about the timeliness,

9    I had talked to Lisa about it, and then, of course, I

10   talked to her at this time.

11      Q.    Okay.  So was your impression that it was

12   a one-off or something that was easily correctible?

13      A.    I would have thought it would have been

14   easily correctible for -- for Lisa.

15      Q.    Okay.  And you said later you gave her a

16   calendar of responsibilities and that did help her,

17   correct?

18      A.    It did.

19      Q.    And you say here on January 30th:

20            I notice that Lisa Graham's response time

21       to the EDs is improving.  We'll continue to

22       monitor.

23            How did you -- how did you happen to

24   notice that her response time to the EDs was

25   improving?

1      A.     A lot of times if -- the EDs, or any

2  employee, for that matter, if they didn't get a

3  response right away they would cc me on the -- on the

4  email.   And the amount of times that I was being

5  included on the emails had gone down consistently.

6      Q.     Okay.  So on February 2nd you wrote that

7  you met with Lisa to discuss whether she had ever

8  heard of any complaint regarding gender bias or

9  sexual harassment.

10           So, first of all, why did you meet with

11 her to ask her that?

12     A.     I don't remember.

13     Q.     It says the conversation ended up going

14 sideways.    What do you mean by that?

15     A.     Like I said, I don't remember this

16 particular issue.   I wish I had had somebody else's

17 name so that I would know, but I don't know.   I -- I

18 don't remember.

19     Q.     Okay.  Why does this Matter of Record only

20 go through February 23, 2018?

21     A.     I don't know.  I might have started

22 another note.   But I would say this is probably

23 around the time that Lisa filed the complaint with

24 the EEOC and the UALD, and I think because of that I

25 had felt like I just needed to, you know, be calm and

1    see how things fared out.    But I -- but to be honest,

2    I don't know why **it** ended at that point.

3        Q.    Okay.

4            MR. FRAZIER:  Hey,  April,  we've been going

5    for about an hour and a half.    Does **it** make sense to

6    take a quick break?

7            MS. HOLLINGSWORTH: Sure.    Why don't we

8    come back in ten minutes.

9            MR. FRAZIER:  Okay.    Sounds good.

10            (Recess from 2:30 p.m. to 2:45 p.m.)

11        Q.    (By Ms. Hollingsworth)    All right.    So in

12    the -- that memo that you wrote, which -- **first of**

13    **all,** where -- where did you keep that?

14        A.    **I don't know if I would have --**

15            MR. FRAZIER:  Are you talking about the

16    exhibit that we just looked at, April?

17            MS. HOLLINGSWORTH: I'm  sorry?

18            MR. FRAZIER:  Are you talking about the

19    exhibit we just looked at?

20            MS. HOLLINGSWORTH: Yeah,  the exhibit  we

21    had just looked at.

22        Q.    (By Ms. Hollingsworth)    A Matter of Record

23    is what you called **it.**

24        A.    Well, I would have kept a copy probably on

25    the C drive of my computer, and **it** would have been in

1  just a file just with any other records I might have

2  had.

3      Q.    What do you mean "in a file with any other

4  records" you might have had?   Did you --

5      A.    Well, if I had a file that said "Matter of

6  Records," I would have put it in there, or maybe in

7  notes, or I might have just kept it on my C drive.

8  It could have been in any of those places.

9      Q.    Did you have a hard copy of it that you

10 kept?

11     A.    Like I said, it was possible I could have

12 had a hard copy and it was just in -- put into a file

13 in my filing cabinet.

14     Q.    Okay.   So let me -- let me pull it back

15 up.  It looks like there's these lines down the side

16 of it as if it were -- this is a hard copy, so do you

17 think this hard copy came from you?

18     A.    I -- I can't venture a guess.

19     Q.    But you may have kept a hard copy?

20     A.    Yes.

21          MR. FRAZIER: Objection.    Calls  for

22 speculation.

23     Q.    (By Ms. Hollingsworth)   Did you keep hard

24 copies on some of your -- hard copies of files on

25 some of your employees?

1          MR. FRAZIER: Are you talking about an

2    employee file, or are you talking about something

3    completely different?    Because the question --

4    objection.    Vague. I'm not sure what you're asking.

5          Q.    (By Ms. Hollingsworth)    I'm talking

6    about -- I'm asking whether you kept hard copies of

7    documents on some of your employees.

8          A.    I could have.

9          MR. FRAZIER: Same objection.    I mean,

10   let's keep in mind -- I don't know if you're talking

11   to her personally or whether you're talking to

12   Bristol.    But unless they just didn't follow the law

13   and keep it in an employee file, I -- so I think if

14   they kept an employee file, the answer to your

15   question would be yes.

16          And I'm not trying to answer for the

17   witness; I'm just not sure what you're asking her.

18   It seems like you're asking an obvious question, and

19   I think you're asking -- I think what you're trying

20   to do is ask something different, is the only reason

21   why I'm making a big to-do out of it.    The way I'm

22   hearing your question, you're not asking what you're

23   trying to ask.    That's what I'm getting at.

24          MS. HOLLINGSWORTH: Well, I think I am

25   asking exactly what I'm trying to ask.

1      Q.     (By Ms. Hollingsworth)    Which is did you

2  keep hard copies, hard copy files, on any of your

3  employees?

4            MR. FRAZIER:  Same objections.

5            THE WITNESS: I -- I could have.

6      Q.     (By Ms. Hollingsworth)    Did you keep a

7  hard copy of a file on Lisa Graham?

8      A.     I don't remember keeping a hard copy.   It

9  doesn't mean I didn't.

10     Q.     Did you send this personal journal

11 regarding Lisa Graham to anyone else?

12     A.     I don't know.

13     Q.     That was an "I don't know," not a "no"?

14     A.     That's an "I don't know."

15     Q.     Okay.  So this particular copy has

16 highlighting which looks like it was done on a hard

17 copy here on the first page.   Some underlining I

18 guess I should say.   Did you do that?

19     A.     I don't believe so.

20     Q.     Did you generally keep hard copy files

21 of -- for each of your employees?

22            MR. FRAZIER:  Objection.    Vague and

23 ambiguous.

24            THE WITNESS:  Should I answer?

25            MS. HOLLINGSWORTH: Yes.

1          MR. FRAZIER:  Yeah.   Go ahead if you

2   understand the question.

3          THE WITNESS:  I would say that I did not

4   have a file on each of my employees.

5      Q.    (By Ms. Hollingsworth)    But you may have

6   kept a hard copy at least of this document regarding

7   Lisa Graham; is that correct?

8      A.    I may have kept a hard copy, yes.

9      Q.    And would you have turned that over in

10  this litigation?

11     A.    No.  I haven't turned any documentation

12  over for this investigation.

13     Q.    Did you leave all your files at Bristol,

14  or did you take any --

15     A.    No.  I left them all at Bristol.

16     Q.    Okay.  If this were your hard copy,

17  where -- did you have a box of files, or whatever,

18  that you left when you retired?

19     A.    I left all of my files in the filing

20  cabinets that were in my office or in my desk.

21     Q.    Okay.  And did you leave your computer

22  there, that you worked on?

23     A.    I did.

24     Q.    In that -- the Matter of Record that we

25  were just looking at, you talked about this incident

1   involving Lisa and Sandy Dayton, an incident that

2   happened at Lisa's cubicle; is that right?

3          A.    Yes.  I believe that was the incident.

4          Q.    And did you ask Lisa to make a complaint

5   or document that incident in any way?

6          A.    No.

7          Q.    Let me ask you about a document we'll call

8   Exhibit 13.

9                (EXHIBIT 13 WAS IDENTIFIED.)

10         Q.    (By Ms. Hollingsworth)    So this is an

11  email to Rich Dahlquist.    Who was he?

12         A.    He was the chief operating officer at the

13  time.

14         Q.    Okay.  And this is labeled GRAHAM 152 to

15  153.

16               I recognize you're not copied on this

17  email, but I wanted to ask you some questions about

18  it because Lisa's first question to Rich is Debbie

19  referred me to you so I could submit my complaint

20  regarding Sandy Dayton.

21               Do you remember --

22         A.    I don't remember -- I don't remember

23  referring her to Rich.

24         Q.    So are you saying that you didn't do that

25  or you just don't remember it?

1          A.      I'm saying that I don't remember it.

2          Q.      Okay.  So it's possible -- it's possible

3     you did, but you just don't remember?

4          A.      I guess anything's possible.

5                  MR. FRAZIER: Calls for speculation.

6                  Debbie, as we're going along, just give me

7     a little space in there to interpose objections.

8                  THE WITNESS: Thanks for the reminder,

9     Ryan.

10         Q.      (By Ms. Hollingsworth)    So at the bottom

11    of this -- I'm going to read this paragraph starting

12    at the bottom of page 1 of Exhibit 13 and going on to

13    the next page and then ask some questions about it.

14                 Lisa Graham set forth her version of the

15    events that happened with Ms. Dayton and then she

16    says:

17                     I took a minute to collect myself and then

18                     immediately went to -- into Debbie Wertz's

19                     office, who was in her office with her door open

20                     the whole time and did nothing to stop Sandy's

21                     behavior.   My conversation with Debbie was

22                     disappointing and demoralizing.   I have a

23                     memorandum of the conversation.

24                     Basically, though, I felt she was not

25                     neutral or objective where Sandy's behavior was

1    concerned.  Debbie stated that what happened was

2    not appropriate, so I asked why she didn't come

3    out of her office and stop this escalating

4    workplace incident.    She replied she was

5    listening to hear if Sandy and I would be of --

6    resolve things ourselves.

7         During the conversation, she seemed to be

8    developing what I thought was a false narrative

9    that had me calling Sandy out, to my tone being

10   appropriate [sic], to I had spoken to Sandy in

11   an accusatory way.  It seemed to me she was

12   expecting me to tacitly agree with her

13   developing story line.  I did not agree.  I felt

14   she was making excuses for Sandy, putting me on

15   the defensive and projecting Sandy's words and

16   behavior onto me.

17        So let me just stop there.

18        And have you ever seen a copy of this

19   email?

20        A.    I don't remember seeing this, no.

21        Q.    Did Rich Dahlquist talk to you about the

22   concerns Lisa expressed here about your handling of

23   the situation?

24        A.    I don't remember.

25        Q.    Were you ever disciplined in any way for

1    how you handled the situation?

2        A.    No.

3        Q.    And so Lisa goes on to say:

4            I asked if there was something that I

5        should know about Sandy, because recently her

6        behavior was more reactive and angry than usual.

7            Do you think that that was accurate?    Did

8    Sandy at some point become more reactive and angry?

9        A.    No.

10       Q.    I explained that she'd recently interfered

11       with three employee files that she was working

12       on and that she created problems where there

13       were none.   Debbie asked for the specific names,

14       which I provided to her.

15           Debbie then replied that she had had

16       complaints about me.  Although I didn't feel

17       bringing up complaints about me was relevant

18       during this discussion, I did ask her for

19       examples.   She provided me with the names of two

20       ex-employees.   And the third one she said she

21       couldn't remember, but it was somewhere in her

22       email.

23           I left her office with the decision to

24       file my written complaint with another member of

25       Bristol's leadership because I did not feel

1          Debbie was neutral or objective where Sandy's

2          behavior was concerned.    I did not have

3          confidence that further discussions with Debbie

4          would be conducted in a fair and impartial way.

5              Debbie later emailed both Sandy and I

6          requesting that we submit our view of the

7          incident, which I felt misrepresented the fact

8          that I'd already made a verbal complaint to

9          Debbie in her office and informed her that I

10         would be submitting a written complaint as well.

11             So you did you bring up complaints made

12    about Lisa in this conversation where she's talking

13    to you about what had just happened with Sandy

14    Dayton?

15         A.    I don't remember talking to her about

16    concerns that were brought up during this

17    conversation, but I did bring up previous concerns

18    that have been brought up which I put in that Matter

19    of Record that you previously showed me.

20         Q.    Okay.  Do you remember providing her the

21    names of two ex-employees who had complained about

22    Lisa?

23         A.    No, I don't remember.

24         Q.    Do you remember any -- two ex-employees

25    who had complained about Lisa?

1    A.    The -- the complaints that I had about

2  Lisa, as I've said, that is in that Matter of Record.

3  I don't know whether they were ex-employees.

4    Q.    Okay.  And what is or was your

5  relationship with Sandy?  Are you still in contact

6  with her?

7    A.    Every once in a while I'll send out "Merry

8  Christmas," so that's about --

9    Q.    So does that --

10    A.    That's about the extent of it.

11    Q.    So does that mean you were in contact with

12  her over the holidays this year?

13    A.    I sent her a text that said "Happy New

14  Year," and that was it.

15    Q.    Okay.  When was the last time you saw her?

16    A.    Sandy Dayton?

17    Q.    Yes.

18    A.    The last time I saw her was in April --

19    Q.    Of last year?

20    A.    No.  It would have been the year before,

21  so April 2021 or maybe October of 2021.

22    Q.    What was the occasion?

23    A.    We both belong to a group that made

24  greeting cards and things like that, and we had a

25  retreat.

1          Q.      What is the group that you belong to?

2          A.      It doesn't have a particular name.  It's

3    just a group that used to do classes at Hobby Lobby

4    and those kind of things.    And Sandy got into it, but

5    she would do it remote.    But she would go to the

6    retreats, and I saw her at the last retreat that was

7    held, so that was probably October 2021.

8          Q.      Is this a group of friends?   Is it church

9    based?   What is the connection?

10         A.      It's community based.  It's -- there's

11   just a group of women that have Cricuts or those kind

12   of machines that put cards together.    There isn't any

13   specific affiliation other than the instructor.

14         Q.      Oh, so where are the classes?

15         A.      Well, the classes were held at Hobby Lobby

16   in Layton, Utah.  The retreats were held at

17   Thanksgiving Point, and they were two-day retreats.

18         Q.      How often are the retreats held?

19         A.      Every six months.

20         Q.      So have you been to a retreat since this

21   one you're talking about seeing her there or --

22         A.      No.

23         Q.      Okay.  That was the last time you went?

24         A.      That was the last time they were held.

25   The woman who would put them on retired.

1    Q.    Okay.  What are the name of the classes?

2    A.    It was just a card making retreat.   She

3  would have, like, different themes.  You know, like

4  it might be seaside theme or it might be a -- I don't

5  know -- Thanksgiving theme.

6    Q.    And were these classes held at a community

7  college or at somebody's house or what?

8    A.    Again, the classes were held at Hobby

9  Lobby, which is a craft store, and the retreats were

10  held at Thanksgiving Point.

11    Q.    And how did you find out about the

12  classes?

13    A.    I had a friend that I worked with years

14  ago who was into it, and she invited me to one of the

15  classes.   And I just kept going.

16    Q.    How often were the classes held?

17    A.    Once a month.

18    Q.    And did you meet Sandy at one of these

19  classes?

20    A.    No.  I met Sandy at work.

21    Q.    And then did you invite her to go to these

22  classes?

23    A.    I didn't.   The individual that had invited

24  me invited Sandy.

25    Q.    How did she know Sandy?

1      A.      Because she worked with Sandy as well.

2      Q.      Where?

3      A.      At Bristol.

4      Q.      Oh.   Who was the person who held the

5   classes?

6      A.      Who -- who told us about the classes?

7      Q.      So is that who you were saying invited you

8   and Sandy?

9      A.      Judy Verbeck was the person who invited

10  me, and then when she came to work for Bristol --

11  because we had been going for a long time -- she

12  invited  Sandy.   And Sandy would go occasionally.

13     Q.      So did you and Sandy -- like, did you

14  drive together to these classes?

15     A.      Not to the classes, no.

16     Q.      What about the retreats?

17     A.      The retreat -- Sandy only lived two miles

18  from me, and Thanksgiving Point is about 50, 60 miles

19  from here, so we would ride together.

20     Q.      Okay.   How often did you go to retreats

21  together?

22     A.      Every six months.

23     Q.      For what period of time?

24     A.      Well, I went for a couple of years.   Sandy

25  probably -- maybe a year, year and a half, probably

1  three retreats.

2          Q.    Okay.  And did you see Sandy socially in

3  addition to these retreats or classes?

4          A.    No.

5          Q.    And who was the instructor of the classes

6  and the retreats?

7          A.    Sue Neal.

8          Q.    Like S-u-e?

9          A.    Yeah.

10         Q.    N-e-a-l?

11         A.    N-e-a-l,  yes.

12         Q.    And those have stopped recently, in the

13  last couple of years?

14         A.    Yes.

15         Q.    Okay.  I think we talked some yesterday --

16  I asked you about other complaints about Sandy.   Am I

17  correct that you don't remember any other -- anybody

18  complaining about Sandy Dayton other than Lisa

19  Graham?

20         A.    Not formal complaints.   I don't remember

21  any.

22         Q.    What about informal complaints?

23         A.    Well, like I said, I would get a phone

24  call; somebody would be concerned she was more curt

25  than she needed to be.   I didn't have complaints as

1    far as her being -- you know, creating a hostile work

2    environment or anything like that.

3          Q.    You don't remember complaints about her

4    saying offensive sexual comments?

5          A.    No.

6          MS. HOLLINGSWORTH: So I'm going to

7    introduce Exhibit 14.

8          (EXHIBIT 14 WAS IDENTIFIED.)

9          MS. HOLLINGSWORTH: And this is GRAHAM 164

10   to 173.

11         Q.    (By Ms. Hollingsworth)    And this is -- do

12   you remember a complaint being made by -- I'm sure

13   I'm going to kill her name -- Kattaleeya -- I don't

14   know how to pronounce that last name, do you?

15         A.    I don't remember this.    The only reason

16   why I remember this name is when I looked at the

17   letter that was sent for this particular complaint,

18   this individual's name was on there.    But I don't --

19   I don't remember it.

20         Q.    How do you pronounce her last name?

21         A.    I don't know.

22         Q.    Did this person work at Bristol?

23         A.    Yes, I believe so.

24         Q.    And what was her job at Bristol?

25         A.    I don't know.  I don't remember this

1    person.    That's what my problem is.

2         Q.    Do you remember that there was a complaint

3    made to the labor commission --

4         A.    No.

5         Q.    -- that she filed?

6         A.    No.

7         Q.    And if we scroll down here to the date,

8    she says she was constructively discharged July 2017,

9    so that's when you were -- you were the vice

10   president of HR at that time; is that right?

11        A.    Yes, I believe so.

12        Q.    So in the attached letter -- so she

13   checked here that she believes that she was harassed

14   based on gender, and then in the attached letter, she

15   says -- she talks about the incident on February 8th

16   where it said:

17             Sandy Dayton in Lisa Graham's cubicle

18        directly beside me.    Debra Wertz called me into

19        her office a week later investigating and asked

20        what I heard.

21             I heard Lisa Graham say, You can't blame

22        me, and you're in my space.

23             Debbie asked if I thought Lisa was being

24        aggressive.    I responded that I felt they both

25        escalated the situation more than it needed to

1       be.

2                      So does that refresh your recollection

3       about who the person is that made the complaint?

4              A.      So that does make me feel like I need to

5       correct the statement earlier --

6                      THE REPORTER: I'm sorry.    Hang on a sec.

7       You're kind of coming in and out, so could you just

8       start your answer over again?    The question was:   "So

9       does that refresh your recollection about who the

10      person is that made the complaint?"

11                     THE WITNESS: Yes.    So she must have

12      been -- she must have been the person that was in the

13      other cubicle and not Annette Beisinger, who I

14      mentioned earlier, so she would have been one of them

15      I had talked to.

16             Q.      (By Ms. Hollingsworth)    Okay.  So this is

17      someone who -- she says here she was hired full-time

18      at Bristol on June 1, 2017, and apparently she worked

19      for Sandy.   So she worked in HR at Bristol, right?

20             A.      Yeah.   And if she worked for -- if she

21      worked for Sandy, she would have been a payroll

22      coordinator, because that's the only other position

23      that worked for Sandy besides benefits.

24             Q.      Okay.  And were you all located -- was HR

25      all, like, in the same building?

1   A.  Yes.

2   Q.  Were you all on the same floor?

3   A.  Yes.

4   Q.  Okay.  So she says here:

5     Soon after being permanently hired at

6   Bristol, Sandy began making offensive and

7   derogatory comments about other Bristol

8   employees, including calling me "a ho" in a

9   closed door roast about another employee.  She

10   laughed about and divulged the name of a female

11   employee who said she had been urinated on by

12   her boyfriend.  She ridiculed and mocked the

13   physical appearance of employees, commenting how

14   one employee looked like a clown because of how

15   she applied her makeup and wore her wig and how

16   she was obese and fat and that no one fat should

17   show their cellulite, because she wore her

18   clothes too tight.

19     Do you remember any concerns being made

20 about Sandy's behavior concerning these incidents?

21   A.  I don't remember this at all.

22   Q.  If an employee raised concerns about the

23 behavior that's discussed here, what should Bristol

24 do about those complaints?

25     MR. FRAZIER: Objection.   Calls for a

1  legal conclusion.

2        Q.    (By Ms. Hollingsworth)    Go ahead.

3        A.    "Mikela" is -- I think she probably means

4  MeKelle and --

5             THE REPORTER: I'm sorry.    We're having

6  some connection problems here again.    I have, "I

7  think she probably means MeKelle and..."

8             THE WITNESS:  Jenna.

9             So I would have interviewed them.

10  Obviously, I would have interviewed this employee if

11  she had brought it to me, and I would have

12  interviewed Sandy.  But I've got to tell you I don't

13  remember this at all.

14        Q.    (By Ms. Hollingsworth)    She says here --

15  if you go down to the next part that I've highlighted

16  under "April, May, and June," it says:

17             Helped once a month with the birthday and

18             anniversary celebrations, which I was

19             relinquished from by Debra Wertz because she and

20             Sandy decided that I should not participate in

21             this activity until my work performance was up

22             to their par.

23             Does that help you remember who this

24  person is?

25        A.    No.

1        Q.    So on July 5, 2017, she has an entry here

2   that says:

3              Debra Wertz called me into her office to

4         discuss my situation with Sandy.  I explained

5         Sandy's rude, aggressive, and mean behavior was

6         creating a hostile work environment for me and

7         that I felt like quitting a couple of times.  I

8         felt I would be fired at any minute for no

9         reason.

10             Debra agreed that Sandy's behavior was not

11        appropriate and responded, If you had known her

12        a year ago, you would have left a long time ago.

13             Does this help you remember this person?

14       A.    No.  I don't remember this person.

15       Q.    Do you agree that Sandy's behavior a year

16   prior to 2017 had been even worse?

17       A.    I was --

18             MR. FRAZIER: Objection.    Calls for

19   speculation.    Lack of foundation.

20       Q.    (By Ms. Hollingsworth)    You can answer.

21       A.    Yes.  I did feel that Sandy's behavior was

22   rude -- I didn't feel she had a hostile work

23   environment, but like I said in my previous

24   testimony, I did feel like she could be curt and come

25   across as rude.   And I was working with her on how.

1  And to be honest, Sandy was on the verge of being

2  fired, and then they moved her under me to see if I

3  could help her to improve, which over the year she

4  did.

5          Q.    So, sorry.   I think you broke up just for

6  a second there.   Did you say Sandy was -- did you say

7  fired and moved under you?

8          A.    No.

9          Q.    What did you say?   Sorry.   I thought

10  you --

11         A.    I said there was enough complaints about

12  her she was on the verge of being fired, and so they

13  moved her under my supervision, hoping that I could

14  help her to soften up her personality.

15         Q.    Okay.  Who had made the decision that

16  there had been enough complaints about Sandy that she

17  should be moved?

18         A.    Well, I was actually pushing that they

19  need to fix that situation, and the CFO essentially

20  said, If you can do better with her, go ahead.

21  Because she was so good as far as her job performance

22  was.   She just excelled at everything.   And so he

23  felt like that I could probably teach her

24  communication skills a little bit better.

25                 And so it was decided that --

1          Q.      What was her -- what was her role exactly?

2          A.      At the time she was a payroll manager.

3          Q.      Okay.

4          A.      That was -- that was a couple of years

5    before this  happened.

6          Q.      Okay.   And so she was moved to be under

7    you because of complaints about her?

8          A.      Yes.

9          Q.      And what was her **title** when she moved

10   under you?

11         A.      Payroll  manager.

12         Q.      So she kept the same **title**; she just moved

13   under your supervision?

14         A.      Right.

15         Q.      And then apparently complaints about her

16   continued based upon this page we're looking at,

17   right?

18         A.      Well, I would say that people's view of

19   Sandy had changed considerably and -- but she **still**

20   had work to do as far as her curtness.   And -- but I

21   never --

22               THE REPORTER: Okay.  I got to the point

23   where "...she **still** had work to do as far as

24   curtness, but I never --".   Didn't get anything after

25   that.

1          THE WITNESS: I never felt that her

2    behavior accelerated to the point of a hostile work

3    environment as far as a protected class or

4    retaliation or creating an environment people

5    couldn't work because of her behavior.   I didn't see

6    any of those things.

7          Q.    (By Ms. Hollingsworth)    So this person who

8    you can't remember is talking in this page about how

9    she feels like she's been bullied, and it says -- she

10   even says here, this part I highlighted:

11              Prior to me, there have been five other

12          women who've left because of the unresolvable

13          conflicts with Sandy.

14              So she's invoked gender here, and she goes

15   on in the next paragraph to say:

16              I felt like this is an abusive

17          relationship, and I was contemplating several

18          times on just not going back to work.

19              Does that suggest to you a hostile work

20   environment?

21          A.    As far as the (inaudible).

22              (A discussion was held off the record.)

23              THE REPORTER: The question is:   "Does

24   that suggest to you a hostile work environment?"

25              MR. FRAZIER: Objection.   Calls for

1    speculation.    The document speaks for itself.

2        Q.    (By Ms. Hollingsworth)    Can you try

3    answering that again?

4        A.    As far as the first statement that you

5    read that starts with, "Prior to me, there have been

6    five women who have left because of unresolved

7    conflicts with Sandy," I am not aware of any employee

8    or event that left specifically because of conflicts

9    with Sandy.

10        Q.    Okay.

11        A.    As far as statement -- okay.    Now it's

12    saying my Internet's unstable.    I'm getting a flash

13    on my computer that says the Internet is unstable, so

14    I'm just making sure you can hear me.

15        Q.    Yeah, now we can.    That's the same thing

16    that was happening to me yesterday.

17            MR. FRAZIER: It's spotty.

18            THE WITNESS: All right.    Well, we've got

19    snow coming down, so that might be part of it.

20        Q.    (By Ms. Hollingsworth)    Yeah.

21        A.    As far as, "I told her I felt like this is

22    an abusive relationship and how I was contemplating

23    several times I'm not coming back to work," I don't

24    remember this employee, so I don't remember the

25    conversation.

1    Q.    And you don't remember the July 5th

2   meeting that she talks about where you -- she went

3   into your office to talk about Sandy; is that

4   correct?

5    A.    I do not remember this employee, and I

6   don't remember this conversation.

7    Q.    Okay.  And at this point in 2017, was this

8   a time period when you and Sandy were going to these

9   retreats together?

10    A.    No.

11    Q.    When were the retreats?

12    A.    The retreats possibly started in two

13   thousand -- I don't know.  Maybe 2019.

14    Q.    Okay.  So later?

15    A.    Yeah.

16    Q.    So it says here in the paragraph I've

17   highlighted on the last page of the exhibit:

18         I've considered bringing my concerns to

19         someone above Debra Wertz but remembered how

20         Lisa Payne and Lisa Graham each submitted a

21         complaint about Sandy Dayton earlier in the year

22         to Debra Wertz and Rich Dahlquist and that

23         didn't make a difference in the HR department.

24         Was Rich Dahlquist above you?

25    A.    I'm not sure why they would go to Rich

1   Dahlquist.    The one that would have been above me

2   would have been Hyrum Kirton.

3        Q.    Okay.

4        A.    Rich Dahlquist was the COO; so...

5        Q.    So he didn't -- did he have any

6   experience, like, handling HR concerns?

7        A.    Well, he --

8             MR. FRAZIER: Objection.    Lack of

9   foundation.  Calls for speculation.

10       Q.    (By Ms. Hollingsworth)    You can answer.

11       A.    I do not know how much HR experience he

12  has, but he worked in a COO position with people

13  under him for years.    I don't know how many years,

14  but for years.   And so I would think that he would

15  have some inclination, but that's just me speculating

16  on him.

17       Q.    Okay.  So you don't know now why these

18  employees would have gone to Rich Dahlquist to

19  complain?

20       A.    Right.   And I know that up at the top of

21  Lisa's previous letter she said that I would have --

22  I referred her to Rich Dahlquist.  I find that hard

23  to believe because, if I was going to lead her in any

24  particular direction, it would have been between

25  Hyrum Kirton or to our compliance officer, Mary

1    Nester.    Those would have been the two individuals I

2    would have sent her to.    So I have a hard time

3    believing that I would have given her Rich's name.

4          Q.    Were you made aware when employees filed

5    charges of discrimination, like, with the labor

6    commission?

7          A.    Yes.    They would have all come to me.

8          Q.    So the exhibit that we just looked at,

9    would that have come to you?

10          A.    It -- it would have.

11          Q.    So you believe this would have come to

12    you; you just don't remember it now; is that correct?

13          A.    That's correct.

14          Q.    So you don't remember any -- what would

15    you generally do with a charge of discrimination when

16    you received it?

17          A.    I would do the same thing I did in other

18    situations.    I would interview the person if they

19    still worked for us; I would interview the one that

20    was accused and any witness that may have been there.

21          Q.    And -- and so am I correct that you don't

22    remember doing any investigation as a result of this

23    charge of discrimination?

24          A.    Yes.    I don't remember.

25          Q.    Okay.    Did you ever discipline Sandy

1    Dayton?

2         A.    No.  I addressed some things in her

3    performance evaluations regarding her interactions

4    and communication. I didn't have anything as far as

5    overall job performance.  She excelled at everything.

6    So communication was her most difficult, and I

7    addressed them in her evaluations.

8              I would counsel her.   I would go over

9    emails with her, give her suggestions on how she

10   could have softened up her approach a little bit.   I

11   would tell her if I thought her behavior was

12   inappropriate.  So -- but I never --

13        Q.    Okay.

14        A.    Other than her performance evaluation, she

15   was never written up.

16        Q.    Okay.  And I'm showing you Exhibit 15,

17   which is a charge of discrimination by the same

18   woman. This is the actual charge form.

19              (EXHIBIT 15 WAS IDENTIFIED.)

20        Q.    (By Ms. Hollingsworth)    Did you ever see

21   this  document?

22        A.    I don't remember seeing it.

23        Q.    Okay.  And do you remember seeing a Charge

24   of Discrimination that was filed by Lisa Graham?

25        A.    Yes.

1          Q.     I'm going to show you what's been marked
2    as Exhibit 16.
3                    (EXHIBIT 16 WAS IDENTIFIED.)
4          Q.     (By Ms. Hollingsworth)     Do you remember
5    when this  -- this being filed in March 2018?
6          A.     Yes.
7          Q.     What -- would you receive, like, all the
8    documents, the charge and all the supporting
9    documents?
10         A.     Yes.
11         Q.     And then you said you would then do an
12   investigation?
13         A.     I would do an investigation.   I would
14   write up my findings.   I would send them to the
15   attorneys, and then the attorney would respond.
16         Q.     Respond to the charge of discrimination,
17   you mean?
18         A.     Right.
19         Q.     Okay.
20         A.     And they would attach all the
21   documentation.
22         Q.     Okay.  So in the second paragraph of the
23   actual charge, the particulars, it says:
24                    Since February 2nd, 2017, the director
25            payroll and benefits and the VP human resources

1      have been creating a hostile work environment,

2      denied equal employment opportunity undermining

3      my work.

4            I discussed in private all the

5      discriminatory behaviors that I experienced to

6      the VP HR --

7            And that was you at the time, right?

8      A.    Yes.

9      Q.    -- and the director of payroll and

10     benefits, the COO --

11           And that -- the COO was Rich Dahlquist.

12  Am I right?

13     A.    I'm not sure if Rich Dahlquist still

14  worked for the company at that time or not.  I think

15  so, though.

16     Q.    Okay.

17           -- and CEO --

18           And who was that?

19     A.    That would have been Hyrum, Hyrum Kirton.

20     Q.    Okay.

21           -- and they claim that this was a singular

22     incident and they would be more vigilant.

23           Do you remember telling Lisa Graham that

24  the February 2nd -- or that February incident was a

25  singular incident?

1    A.    I don't remember telling her that.    It

2  might -- if she talked to the COO and the CEO, maybe

3  they -- maybe they said it, but I have no idea.

4    Q.    Okay.  Did you feel like it was a singular

5  incident?

6    A.    I felt like -- the incident that she

7  talked to me about that was in the cubicle, I do feel

8  that that was a singular incident.

9    Q.    And that's even though Sandy Dayton had

10 already been moved because of complaints that other

11 employees made about her?

12   A.    Sandy was moved under me before Lisa even

13 started working for Bristol.

14   Q.    Right.  That's my point.  So there was a

15 history of her being difficult and to the point that

16 employees made complaints, so why would you think

17 that her incident with Lisa was a singular event?

18        MR. FRAZIER: Objection.    Assumes facts

19 not in evidence.

20   Q.    (By Ms. Hollingsworth)    You can answer.

21   A.    The complaints that had come in about

22 Sandy, as I mentioned before, were more about her

23 curtness almost to the point of being rude to

24 employees when they asked questions and things like

25 that.    This particular situation that occurred at the

1  cubicle was the only one that I knew, and I felt that

2  that particular incident, both her and -- both Lisa

3  and Sandy were at fault in that particular situation.

4        Q.    So once you got the charge of

5  discrimination, did you do any further investigation

6  of this complaint?

7        A.    I didn't feel -- I'm not sure I felt like

8  there was a need.  Hold on.  I'm trying to read

9  through it so I can see if I can remember.

10        Q.    Okay.

11        A.    Okay.  So this one was against me as well

12  as against Sandy.  I would have sent information,

13  because she claims in here we were undermining her

14  work, her reputation, we were talking to executive

15  directors and demeaning her.   That just plain wasn't

16  true.

17              As far as her belief that her age and

18  gender is a determining factor, I find that -- I

19  found that to be ludicrous.   Every employee, with the

20  exception of one, that I had working for me were

21  female, every one.  And as far as her age, I still

22  today don't even know what her age is, and so there

23  was no discrimination regarding her -- her age.

24              I didn't feel that -- the emails that

25  Sandy Dayton had sent to Lisa regarding her

1  performance and things that needed to be done, I felt

2  like they were accurate and they were things that

3  needed to be done, and so I didn't feel like that

4  that was discriminatory in nature.   It's not -- in my

5  opinion -- and I'm not an attorney, but it's not

6  discriminatory to address performance issues.    And

7  those performance issues were not based on gender or

8  age, so they weren't a protected class.    It  was

9  strictly regarding her performance.

10      Q.     So my question was did you do any

11  investigation after you received this complaint?  And

12  I'm gathering that the answer is no; is that correct?

13      A.     Well, I certainly would have pulled

14  together --

15            MR. FRAZIER: Objection.     Mischaracterizes

16  the testimony.

17            THE WITNESS: I certainly would have --

18      Q.     (By Ms. Hollingsworth)    You can answer.

19      A.     I would have certainly gathered all of the

20  information that I had regarding those situations,

21  and I would have provided them for our attorneys so

22  that they could respond to this claim.

23            MS. HOLLINGSWORTH: Let's  see.    I'm  going

24  to pull up what I've marked as Exhibit 17.

25            (EXHIBIT 17 WAS IDENTIFIED.)

1    Q.    (By Ms. Hollingsworth)    And it looks like
2    this is a document -- well, let me back up.    So this
3    was more -- do you recognize this type of document?
4    Have you seen these in your job?
5    A.    Yeah, occasionally.
6    Q.    So this is a form that Ms. Graham filled
7    out, the Intake Questionnaire to the labor
8    commission.
9          Would you receive copies of these when
10   you -- when you got the charge, did you get these,
11   too?
12   A.    Yes, I believe so.
13   Q.    Okay.  So it says here:
14          Debra Wertz and Sandy Dayton, individually
15          and together, creating a hostile work
16          environment that's created a risk to my health.
17          Did you know that Lisa felt like the work
18   environment was harming her health?
19   A.    When she came in to claim FMLA, she stated
20   that she was under a lot of stress, and that's -- I
21   believe that's the reason why she wanted to go on
22   FMLA.
23   Q.    Okay.
24   A.    I don't remember her saying that it was
25   because of a hostile work environment.

1          Q.      Okay.  Let me ask you --

2          A.      Also, according to this document, it

3    appears that Chuck Gonzales was the CEO at the time

4    and not Hyrum Kirton.

5          Q.      Okay.  Was Chuck Gonzales before Hyrum

6    Kirton?

7          A.      Yes.

8          Q.      So it looks like, then, if she -- Lisa had

9    gone all the way to the CEO about her concerns.    Were

10   you made aware of that?

11         A.      I don't know whether she went to the CEO

12   or not.

13         Q.      Well, okay.  It says here that he said:

14                 Bristol would be vigilant and watch Debra

15             Wertz and Sandy Dayton [sic] behavior.

16                 Doesn't that indicate that she'd gone to

17   the  CEO?

18         A.      Well --

19                 MR. FRAZIER: Objection.    The document --

20                 THE WITNESS: -- as long as what she

21   put -- as long as what she put on this document was

22   true, then yes.

23                 MR. FRAZIER: Objection.    The document

24   speaks for itself.

25                 Debbie, let me interpose the objections in

1    there.    Thanks.

2         Q.    (By Ms. Hollingsworth)    And going back --

3    I'm on page 5 of the PDF.  She says here that what

4    she was looking for is, under number five, an

5    immediate stop to Debbie and Sandy's harassment and

6    external, independent investigation of the grievance

7    process and external, independent investigation of

8    Debra Wertz and Sandy Dayton creating a hostile work

9    environment.

10         Did any of those things ever happen, as

11   far as you know?

12         A.    Generally speaking, when the -- when these

13   things went into the UALD or the EEOC, we let the

14   UALD and the EEOC do the investigation.    So we would

15   have sent them any applicable documents that we had,

16   and then we would have let them decide whether there

17   were these cases or not.

18         Q.    Okay.

19         A.    I don't -- I mean, it took two years for

20   the EEOC to respond to this, so I -- I do not know

21   what their process is.

22         Q.    Well, actually, you had a mediation about

23   this -- Lisa's complaints, right?

24         A.    Yes, we did have a mediation.

25         Q.    And what do you remember --

1         A.      So if this -- let me clarify, please.

2                 If this -- I didn't notice the date on

3    this.   If this is the one that we had the mediation

4    for in April -- we did have the mediation.   We went

5    into the mediation.   It was -- it was for us to try

6    to resolve the issue without the EEOC having to go

7    through all of it, right?

8                 The one that I am talking about where we

9    would have just ignored it would have been at the

10   time that -- and I don't mean ignore, that we

11   wouldn't have responded.   But if this was the one

12   that was sent at the time that she was terminated, I

13   don't know what actions -- we didn't go in for

14   mediation on that one, and I don't know what actions

15   the -- well, the UALD just gave it up and turned it

16   over to the EEOC.

17                And then I don't know what process the

18   EEOC uses.   I do know that they did not -- at least

19   at the time I worked there, they did not come out and

20   do an investigation.

21        Q.      Okay.  And ultimately, did you agree with

22   Lisa that -- to move forward to work on your

23   relationship if she withdrew her charge?

24        A.      That is not the way I remember that

25   conversation.

1        Q.     Okay.

2        A.      We went to the mediation, and at the

3    time -- at the mediation, she did not want to drop

4    the charge.   She wanted to be promoted to a manager,

5    and she wanted to not report to Sandy Dayton.   I

6    wouldn't agree to that, so she wouldn't agree to

7    the -- to dropping the charges.

8               During the mediation, in the end, Lisa

9    said, I just want things to go back to the way they

10   were.

11              And I said, I'm fine with that, but you

12   need to understand that I have concerns about your

13   performance, and that's the reason why I haven't

14   given you your evaluation yet, because I want to give

15   you a chance to improve.

16              She said, Thank you.

17              We both left the mediation, we went back

18   to work, and we went back to work as normal.

19              About two or three days later, she came

20   in, and she said -- this is my recall -- she said, I

21   want things to go back, and so I'm going to drop the

22   EEOC charge.

23              And I said, I appreciate that.   I never

24   said, Things will go back to normal if you drop this.

25   To me that would have been coercion, and I wouldn't

1   have said that to her.   I would agree that I wanted

2   our relationship to improve, but I would have never

3   used it as a tactic to try to get her to drop the

4   charges.

5          Q.     So you talked about what happened in the

6   mediation.   Why did you bring up your concerns about

7   her performance during the mediation?

8          A.     Why did I bring it up?

9          Q.     Right.

10         A.     Because I felt like it was important for

11   her to understand that even though she feels like

12   she's doing a good job, at that point she was not

13   where I felt like she needed to be.

14         Q.     Why would --

15         A.     And I felt like it was important for her

16   to understand that -- if she came back that I would

17   continue to evaluate her performance.

18         Q.     Why did you feel that was something

19   appropriate to bring up while you're mediating her

20   complaint of discrimination?

21         A.     Again, I felt like it was important for

22   her to know that, when she came back to work, the

23   assessment of her performance was going to be the

24   same.  It wasn't going to change and that her

25   performance was still an issue.   That's the sole

1    reason why I brought it up.

2        Q.    When you say come back to work, had she

3    been off work for a while?

4        A.    No.  No.  And I -- I'm --

5        Q.    What are you talking about?

6        A.    Well, we were going to go back to work.

7        Q.    Are you talking --

8              THE REPORTER: I'm sorry.  I didn't hear

9    the question.  I didn't hear the question.

10       Q.    (By Ms. Hollingsworth)    You've got to let

11   me finish my question.

12             So I'm asking are you talking about, like,

13   the next day, like, she'd just been working and you

14   did this mediation and she's -- and then there will

15   be a workday following?

16       A.    Well, we would have come -- we would have

17   come back to work.  She said she wanted things to get

18   back to the way they were, and I wanted to make sure

19   she knew that her performance was still in question.

20   And when I said "go back to work," it's because we

21   had gone to the mediation early in the morning, and

22   we were going back to work.

23       Q.    Okay.  So I'm going to share my screen

24   with you again.   This is -- I've got on the screen

25   Exhibit 18, which is GRAHAM 664.

1              (EXHIBIT 18 WAS IDENTIFIED.)

2         Q.     (By Ms. Hollingsworth)     Have you seen this

3    document before?

4         A.     Yes.

5         Q.     Okay.  In what context did you see this

6    document?

7         A.     It was sent to me from the EEOC.

8         Q.     Okay.  So did you know that Lisa was going

9    to be withdrawing her charge?

10        A.     Like I said, she came in to me a couple of

11   days later and told me that she decided that she was

12   going to drop the charges.   And, again, I said, Well,

13   that's good.   And then the next day she came in and

14   confirmed that she had withdrawn the charge.   So

15   she's the one that notified me first, and then I got

16   this document later.

17        Q.     Okay.  So tell me -- well, we'll get to

18   this.

19             Was -- were -- Faith and Mia, did they

20   become employees of Bristol Hospice at some point?

21        A.     They did.

22        Q.     When was that?

23        A.     It was after we purchased their company.

24   I'm not sure of the exact dates.

25        Q.     Okay.  So initially when -- when -- when

1  you met them, were they employees of Optimal?

2      A.    Yes.

3            MS. HOLLINGSWORTH: I'm going to introduce

4  Exhibit 19.

5            (EXHIBIT 19 WAS IDENTIFIED.)

6      Q.    (By Ms. Hollingsworth)    So Exhibit 19 is

7  marked GRAHAM 69 [sic], and is this an email that you

8  sent?

9      A.    Yes, it appears to be.

10     Q.    In July 2018.

11           So who is Kelly Binninger?

12     A.    Kelly Binninger was the vice president of

13 HR for Optimal.

14     Q.    Okay.  So explain what is going on here in

15 this email.

16     A.    So Bristol was looking at purchasing

17 Optimal, and we were considering -- because we were

18 going to double in size, we were considering keeping

19 on some of the HR employees that they had.    Matter of

20 fact, I think it was all the HR employees that they

21 had.  So I had requested a meeting.    And Kelly, Mia,

22 and Faith were going to come out, and then we were

23 going to have a discussion about what the

24 organization would look like.

25           And then at a particular time, Lisa would

1  go over the job responsibilities for the position,

2  because Faith would have been put into the same role

3  as Lisa was in except **it** would have been for

4  California.

5       Q.    Okay.  So Optimal was based in California?

6       A.    Yes.

7       Q.    Okay.  And then -- so under the Tuesday,

8  July 10th from 1:45 to 4 you wrote:

9            Discussion regarding Bristol HR positions

10           and Optimal HR positions and how they will blend

11           in the future.

12           And then you said:

13           If you're uncomfortable with Faith being

14           in this meeting, we can set her up in on office

15           or cubicle, and she can work on her laptop if

16           she has one.

17           Why did you add that sentence?

18       A.    Because Faith was not -- and neither was

19  Lisa.  Neither one of them were directors.    They

20  weren't at a higher level in the organization, and I

21  didn't know whether Kelly would feel comfortable with

22  having the lower level staff in that meeting.

23       Q.    Okay.

24       A.    And when I mean "lower level," I mean

25  nonmanagement. ^ What she said

1      Q.    Okay.  Is this your handwriting at the

2  bottom of the page?

3      A.    Looks like it.

4      Q.    Okay.  Do you know why you printed a copy

5  of this and wrote on it?

6      A.    No, but I know I sent out a copy to all of

7  those that were involved.

8      Q.    You sent a copy of the -- you sent an

9  email to those that were involved, right?

10      A.    Right.

11      Q.    And then are you saying you sent a hard

12  copy to those involved?

13      A.    I don't -- I think I had a hard copy for

14  the actual meeting itself, but I probably printed

15  this off for myself and just wrote down there that I

16  had sent the email.

17      Q.    Okay.  If you printed it off for yourself,

18  where would you have put it, then?

19      A.    I don't know.  It probably would have just

20  been in a folder.

21      Q.    What kind of folder?

22      A.    Like a manila folder.

23      Q.    Like, under what topic?

24      A.    It -- it probably wouldn't have had a

25  topic.  It would have just been a folder I kept for

1    the meeting.

2         Q.    So did Mia and Faith become employees of

3    Bristol at the same time?

4         A.    No, not at the same time.

5         Q.    Who came first?

6         A.    Oh, you mean if they both came -- when

7    they came in, were they hired for the same date?   Is

8    that what you mean?

9         Q.    Around the same time, yeah.

10        A.    Yes, they would have been hired at the

11   same time.   I thought you meant at the same time as

12   the meeting, and that would have been a no.

13        Q.    Okay.  So we've got a job description

14   signed by Ms. Warren I'm going to call Exhibit 20.

15                   (EXHIBIT 20 WAS IDENTIFIED.)

16        Q.    (By Ms. Hollingsworth)   So this is HR

17   manager job position, and the supervisor was the EVP.

18                   That was you at this point, right?

19        A.    Yes.

20        Q.    And did you write this job description?

21        A.    Yes.

22        Q.    Okay.  And then we've got Mia Warren's

23   signature at the bottom.   So is this something you

24   gave to her when she was offered the job?

25        A.    Yes.

1          Q.    Okay.   And then I'm showing you now

2    what's -- I've marked as Exhibit 21, and this is an

3    August 10th offer letter.

4                (EXHIBIT 21 WAS IDENTIFIED.)

5          Q.    (By Ms. Hollingsworth)    And that's your

6    signature on that page; is that right?

7          A.    Yes.

8          Q.    Okay.   So Faith would have been offered a

9    job around this same time?

10         A.    Yes.

11         Q.    In the fall of 2018.

12               And then how long did they -- were they

13   there through the end of your tenure with Bristol?

14         A.    No.

15         Q.    What happened to them?

16         A.    Faith -- when we decided to not move

17   forward with hiring Kelly Binninger, Faith didn't

18   like that.   She liked Kelly being her supervisor.   So

19   she found another position.   At least this is the

20   reasons I was told.   She found another position with

21   another company and left.

22               Mia -- Mia worked for us --

23         Q.    How long -- how long was that after --

24   after they were offered jobs?

25         A.    I would say Faith probably left within a

1   month or two.

2        Q.    So did Faith actually become -- did Faith

3   actually become a Bristol employee?

4        A.    She did.

5        Q.    For about a month?

6        A.    Month or two.

7        Q.    Okay.   And then what about Mia Warren?

8        A.    So Mia, she worked for us for a while.

9   And then she ended up having an FMLA claim, and so

10  she went on FMLA.  And then while she was an FMLA,

11  she secured a job somewhere else and resigned the day

12  she was supposed to come back to Bristol.

13       Q.    Okay.   And what was -- why do you maintain

14  that Lisa Graham was terminated?

15       A.    Why did I -- why did I terminate Lisa

16  Graham?

17       Q.    Yes.

18       A.    Because I had asked her to -- there was a

19  couple of reasons.   I had asked her to train Faith

20  during the time that they were out here, and so she

21  was supposed to take a couple of hours.    And I gave

22  her a list of all the things that she was supposed to

23  train her on.   She did not do the training, or it was

24  reported to me that she did not do the training.

25             After I got that report, I asked Lisa to

1  send to me a list of the things that she had trained

2  Faith on, and she sent me a list, which was

3  essentially a regurgitation of the list that I sent

4  her.   I sent the list -- let me go back.

5           The day after Lisa was supposed to train

6  Faith, I asked Faith, How did it go?   How was the

7  training?

8           And she looked over at her -- her VP, and

9  they said, Go ahead and tell her.

10          She said, I didn't get any training.

11          I said, What do you mean you didn't get

12  any training?   And I said, Did Lisa bring in her

13  laptop to go over Paylocity with you?

14          The answer was no.

15          I said, Did you go over benefits or

16  anything?

17          No.  She said that Lisa was out of the

18  room for a significant amount of time and left her

19  alone in the room.   When she came in, she made some

20  detrimental comments regarding the cohesiveness of

21  our HR team, and then she went into details about

22  what her qualifications -- meaning what list Lisa's

23  qualifications were for the job.   But there was no

24  training.   The rest was just a chat.

25          So meanwhile, I had had a report that Lisa

1    was upset because I was asking her to train Faith and

2    that she couldn't believe that I was going to make

3    her babysit.

4              So that got me a little bit concerned.

5    That was another report I had received.    So I

6    thought, Okay, I want to give Lisa a chance to answer

7    this.    So I sent her an email, and I asked her to

8    please send me a list of the things that she had

9    trained Faith on.

10             She sent me a list.    I thought, Well, boy,

11   that's -- that's a lot considering that I was told in

12   this report that she didn't get trained at all.

13             So I sent the list to Faith and asked her

14   to confirm the things that she was trained on.    Faith

15   responded that she wasn't trained in any of those

16   areas.

17             So now I have a person who I felt like was

18   insubordinate and had not been truthful when I asked

19   whether she had -- whether she had trained this

20   employee.   Now, my thought process is you can train

21   people in performance, and you can train them about

22   steps that they can take if they don't succeed on a

23   task.    You cannot train truthfulness or ethics.

24   Those are core values.

25             I was really concerned because we were now

1   bringing on other companies.  I should have been able

2   to rely on Lisa to be able to train people that were

3   coming into the department.  I also -- I thought it

4   was a great opportunity for her because she was

5   constantly saying she wanted to be a manager and I

6   thought, Okay, this will give her an opportunity to

7   show how she can train and how she can come across as

8   a manager.  And, instead, she didn't do the training

9   and then the final straw for me was that she lied

10  about it.

11          And I still believe today that that's the

12  case.

13          Q.    Okay. Let's look at Exhibit 22, and this

14  is a page marked GRAHAM 695.

15                (EXHIBIT 22 WAS IDENTIFIED.)

16          Q.    (By Ms. Hollingsworth)    And it shows an

17  email from you at the bottom to Lisa on July 11th

18  saying:

19                Please provide me with a summary of the

20                training you provided to Optimal during their

21                visit.

22                So are you saying that there's a different

23  email where you asked her to list everything, or is

24  this the email that you're referring to?

25          A.    So the first one is where I ask her, and

1  the second is where she tells me she had trained her

2  in all of those areas --

3        Q.    Right.  Is this --

4        A.    -- and then I thanked her for her summary.

5        Q.    Okay.  What I'm saying is earlier you

6  asked her to specifically tell you everything she had

7  done.  Is this the email that you're referring to on

8  July 11th where you said, Please provide me with a

9  summary of the training you provided?

10       A.    Yes.

11       Q.    Okay.  So she provides you with this

12  response --

13       A.    Um-hum        (affirmative).

14       Q.    -- on the 12th, and you said, "Thank you

15  for the summary."  And are you saying that you

16  forwarded this email on to Faith to ask what actually

17  occurred?

18       A.    Yes.  So I sent this to her, and I said,

19  Lisa is saying that she trained you in these areas.

20  Can you confirm if she trained you?   And she sent me

21  an email back saying that she was not trained in any

22  of those areas.

23            MS. HOLLINGSWORTH: Okay.  All right.

24  Well, this is a good time to take a quick break, so

25  why don't we take ten minutes and come back in a few.

1          MR. FRAZIER:  Sounds  good.

2          April, how  much  longer  do  you  think  you've

3  got?  It's  4:07.

4          MS. HOLLINGSWORTH: Yeah.  I'll  try  and

5  get  through  in  another  hour.   Does  that  work?

6          MR. FRAZIER:   Yeah.

7          THE WITNESS:  I'm  fine  with  that.

8          MR. FRAZIER:  We  need  to  get  it  done.

9  We're  probably  pushing  the  limits  of  the  seven  hour,

10  but  yeah.

11          MS. HOLLINGSWORTH: Okay.  Let's  --  we'll

12  see  you  in  ten  minutes,  so  we'll  say  4:20.

13          (Recess  from  4:08  p.m.  to  4:21  p.m.)

14          MS. HOLLINGSWORTH: All  right.    Ryan,  we

15  don't  have  an  email  from  Ms. Wertz  to  Faith  about,

16  you  know,  the  events  of  July 10th,  so  can  you  check

17  for  that?

18          MR. FRAZIER:  I'll  see  what  I  can  find.

19          MS. HOLLINGSWORTH: Thanks.

20          Let  me  introduce  Exhibit  23.

21          (EXHIBIT 23 WAS IDENTIFIED.)

22          MS. HOLLINGSWORTH: This  is  labeled

23  GRAHAM 690 to 693.

24          Q.    (By Ms. Hollingsworth)    Do you recognize

25  this  document?

1          A.      (No response.)

2          Q.      Was this a yes?

3          A.      No.  I'm looking at it.

4          Q.      Okay.

5          A.      I don't -- I don't remember seeing this

6    document at all.

7          Q.      Okay.  So -- so are you saying you didn't

8    receive it or you just don't remember it?

9          A.      Well, I can't say I didn't receive it if I

10   don't remember it, so -- I don't remember it.

11         Q.      Do you know if -- do you remember Faith

12   being concerned that she would be let go when Bristol

13   bought Optimal?

14         A.      No, and I don't know why she would have

15   thought that because we were making it very clear we

16   were holding onto those employees.

17         Q.      Okay.  Well, if you don't remember

18   receiving this, then we can move on.

19                 Exhibit 24 is the termination letter, and

20   this is -- BH 353 to 354.

21                 (EXHIBIT 24 WAS IDENTIFIED.)

22         Q.      (By Ms. Hollingsworth)    Is this a document

23   that you signed?

24         A.      Yes.

25         Q.      And did you write it?

1      A.      Yes.

2      Q.      Did anybody else write it with you or just

3  you?

4      A.      Just me.

5      Q.      Okay. So is July 13th the date that

6  Lisa -- like, her termination was effective?

7      A.      Yeah, it would have been the date of the

8  letter, so yeah, it would have been July 13th.

9      Q.      Okay.   When was the decision made?

10     A.      The decision was made after I received the

11  response from Faith when I sent the information over

12  that Lisa had provided and then Faith came back and

13  said that it was -- that that did not happen.  And so

14  because I felt that Lisa had lied to me and that I

15  couldn't count on her to provide training to new

16  employees that were coming on, I felt like it was in

17  the best interest to find someone that I felt could

18  represent the company better.

19          And I did get approval from our CEO to

20  move forward with the resignation.     And then on the

21  13th -- and then on the 13th, Hyrum and I visited --

22  or met with Lisa to terminate her employment.

23     Q.      Did you meet with Faith Myers about this

24  July 10th training?

25     A.      Yeah.  Faith Myers is the one that I sent

1  the letter to.  She's the one that told me that the

2  training didn't happen.

3       Q.    Right.  I'm asking if you met with her in

4  person.

5       A.    Yes.  We were in a meeting.  She had come

6  in with -- I didn't meet with her in person after I

7  got the response from Lisa.  I just sent it to her in

8  an email.  I did meet with her in person when she was

9  reporting that she didn't get trained.

10      Q.    Okay.  And was training one of Lisa's job

11  responsibilities?

12      A.    Yes.  She was responsible to train staff

13  as far as their benefits and things like that, and

14  then I was having her train her -- her counterpart as

15  far as California was concerned.

16      Q.    Okay.  And had the acquisition already

17  happened at this point?

18      A.    No.  It was not completed yet.

19      Q.    When was it completed?

20      A.    I believe it completed sometime in August,

21  either the end of July or the beginning of August.

22      Q.    So a month or so later?

23      A.    Um-hum       (affirmative).

24      Q.    That's a yes?

25      A.    Yes.   Sorry.

1          Q.     So why was it so important for Lisa to

2    train Faith on July 10th when this merger or this

3    acquisition hadn't even happened yet?

4          A.     Because we had every intention of hiring

5    her as well as Mia, and it was an opportunity, since

6    they were here, that she could sit down with her in

7    person and train her on those areas.   It would have

8    just been a two- or three-hour training.   It would

9    have only been cursory.   She would have had to gone

10   into more detail at a later time.

11         Q.     And are you saying that you're under the

12   impression that Lisa didn't even do a cursory review?

13         A.     Not at that time.

14         Q.     Okay.   I mean would -- so what were you

15   expecting of Lisa?   Were you expecting Lisa to teach

16   Faith Paylocity?   What were you expecting --

17         A.     I was expecting her to go through the

18   policies and procedures that we had for workers'

19   comp, talk about who we have cover our workers' comp,

20   our benefits.   She would go through Paylocity to show

21   how the system worked and the different steps that

22   she would have to take and then, of course, go

23   through our benefits, FMLA processes, ADA processes,

24   all of the things that we would expect from a

25   corporate level.

1          Q.     And do you know whether or not Bristol

2     Hospice's processes for those -- for workers' comp,

3     FMLA, that sort of thing, were different from

4     Optimal's?

5          A.     I did not.   That's why I needed to have

6     Lisa go over them with her so that we could see what

7     areas we were going to have to work with.

8          Q.     And how long had Faith been at Optimal?

9          A.     I don't know.

10          Q.     And this sentence you wrote in the

11     termination letter, it says:

12               Also, on July 11, 2018, you requested

13               several times for Mia Warren's contact

14               information after you had been specifically

15               directed not to reach out to her.

16               So, first of all, who was Mia Warren at

17     that point?

18          A.     Mia Warren was an HR manager.   She -- the

19     reason why I instruct --

20          Q.     For Optimal?

21          A.     For Optimal, yes.

22               The reason why I instructed them not to

23     get contact information was because I was working

24     directly with them, and we -- you know, until you

25     sign on the dotted line, the sale isn't final, right?

1    So I didn't want my staff to be reaching out to their

2    counterparts out there until we knew for sure what

3    was going to happen.  So I said, just let me contact

4    them, be their main port of contact, and when this is

5    over, you'll be free to reach out to them.

6         Q.    So given that, I guess I'm confused as to

7    why you were so insistent that -- that Lisa train

8    Faith when you didn't even have a deal yet with

9    Optimal.

10         A.    Because this was the opportunity that they

11    had to come into our location, and even if we were

12    going to keep them on, they may -- they may decide

13    that they don't want to stay on based on our policies

14    and procedures and those type of things.   I just felt

15    like -- also, I knew that we were going to be talking

16    about some reorganization things, and I felt like

17    Faith -- it would be better for Faith and Lisa both

18    to be working on this training.

19         Q.    Working on what training?

20         A.    On the training that I asked Lisa to do

21    for Faith, so the workers' comp, the FMLA, the ADA,

22    Paylocity, benefits, emergency assistance program.

23         Q.    Do you know -- you didn't do anything to

24    find out if Faith Myers already had experience in

25    these areas?

1     A.     Well, I knew she had -- I knew she had

2   experience in how they handled it.    She might have

3   had experience in specific laws or processes, but she

4   would not have had experience in our, meaning

5   Bristol's, processes.

6     Q.     Do you remember an issue that arose with a

7   Tara DeMarco signing someone else up for insurance on

8   her plan who was married to someone else?

9     A.     No.  I kind of -- it's kind of back there

10  in the back of my mind, but I don't remember when or

11  any specific -- you know, the specific situation.

12    Q.     Okay.   Let me see if I can refresh your

13  recollection a little bit.    My understanding is -- do

14  you remember a Tara DeMarco?

15    A.     The name sounds familiar.

16    Q.     What was -- do you remember what her

17  position  was?

18    A.     No.

19    Q.     And do you remember as an employee of

20  Bristol she wanted to sign someone else up on her

21  insurance policy who was married to someone else?

22    A.     No, I don't remember that specifically.

23    Q.     Okay.

24    A.     But it was possible.

25    Q.     Would that be -- if -- would -- signing

1    someone up on your insurance that you weren't married

2    to but who was actually married to someone else,

3    would that be considered some kind -- like, fraud for

4    the insurance?

5              THE WITNESS:  Not --

6              MR. FRAZIER:  Objection.    Calls  for  a

7    legal  conclusion.

8              Q.     (By Ms. Hollingsworth)    Go ahead.

9              A.     From my perspective, not necessarily.

10   There's a lot of people that -- that have

11   responsibility to carry insurance, when they've been

12   divorced, with someone else that doesn't necessarily

13   cancel when they marry someone else.

14             Q.     Right.   What I'm saying is if Tara was

15   trying to sign someone up on her insurance to become

16   a beneficiary but that person was married to someone

17   else and not married to Tara, do you consider that to

18   be a violation of any rules with respect to the

19   insurance benefit?

20             A.     Again, there are instances when people get

21   divorced where the spouse -- one spouse is required

22   to carry insurance on the other spouse, and it's a

23   court order.   In those cases we would have to comply

24   with it.   If they were trying to just sneak it and

25   there was no legal reason for doing it, then I would

1    consider it fraud, yes.

2            Q.    Okay.  And you don't have any recollection

3    of that happening?

4            A.    No.

5            Q.    With -- how many people have you

6    terminated without going through progressive

7    discipline?

8            A.    I -- I couldn't tell you.

9            Q.    Can you give me any examples other than

10   Ms. Graham?

11           MR. FRAZIER: Objection.    Assumes facts

12   not in evidence.

13           THE WITNESS:  Do you want me to answer?

14           Q.    (By Ms. Hollingsworth)    Yes.

15           A.    All right.    So we had a situation where we

16   had an employee who was working in a nursing home,

17   and we had another employee who was a nurse.    And the

18   gentleman employee asked the nurse to give him an

19   enema in a room that was vacant, that didn't have a

20   patient in there.    And they were caught in the act of

21   her giving him an enema in this room in the nursing

22   home, and so we let them go.

23           Q.    Okay.  Any other examples?

24           A.    There were times when -- well, I've

25   already stated the one that we did in -- well, he

1  ended up resigning, but he would have been terminated

2  without going through the process.    He was the one

3  that was having a romantic relationship with one of

4  his  employees.

5        Q.    And why was he allowed to resign?

6        A.    Well, you can't stop someone from

7  resigning.    How do you stop someone from resigning?

8        Q.    You can terminate them before they resign,

9  right?

10        A.    Well, you could, but we were in the middle

11  of the investigation.    And he came in the next day,

12  and he resigned.

13        Q.    And --

14        A.    So there was -- there was no reason to

15  terminate him because he was already gone.

16        Q.    Okay.  Can you think of any other

17  examples?

18        A.    Not off the top of my head with the

19  exception of -- well, we've had a few employees

20  who -- within their first 90 days, they couldn't

21  perform.  They either didn't show up to work or they

22  didn't even bother to show up to their new hire

23  orientation, and so we would terminate them without

24  going through the process.

25        Q.    And what's the significance of, you know,

1    it being within their first 90 days?

2         A.    Generally, to me, there wasn't a

3    difference.    I probably would have put them on a

4    performance improvement plan.    But sometimes the

5    supervisors didn't always -- they just felt that if

6    they didn't show up and it was three days straight,

7    they were just going to tell them not to come back.

8    And so they ended up terminating them.    That could

9    happen.

10        Q.    Okay.  Are --

11        A.    Me -- me, I didn't really --

12        Q.    I'm sorry?  Go ahead.  Go ahead.  Finish

13   your thought.

14        A.    I didn't feel that there was a difference

15   between 90 days and 45 days or a hundred days.    You

16   know, I would have gone through a progressive

17   discipline if it had to do with job performance.

18        Q.    Okay.  And in your case -- or sorry.   In

19   this case, in Ms. Graham's case, you didn't do an

20   investigation, right?

21        A.    I don't think that's accurate.

22             MR. FRAZIER: Objection.    That

23   mischaracterizes prior testimony.

24        Q.    (By Ms. Hollingsworth)    Would you say that

25   you did an investigation?

1    A.    I would.  I -- I asked for Lisa's input on

2  the training that she provided.  I talked to the

3  witnesses that were there, that were there in the

4  office when Faith told us that she wasn't trained.    I

5  investigated or spoke to the individuals that Lisa

6  had talked to and said she was upset because she was

7  having to babysit Faith.  So I didn't --

8    Q.    What's wrong with that?

9    A.    What's wrong with that?

10    Q.    Yeah.  What's wrong with expressing

11  annoyance because you feel like you're having to

12  babysit  somebody?

13    A.    I feel like that's unprofessional.  I

14  think training someone, a potential employee, to do a

15  job, shouldn't be considered babysitting.   I thought

16  that was an inappropriate comment.

17        Now, I didn't fire her because she said

18  that.   I fired her because she didn't do the training

19  and she lied about it.

20    Q.    Do you remember testifying in Ms. Graham's

21  unemployment hearing?

22    A.    Yes.

23        MS. HOLLINGSWORTH: I've made that

24  transcript Exhibit 25, so I've got that on the

25  screen.    That's GRAHAM 1 through whatever, presumably

1   41.   It's a 41-page document.

2               (EXHIBIT 25 WAS IDENTIFIED.)

3         Q.   (By Ms. Hollingsworth)   So -- I'm not

4   going to go through all of this.   I'm going to scroll

5   through to a couple points.

6               So do you agree that Ms. Graham had

7   never -- you'd never had a problem with her

8   misrepresenting anything in the past?

9         A.   I wasn't aware in the past if she had

10  misrepresented anything.

11        Q.   Okay.  And that she hadn't refused to do

12  anything you had asked in the past?

13        A.   That's not accurate.   There were times

14  when I would ask her to do something or Sandy would

15  ask her to do something, and she would just walk out

16  of the room and not do it.

17        Q.   Well, here --

18        A.   Did I document it?   No.

19        Q.   Well, here when you were asked --

20        A.   But there were --

21        Q.   Can you let me finish?

22               Here in the unemployment hearing where --

23  you said:

24               I felt like Lisa was insubordinate in the

25          fact that she didn't provide that training, and

1        then on top of **it**, she misrepresented what was
2        actually presented to that person, so we
3        terminated her for cause for those reasons.
4              And then the judge said:
5              Had she ever had a problem like this in
6        the past?
7              And you said:    No.
8              Are you changing your answer now?
9        A.    Are you going to let me finish my answer?
10       Q.    I am.
11       A.    Thank you.
12             No, I'm not going to change **it**.    I felt
13   like I did not know whether she had ever
14   misrepresented herself before, and so that was
15   accurate.
16             As far as -- do you have another question,
17   or do you want me to continue?
18       Q.    You can continue.
19       A.    As far as the insubordination, as you list
20   in some of the other writings, I was concerned
21   because she was not doing her job responsibilities
22   when she was asked to.    And so there were times when
23   she did not always do what she was asked to do.
24       Q.    And she was never written up for that,
25   right?

1      A.     No.

2      Q.     "Right," meaning -- "no," meaning she

3  was -- no, she was not written up for it?

4      A.     No, she was not written up for it.

5      Q.     So here you told the Court, you said:

6            I specifically asked her in writing to

7            provide me with a summary of the training that

8            she had provided, and she did not do so.

9            We just looked at an email from you to her

10  where you said thank you for the summary that she had

11  provided you, so why did you tell the judge in the

12  unemployment that she didn't provide with you that

13  summary?

14      A.     I don't know.

15      Q.     So also in the unemployment, Ms. Graham

16  got a chance to ask you some questions, and she

17  said -- I'm looking at the page marked GRAHAM 19.

18  She says:

19            When you spoke to the investigation, you

20            spoke to Annette Beisinger and you spoke to Mia

21            and you spoke to Faith Myers during the

22            investigation.    Investigated them, and they had

23            the opportunity to speak to you and also in

24            writing to make their -- make their statement.

25            So you responded:

1        So let me be clear on that.    There was no

2    investigation.    The information that I had

3    received came to me voluntarily from those

4    particular individuals.    At a later date I did

5    request that they put it in writing, but there

6    was no formal investigation done on the matter.

7        So at what later date did you request that

8    those individuals put something in writing?

9        A.    Lisa had applied for unemployment, and I

10   disagreed with it.    So we were supposed to present

11   other evidence, and I asked those employees to put in

12   writing what had occurred and what they asked, you

13   know.  And I had them notarized and presented it

14   during the hearing.

15       Q.    Okay.  So those statements were in

16   response to Lisa's unemployment request?

17             MR. FRAZIER: Objection.    Vague.

18   Ambiguous.

19       Q.    (By Ms. Hollingsworth)    Go ahead.

20       A.    The written responses, yes.

21       Q.    Okay.  And are you the one who asked them

22   for those statements?

23       A.    I did.

24       Q.    So at the time you made the decision to

25   terminate Lisa, you just had verbal statements from

1  them?

2          A.      Yes.

3          Q.      And you said here -- you said:

4                  Let me be clear on that.   There was no

5          investigation.

6                  And you reiterated it:

7                  There was no formal investigation done on

8          the matter.

9                  Why didn't you do a formal investigation

10  before  terminating  someone?

11          A.      Well, in this particular case, I thought

12  it was pretty self-explanatory.   I mean, there's only

13  a couple of people involved, and I had their input.

14  I -- I guess I could have gotten statements from the

15  other people that were in the office at the time that

16  it was reported that she didn't train, but I -- I

17  didn't feel that it was necessary.

18          Q.      Well, you had Lisa telling you she did

19  train Faith, and you had Faith saying that she

20  didn't; is that right?

21          A.      Correct.

22          Q.      Why wouldn't you have asked Faith to put

23  something in writing then?

24          A.      Because at the time I didn't feel it was

25  necessary.

1      Q.    Okay.   Why would you believe Faith, who --

2  did you know Faith before January -- July --

3      A.    No.   No.

4      Q.    So why would you believe someone you had

5  just met over someone who you had worked with for a

6  couple years at that point and who you just testified

7  you had no reason to believe she had misrepresented

8  anything to you before?

9      A.    Because I didn't feel that there was any

10  reason why Faith would lie.   There wouldn't -- in my

11  opinion, there wouldn't have been a purpose.   There

12  wouldn't have been a value to her to tell an untruth.

13  She didn't -- she didn't know Lisa, so she couldn't

14  resent her or dislike her.   She was counting on Lisa

15  for some training.   And at that point she wasn't even

16  offered a job.   So she didn't work for me, so there

17  was no reason for her to lie.

18        On the other hand, if Lisa didn't provide

19  the training and if she didn't -- and if she said

20  that she didn't provide the training, there would

21  have been a reason for her to lie.   And so I felt

22  that Faith was the more credible person.

23      Q.    Let me ask you some other complaints.

24        MS. HOLLINGSWORTH: I'm going to introduce

25  Exhibit 26 -- or, sorry -- 27.

1                (EXHIBIT 27 WAS IDENTIFIED.)

2        Q.    (By Ms. Hollingsworth)    And this is a

3    letter from Melany Zoumadakis at the request of Lisa

4    Graham, and she talks here in the highlighted portion

5    about Debra Wertz and Sandy Dayton harassing and

6    bullying her whenever she had to connect directly

7    with them about payroll.

8              Did anybody ever talk to you, discipline

9    you, anything, from Bristol about your treatment of

10   Melany Zoumadakis?

11       A.    No.   Why Melany would feel this way, I --

12   I can't guess as to why she would feel this way.   I

13   worked with her for probably almost two years and

14   working with her through her grief, her FMLA issues.

15   She actually received more FMLA than she should have

16   received.   But if she didn't get the answers she

17   wanted, then all of a sudden, people were mean or

18   bullying or not helping her, or whatever.   And so

19   I -- I don't know why she would think those things.

20       Q.    Okay. I'm going to introduce Exhibit 28.

21             (EXHIBIT 28 WAS IDENTIFIED.)

22       Q.    (By Ms. Hollingsworth)  And this says it's

23   a Complaint Investigation February 2018 Summary by

24   Mary Nester.

25             Have you seen this document before?

1      A.     Yes.

2      Q.     What was the context of you seeing it?

3      A.     Well, it would have been because it was an

4  employee-related issue.   Mary would have sent it to

5  me as far as the conclusion of that investigation.

6      Q.     So generally, the person being complained

7  about gets a copy of the -- of the conclusion?

8      A.     Not always.   I think the reason why I got

9  a copy was just because of what my role was.

10      Q.     Okay.

11      A.     And it --

12      Q.     What was Mary Nester's role at the time?

13      A.     She's compliance officer.

14      Q.     Is she still with the company?

15      A.     I heard that she retired, but I'm not

16  sure.   I couldn't tell you for sure.

17      Q.     And what about Sandy Dayton, does she

18  still work for the company?

19      A.     No.

20      Q.     When did she leave?

21      A.     I don't -- I don't know for sure when she

22  left.   I think it was the year following after I

23  left.

24      Q.     Okay.

25      A.     But I don't know for sure.

1          Q.     Okay.  Were you interviewed by Mary as
2    part of this investigation?
3          A.     Yes.
4          Q.     What did she ask you?
5          A.     I don't remember.
6          Q.     Okay.  I'm going to show you Exhibit 29.
7                 (EXHIBIT 29 WAS IDENTIFIED.)
8          Q.     (By Ms. Hollingsworth)    And is this your
9    handwriting at the top of the page on Exhibit 29?
10         A.     I'm sorry.   Ask me that question again.
11         Q.     I said is this your handwriting at the top
12   of --
13         A.     Yes.  Sorry.
14         Q.     Do you remember this chain of emails?   And
15   this is a three-page document that goes from BH 960
16   to 962, and it looks like you wrote an email to Rich
17   Dahlquist on February 15th and responding to concerns
18   that Lisa wrote.
19                And it looks like -- and I wanted you to
20   confirm that in red these are your responses to what
21   she had said.   Is that correct?
22         A.     Can you make it a little bigger?   Because
23   I can't see it.   The writing is -- okay.  Yes, it
24   appears as if those would have been my responses.
25         Q.     Okay.  And so you say here to

1    Mr. Dahlquist -- who is the COO at the time; is that

2    right?

3         A.    Correct.

4         Q.    So does this refresh your recollection

5    that he was looking into Lisa's complaint, for

6    whatever reason?

7         A.    Well, it certainly appears so, so yes.

8         Q.    And you say here:

9              I was disappointed to see that Lisa Payne

10             had shared with Lisa Graham the complaint she

11             had filed.

12             What complaint had Lisa Payne filed?

13        A.    I don't remember.

14        Q.    Okay.  And what was -- was your purpose in

15   making the comments in red to Rich to make him

16   understand your view of what happened in the incident

17   that --

18        A.    Yes.

19        Q.    -- that Lisa complained of?

20        A.    Yeah.  He probably would have sent it to

21   me for a response, and so I responded.

22        Q.    Okay. Let's take a couple minutes for a

23   break.  I'm close to done.  And then I'd like to just

24   look over my notes and see what else I need to go

25   over in the last few minutes.   So can we take, like,

1    ten minutes?

2                    MR. FRAZIER:  That's fine.

3                    MS. HOLLINGSWORTH: Okay.   All right.

4    **I'll** see you at 5:10.

5                    (Recess from 5:01 p.m. to 5:11 p.m.)

6         Q.    (By Ms. Hollingsworth)   Okay. I've just

7    got a couple more exhibits to go through.   I'm going

8    to post Exhibit 30, which is BH 971, and give you a

9    second to read that.

10                   (EXHIBIT 30 WAS IDENTIFIED.)

11        Q.    (By Ms. Hollingsworth)    Do you remember

12   this email?

13        A.    I do.

14        Q.    And is this the complaint you referred to

15   that Lisa Payne made?

16        A.    No.  I didn't think this was a complaint.

17   This was regarding that incident that was outside my

18   office, and I felt like that this was her take on

19   what had occurred.   If you remember my previous

20   testimony, I said that there was one individual that

21   felt that it was inappropriate, but the others felt

22   like that it was equal on both sides.

23        Q.    Well, she -- it looks -- it looks like she

24   wrote to you unprompted, because she says here --

25   starts saying:

1              I'm writing to you regarding an incident

2        that I witnessed earlier this week that seemed

3        aggressive and inappropriate.

4              And then she says:

5              As I've reviewed the harassment policy,

6        among others, I felt it my responsibility to

7        share my concerns as a witness to this incident,

8        as it appeared to be bullying and creating a

9        hostile situation.

10             So --

11        A.    So she sent this one a few days later, but

12   it was still my request for her to tell me what she

13   had observed.

14        Q.    Okay.  So you're saying that you asked her

15   for this?

16        A.    Yes.

17        Q.    Okay.  And based on what she said here

18   about Sandy saying, What is it you don't understand

19   in a loud and dominating voice, did you do anything

20   to discipline Sandy?

21        A.    No.  And the reason -- well, I did talk to

22   Sandy.  I think -- I believe I already testified that

23   I did talk to her about addressing issues in her

24   office and not out in the area.   But the reason why I

25   didn't discipline her is because I had talked with

1    the other people that were in the area at the time it

2    occurred, and she did not -- they did not have the

3    same perception that Lisa Payne had.

4         Q.    Okay.   And do you remember an employee

5    named Mandy Jensen?

6         A.    Mandy Jensen, yes.   I -- if it's the

7    person I think of, I remember her.

8         Q.    And how was your --

9         A.    I think she was a nurse.

10              My relationship with Mandy --

11        Q.    Yes.

12        A.    -- is that what you're asking me?

13        Q.    Yes.

14        A.    I did not have a relationship.   She did

15   not work in my department.

16              MS. HOLLINGSWORTH: Okay.  That's  all  the

17   questions I have.

18              MR. FRAZIER:  Okay.  I just have a couple

19   of questions.

20

21                      EXAMINATION

22   BY MR. FRAZIER:

23        Q.    Debbie, I wanted to ask you a little bit

24   about that incident that you were just talking about,

25   the incident between Sandy and Lisa that you said

1    you'd overheard.   And I think you just saw in that

2    Exhibit 30, that email from Lisa Payne, where she

3    deems it a, quote-unquote, hostile situation.

4            Do you remember that email we just looked

5    at?

6        A.    Yes.

7        Q.    So I wanted to ask you also, I heard

8    earlier in the deposition that there was some --

9    there was a question about whether this would be --

10   constitute a hostile work environment.

11           Let me ask you this:   What is your

12   understanding of what a hostile work environment is

13   under the -- under the law in kind of the HR world?

14       A.    My perspective of a hostile work

15   environment --

16           MS. HOLLINGSWORTH: Let me object that it

17   calls for a legal conclusion.

18           But go ahead.

19           THE WITNESS:  My view of what a hostile

20   work environment would be is if somebody's behavior

21   was so pervasive or persistent that it would be --

22   that another employee would be unable to perform the

23   duties of their job based on a protected class such

24   as gender, religion, and those kind of areas.

25       Q.    (By Mr. Frazier)   Okay.   And so -- and

1   based on that understanding, was there anything that

2   you personally overheard or observed in that incident

3   between Sandy and Lisa that you believe would

4   constitute a hostile work environment?

5           A.      No.

6           Q.      Do you recall, other than this email from

7   Lisa Payne calling it a hostile situation, do you

8   recall anybody reporting to you anything that would

9   have given you any concern about that incident that

10  would have caused it to rise to the level of a

11  hostile work environment as you just described your

12  understanding of that term?

13          A.      No.

14          Q.      Now, I want to ask you another question on

15  a different issue.     You were asked about whether you

16  maintained hard copies or files on employees.     And as

17  you know, I think part of the confusion here is we're

18  doing your deposition and the Rule 30(b)(6) of

19  Bristol simultaneously, so I just want to make sure

20  the record's clear.

21              Did the company, Bristol, maintain, like,

22  personnel or employee files?

23          A.      Yes.

24          Q.      Okay.   And it would have maintained one on

25  Lisa Graham?

1        A.      Yes.

2        Q.      Okay.  And that would have been separate

3   from anything that you may have personally

4   maintained; is that correct?

5        A.      That's correct.

6        Q.      Okay.  And -- and documents relating to

7   their employment write-ups, things of that nature,

8   would have been included in those employee files?

9        A.      Yes.

10               MR. FRAZIER:  I have no further questions.

11               MS. HOLLINGSWORTH: Okay.    Thanks,

12  everybody.

13               THE WITNESS:  Thank you.

14               MR. FRAZIER:  Okay.  We would like to have

15  the right to read and sign, Susette.

16               THE REPORTER:  All right.   And do you want

17  a copy of this deposition?

18               MS. HOLLINGSWORTH:  We would.   I think

19  we'd like an electronic copy.

20               THE REPORTER:   Okay.

21               MR. FRAZIER:  Yeah.   And if you could just

22  send me the read-and-sign copy as well, I will get

23  that to Debbie for her review.

24               THE REPORTER:  Of course.

25               (The deposition concluded at 5:19 p.m.)

1                    REPORTER'S CERTIFICATE

2

3

4           I, Susette M. Snider, Certified Shorthand
Reporter, Certified Shorthand Reporter and Registered
5   Professional Reporter do hereby certify:

6           That prior to being examined, the witness,
Debra Wertz, was by me duly sworn to tell the truth,
7   the whole truth, and nothing but the truth;

8           That said deposition was taken down by me
in stenotype on January 10, 2024, via Zoom
9   videoconference and was thereafter transcribed and
that a true and correct transcription of said
10  testimony is set forth in the preceding pages in
accordance with my ability to hear and understand the
11  Zoom videoconference audio;

12          I further certify that a reading copy was
sent to Ryan Frazier, Attorney at Law, for the
13  witness to read and sign and then return to me for
filing with April L. Hollingsworth, Attorney at Law.

14          I further certify that I am not kin or
15  otherwise associated with any of the parties to said
cause of action and that I am not interested in the
16  outcome thereof.

17          WITNESS MY HAND this 17th day of January,
2024.

18

19

20

21

22  _____
    Susette M. Snider, CSR, CRR, RPR
23

24

25

```
 1   Case:  Graham v. Bristol Hospice Holdings, Inc.
     Case No.:  2:21-cv-00754
 2   Reporter:  Susette M. Snider
     Date taken:  January 10, 2024
 3
                    WITNESS CERTIFICATE
 4
            I, DEBRA WERTZ, HEREBY DECLARE:
 5        That I am the witness in the foregoing
     transcript; that I have read the transcript and know
 6   the contents thereof; that with these corrections I
     have noted this transcript truly and accurately
 7   reflects my testimony.

 8   PAGE-LINE         CHANGE/CORRECTION              REASON
 9   _____     _____   _____
     _____     _____   _____
10   _____     _____   _____
     _____     _____   _____
11   _____     _____   _____
     _____     _____   _____
12   _____     _____   _____
     _____     _____   _____
13   _____     _____   _____
     _____     _____   _____
14   _____     _____   _____
     _____     _____   _____
15   _____     _____   _____
     _____     _____   _____
16   _____     _____   _____
     _____     _____   _____
17   _____     _____   _____
     _____     _____   _____
18   _____     _____   _____

19
     _____     No corrections were made.
20

21        I, Debra Wertz, hereby declare under the
     penalties of perjury of the laws of the United States
22   of America and the laws of the State of Utah that the
     foregoing is true and correct.
23
                         _____
24                       Debra Wertz

25            Date:  _____
```