IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

-ooOoo-

ELIZABETH GRAHAM,                    :

**Plaintiff,** :

v.                                   :

                                            Civil Case No.

BRISTOL HOSPICE                      :      2:21-cv-00754-TS-DSP
HOLDINGS, INC.,

                              :   District Judge: Ted Stewart
                Defendant.        Magistrate Judge:
                              :      Dustin B. Pead

_____

DEPOSITION OF ELIZABETH GRAHAM
TAKEN THROUGH
VERITEXT

Taken on Friday, September 24, 2023
9:38 a.m. to 5:02 p.m.

At KIRTON MCCONKIE
36 South State Street
Suite 1900
Salt Lake City, Utah 84111

Reported by:   Abigail D.W. Johnson, RPR, CRR, CRC

Page 1

1                       A P P E A R A N C E S
2
      For the  Plaintiff:
3
                 Katie  Panzer
4                HOLLINGSWORTH LAW OFFICE,   LLC
                 1881  South  1100  East
5                Salt  Lake  City,  Utah  84105
                 Katie@aprilhollinsworthlaw.com
6                (801)  415-9909
7
      For  the  Defendant:
8
                 Ryan  B.  Frazier
9                KIRTON  MCCONKIE
                 36  South  State   Street
10               Suite  1900
                 Salt  Lake  City,  Utah  84111
11               Rfrazier@kmclaw.com
                 (801)  328-3600
12
13
      Also  Present:   Whitney  Nelson
14
                            -ooOoo-
15
16
17
18
19
20
21
22
23
24
25

                                         Page  2

1
# I N D E X

2
EXAMINATIONS                                                        PAGE

3
  Examination By Mr. Frazier.................................................................4

4

5
# E X H I B I T S

6
EXHIBIT  NO.                    DESCRIPTION                      PAGE

7
Exhibit  1       Plaintiff's Responses to Defendant's...............12
                 First Set of Requests for Production of
8                Documents   and   Interrogatories

9
Exhibit  2       Elizabeth Graham's Resume. .....................................24

10
Exhibit  3       Position   Description.................................................39

11
Exhibit  4       Charge of Discrimination...........................................88

12
Exhibit  5       7/12/2018 Email  correspondence............................144

13
Exhibit  6       7/13/2018 letter from Debra Wertz to.............154
                 Elizabeth   Graham

14

Exhibit  7       Complaint.................................................................208

15

Exhibit 8        Plaintiff's   Initial   Disclosures.......................227

16

Exhibit  9       Elizabeth  Graham  2016  Taxes.................................229

17

Exhibit  10      Elizabeth  Graham  2018  Taxes.................................237

18

Exhibit  11      Elizabeth  Graham  2019  Taxes.................................241

19

Exhibit  12      Elizabeth  Graham  2020  Taxes.................................244

20

Exhibit  13      Elizabeth  Graham  2021  Taxes.................................245

21
-o0o-

22

23

24

25

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1  September 22, 2023                    9:38 a.m.

2                    P R O C E E D I N G S

3                            -o0o-

4  Thereupon --

5                    ELIZABETH GRAHAM,

6   was called as a witness, and having been first duly

7   sworn to tell the truth, the whole truth, and nothing

8             but the truth, testified as follows:

9                        EXAMINATION

10  BY MR. FRAZIER:

11        Q.    Good morning, Ms. Graham.

12        A.    Good morning.

13        Q.    My name is Ryan Frazier.   I'm an attorney

14  with the law firm of Kirton McConkie.   And I represent

15  Bristol Hospice Holdings, Inc. in a matter that you

16  have asserted against it.

17            Is it okay if we refer to my client as

18  "Bristol" today?

19        A.    Yes.

20        Q.    Okay.  Could you please state your name and

21  spell it for the record?

22        A.    Elizabeth Graham, E-l-i-z-a-b-e-t-h

23  G-r-a-h-a-m.

24        Q.    Now, there have been some documents and

25  things in the case where I've noticed it refers to

                                        Page 4

1    "Lisa"  Graham.

2              Is  that  a  name  you  also  go  by?

3         A.     Yes.

4         Q.     As  we  go  forward  today,  how  would  you

5    prefer  that  I  refer  to  you?

6         A.     "Lisa"  is  fine.

7         Q.     "Lisa"  is  fine?   Is  that  what  you  typically

8    go  by?

9         A.     Yes, I  do.

10        Q.     Okay.  Is  that  a  middle  name  or  just  a  --

11        A.     Not  a  middle  name.

12        Q.     Okay.  Just  a  name  you  go  by?

13        A.     Correct.

14        Q.     Okay.  Have  you  ever  been  involved  in  a

15   deposition  such  as  this  previously?

16        A.     I  have.

17        Q.     On  how  many  occasions?

18        A.     I  believe  it  was  one.

19        Q.     Okay.  And  what  was  that  deposition  in

20   connection  with?

21        A.     It  was  in  connection  with  the  --  a  lawsuit

22   with  NuSkin  International, a  gender  discrimination

23   lawsuit.

24        Q.     And  were  you  a  party  to  that  lawsuit?

25        A.     I  was.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1      Q.      Were you a plaintiff against NuSkin?

2      A.      Yes.

3      Q.      Okay.  And when did that deposition take

4    place?

5      A.      I don't exactly remember.  I believe it was

6    in the -- let's see -- I believe it was in the late

7    '80s or early '90s.

8      Q.      So was NuSkin a prior employer?

9      A.      Yes.

10      Q.      Okay.  And what did you do for NuSkin?

11      A.      I started out as a translation manager.

12    They were going into the international market.   I

13    was -- I spoke French.   So -- and was from Canada.   So

14    I -- I started in that position, then I moved into

15    international development and assisted with opening

16    markets in New Zealand, Australia and Canada.

17      Q.      Okay.  And aside from providing testimony

18    in that deposition, have you provided sworn testimony

19    in any other place, such as in a court or in an

20    administrative  hearing?

21      A.      Not that I recall.

22      Q.      Okay.  Now, you mentioned that you had this

23    gender discrimination lawsuit against NuSkin.

24              Were you the only plaintiff in that

25    lawsuit?

1     A.    No.

2     Q.    How many were there?

3     A.    I believe that there was six.

4     Q.    Okay.  So you were one of six plaintiffs in

5 the NuSkin lawsuit?

6     A.    Yes.

7     Q.    And were all of the plaintiffs alleging

8 gender discrimination?

9     A.    Yes.  It was a group action.

10    Q.    Okay.  And how did that lawsuit end?

11    A.    It ended in -- before trial.

12    Q.    In a settlement?

13    A.    Correct.

14    Q.    Was that settlement confidential?

15    A.    Yes, I believe it was.

16    Q.    Have you been involved in any other

17 lawsuits?

18    A.    No, not that I know of.

19    Q.    Now, it sounds like it has been some time

20 since you have been involved in a deposition.   So I

21 just like to go over some ground rules or admonitions

22 before we go, just more to keep a clean and clear

23 record.

24          So foremost, you understand that you are

25 under oath today?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    A.    Yes, I do.

2    Q.    Okay.  And that means you have an

3    obligation to tell the truth just as if you were in a

4    court of law?

5    A.    Yes.

6    Q.    Okay.  And you also understand that

7    everything said is being recorded by the court

8    reporter?

9    A.    Yes.

10    Q.    And as such, she's taking down everything

11    stenographically.  As such, I would request that you

12    respond to my questions verbally, as it's difficult for

13    the court reporter to get down nods of the head,

14    gestures, pointing, things of that nature.

15              In addition, I would also request that you

16    be clear in your responses.  As you might imagine,

17    responses such as "uh-huh" or "huh-uh," while common

18    colloquially, they don't come down on the record very

19    clearly.

20              Therefore, at times I may prompt you, "Is

21    that a yes" or "Is that a no."  I'm not being

22    impertinent.  I'm just trying to make sure that we get

23    a clear record.

24              Is that okay?

25    A.    Yes.

Page  8

1    Q.    In addition, I would just encourage you to

2  understand every question that I ask before you answer

3  it.    If you answer, I will assume that you understood

4  the question as I asked it.    If you need a break or a

5  recess at any time, that's fine.    I'm happy to oblige.

6  The only thing that I would ask is that if there is a

7  question, you will answer the question before we break.

8         Have you understood everything I have said

9  so far?

10    A.    Yes.

11    Q.    Okay.    Any questions before we proceed?

12    A.    No.

13    Q.    Okay.    Have you taken anything in the last

14  24 hours that could impair your ability to testify

15  fully and accurately, such as alcohol or any

16  medications that could affect your ability to answer?

17    A.    No alcohol.    I do take three

18  immunosuppressants for a kidney transplant, but other

19  than that, no.

20    Q.    And do those medications affect your

21  ability to think or to provide clear responses?

22    A.    Not that I know of.

23    Q.    Okay.    Any reason we should not go forward

24  today?

25    A.    No.

Page  9

1    Q.    Have you ever been convicted of a crime?

2    A.    I have not.

3    Q.    Have you ever been charged with a felony?

4    A.    I have not.

5    Q.    What did you do to prepare for your

6    deposition testimony that you would provide today?

7    A.    I went through notes, emails that I

8    previously submitted to the EEOC. I went over some of

9    the Department of Labor documentation, as well as the

10    unemployment insurance documentation.    And basically,

11    that was it, a few of my notes.

12    Q.    Okay.  Did you speak with anybody in

13    preparation for your deposition?

14    A.    No, other than my attorney this morning.

15    Q.    Okay.  So you met with your counsel this

16    morning?

17    A.    Yes.

18    Q.    Have you met with her previously in

19    connection  with this deposition?

20    A.    No.

21    Q.    For how long did you meet?

22    A.    Just for probably 20 minutes or so.

23    Q.    Okay.  Was that an in-person meeting?

24    A.    Yes.

25    Q.    And who all was present during that

Page  10

1      meeting?

2              A.      Katie, the attorney.

3              Q.      And anyone else?

4              A.      Also the other attorney.

5              Q.      The law clerk?

6              A.      Yes.

7              Q.      Who is here present?

8              A.      Yes.

9              Q.      Okay.   Anyone else?

10             A.      No.

11             Q.      Did you speak with anyone else about the

12     substance of the testimony that you may provide today?

13             A.      No.

14             Q.      Other than what you have described for me

15     so far, did you do anything else to prepare for your

16     deposition?

17             A.      No, not that I can think of.   I went

18     through, like I said, the notes that I mentioned

19     previously, the EEOC documentation, notarized

20     information from -- notarized statements from previous

21     employees and UI documentation and also the Department

22     of Labor documentation as well.

23             Q.      Okay.   Have you signed any written

24     statements about the events at issue in this lawsuit?

25             A.      No.

1    Q.    Now, have you produced or provided

2    documents in connection with this lawsuit to be

3    supplied as potential evidence?

4    A.    Yes, I have.

5    MR. FRAZIER:  Mark this as the first

6    exhibit.

7    (Exhibit No. 1 was marked

8    for identification.)

9    MR. FRAZIER:  Counsel, I believe this is

10   the first deposition being taken in this lawsuit.   If

11   you are okay -- and I realize today it probably doesn't

12   matter as much.   What I would recommend is that we --

13   just to stipulate, to use a sequential numbering of

14   deposition exhibits for all exhibits.   In other words,

15   we pick up where we left off rather than starting over.

16   I think it avoids confusion.

17   MS. PANZER: Yeah, that's our preference as

18   well.

19   MR. FRAZIER:   Okay.

20   BY MR. FRAZIER:

21   Q.    All right.   Lisa, you have been handed what

22   has been marked as deposition Exhibit No. 1.

23   A.    Mm-hmm.

24   Q.    Do you recognize this document?

25   A.    No.

1    Q.    Okay.  I will represent to you that these
2    are the responses that we received on your behalf from
3    your counsel that are your responses to, what are
4    called, "Requests for Production of Documents and
5    Interrogatories."
6              So in other words, these are the -- we had
7    made specific requests of you to provide information.
8    A.    Mm-hmm.
9    Q.    And these are your responses to those.
10             Does that -- looking at it now, does that
11   refresh your recollection as to whether you have seen
12   this document previously?
13   A.    Yeah.  I -- yes, I remember responding to
14   some questions or requests for production.
15   Q.    Okay.  Do you recall seeing this particular
16   document before it was sent out?
17   A.    I can't remember if this is the specific
18   document.
19   Q.    Okay.
20   A.    It looks like it, but I'm not -- I'm not
21   sure.
22   Q.    Sure.  And there are two components, as I
23   understand it, to this document.  The first part is
24   the -- your responses to the requests for production of
25   documents, which begins on page 1.

Page  13

1      Do you see that?

2      A.      Yes.

3      Q.      And that continues over through page 5.

4    And I'm going to come back to that in just a moment.

5      But then at the bottom of page 5, you will

6    see that there is a beginning of what are called

7    "Interrogatories," which are written questions to you

8    to be responded to under oath.

9      Do you see that?

10     A.      I do.

11     Q.      Okay.  And what I understand it to be,

12   starting on page 5 and going -- and continuing on

13   through page 9 -- there isn't a page number on page 9

14   for whatever reason -- are your responses to those

15   written questions.

16     Do you see where I'm talking?

17     A.      Yes.

18     Q.      Okay.

19     A.      Page 9?

20     Q.      Yes.  Do you know whether you reviewed and

21   approved the responses to the interrogatories that are

22   contained in this document?

23     A.      I -- I believe I did.

24     Q.      Okay.  Now, one thing I will note is there

25   on that page 9 --

Page  14

1        A.     Mm-hmm.

2        Q.    -- at the bottom there is a purported

3 signature, at least an electronic signature, April

4 Hollingsworth.

5            Do you see that?

6        A.    I do.

7        Q.    And it purports to be as to the objections.

8            Typically, what is done in response to

9 interrogatories is that there is a verification by

10 which a witness testifies that the contents of the

11 responses to the interrogatories are true and accurate

12 to the best of their knowledge. I don't see such a

13 verification here.

14            Do you know whether you ever signed one?

15        A.    I don't recall. It seems like I did review

16 this, but I don't remember signing.

17        Q.    Okay. When you reviewed it, did you look

18 to the responses in the interrogatories to determine

19 whether -- well, to look at the veracity of the

20 responses?

21        A.    Yes, I believe I did.

22        Q.    Okay. And to your knowledge, are they true

23 and correct?

24        A.    Well, I mean, I haven't reviewed them right

25 at this moment. I'm not sure how I can respond to

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    that.

2            Q.      Sure.

3                    MR. FRAZIER:  Well, maybe we can do this --

4    I mean, I'm not sure how long we will go today, but

5    perhaps, at some point, we can take a break and just

6    have her review those.

7                    If we go through the lunch hour, maybe she

8    could do it at that point.   And I would like to come

9    back and have her tell us whether those are accurate or

10   not.

11                   MS. PANZER:  Sure.

12                   MR. FRAZIER:  So I don't want to use the

13   time right now so that we are all sitting here while

14   she reviews them.

15   BY MR. FRAZIER:

16           Q.      So we will come back to that.

17           A.      Okay.

18           Q.      But now I want to turn your attention to

19   those first pages which are the responses to the

20   requests for the production of documents.

21           A.      Mm-hmm.

22           Q.      So as you'll note there, there are several

23   requests.   And I don't want to dive into the details of

24   each one of them, but you will note there are 14

25   different requests.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          And I believe you testified that you

2     provided documents and other materials for production

3     in this lawsuit?

4          A.     Yes, I did.

5          Q.     Okay.  What did you do to search for and

6     gather documents in response to the document requests

7     that we made?

8          A.     I went through -- let's see.  I went

9     through one, the EEOC document that I provided.   I went

10    through the Department of Labor documents that I

11    provided to the Department of Labor.   I went through

12    the unemployment insurance transcript of -- of the -- I

13    guess it was -- I don't know if you would consider that

14    a court, but I went through all the statements that I

15    had received, you know, notarized copies of co-workers,

16    for example.  And I'm just trying to think what else.

17    That's all I can remember at this point.

18         Q.     Okay.  Did you search for any emails or

19    text messages that might be responsive to the requests

20    that were made of you?

21         A.     Yes, I did.

22         Q.     Okay.  And how did you sort through or

23    search your emails and text messages?

24         A.     Well, I just went through my -- my text

25    messages by person.   And then I was asked to copy them

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1     and provide them as evidence.

2          Q.     And how did you determine which persons --

3     how did you determine the identities of the persons for

4     whose text messages you searched?

5          A.     It was co-workers that I had worked with at

6     Bristol Hospice.

7               There was a previous -- there was a

8     previous worker I didn't -- that I did reach out to.

9     And I did search, actually, for -- I believe it was

10    LinkedIn, for him to find out some information.

11              The EEOC representative asked me to -- or

12    directed me to sort of go ahead and -- and find out if

13    there was any previous employees that had a -- had

14    similar situations as mine.  So I did research and

15    followed up with that one individual.

16         Q.     Okay.  And so, to your knowledge, did you

17    search through all of the text messages that you had

18    with co-workers -- of the co-workers that you had while

19    at Bristol?

20         A.     Yes, I believe I did.   I believe it was

21    comprehensive --

22         Q.     Okay.

23         A.     -- as far as the text messages go.

24         Q.     Any other text messages that you looked

25    through?

Page  18

1    A.    Well, I went through -- I'm not sure I

2    understand.    What other text message would I be looking

3    through?

4    Q.    Well, for example -- I mean, it depends on

5    the -- on the request; right?    But it may have been

6    that perhaps you communicated with somebody about

7    Bristol who was not a co-worker regarding the

8    allegations.    And I'm not looking for anything from

9    counsel or with counsel, but more, you know, other

10   parties with whom you were speaking about your

11   allegations, let's say, against Bristol or statements

12   that you had made about the events.

13   A.    Not --

14   Q.    Maybe a family member you communicated

15   with?

16   A.    Well, no.    It was -- it was really focused

17   on co-workers, you know, people I had worked with.    And

18   I had -- I -- my son was aware that I was involved in a

19   lawsuit.

20   Q.    Did you send any text messages to him, to

21   your knowledge, regarding --

22   A.    No.

23   Q.    -- the issues with Bristol?

24   A.    No.

25   Q.    Anyone else that -- that you're aware of

Page  19

1    with whom you may have communicated regarding Bristol,

2    outside of co-workers or your son?

3        A.    No, not that I can remember.

4        Q.    Did you run any general searches on your

5    email or text messages using terms like "Bristol" or

6    anything of that nature?

7        A.    I think I did run searches when I was

8    looking for Eric Payne's contact information because I

9    knew that, obviously, he had worked there previously.

10    And I was looking for his contact information.

11        Q.    Who is Eric Payne?

12        A.    He's a former worker.  In fact, I was the

13    one that replaced his position, essentially, at Bristol

14    Hospice.

15        Q.    Okay.  So when you started in your position

16    of an HR generalist -- benefits generalist at Bristol,

17    you replaced Mr. Payne?

18        A.    Yes, HR benefit generalist.

19        Q.    Yes.

20        A.    I believe he had a different title.

21        Q.    Okay.  Did you ever work at Bristol

22    concurrently with Mr. Payne?

23        A.    I did not.

24        Q.    Okay.  So how are you aware of him?

25        A.    I was -- when I had submitted the paperwork

1    and documentation -- or I was -- I was working towards

2    that preparation, the EEOC representative asked me if

3    there was previous employees that had -- had similar

4    experiences.  And I -- I remembered Eric Payne's name

5    coming up.  And -- and so I decided to find out -- to

6    contact  him.

7             Q.    And do you recall through what media you

8    communicated with Mr. Payne?

9             A.    I -- I think I reached out by texting him.

10            Q.    Okay.  And did he respond?

11            A.    Yes, he did.

12            Q.    Okay.  And what were the nature -- what was

13   the nature of the communications that you had with

14   Mr. Payne?

15            A.    Yeah, I had never met him before I spoke

16   with him before.  But the EEOC -- I explained to him

17   that I was putting together documentation for my EEOC

18   filing.  And I would -- I asked him if there was any

19   issues or difficulties.   I explained my situation, what

20   had happened as far as my termination goes.

21                 And I asked him, Was there anything that

22   you experienced similar or had sort of any issues or

23   concerns, you know, with your employment at Bristol

24   Hospice.

25            Q.    How did he respond?

Page  21

1    A.    He did have issues.

2    Q.    And do you recall what those issues were?

3    A.    He was terminated, like, on the spot.

4    Q.    And what was the reason?

5    A.    Apparently, there was a conversation

6  between him and Debbie Wertz.   And he was --

7  Debbie Wertz was asking him to sign his job

8  description.   And he had not seen that job description

9  before.   And it included, like, travel up to 50 percent

10  and being, you know -- being -- going up to travel at

11  any point in time.

12         And Eric Payne was hesitant to sign that

13  because he didn't, you know, realize that that was part

14  of his job description, even though he had been working

15  there for a year, because he had not received a job

16  description.

17         And Debbie says, Well, you have to -- you

18  have to sign it or resign.   And Eric Payne replied, you

19  know, that he felt like he was getting a -- he asked

20  Debbie if he could have 24 hours to talk to his wife to

21  sort of review, you know, resigning or signing the job

22  description.   And she said, I will make it easy for

23  you.   You're fired.

24    Q.    And did you produce your communications

25  with Mr. Payne --

Page  22

1       A.    Yes.

2       Q.    -- in -- in this lawsuit?

3       A.    I did.  Actually, he had -- he said that

4 he -- he had wanted to file an EEOC claim as well.  And

5 apparently, he had paperwork that was already -- he

6 had -- he had kept a file, apparently.  And so he

7 had -- I asked him to -- if he would provide a

8 notarized copy because the EEOC representative

9 suggested that I get notarized copies of statements.

10        And he did provide that to me, as well as

11 job evaluations, emails between Debbie Wertz and Sandy,

12 documentation with regard to the CEO at the time.

13        So there -- it was quite a, you know,

14 comprehensive -- and I can't remember exactly how many

15 pages it was, but I think his statement -- his own

16 statement of his experience was about ten pages --

17       Q.    Okay.

18       A.    -- notarized.  I have never -- I have never

19 met Eric.

20       Q.    And going back to the production of

21 documents and the requests to which you responded, to

22 your knowledge, have you withheld any information or

23 documents that were requested that -- well, have you

24 withheld any information that was requested?

25       A.    No, not that -- not that I can recall.   I

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    was asked by my attorney to produce a comprehensive

2    list, and that's what I did.   And if there was anything

3    that I missed, it -- I didn't know.  It's like, I gave

4    what I had.

5         Q.    Okay.  But, to your knowledge, there wasn't

6    something that was intentionally --

7         A.    No.

8         Q.    -- left out?

9         A.    No, I didn't.

10         Q.    I would like to turn my attention a little

11    bit back to your background for your employment.

12         A.    Sure.

13         MR. FRAZIER:   Let's have this marked as the

14    next exhibit.

15              (Exhibit No. 2 was marked

16               for identification.)

17    BY MR. FRAZIER:

18         Q.    Lisa, you have been handed what has been

19    marked as Deposition Exhibit No. 2.

20         A.    Okay.

21         Q.    Have you seen this document before?

22         A.    It does look recognizable, yes.

23         Q.    What is it?

24         A.    It is a résumé from -- I guess, since I

25    started at Resource Innovations.

Page  24

1    Q.    Okay.  And just to be clear, this is your
2    résumé; is that correct?
3    A.    I believe it is, yes.
4    Q.    Okay.  And who prepared this document?
5    A.    I did.
6    Q.    Now, you said that it was when you were
7    with Resource Innovations.
8         Has --- are you no longer with Resource
9    Innovations?
10    A.    I am with Resource Innovations.
11    Q.    Okay.  How current is this résumé?
12    A.    It's not current.
13    Q.    Okay.  And what information would you add
14    to make this résumé current?
15    A.    I was promoted to an associate program
16    manager for the ComEd standard program at Resource
17    Innovations.  And I no longer work out of Salt Lake
18    City.  I work out of Chicago.
19    Q.    So did you relocate --
20    A.    No, I didn't.
21    Q.    -- to Chicago?
22    A.    I'm remote.
23    Q.    Okay.  So you work out of the Chicago
24    office, but you do so here in the Salt Lake area?
25    A.    Correct.

Page  25

1    Q.    And when were you promoted to the associate
2    program manager position with Resource Innovations?
3    A.    September -- actually, it probably would
4    have been earlier than September.  I believe it was
5    August of 2022.
6    Q.    And in connection with that, did you
7    receive an attendant boost in compensation?
8    A.    I did.
9    Q.    A raise, if you will?
10   A.    Yes.
11   Q.    And what is your current compensation at
12   Resource Innovations?
13   A.    84,975.
14   Q.    As an annual salary?
15   A.    Correct.
16   Q.    Okay.  And is that what you have received
17   ever since you were promoted to that position?
18   A.    No.  I started out with 82,500.
19   Q.    Okay.  And then, at some point, it was
20   raised to the amount you just --
21   A.    Correct.
22   Q.    When did that happen?
23   A.    That happened at the first -- I think it
24   was the first quarter of 2023.
25   Q.    Okay.  Now, you will note here on your

Page  26

1    résumé, **it** says that you started with Resource

2    Innovations in January of 2019; is that correct?

3         A.    That's correct, as a temporary employee.

4         Q.    Okay.   And when you say a "temporary

5    employee," are you meaning that you were provided --

6    that you were provided through a resource staffing

7    agency?

8         A.    Correct.   Well, **it** wasn't a resource

9    staffing agency. It was a third-party staffing agency.

10        Q.    Okay.   And what was the name of that

11    staffing agency?

12        A.    I think **it** was -- I think **it** was Eric

13    Turner, maybe.

14        Q.    And, at some point, did you move from the

15    staffing agency to becoming a full-time, non-temporary

16    employee with Resource Innovations?

17        A.    I did.

18        Q.    And when did that happen?

19        A.    I started as a temp in January of 2019, and

20    I became a full-time employee in July -- on July 1st.

21    I believe **it** was the very beginning of July, excuse me.

22        Q.    And when you were **fi**rst hired on, what --

23    as a temporary employee, what were you hired to do?

24        A.    I was just doing a rebate -- assisting in

25    the rebate program of a couple of programs they had,

Page 27

1  like ThermWise and MidAmerican.   And I was -- I'm just

2  trying to think what I did.

3           Basically, I was just assisting in there

4  while I was looking for positions -- full-time

5  positions.

6       Q.   Okay.  And then when you transitioned to

7  full-time employment in -- in July of that year, did

8  your duties change or your title?

9       A.   Yes.

10      Q.   In what way?

11      A.   I became, I believe, a specialist.   An

12 account -- not an account specialist, but a specialist

13 in part of the program that I was working for.   And I

14 started working for the MidAmerican Energy program.

15      Q.   Okay.  And did your compensation remain the

16 same or change when you made that transition to

17 full-time  employment?

18      A.   It increased, yeah.

19      Q.   Okay.  Do you remember what your

20 compensation was at the time?

21      A.   I don't.

22      Q.   Okay.  And did that compensation remain

23 static or consistent from the time that you came on as

24 a full-time employee until you became the associate

25 program  manager?

Page  28

1    A.    No.  I believe I got two promotions while I
2  was in the Salt Lake office.   And so I think there was
3  two -- I got -- I got a wage increase every time there
4  was a wage increase or an incentive for a bonus.
5    Q.    Okay.  And in that, did you -- you said you
6  received promotions.
7          Were those just compensation increases or
8  were they -- did you also have a change in title and
9  duties?
10    A.    Yeah.  I had a change in title and duties
11  because I went from temporary to a specialist position
12  to the account manager and then to the associate
13  program manager.
14    Q.    Okay.  So you've had relatively -- or
15  roughly, four different positions with Resource
16  Innovations, if you include the time that you were a
17  temp employee?
18    A.    Let's see, one, two, three.   I think it's
19  more like three.
20    Q.    Okay.  Now, if you look at your résumé --
21    A.    Mm-hmm.
22    Q.    So we have been looking at the Resource
23  Innovations position that started in January of 2019.
24          The position listed prior to that is with
25  Bristol; is that correct?

Page 29

1      A.      Yes, it is.

2      Q.      And you have it there listed as 2015 to

3  July of 2018?

4      A.      Correct.

5      Q.      Okay.  Did you have any other employment or

6  other means of obtaining compensation in between

7  July 2018 and the time that you hired on as a temp

8  employee with Resource Innovations?

9      A.      Other than unemployment insurance, perhaps?

10     Q.      Yeah.

11     A.      Is that what you are thinking?

12     Q.      Other -- well --

13     A.      Yeah.

14     Q.      Other than that, yes.

15     A.      No, I wasn't working.  I was -- I received

16  unemployment insurance from -- I believe it was July

17  through January.

18     Q.      Okay.  And my understanding was you -- you

19  had applied for unemployment once your employment with

20  Bristol came to an end; is that correct?

21     A.      No.

22     Q.      Okay.  Explain how that process happened.

23     A.      Well, because I was terminated in the way I

24  was, falsely accused, I was -- was not eligible for

25  unemployment insurance.  So I appealed -- I appealed

Page  30

1    that decision.

2         Q.    Okay. Right. But you -- initially you

3    applied and you were denied; is that correct?

4         A.    Yes.

5         Q.    Okay.

6         A.    I guess -- I don't remember actually

7    applying for it.

8         Q.    Okay.

9         A.    It's like -- because I was -- I was denied

10   right from the beginning. So I had to appeal for it.

11        Q.    And then after your appeal, then that's

12   when you received unemployment compensation,

13   retroactive?

14        A.    Yeah, correct.   Yeah. I did get

15   retroactive.

16        Q.    Okay.  And aside from unemployment

17   compensation, did you receive any other forms of

18   compensation or wages in between the time that you left

19   your employment with Bristol and the time you started

20   with Resource Innovations in January of 2019?

21        A.    No.  I don't believe I had any other wage

22   except for the unemployment insurance.

23        Q.    Okay. Now, the position that's listed here

24   for Bristol, this is the position that's at issue in

25   this lawsuit; is that correct?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1       A.    Yes.

2       Q.    And then, prior to that, it says you were a

3 "Digital Arts Grant Specialist" with Salt Lake

4 Community College?

5       A.    Yes.

6       Q.    Okay.  And what did you do with Salt Lake

7 Community College specifically?

8       A.    Just oversaw the development and

9 implementation of a Department of Labor grant, digital

10 arts grant.

11       Q.    Okay.  And it looks like you were employed

12 there from 2011 through July of 2014?

13       A.    Yes, it was a contract.

14       Q.    Okay.  And why did your employment with

15 Salt Lake Community College come to an end?

16       A.    The contract ended.

17       Q.    Okay.  So it was a contract for a set term?

18       A.    Yes.  And it was extended at one point, I

19 believe.

20       Q.    Okay. But the contract, it just ended

21 according to its terms in July of 2014; is that fair?

22       A.    Yes.

23       Q.    Okay.

24       A.    I believe that is.

25       Q.    Now, it looks like there is a gap between

Page 32

1　July of 2014 and when you started with Bristol; is that

2　correct?

3　　　　A.　　Yes.

4　　　　Q.　　Did you have any employment during that

5　time?

6　　　　A.　　No, I do not believe I did.

7　　　　Q.　　Okay.  And then it looks like, at the

8　time -- and it looks like it's partially overlapping

9　with the time you were at Salt Lake Community College.

10　　　　　　You were an external marketing director for

11　the Junior League of Salt Lake City?

12　　　　A.　　Yeah, that was a volunteer position.

13　　　　Q.　　Sure.　　Non-compensated?

14　　　　A.　　It was compensated by me being noted in the

15　cookbook as an external marketing director.

16　　　　Q.　　Okay.  And how much time would you say you

17　spent on that, let's say, per month?

18　　　　A.　　I -- actually, I don't remember at this

19　point.

20　　　　Q.　　Okay.  But, again, that was a volunteer

21　position?

22　　　　A.　　Yes, it was.

23　　　　Q.　　Okay.  And so prior to your time with Salt

24　Lake Community College, it looks like you were at

25　Macy's, Inc. as a human resources operations

Page  33

1    administrator?

2         A.    Correct.

3         Q.    Okay.  And what were you doing in that

4    capacity for Macy's?

5         A.    I was overseeing the human resource part of

6    it and -- and also the operations administrator for the

7    company had just recently merged.  And I was doing HR

8    functions like recruitment, training and development.

9    And I also had a staff for HR -- for the operations

10   team.

11        Q.    Okay.  Now, it looks like you did that from

12   2005 to 2009.

13              Are those dates correct?

14        A.    Yes.  I believe they are.

15        Q.    And it looks like there was a gap then, in

16   employment, from the time that you departed from Macy's

17   until you started working on that contract with Salt

18   Lake Community College?

19        A.    That's right.

20        Q.    Any other employment between Macy's and

21   Salt Lake Community College?

22        A.    Not that I remember, no.

23        Q.    Okay.  And then it says you also received a

24   bachelors degree in economics and political science

25   from the University of Toronto?

Page  34

1      A.     Yes.   And also from St. Francis Xavier.

2      Q.     And when you say, "also from St. Francis

3  Xavier" --

4      A.     I spent the second year of college at

5  St. Francis Xavier.

6      Q.     Okay.  But the degree itself --

7      A.     That's correct.

8      Q.     -- was from the University of Toronto?

9      A.     Correct.

10      Q.     Any other degrees that you received aside

11  from that bachelor's degree?

12      A.     No.

13      Q.     Post, we will say, secondary or high

14  school, have you received any other training or

15  post-high school education besides what you've

16  described?

17      A.     As far as, like, for instance, yeah, I have

18  received multiple certifications, but no additional

19  bachelor's degree.

20      Q.     Okay.  And what have you received

21  certifications  in?

22      A.     International business at Salt Lake

23  Community College, a certification for that.

24              During -- let's see, workers' compensation

25  OSHA training.   There was certifications for that.   And

Page  35

1  there was -- there is other -- there is other ones,

2  too, but I can't think of them right at the moment.

3         Q.    Okay.  And from whom did you get the

4  workers' compensation certification?

5         A.    Workers' Compensation of Utah.

6         Q.    Okay.  And the OSHA training?

7         A.    The same.

8         Q.    So that was a state certification, not

9  federal?

10        A.    No.  Yeah, it wasn't -- it was really

11 just -- yeah, state.  I think it was work -- if I'm

12 remembering correctly, it was, like, Workers'

13 Compensation of Utah.

14        Q.    Okay.

15        A.    And that's where the courses and the

16 workshops were always held.

17        Q.    Okay. Any other certifications in

18 particular in connection with human resources that you

19 can think of at this time?

20        A.    I was a member of SHRM.  And no, I didn't

21 get certifications specifically to HR.

22        Q.    Okay.  Now, we have spoken a little bit

23 today about Bristol and the fact that you were employed

24 there, as we noted on your résumé.

25               How did you first become aware of a

Page  36

1    position with Bristol?

2         A.    I believe that I first became aware of the

3    position at Bristol through a staffing agency.

4         Q.    Okay.  Do you recall what that staffing

5    agency was?

6         A.    No, I don't.

7         Q.    Okay.  And you originally started there as

8    a temporary employee --

9         A.    Correct.

10        Q.    -- through the staffing agency?

11        A.    Yes.

12        Q.    Okay.  What do you understand that Bristol

13   does?  In other words, what is it in the business of

14   doing?

15        A.    Hospice, providing -- providing care,

16   medical care to patients that are -- their lives are

17   ending.

18        Q.    Now, do you recall when you first started

19   working as a temporary employee with Bristol?

20        A.    December 28th, 2015.

21        Q.    Okay.  And, at some point, you were hired

22   on as a direct employee of Bristol?

23        A.    Yes.

24        Q.    And do you recall when that was?

25        A.    April 1st of the following year.

Page  37

1      Q.    So that would have been --

2      A.    2016, yeah.

3      Q.    Now, when you were hired on as a temporary

4  employee, what were you doing for Bristol?

5      A.    I was doing essentially the same thing that

6  I eventually ended up doing, an HR benefits generalist.

7      Q.    Okay.  And so when you were brought on as

8  that temporary employee, is that when you took over the

9  duties that had previously been done by Mr. Payne?

10     A.    Yes, I believe it was.

11     Q.    Okay.

12     A.    The essential duties, I believe, are the

13  same.  There might have been a little bit of variation.

14     Q.    Okay.  And so it -- as you said, on

15  April 1st of 2016, that's -- that's when you became a

16  full-time direct employee of Bristol?

17     A.    Yes.

18     Q.    Okay.  And did you, at that point, have the

19  title of human resources benefits generalist?

20     A.    Yes.

21     Q.    And was that your title the entire time

22  that you worked for Bristol?

23     A.    Yes, I had the same title.

24     Q.    Okay.

25            MR. FRAZIER:   Let's mark this as the next

Page  38

1    exhibit.

2                    (Exhibit No. 3 was marked

3                        for identification.)

4    BY MR. FRAZIER:

5         Q.    Lisa, you have been handed what has been

6    marked as Deposition Exhibit No. 3,

7              Do you recognize this document?

8         A.    Yes, I believe this is the -- my job

9    description.

10        Q.    Okay.  And while you were employed with

11   Bristol, you had the opportunity to review this?

12        A.    I believe I did.

13        Q.    Okay.  And if you'll look at the third page

14   of this document, it has got a -- it says "Page 3," but

15   it also has what we call a Bates number and they are

16   numbers that are put on a document, a control number.

17   And it says GRAHAM 000102.

18              Do you see that?

19        A.    I do.

20        Q.    Okay.  On that page, there purports to be a

21   signature above what says, "Employee Signature."

22              Do you see that?

23        A.    Yes, I see my signature.

24        Q.    Okay.  So that is yours?

25        A.    That's correct.

                                        Page  39

1  Q.   All right.   And **it** appears that you signed
2  **it** on or about April 1st, 2016?
3  A.   Yes, that's what **it** appears.
4  Q.   Okay.   So that would have been the date
5  that you became -- I think that you testified you
6  became the full-time employee?
7  A.   Yes, I believe that's true.
8  Q.   Okay.   And do you recall reviewing this
9  position description prior to signing the document?
10  A.   I don't recall.
11  Q.   Okay.   But you understood when you signed
12  this, there on April 1st, 2016, that this was a
13  document that laid out the duties and roles that you
14  would have in the capacity as an HR benefits
15  generalist?
16  A.   Yes, and also additional ones that -- other
17  functions as well --
18  Q.   Okay.   And --
19  A.   -- that would be -- that would be given to
20  me.
21  Q.   Okay.   And I want to go to the job summary
22  that's on the very first page, also GRAHAM 100.
23      Do you see where **it** says, "Job Summary"?
24  A.   Yes, I do.
25  Q.   Okay. It says, "This individual is

Page 40

1    responsible for the implementation of all Bristol

2    Hospice and Homecare wellness programs, processes,

3    procedures and systems including, but not limited to,

4    Benefits, FMLA, ADA, Workers' Compensation, Safety,

5    Employee Assistance Program, and Wellness programs."

6            As you were working for Bristol, were you

7    involved in all of those different programs and

8    systems?

9        A.   Yes, I was.  I believe I was.  Except

10    for -- I don't believe that the wellness -- they didn't

11    have a wellness program at the time or I wasn't aware

12    of it.

13        Q.   Okay.  So you don't recall ever doing

14    anything with the wellness program while you worked

15    there?

16        A.   I don't.

17        Q.   And in connection with benefits, what --

18    tell me what you would do in this position for Bristol.

19        A.   Well, Bristol, at the time, had 500

20    employees.  And, basically, I was the point person for

21    the seven locations -- seven state locations.   And I

22    think there was, like, 13 offices.   And I would be

23    involved in the enrollment, prepping for the enrollment

24    and assisting employees with their benefits if they had

25    any questions, the mainland and also, Hawaii.   And I

Page  41

1  was training executive directors, business office

2  managers and employees on the benefits that were

3  available to them through the -- the insurance programs

4  that we had.  So it was, like, medical insurance,

5  supplemental insurance, going through those -- the --

6  the enrollment of it and then also assisting them with

7  whatever questions and whatever issues they had with

8  their benefits.

9      Q.    Okay.  And as you mentioned -- you

10  mentioned a couple of them, I think, as you were

11  providing that synopsis.

12          What benefits do you recall Bristol

13  providing during the time that you worked there?

14      A.    Medical, vision.  They had actually -- at

15  the very beginning, they had an enormous selection of

16  benefits.   So they had the main medical insurance and

17  then they had supplemental insurance as well, life

18  insurance.   They had FSAs.  They had HSAs.  And that's

19  really, you know, the entire expanse of that.   They had

20  also, like, pet insurance and numerous -- at the

21  beginning, they had a numerous kind of selection of

22  insurance, but they definitely pared it down as time

23  went on and they got new contracts.

24      Q.    Okay.  Any other benefits that you recall?

25      A.    Not that I can, at this time.

Page  42

1    Q.    Okay.  And to whom were the benefits

2    offered?    In other words, which -- to which employees

3    were the -- the medical insurance and the other

4    benefits offered?

5    A.    Full-time employees, there was a -- there

6    was a program for -- benefits for full-time employees

7    and there was benefits for part-time employees.  I

8    believe there was other benefits for other employees

9    that were in different categories as well.

10   Q.    Okay.  And while you worked there as a

11   full-time employee, you would have been entitled to

12   those benefits as well?

13   A.    I was.

14   Q.    Okay.  Now, next, you say that you were

15   also involved in FMLA and ADA.

16        What did you do in connection with FMLA and

17   ADA?

18   A.    Well, as far as FMLA, the corporate office

19   was the centralized point for FMLA. So basically, I

20   was the point in the corporate office for FMLA and

21   coordinated with the 12 -- or the 13 offices at the

22   time, with the executive directors.    They would get --

23   they would get a request from an employee, get the

24   information.    I would get it back to corporate, go

25   through it, see if they were eligible, go through all

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    the paperwork, prepare **letters**, send **it** back to the

2    corporate office -- or send **it** back to the location

3    executive director or business office manager.  And

4    they would, you know, go through that information with

5    the employee.  And then I would basically follow up

6    with the employee until they returned back to work.

7          Q.    Okay.  And what would you do in connection

8    with the ADA?

9          A.    ADA, I can't remember any specific issues

10   with ADA, but I recall having conversations with Debbie

11   Wertz on ADA.

12                I don't believe that we had any employees

13   that had ADA issues because I remember a conversation

14   that we had like that.  But other than that, no.  It's

15   like I wasn't following up with any employees, so to

16   speak, that did have ADA issues.

17         Q.    Okay.

18         A.    As far as I understood, there was no

19   employees that had ADA issues.

20         Q.    Okay.  And to your knowledge, there weren't

21   any employees -- let me back up.

22                Would you have been the person that would

23   have handled a request for an accommodation?

24         A.    I think that I would have been involved in

25   that request, but I think that Debbie Wertz would have

Page  44

1    also been involved in that as well.

2         Q.    Okay.  But you don't recall handling any of

3    those during the time you were employed there?

4         A.    The only one I can really think of was

5    Melany Zoumadakis.  I was -- I was asked to do employee

6    relations followup with her during an FMLA situation.

7    And I believe that she was -- I believe that there were

8    some ADA issues with that employee.

9         Q.    All right.  Now, the next one is "Workers'

10   Compensation."

11        What did you do in connection with workers'

12   compensation?

13        A.    Like FMLA -- FMLA, workers' compensation

14   was centralized in the corporate office.   And so

15   basically, again, you know, I was the liaison to the

16   locations, working with the executive directors,

17   following up with -- with any of the workers'

18   compensation issues for any of the employees.   And we

19   would go back.

20        We would basically follow up their claim

21   until they got back to work.

22        Q.    Okay.

23        A.    And we -- we did have a -- a software

24   management at the end with Liberty Insurance, where we

25   would, you know, run loss reports probably on a monthly

Page  45

1    basis.   Because every location had -- you know, we

2    monitored every location as far as the -- of the

3    workers' compensation that they had.

4         Q.    Okay.  And then you say also safety and the

5    employee assistance program.

6              What -- what was your involvement in those

7    programs?

8         A.    Yeah, the safety was really not as

9    established.   This is something that was really

10   implemented.  I had a lot to do with the implementation

11   of the safety, especially OSHA. It wasn't, you know,

12   really established as it's required to be.   But when I

13   got on board, because I had background information, I

14   was actually the safety manager at Macy's.

15             I was the point person for all the OSHA

16   reporting.   Making sure that all the locations were,

17   you know, doing their documentation and posting the

18   requirements for -- for OSHA and the safety program and

19   making sure that each location had a -- you know, a

20   required safety program.

21        Q.    Okay.

22        A.    And also, as far as safety goes, too, there

23   was -- just after Katrina, there was a -- I think it

24   was a federal/state medical requirement that all

25   organizations within a community work together for

Page  46

1  emergency preparedness.   And that took a year to -- I

2  think it took about a year to establish.   And I was,

3  like, the committee chair for that.

4            I did eventually get another co-chair for

5  that, but that was working, again, with the executive

6  directors from all the locations and implementing that

7  program.

8       Q.    Okay.  Now, in administering these various

9  programs and things that you were involved with,

10 what -- what computer programs and applications would

11 you use?

12      A.    We used Chronus for -- we used Chronus.   We

13 used Paylocity.   We used DBA Software.   We used

14 software for the HSAs. I'm trying to think what else.

15 It's really -- I think there was another software that

16 we had, an HR management, but I can't recall right now.

17      Q.    Okay.

18      A.    But basically, in the end, we were using

19 Paylocity.

20      Q.    Okay.

21      A.    And that was HR.

22      Q.    For everything?

23      A.    Yeah.  It was -- it was comprehensive in

24 the sense that it was, like, for payroll as well as HR,

25 like, benefits and everything like that.

1       Q.      But in your capacity, you didn't have

2  anything to do with the payroll?

3       A.      Well, yes, I did.  Because it's, like -- as

4  far as, like -- for instance, like, with FMLA, you

5  know, they would have to pay a monthly -- you know, in

6  order to continue their insurance, I would calculate

7  what they needed to pay to continue their insurance

8  while they were on leave.

9       Q.      Okay.

10      A.      And so I did coordinate with the payroll

11  department to insure that that was correct and that

12  they were making payments and that their accounts were

13  up to date.

14      Q.      Okay. Now, as far as benefits go, like the

15  health insurance that you described, for full-time

16  employees, were -- was -- to your recollection, was --

17  did Bristol just provide the health insurance or was

18  the employer required to pay for a portion?

19      A.      The -- Bristol Hospice paid for a portion

20  and the employees paid for a portion of it.

21      Q.      Okay.  And do you recall approximately what

22  percentage each -- of the premium each paid?

23      A.      No, I can't remember right at this time.

24      Q.      Okay.  I mean, was it -- did Bristol cover

25  a substantial portion, like 80 percent or was it a

Page  48

1    smaller portion, like, 50 or --

2         A.    I don't -- I don't recall.

3         Q.    Okay.  And you said that you used

4    Paylocity.  At some point, that just became the program

5    that you used for virtually everything; is that right?

6         A.    Yeah, 2018.

7         Q.    In 2018?

8         A.    Mm-hmm.

9         Q.    Had you worked with Paylocity before you

10   worked at Bristol?

11        A.    No, I did not.

12        Q.    How did you become familiar with that?   How

13   did you learn the program?

14        A.    There was a point person or basically a

15   coach-in-training representative for Paylocity.  And I

16   believe I got most of my training through there.   There

17   was other -- there was other courses available, too.

18   But really, the most training that I got was actually

19   using the software and conferring and collaborating

20   with this representative that we had to train us.

21        Q.    Okay.  And did you feel like you became

22   fairly proficient in Paylocity?

23        A.    Yes.  It's like it was implemented at the

24   beginning of 2018.  And so, it's like I was there, you

25   know, for seven months after that.   I would say I

Page  49

1    was -- yeah, pretty proficient in it.   I was able to do

2    all that I did.

3            It was a -- it was definitely a learning

4    curve, you know, for the entire team in the HR

5    department, but step by step, you know, we had good

6    support from the Paylocity team.

7            And I believe that we were, you know,

8    developing the skill set to become proficient and

9    comprehensive so that we could provide, you know, the

10    good customer service to our employees.

11        Q.    Okay.  And I think that you said that your

12    employment with -- with Bristol came to an end in or

13    about July of 2018?

14        A.    July 13th.

15        Q.    The 13th?

16        A.    2018.

17        Q.    Okay.  Now, while you worked for Bristol,

18    were you paid on an hourly or a salary basis?

19        A.    I was paid hourly.

20        Q.    For the entire time that you were there?

21        A.    I believe that's correct.

22        Q.    And were you considered a nonexempt

23    employee then?

24        A.    No, I -- I think that a nonexempt would be

25    salary.

1    Q.    Oh, right.    Right.    No, it would be exempt

2    salaried, right, not exempt --

3    A.    Yeah.

4    Q.    That you were -- you were subject to the

5    FLSA?

6    A.    I could work -- I could do -- yeah, I could

7    work --

8    Q.    You were entitled to overtime and minimum

9    wage; correct?

10    A.    Correct, yeah.    Yeah, yeah.

11    Q.    So you -- you would have been nonexempt?

12    A.    Yes.

13    Q.    Because you would have been subject to the

14    law?

15    A.    Right.

16    Q.    Yeah.    And so you were -- do you recall

17    what your hourly rate was when you left in July of

18    2018?

19    A.    I think it was, like, 27 or $28 an hour --

20    Q.    Okay.

21    A.    -- if I remember correctly.

22    Q.    Do you recall what it was when you started?

23    A.    No, I don't.

24    Q.    Okay.    Do you recall whether you received

25    significant raises over time or whether it was pretty

Page  51

1　constant?

2　　　　A.　You know, I don't remember the sequence of

3　what wage increases -- from the time that I was hired

4　on April 1st, 2016, to when I left, but I do believe I

5　did get wage increases.

6　　　　Q.　Okay. And in addition to -- did you

7　receive any other compensation in addition to your

8　hourly rate?

9　　　　A.　Yeah, I think that there was bonuses,

10　maybe. Excuse me. Also, too, there was a -- there was

11　a wage increase of 3 percent that I was supposed to get

12　before I -- I left.　But I was -- I didn't get that.

13　And I did go to the Labor Commission for that.

14　　　　　　I think there was, like, a missed amount

15　of, like, something like $1,100 or $1,700-plus there

16　because I had received a certification, an insurance

17　certification.

18　　　　Q.　And you understood that, pursuant to

19　Bristol's policies, that you were entitled to a 3

20　percent raise if you obtained that particular

21　certification?

22　　　　A.　Not necessarily a specific certification,

23　but a certification that would qualify for a 3 percent

24　raise.

25　　　　Q.　Okay.　And you believe you obtained that

Page  52

1  certification that was required for the 3 percent
2  raise?
3       A.     I -- yes.
4       Q.     Okay.
5       A.     I understood that that was eligible for a
6  3 percent raise.
7       Q.     Okay.  And do you recall when you received
8  that particular certification?
9       A.     I don't.  It may have been August -- it was
10 probably about a year before I was terminated, which
11 was 2017, maybe the summer, August or something like
12 that.  I'm not really sure of the -- actually, I had --
13 I had more than one certification.    It was, I think --
14 I think there was two or three certifications that I
15 got.
16      Q.     That would have qualified you for the
17 3 percent raise?
18      A.     Mm-hmm.
19      Q.     Okay.  Now, you said you believe that that
20 was approximately $1,700?
21      A.     Or $1,100-plus.
22      Q.     And how did you determine that?
23      A.     I went through -- I was requested to go
24 through my payroll stubs by the Department of Labor.
25      Q.     And did the Department of Labor award you

Page 53

1  that particular amount, whether it was 1,100 or 1,700?

2      A.    They did not.

3      Q.    Okay.  So it was denied?

4      A.    It was denied.

5      Q.    So it -- so the Department of Labor, as you

6  understood it, determined that you are not entitled to

7  that  amount?

8      A.    I wasn't entitled to that amount.  I'm not

9  sure if it was because I was terminated under the

10  circumstances that I was terminated.

11      Q.    All right.  So you -- you don't know why

12  you were denied it, you just know you were denied it?

13      A.    I -- yeah, I was denied it.

14      Q.    Okay.  And you're not suing to collect that

15  amount in this lawsuit; correct?

16      A.    Well, I mean, I think that I should get

17  that amount.  I had earned it, and I didn't get it.

18      Q.    Okay.  But my question is slightly

19  different, which is:  Is that a claim that you are

20  making in this lawsuit?

21          MS. PANZER: Objection to the extent it

22  calls for a legal conclusion.

23          THE WITNESS:  Yeah, I don't know.

24  BY MR. FRAZIER:

25      Q.    Okay.  Now, you said you believe you also

Page  54

1    were entitled to bonuses.

2              Do you recall what you received by way of

3    bonuses?

4         A.    I don't.

5         Q.    Okay.   Were they annual bonuses?   Were they

6    discretionary  bonuses?   Do you -- do you recall any of

7    the details of the bonuses?

8         A.    I don't.

9         Q.    Okay.  Are you even certain whether you

10   received bonuses?

11        A.    Yes, I did receive -- I believe I did

12   receive bonuses.  I just can't recall at this time

13   exactly what -- you know, what constituted the bonus.

14        Q.    Okay.

15        A.    I'm not sure.

16        Q.    So you just don't remember what they were;

17   is that fair?

18        A.    I don't understand your question.

19        Q.    Sure.  I'm just trying to get to the bottom

20   of what the bonuses were.  And it sounds like you

21   believe there were bonuses, you just don't remember

22   what they were for or how much they were?

23        A.    I believe there was bonuses.  I don't

24   recall exactly the makeup of the bonus --

25        Q.    Okay.

Page 55

1       A.    -- at this time.

2       Q.    Do you recall how frequently you would

3  receive the bonuses?

4       A.    No.

5           MR. FRAZIER:  Okay.  Why don't we go ahead

6  and take a break for a few minutes.  Maybe a 10-minute

7  or so.

8           MS. PANZER:  Okay.

9           (Recess was taken.)

10          MR. FRAZIER: Let's go ahead and go back on

11  the record.

12          MS. PANZER:  Let's do **it.**

13  BY MR. FRAZIER:

14       Q.    And, then, you said you were an hourly

15  employee while you were at Bristol?

16       A.    Yes.

17       Q.    Do you -- did you have an understanding of

18  how the person who -- Mr. Payne, who was in the

19  position before you, was compensated?

20       A.    Yes.

21       Q.    And how -- what did you understand was --

22       A.    I understand that -- I understood that was

23  salaried.   And -- yep.

24       Q.    Okay.  And did you have an understanding of

25  why there was a change there?

Page 56

1     A.     No, I didn't.   I -- I expected and I
2   thought that I was going to be salaried as well.
3     Q.     Okay.   Did -- how did you feel about being
4   an hourly employee?
5     A.     I understood that it was going to -- well,
6   that's  what I was offered, and I accepted the position.
7     Q.     Okay.  So no concerns about the fact that
8   you were on an hourly basis?
9     A.     No.
10    Q.     Okay.  Now, are you familiar with somebody
11  by the name of Debra Wertz?
12    A.     Yes.
13    Q.     Who is that?
14    A.     She was the EVP of HR while I worked there
15  and my supervisor.
16    Q.     All right.   And how would you describe your
17  relationship with her?    I don't mean mechanically, but
18  just more, the nature, you know?    How did you get along
19  with her?   Things of that nature.
20    A.     I got along well with her.   She was, like,
21  my supervisor.   I was her direct report.      And we went
22  back and forth.  There wasn't a lot of communication.
23  We didn't have, like, one-on-ones regularly, in any way
24  whatsoever, but, you know, I was literally just right
25  outside her office.     And I felt like I had access to

Page  57

1  her any time I needed, really.

2      Q.   Did you ever have any issues with

3  Ms. Wertz?

4      A.   I think that there was -- there was some

5  issues with regard to when I was involved with

6  investigations that I was asked to be a part of and I

7  was a part of.

8          For example -- well, just EEOC

9  investigations or internal investigations about

10  employees.

11      Q.   You would be involved with such

12  investigations?

13      A.   Yeah, I was asked to be involved in those

14  investigations.

15      Q.   By Ms. Wertz?

16      A.   Yes.

17      Q.   Okay.  Any time that you believe you

18  were -- that your relationship became antagonistic?

19      A.   What do you mean, "antagonistic"?

20      Q.   Well, that there was, you know, a

21  confrontation between you or where there was --

22      A.   Well, I think that when I was asked to --

23  when she was required to do an EEOC investigation into

24  a sexual harassment lawsuit by Leeya Sengthavichithy.

25  I think that that investigation -- I felt like there

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    was, like, definite hostility.   She -- you know, she

2    physically was, like, beet red and -- and she was very

3    angry, I believe.

4           Q.    At you?

5           A.    Yes.

6           Q.    Why?

7           A.    I -- from what I could tell, it was, like,

8    from what I was reporting to her of what I knew about

9    some of the sexual, you know, allegations that were

10   made against another employee.

11          Q.    So is it fair to say that her reaction

12   wasn't so much a reaction to you as a person, but more

13   to the substance of what you were reporting?

14          A.    Yes, I believe that's true.

15          Q.    Okay.   Any other times when you can -- when

16   you believe your relationship with Ms. Wertz was

17   negative or hostile in any way?

18          A.    I -- I believe that when I submitted a

19   verbal complaint and a written complaint against Sandy

20   Dayton, I felt the same way.   It was -- she was -- she

21   just appeared to be very angry and upset at the -- at

22   what I was -- what was -- the information that I was

23   providing.

24          Q.    In other words, she was antagonistic to the

25   allegations you were making?

1      A.      Yes --

2      Q.      Okay.

3      A.      -- I believe.

4      Q.      And now you said that you made a complaint

5   against somebody by the name of Sandy Dayton?

6      A.      Pardon me?

7      Q.      You said you made the allegations -- or the

8   complaint against somebody by the name of Sandy Dayton?

9      A.      Yes.

10      Q.      Okay.   Who -- who was Sandy Dayton?

11      A.      She was the -- the director of payroll and

12   benefits.

13      Q.      Okay.  In that capacity, would she be your

14   supervisor?

15      A.      Well, I -- I reported directly to Debbie

16   Wertz, but I did have a dotted line to Sandy Dayton.

17      Q.      Okay.   In what way did you have a dotted

18   line to her?

19      A.      With the benefits, because it's, like, a

20   lot of the benefits were tied to the -- the payroll.

21      Q.      Okay.  So she -- so you didn't directly

22   report to her, but she certainly supervised things that

23   you were doing?

24      A.      Yeah.  Generally speaking -- no, I would

25   say, generally speaking, I was -- I was reporting to

Page  60

1    Debbie, but there were -- there was portions of the
2    work, especially towards the end, that I think that she
3    was -- that I did more with her.   Probably with the
4    implementation of Paylocity, there was more interaction
5    there.   Up until that time, there wasn't really a lot.
6          Q.    Okay.   Now, did there come a time, while
7    you were working at Bristol, when Ms. Dayton was
8    promoted to that position?
9          A.    I believe it was, like, in 2016 that she
10   was promoted to that position.
11         Q.    So that was prior to your time at Bristol?
12         A.    No, I was there, because I started in
13   December of '15.
14         Q.    Oh, '15, right.
15         A.    But I think it was soon after.   I can't
16   remember if it was before I was hired permanently,
17   full-time or it was after, but I do remember her
18   getting a promotion to being the director.
19         Q.    How -- how did you feel about her getting
20   promoted to that position?
21         A.    I don't really recall.   I think that Debbie
22   and I may have had a conversation about that.   I wasn't
23   really sure why she was getting promoted to the
24   benefits because she had -- as far as I understood from
25   Debbie, she didn't have experience doing it, except for

Page  61

1    filling in in the interim between me and Eric Payne.

2         Q.    Okay.

3         A.    But other than that, it's like we -- you

4    know, that was she was promoted, I think, very early on

5    when I started.

6         Q.    And -- and given that you thought she

7    wasn't -- she didn't have the -- whatever -- the

8    knowledge or skills or whatever to be over the

9    benefits, did you have a sense of who you thought would

10   be a better fit?

11        A.    Well, I didn't really know her background,

12   you know, at that time in 2016.  And that's why Debbie

13   and I were talking about it.  I believe we had a

14   discussion about it.  And I -- I just had asked,

15   because the position hadn't been posted, but apparently

16   she had some benefit experience, like I said, during

17   the time between -- a few months between Eric Payne and

18   me taking the position.

19        Q.    Okay.

20        A.    So I wasn't really aware of her background.

21   Like, I don't recall seeing her résumé with -- with

22   benefits background, but she was basically hired on, I

23   believe, as a payroll manager.

24        Q.    Okay.  Now, had you applied for or sought

25   to be in that position?

Page  62

1    A.    No.

2    Q.    All right.    Did you believe that, at least

3 with respect to benefits, you were more qualified than

4 she was for that position?

5    A.    Well, in hindsight, probably, because I did

6 have another position at Macy's as well, doing that

7 position.    But what I was -- what I was interested

8 in -- I was not interested in a -- in a director

9 position.    I was interested in the manager position

10 that Eric Payne had, you know, when he left.    That was

11 the position I thought I was working towards.

12    Q.    Did you recall ever expressing to Ms. Wertz

13 that you believed that you should have been in that

14 position, rather than Ms. Dayton?

15    A.    No, I did not apply for or -- the director

16 position at all.

17    Q.    Do you recall --

18    A.    And I -- and as far as payroll goes, no.

19 Because it's -- like, I didn't have payroll experience.

20    Q.    Okay.  Did you -- do you recall having a

21 meeting with Ms. Wertz in which you expressed that you

22 would be better qualified or that you should be in that

23 position, at least with respect to benefits?

24    A.    I don't -- I remember having a conversation

25 with her with regard to Sandy Dayton's experience with

Page  63

1    benefits, because I wasn't aware of it, of her

2    experience.   And, like I had mentioned, it's, like,

3    what I understood from Debbie Wertz is that she did

4    have experience between Eric Payne and me getting the

5    job.

6          Q.   Okay.  And you understood that you had been

7    considered for the job?

8          A.   No, I don't -- I don't believe I was

9    considered.  I had just started.   It was either before

10    or after I was full-time.   So I wasn't applying for

11    that job.   And I wasn't going to be getting that job.

12          The position I was working in was HR -- or,

13    you know, for full-time position.   It was HR benefits

14    generalist.

15          What I -- what I thought I was going to --

16    what I would have applied for would be the manager

17    portion that Eric Payne did.

18          Q.   Was somebody else filling that particular

19    role?

20          A.   No.

21          Q.   Okay.  So did Ms. Dayton assume those

22    duties of the manager over benefits when she took that

23    position?

24          A.   I don't -- you know what, I don't remember

25    what she was doing during that time, but I do remember,

Page  64

1  you know, once we transitioned from White Chronus to

2  Paylocity at the end of 2017, I remember her, you know,

3  more involved with the benefits at that point.   But

4  until then, it was like I was -- I remember being

5  really directly involved with benefits, you know, with

6  Debbie Wertz.   She was my direct supervisor.

7              And it wasn't until, I believe, 2017 that I

8  was -- that Debbie explained to me that I had a dotted

9  line to Sandy Dayton.

10        Q.    When was that, again?   I'm sorry.

11        A.    I don't know.   There was -- I know we had

12  one conversation in 2017 when Sandy was more involved

13  with the Paylocity transition.    Other than that, I

14  can't  remember.

15        Q.    Okay.   And when you said you recall a

16  conversation in 2017, with whom did you have that

17  conversation?

18        A.    Debbie Wertz.

19        Q.    Okay.   And were only the two of you

20  involved or were there others involved in that

21  conversation?

22        A.    I believe it was just Debbie and I.

23        Q.    Okay.   And where did it take place?

24        A.    I believe it was in Debbie's office.

25        Q.    Okay.   And do you recall when in 2017 that

Page  65

1    took place?

2         A.    No, not -- not exact month, I don't

3    remember.  I think it was probably after, like,

4    September, perhaps.

5         Q.    Okay.  Do you recall -- could it have been

6    in November?

7         A.    I don't remember.

8         Q.    Okay.  And I just asked because I'm aware

9    of a November 2017 meeting where I think there was a

10   discussion about Sandy Dayton between you and -- and

11   Debbie -- Debbie Wertz.

12              So, you know, I was wondering if we are

13   talking about the same meeting.

14        A.    I'm not sure.

15        Q.    Okay.  During the meeting that we're

16   talking -- that you're describing, when you -- when you

17   met with her, do you recall expressing frustration that

18   Sandy Dayton was assigned to be over the benefits

19    program?

20        A.    No.   I -- what I remember was that I wasn't

21   invited into meetings that I -- I -- that I needed to

22   be invited to, as far as requirements for my job to

23   provide information to employees about the transition.

24              And I was asking why I wasn't -- you know,

25   if I could be involved in that -- in those transition

Page 66

1    meetings like I had been previous -- in the previous
2    year, for instance.   Because it was difficult having
3    500, you know, employees.
4               And I was basically one of the main point
5    people for the benefits program.   And I wasn't aware
6    of, you know, the date, for instance, of open
7    enrollment for 20 -- the year of 2017, which would be
8    effective in 2018.
9         Q.    Okay.   And who called those meetings?
10        A.    I don't know, because I wasn't at those
11   meetings.
12        Q.    Okay.   Do you know who did attend those
13   meetings?
14        A.    I believe that Debbie Wertz did.   I think
15   Debbie Wertz was involved in those transition meetings.
16   Sandy was involved.   And there may have been some --
17   there may have -- you know, periodically, maybe the CEO
18   was involved.
19        Q.    Okay.   Now, I think you -- let me back up.
20   And just to close the loop on this.
21               Do you recall, at any time, having a
22   meeting with Ms. Wertz in which you expressed
23   frustration about Sandy Dayton being in the position of
24   the payroll and benefits director?
25        A.    Not specifically about that.   I remember --

Page 67

1    you know, there was frustration sometimes with the

2    manner in which she treated employees and myself.

3          Q.    And when you say "she," to whom are you

4    referring?

5          A.    Sandy, Sandy Dayton.

6          Q.    Okay.   And what do you mean by that?

7                When you say you were expressing

8    frustration with how she would treat employees, tell me

9    what you mean by that?

10         A.    Like, for instance, with Leeya

11   Sengthavichithy, you know, there was, like, very

12   sexually explicit conversations between Sandy Dayton

13   and other employees including Leeya Sengthavichithy and

14   her behavior and what she was saying, you know, to

15   these employees.

16         Q.    And is it your understanding that these

17   employees were complaining about what Sandy was saying

18   to them or were you complaining that you had overheard

19   them in these sexually explicit conversations?

20         A.    I was -- well, really, this is, like -- the

21   issue is Leeya Sengthavichithy was part of an EEOC

22   investigation.   So that was one of the discussions I

23   had with -- with Debbie about Sandy Dayton and, you

24   know, behavior towards Leeya Sengthavichithy.   It

25   was -- it was information that Leeya provided to me and

Page  68

1    it was also information that I witnessed because I sat

2    right beside Leeya Sengthavichithy.

3         Q.    Okay.  So let me break that down a little

4    bit.

5              So you noted that there -- that there was

6    an EEOC investigation.        When you were reporting what

7    Leeya had told you, were -- was that in a -- in an

8    official capacity in which you were conducting some

9    sort of internal investigation or had you just had

10   conversations with her about what Sandy had told her

11   informally?

12        A.    I didn't -- I didn't initiate the EEOC

13   investigation.    I understood the EEOC investigation was

14   required by Bristol Hospice.  And it was Debbie Wertz

15   who was conducting that investigation.

16             And when I was asked what I -- if I had

17   heard of any sexual harassing -- you know, Leeya was

18   making -- submitted, I think, a complaint about

19   sexually -- sexual harassment.  And -- and part of that

20   was the way in which, you know, Sandy would sexually --

21   would be very sexually explicit in her descriptions of

22   people -- of employees at Bristol Hospice.  And I did

23   relate that to Debbie.

24        Q.    Okay.  So what you're saying -- when you

25   related that to Debbie, that was as she was conducting

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1  an internal investigation and asking you, almost in a

2  capacity where you were a -- for lack of a better term,

3  witness?

4        A.    Yes, I believe that was what I was.   It's

5  like they were -- it was not -- not just me, but there

6  was multiple people that were -- that were asked to

7  kind of -- Debbie asked to come in and go over

8  information that Leeya had, you know, discussed with

9  them or they had been a part of something directly or

10 they saw something directly, you know?  And Debbie was

11 conducting that investigation.

12       Q.    Okay.

13       A.    And replied back to the EEOC on it.

14       Q.    Okay.  And just to be very clear, you

15 hadn't been asked to participate in conducting that

16 investigation?

17       A.    I'm not sure I quite understand your

18 question because it's like I was part of the

19 investigation.

20       Q.    Sure.

21       A.    But I was asked by Debbie Wertz what I knew

22 of the situation between, you know, Leeya

23 Sengthavichithy and -- and Sandy Dayton.   And what I

24 did is, like, I -- basically, for example, I -- I let

25 Debbie know that, you know, Leeya was very upset that,

Page  70

1    for instance, she was -- Debbie -- Sandy Dayton was

2    calling her a hoe and a hag.    And that she was laughing

3    and -- you know, at another -- or disclosing another --

4    about another employee, alleging that this employee was

5    allowing her boyfriend to urinate on her.    And there

6    was also -- and I did mention that -- that Leeya was --

7    you know, expressed that Sandy, in a mocking and very

8    disrespectful way, would -- would describe one of the

9    employees as, you know, looking like a clown in the way

10    that she applied her makeup and that her -- her wig

11    looked ridiculous, and that she was obese and fat, and

12    that she was wearing clothes that were too tight.    And,

13    you know, nobody that fat should be wearing clothes

14    that tight, et cetera.

15            It was that kind of -- those kind of

16    comments that Leeya, you know, shared with me and, I

17    believe, other HR department employees as well, as one

18    of the reasons why she was, you know, at the point of

19    just quitting.    She couldn't -- she just couldn't, you

20    know, take that kind of behavior --

21         Q.    Okay.

22         A.    -- continuing.

23         Q.    And so, just to be clear -- and I guess my

24    questions have not been very clear.

25            But when you were talking to Leeya, had you

1   been charged by Bristol, in an official capacity, to go
2   inquire as to her experience or was Leeya just sharing
3   it with you as a co-worker?
4           A.    Yeah.  Leeya was just sharing it as a
5   co-worker with me.  And she shared it with multiple
6   other people -- with other people, for sure, in the HR
7   department.  And she was expressing frustration with
8   how she was being treated or how she was allegedly
9   being treated by Sandy Dayton.
10          And those examples were some of the
11  examples that especially bothered her, that she was
12  just, you know, tired of having to listen to these
13  sexually explicit, you know, descriptions from Sandy.
14  And it was, you know, apparently what she -- what Leeya
15  was saying, it was done a very mocking and humiliating
16  way.
17          I, myself, you know, could see the -- you
18  know, that she was upset.  She was right beside me.
19  And it could be where Sandy Dayton would not speak to
20  her and give her the silent treatment, so to speak, you
21  know?  She would ask a question to Sandy, and Sandy
22  wouldn't reply to it.  And oftentimes, towards the end,
23  it was -- Leeya was, like, very upset and crying and --
24  to keep her calm.
25          Q.    So when you were talking to Debbie, that

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    was -- as you understood it, Debbie conducting an

2    investigation into the allegations that had been made

3    by Leeya?

4        A.    Debbie was conducting an EEOC investigation

5    about the allegations that Sandy -- yeah, Sandy's

6    sexual harassment.

7        Q.    Allegations by Leeya against Sandy?

8        A.    Yes.   And I believe that -- actually, that

9    it was also -- not the -- not the sexually explicit

10   language or discussions that Sandy initiated with

11   employees, but also the fact that Leeya was trying to

12   resolve it and wanted to go to different people in the

13   HR department, like Debbie, which she did go to.

14            And she just felt like she couldn't go to

15   Debbie to get, you know, a neutral response from her

16   because it was Sandy.

17       Q.    And when you say, "because it was Sandy,"

18   are you suggesting that there was a -- whether it's a

19   friendship or whatever, kind of a unique relationship

20   between Ms. Wertz and Ms. Dayton that made Leeya feel

21   uncomfortable to reporting to Ms. Wertz?

22       A.    I'm not suggesting it.   I'm just saying

23   that Leeya didn't feel comfortable going to Sandy -- or

24   she -- she told me that she didn't feel comfortable

25   going to Debbie and making a complaint or using the

Page  73

1    hotline or going to the CEO at the time, Chuck

2    Gonzales, because she didn't feel that she was going to

3    get, you know, kind of a fair opportunity there and

4    that they were just going to -- you know, together,

5    they were just determined to see her fired,

6    essentially.

7         Q.    When you say to "see her fired" --

8         A.    Leeya Sengthavichithy.

9         Q.    Okay.  And was she ultimately fired?

10         A.    She actually resigned.  She just -- she --

11    she told me she just couldn't take it anymore.  And she

12    resigned and then her resignation was accepted

13    immediately by Sandy.   And she left.

14         Q.    Okay.  Do you recall any other

15    conversations you had with Ms. Wertz, aside from the

16    information that you provided in connection with the

17    sexual harassment investigation, about Ms. Dayton?

18         A.    Yeah.  There was -- in 2016, apparently,

19    there was another investigation.    It was an internal

20    investigation.    There was some complaint about Sandy

21    bullying people, I believe.   And Debbie conducted that

22    investigation in 2016.  And I believe she called in

23    several employees, and I was one of them.

24         Q.    Okay.  Again, you were just a witness in

25    that particular investigation?

Page  74

1          A.      I'm not quite sure what you mean by
2     "witness."  I'm not --
3          Q.      Well, a witness would be somebody who would
4     be telling what they know.
5          A.      Yeah.
6          Q.      Right?   Whereas somebody filing a
7     complaint --
8          A.      Right.
9          Q.      -- could be the victim.
10         A.      I see, okay.
11         Q.      I'm saying, you know, you have got somebody
12     who is reporting what they know.
13         A.      Got it.
14         Q.      Somebody who is the actual one who is the
15     alleged victim.   Someone else who is the investigator.
16         A.      Yeah, there was -- there was an
17     investigation.    There was some kind of complaint that
18     was -- that was submitted about Sandy and -- in 2016.
19     And -- and I know that there was several employees that
20     took part in it.
21              And I was one of them that was called in to
22     see if I had seen any indication that Sandy had that
23     kind of behavior, bullying and stuff like that.   So --
24     and I did say, Yes, I did.   I experienced it myself.
25         Q.      Okay.  Had you been a part of the group

1  that had made the complaint?

2       A.    No.

3       Q.    Okay.  Now, you said that you were called

4  in by Ms. Wertz; is that correct?

5       A.    I believe, yeah.  It was Ms. Wertz that

6  called me in.

7       Q.    Were you aware of the investigation going

8  on prior to the time that you were called in?

9       A.    Not that I'm aware of.  I think that there

10  was a complaint and then Debbie just had me -- called

11  me in.  And she explained that there was a complaint

12  and that she was doing an investigation.   And she was

13  wondering if I had -- you know, had -- had any input

14  into that or had any -- any signs of, like, bullying

15  from Sandy to -- with other employees.

16       Q.    Okay.  And you reported -- you said that

17  you had reported that you had experienced it yourself;

18  is that right?

19       A.    Well, I did experience it myself, but there

20  was other several employees that experienced it as

21  well.

22       Q.    Okay.  And what did you tell Ms. Wertz in

23  connection with that inquiry?

24       A.    I -- well, just as I said, just as I

25  mentioned, it's like there were several complaints

Page  76

1    about Sandy Dayton bullying people.    And then I said,

2    And I have experienced that myself.

3         Q.    Okay.  Did you have -- give any examples or

4    report particulars?

5         A.    Yeah, like, one of the things that Sandy

6    would do is, like, I would be in my cubicle, my back

7    facing the entrance.   She would come in -- she would

8    always come into, you know, my cubicle unannounced.

9    And she would take the back of my chair and just keep

10   shaking it.

11        And, you know, I asked her to, you know,

12   please stop.   It's like -- and she just would continue

13   to do that when she came into my cubicle.    And she

14   would also make very derogatory references to some, you

15   know, employees working.

16        Q.    To your knowledge, did she ever make

17   derogatory references to you?

18        A.    I don't know that she did that.   Well, I

19   think there was one incident in 2017 where Sandy did

20   come into my cubicle and was, you know, right in my

21   space.   She came in unannounced again.

22        In her face, I could see that she was

23   clearly agitated and frustrated.    And it's, like, so

24   much so that it was difficult to even understand

25   what -- why she was in my cubicle, but she had some

Page  77

1  issue with an employee file and I was trying to figure
2  out, you know, what -- what exactly we were talking
3  about.

4           And she just got, you know, kind of further
5  enraged about it, just, like, right up in my space, in
6  my face.  I was sitting down.  She was, like, right to
7  the right of me.  And it's like -- and I said, It's
8  like, you know, you are in my space.

9           And it's like -- I felt she was trying
10 to -- she was trying to get me to admit to something
11 that she wanted me to admit to.   And it wasn't true.
12 And I just said, Sandy, I'm sorry.   That's not what
13 happened.   Something like that.   And she just kept
14 pursuing it, pursuing it.

15           And I said, you know, Can we just agree to
16 disagree?  I wanted to deescalate it because she was --
17 you know, she had -- she had a tendency to be -- you
18 know, her reactions were pretty intense and it's, like,
19 I just tried to deescalate it.

20           Let's just agree to disagree, you know?
21 And she seemed to sort of settle down a little bit.
22 And then she went on again.   And then, you know, as
23 fast as she came into the cubicle, she went out of the
24 cubicle, without really, you know, resolving anything,
25 necessarily.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1                     But -- and I went -- and I did make a

2 complaint about that to the COO, Rich Dahlquist.  And

3 there was a witness to that, who also made a complaint

4 to Rich Dahlquist, who was Lisa Payne, who was the

5 senior recruiter in Bristol Hospice, who just happened

6 to be walking by and looking into the cubicle at the

7 situation between myself and Sandy.  And she -- she

8 also had a complaint as well, of her behavior with me

9 in that -- at that moment.

10        Q.  What was the issue that Sandy came in

11 about?

12        A.  It was -- it was an employee issue.  I

13 believe it was, like, an employee issue from Hawaii,

14 maybe.  And I -- I really can't remember the specifics,

15 but she was basically telling me that I had done

16 something which I had not done.

17                   And she was just trying to -- kind of

18 bullying me to admit something to that.  And she was,

19 like, really adamant about it.  And she just kind of

20 continued.  And there was just that level of intensity.

21 It wasn't professional.  I mean, it was -- it was,

22 like, intimidating.

23                   And I -- you know, I thought of leaving my

24 cubicle, but I didn't really have the space to do so.

25 So I just did what I could do and then I went directly

1  into Debbie's office, who was right there listening.

2  And, you know, I made a verbal complaint to Debbie.

3            And then she asked me and Sandy to

4  prepare -- I think it was, like, she asked us to both

5  prepare our versions of what happened.  And then I was

6  referred to Rich Dahlquist, who was the COO at the

7  time.  And he did an investigation, apparently.

8        Q.    Did he interview you about the incident?

9        A.    No.

10        Q.    Do you know whether he spoke to Sandy

11  Dayton about the incident?

12        A.    I don't.  I know that -- I think that he --

13  I understood, but I don't know that he read my -- my

14  memorandum about the event, but I -- I was not

15  interviewed at all.

16        Q.    Okay.  Now, you -- you had mentioned that

17  you went in immediately and reported this to Ms. Wertz;

18  is that right?

19        A.    That's correct.

20        Q.    Okay.  And you understood she escalated it

21  up to Mr. Dahlquist?

22        A.    Yes.

23        Q.    Okay.  Now, this was all after the

24  investigation about the bullying; is that right?

25        A.    Yeah.  2016 was, like, a general

Page  80

1    investigation, as far as I understood, about a group of

2    people that -- that put in a complaint about Sandy.

3    And then in 2017, in February, I had -- there was --

4    there was that altercation in my cubicle with Sandy

5    Dayton.

6         Q.    So in light of what you said, I'm just

7    curious, how -- how would you describe your

8    relationship with Sandy Dayton?

9         A.    Well, I didn't really have a lot to do with

10   Sandy Dayton, a terrific amount of, you know,

11   back-and-forth with her.   I obviously was, you know --

12   you know, had a lot on my plate, as far as benefits and

13   my main, you know, connection was going to be with the

14   employees, with the executive directors, with the

15   business office managers, training, OSHA, FMLA.

16             There was -- like I said, there was a few

17   things that did connect us, like FMLA and the amount of

18   insurance money that had to be had.   And I -- I would

19   say there was more interaction towards the end of 2017

20   because she was more involved with the benefits at that

21   point in time.

22             I mean, I was -- you know, I was -- I had a

23   professional relationship with her, but at the same

24   time, you know, how she -- you know, I can't say that,

25   you know, it's like having these experiences I had with

Page  81

1     her, they weren't good experiences. I mean, as far as

2     that goes.

3            However, it's like, for instance, you know,

4     when I did make that complaint to Sandy, in the

5     following April, you know, Debbie took me out to lunch

6     for my birthday, which was traditional. And she asked

7     me how things were going with Sandy. And I said, like,

8     Well, I have moved on. Okay? Because it's like

9     Rich Dahlquist said, The case is closed. It is over

10    and done with. It was a one-off. And we went on from

11    there.

12           And even Lisa Payne, at that point, she

13    said, you know, I -- I will put in a second complaint

14    if I see anything else. So -- and she asked me how

15    things were going with Sandy. And I said, I don't

16    think Sandy is still over it because I'm getting the

17    silent treatment, not just from her, but from, you

18    know, some of her friends in -- in the office. And she

19    doesn't, you know, speak to me. Like, she will walk by

20    me and pretend I'm not there. But at the same time, I

21    would still go into her office if I, you know, needed,

22    obviously, some information to get my work done. And,

23    you know, it was -- it was very limited, actually.

24           And Debbie says, Well, you know, don't be

25    so -- what did she say? She said -- she said, Well,

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1   you should not be surprised because you almost had her

2   fired.

3          Q.    Were you aware of that fact?

4          A.    Aware of what fact?

5          Q.    That she had almost been fired?

6          A.    No, I wasn't.

7          Q.    So this was a surprise to you when you

8   heard that?

9          A.    Yeah.  I was really surprised because it's

10  like -- because I understand there was two times where

11  Sandy was almost fired, once before I was even there,

12  working there.  I understood that she was -- really,

13  because she was payroll, she was technically under the

14  finance department under the CFO, Jerry Christensen.

15          And Jerry and Sandy -- and I -- you know,

16  this is -- I don't know this for a fact, but I heard

17  that there was such -- excuse me -- confrontation there

18  that -- that Jerry -- that she was on the verge of

19  getting fired.  And Debbie stepped in and said, You

20  know, she can -- I will take her under my department.

21  So somehow the payroll started being -- you know, HR

22  absorbed the payroll position that Sandy had.

23          Q.    Okay.

24          A.    That -- that one is, like -- so I was aware

25  of that, you know, allegation that she was fired almost

                                                Page  83

1    at that point.    And then Debbie mentioned that she was

2    almost fired --

3         Q.    Okay.

4         A.    -- after this altercation in my cubicle.

5         Q.    After that, did you have any more

6    altercations or other confrontational incidents with

7    Sandy?

8         A.    Not that I can recall of right now in the

9    timeline, so to speak.  I had -- there was some, like,

10   back and forth emails going on at the end, I believe

11   of, like, 2017.

12             And, you know, with those emails, I

13   remember Debbie -- now, I remember going in to Debbie

14   and talking about that directly with her.   And she told

15   me to -- you know, not to go in to talk to Sandy.   That

16   she would, you know, deal with Sandy herself.

17        Q.    Okay.

18        A.    So -- so there was issues there, but I -- I

19   was -- it was Debbie who I was talking to about them,

20   not Sandy.

21        Q.    Now, did there come a point in your

22   employment with Bristol where you became dissatisfied

23   with opportunities for growth or promotion from the

24   position in which you were in?

25        A.    Well, I had -- I think the only thing

Page  84

1    that -- like I said before, it's like when I was first
2    hired on, I did expect to be a manager and salaried,
3    because that's what I understood I was being hired for,
4    but that didn't happen.  So I was hoping that that
5    would be my next step in my progression.
6              And it's -- you know, that didn't come
7    about, but at the same time, he was able to -- I had --
8    Debbie was very generous, in the sense of giving me
9    opportunities to develop workers' compensation skills
10   because I did do -- I believe I had a certification
11   there.
12             I was doing a lot of the safety, you know,
13   with the OSHA and everything to sort of develop the
14   program within -- within Bristol Hospice.  So I had --
15   I really did have some very good opportunities of
16   growth.  And specific projects and being able to sort
17   of develop and flesh out, like, the OSHA program and
18   the safety program and the safety committee program and
19   the emergency preparedness program and also, workers'
20   compensation.  So I felt like those projects were very
21   significant.  And I was -- I was -- that is, you know,
22   one part I would consider kind of, you know, a
23   professional  development.  So I did have those
24   opportunities.
25             Q.    Okay.  Did -- did you ever express any

                                        Page 85

1    frustration  or  dissatisfaction  about  the  growth

2    opportunities  to  Ms.  Wertz?

3           A.     I  think  we  already  --  did  we  not  go  over

4    that  question?

5           Q.     I  don't  know,  you  told  me  everything  about

6    that.    I  mean,  we  have  talked  about  meetings  in  which

7    you  expressed  frustration  about,  like,  Ms.  Dayton

8    getting  promoted.

9           A.     I  think  I  may  have  --  I  think  that  there

10   was  --  I  don't  know  if  it  was  --  I  think  it  was  the  --

11   the  issue  was  that  --  I  think  I  remember  having  a

12   conversation.  It's,  like,  well,  Eric  Payne  had  this

13   position,  he  was  a  manager  and  salaried.    And  I'm

14   essentially  doing  the  same  thing,  you  know?

15            And  I  understood  that  that  is  what  I  was

16   going  to  be,  a  manager,  salaried  position,  but  it  ended

17   up  that  it  --  it  ended  up  as  an  HR  --  what  was  it  --  HR

18   benefits  specialist  or  generalist.    And  --  and  I  do  --

19   I  recall  having  a  conversation  about  that.    And  I  --

20   and  I  remember  now  that  I  --  that  she  said  that  I

21   couldn't  be  a  manager  because  I  had  no  direct  reports.

22            And  I  remember  saying  --  you  know,  it's

23   like  --  and  that  was  her  reasoning  why.  For  me,  I

24   couldn't  become  a  manager  because  I  didn't  have  a

25   direct  report.

Page  86

1   Q.   Okay.  And do you -- you did say you, like,

2   mentioned that, I think you said, to her?  I just want

3   to be clear, that was -- you are talking about -- to

4   Ms. Wertz; is that right?

5   A.   Debbie Wertz.

6   Q.   Yeah.

7   A.   Correct.

8   Q.   Now, when you -- when you first received

9   your offer, it was clear that it was a generalist

10  position on an hourly --

11  A.   Yes.

12  Q.   -- compensation?

13  A.   Yes.  It was -- well, we looked at the job

14  description.  It was hourly.  It was -- and it was

15  the -- the title was not a manager position.  It was HR

16  benefits generalist.

17  Q.   So when you said that you had an

18  understanding that you were going to be doing what

19  Mr. Payne had been doing as a manager and on a salaried

20  basis, had somebody communicated that to you or had you

21  just assumed that -- where did you derive the

22  understanding or anticipation that that is what the

23  position would be?

24  A.   I believe it was in a conversation with

25  Debbie Wertz, but -- but really, I don't remember.

Page  87

1     Q.     Okay.  So you don't remember where you came

2     up with that notion that that is what you -- or that --

3     you don't recall where you got that expectation from?

4     A.     I don't recall where I got that notion or

5     expectation from.

6     Q.     Now, a moment ago, you mentioned that you

7     did the verbal complaint against Sandy Dayton, which

8     then you submitted a paper on -- that was considered by

9     Rich Dahlquist; is that right?

10     A.     Yes.

11     Q.     Did you make any other verbal or written

12     complaints regarding Ms. Dayton?

13     A.     Well, I did a UL- -- a UALD complaint.

14     Q.     Okay.

15     A.     And an EEOC complaint.     And both

16     Debbie Wertz and -- and I believe Sandy Dayton was

17     named in those -- both of those complaints.

18                    (Exhibit No. 4 was marked

19                       for identification.)

20     BY MR. FRAZIER:

21     Q.     You brought up a complaint with the UALD

22     and the EEOC. You have been handed what has been

23     marked as Deposition Exhibit No. 4.

24                    Is this the complaint to which you just

25     referred?

Page  88

1        A.     It appears to be.

2        Q.     Okay. So this was a charge of

3 discrimination that was submitted on your behalf to the

4 UALD; is that correct?

5        A.     Correct.

6        Q.     Okay. And if you will look at the bottom,

7 there's a signature block down there, it says,

8 "Signature of Charging Party."

9        Do you recognize the signature there?

10       A.     Yes, that's my signature.

11       Q.     Okay. And you signed it apparently on --

12 on or about the third day of March in 2018?

13       A.     That's correct.

14       Q.     Okay. Now, I would like to go through this

15 with you. You will note that there are boxes that are

16 checked here.

17       A.    Mm-hmm.

18       Q.     And typically, these are -- are prepared

19 after kind of an intake questionnaire is filled out; is

20 that right? Is that what happened in this case?

21       A.     Yeah, I believe there was an intake

22 questionnaire. And I believe that I sat down with the

23 UALD representative.

24       Q.     And then they helped you prepare this

25 document; is that correct? The -- the UALD

Page 89

1    representative?

2          A.    I think I do -- yeah, I do remember getting

3    some kind of guidance or direction.      Not direction,

4    but, you know, just information about the document

5    itself.

6          Q.    Okay.  Now, I want to -- I want to talk to

7    you a little bit about this.  So, you know when you

8    were hired and things and you were in the generalist

9    position.

10          But after that, if we go to the second

11   paragraph, you said, "Since February 2, 2017, the

12   Director of Payroll & Benefits" -- who was that?

13          A.    Sandy Dayton.

14          Q.    -- "and the VP Human Resources" -- who was

15   that?

16          A.    Debbie Wertz.

17          Q.    Okay.

18          -- "have been creating a hostile work

19   environment."   Now, I'm going to ask you individually,

20   so it makes sense to just do it piecemeal.

21          How was Sandy Dayton creating a hostile

22   work environment, as you meant here in this charge of

23   discrimination?

24          A.    I was referring to the complaint I made

25   with the altercation in the cubicle, in my cubicle.

Page  90

1    Q.    All right.    Any other events that created a

2  hostile work environment, specifically by Sandy Dayton?

3    A.    Like, since February 2nd?

4    Q.    Yeah.    Between then and --

5    A.    I think afterwards --

6    Q.    -- the time you would have submitted this.

7    A.    Well, I submitted it in March; right?

8    Q.    Yeah.

9    A.    So February or March.

10    Q.    Well, that was a little over a year; right?

11  Because it's February 2017 to March 2018.

12          Do you see that?

13    A.    Yes.

14    Q.    I don't know if that was intentional,

15  but --

16    A.    This would include the -- the end of the

17  year and the transition of the benefits.    And that's

18  where I was trying to get information to get my job

19  done.    And I wasn't invited to those meetings that I

20  needed to be, in order to get information to service

21  the customer -- or employees.

22    Q.    And so are you suggesting, that by not

23  being invited to those meetings, that was part of the

24  creation of the hostile work environment?

25    A.    Yes.    And I was -- you know, I didn't -- I

Page  91

1    believe it was.  I believe that since that altercation
2    in the cubicle, you know, that was something that
3    started kind of a hostile work environment, like I had
4    mentioned, she was giving me the silent treatment.
5    I wasn't getting information about my position that I
6    needed in order to complete my job responsibilities
7    that are in my job description.    And that continued
8    through that time.

9              I believe in January, when I came back from
10   vacation, I had no access to -- I had no access to
11   Chronus for 2017.  I had no access to a particular --
12   access that I needed for Paylocity.  I -- there was
13   Leap access missing.  I did not have access to DBA --
14   DBI.

15             There was a lot of accesses that I was
16   missing that I documented.  And I asked for access so I
17   could actually do my job because I just didn't have
18   that.  And I reached out to Debbie and to Sandy.  And
19   it was a back and forth struggle to get the information
20   that I needed.

21             And -- and previously to that, I believe --
22   I don't know exactly when the meetings started
23   happening, but I wasn't aware -- and not being able to
24   prepare for this onboarding in -- in 2017 for the 2018
25   benefit year, that -- I felt like that -- you know,

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    that denial of information, you know, for me to get my

2    job accomplished was, like, a hostile work environment.

3         Q.    Okay.   And just so we are on the same page,

4    I think the words "hostile work environment" were

5    probably selected by the individual who was assisting

6    you in preparing this; is that fair to say?   Or were

7    those your words?

8         A.    Well, I think it was -- I think it was a

9    hostile work environment because I was trying to do my

10   job and I wasn't -- I didn't have access to the

11   information to do my job.

12        Q.    Okay.   So let me -- let me just ask you

13   this:   As you use that term -- obviously, both in your

14   testimony today and in connection with this charge of

15   discrimination that you signed, when you use the term

16   "hostile work environment," what do you mean?

17        A.    Well, in this particular situation, as I

18   mentioned when I was in -- you know, they had the

19   altercation with Sandy in my cubicle, I believe that

20   was a hostile work environment.   I think that the

21   manner in which she came in and, you know, it was very

22   intense and I felt abused.   You know, it was abusive.

23   I felt that was a hostile work environment.

24             I feel like the aftermath of that, like I

25   had mentioned previously, where she was giving me the

Page 93

1    silent treatment, where she was not giving me access to

2    information that I needed to do my job, I see that as a

3    hostile work environment.   Before, **it's** -- maybe **it's**

4    called retaliation.   But, in fact, **it's** like, when I

5    made a complaint in 2017, I felt like that -- you know,

6    that behavior that I -- that I received, you know, from

7    Sandy, continued.

8         Q.    Okay.

9         A.    And **it didn't stop.**  And **it's,** like, toward

10   the end of 2017 is when -- I said before that there was

11   more back and forth with Sandy because of the

12   transition between Chronus and Paylocity.

13        Q.    Okay. Now, in using that term, "hostile

14   work environment," I mean, I notice in here, you

15   allege -- in this charge of discrimination, age

16   discrimination and gender discrimination is what I'm

17   seeing.   And we can talk about that in just a minute.

18             But in looking at that, was there anything

19   in the actions of either Ms. Dayton or Ms. Wertz that

20   was hostile to you in the sense of disparaging you or

21   attacking you or coming after you in any way because of

22   your gender?

23        A.    Well, I think with Sandy, when she was

24   sexually explicit, making sexually explicit comments,

25   **it** was -- from what I understand, **it** was -- **it** was, you

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1　know -- from what I heard, it was female only.　And

2　there was never -- I never heard of -- or I don't

3　recall hearing of anything with regard to any male, but

4　it was specifically to females and -- and generally

5　speaking, how they looked, how their intellectual

6　capacity was -- you know, was not up to par, according

7　to her.

8　　　　　　And -- and so it's like, in that way, yes,

9　it was -- it was -- it was female, as far as what I

10　heard, you know, from Sandy.　I did not recall Sandy

11　speaking about any male.　I don't recall, you know, her

12　speaking about males like she did females.　Just --

13　just the females.

14　　　　Q.　Were any of those remarks that you just

15　discussed that were directed to females, whether they

16　were sexually explicit or even just perhaps disparaging

17　or denigrating toward women's intellectual capacity or

18　abilities or anything like that, were any of those

19　directed to you because you were a woman?

20　　　　A.　Well, she did -- you know, she was -- I

21　think there was times where she -- I'm just trying to

22　think -- you know what, I can't remember at this point.

23　It's, like, that seems really --

24　　　　Q.　Is it fair to say you don't recall either

25　Ms. Wertz or Ms. Dayton ever making epithets or other

Page 95

1    negative remarks about you because of your gender?

2         A.    I don't recall.   I don't remember.

3         Q.    Meaning, as you sit here, you don't

4    remember any such comments?

5         A.    No, I don't remember at this point in time,

6    you know, specific examples of that right now.

7         Q.    I mean --

8         A.    I do remember Debbie phoning -- like, I

9    understood after -- after I was terminated, I did reach

10   out to Debbie Barry, who was the executive director of

11   the Utah location.   And I asked her if she -- you know,

12   if Debbie Wertz had ever kind of, you know, said

13   anything negative about me to her.   And she did.   And

14   she did write a statement.   There is a statement in the

15   documentation for that.

16        Q.    And did you -- have you reviewed that

17   statement?

18        A.    Yes, I did.

19        Q.    Do you recall her stating in that statement

20   that Ms. Dayton had ever said anything negative about

21   you because of your gender?   Am I making sense?

22        A.    No.

23        Q.    That -- so, for example, if I'm in a

24   workplace and they are talking to me, well -- and it

25   doesn't matter if it is a male or female saying it, but

Page 96

1    Ryan, he's an idiot, he's a male.  He's just a dumb

2    guy.  You know, all the guys that are supervisors are

3    idiots, Ryan is one of them.

4                So was there anything ever directed to you

5    negative -- in a negative sense or that was denigrating

6    in any way because of your gender?  In other words,

7    the -- the negative statements about you were being

8    tied to your gender?  That's what I'm getting at.

9         A.    I can't really speak for Debbie Barry, if

10   there was anything attached to that, but I would --

11   like, obviously, it's like I'm female, and she is

12   talking about me and denigrating me.  Specifically,

13   it's like, in her statement, she doesn't -- I don't

14   believe there is anything there, but I can't say -- I

15   can't speak on her behalf.

16        Q.    Okay.  Are you aware of anything being said

17   by either Ms. Dayton or Ms. Wertz about you in a

18   negative sense that is tied directly to your gender?

19        A.    Like, saying, basically -- you will have to

20   give me an example, if you don't mind.  I really don't

21   understand the question.

22        Q.    Well, right.   You were -- just anything

23   disparaging about you because of your gender, such as

24   because you are a woman.

25        A.    Both of them said disparaging things about

Page  97

1    me.

2         Q.    Okay.

3         A.    Whether it was indirect or, you know,

4    direct, it -- but they didn't say -- and, you know, my

5    gender is female.   So I don't know.   There was nothing,

6    like, this is gender discrimination.    You know, they

7    didn't qualify that.   Is that what you are asking?  I'm

8    not sure.

9         Q.    Well, that's what I'm getting at is -- you

10   have made a statement here about gender discrimination,

11   correct, in this -- this charge?   And that's what I'm

12   kind of exploring.   And what I'm trying to figure out

13   is whether you're aware -- I mean, you had obviously

14   filed this and you had some basis.   And I'm just trying

15   to figure out what that basis is.   And it may be

16   something else completely.

17              I am just trying to find out:   Are you

18   aware of either Ms. Wertz or Ms. Dayton saying anything

19   about you negatively because of your sex?   In other

20   words, that it's actually -- not just that they said

21   something negative about you and you do have a gender,

22   because we all do; right?

23              The question I'm asking is:   Did they

24   make -- did they tie the two together?   In other words,

25   you know, like the classic form of discrimination would

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1   be I'm a male and I don't promote women because I think

2   they are inferior, or whatever; right?

3          Or I may make some disparaging remark about

4   women generally.   So I'm really trying to figure out if

5   they said anything about you because of your gender.

6          A.   I believe that what they did say was

7   because of my gender sometimes.

8          Q.   Okay.   And what was that?

9          A.   You know, in comparison to, like -- like I

10  had mentioned, the males in the corporate office, there

11  was no issues with -- with males or with -- or I

12  didn't -- I didn't -- I don't remember.   And I don't

13  recall any issues with -- with Sandy or -- or Debbie

14  denigrating male employees, but I do remember that all

15  the issues that came up, that I was aware of or that I

16  can remember, were all female, all females were

17  experiencing this.

18         Q.   Okay.

19         A.   It was either individually or together,

20  they would be doing this.

21         Q.   Okay.

22         A.   And I think that the fact that, you know,

23  their actions were, you know, kind of indicative of --

24  of, you know, the gender, perhaps.

25         Q.   So -- and just to kind of close this loop.

Page  99

1    I know, it seems like we are going on.   But I'm really

2    trying to get to the heart of it.

3              And so -- and I don't know that we ever

4    quite get there.   We are kind of circling around the

5    outside.

6              Did -- so you -- so you have indicated that

7    the only people that you ever recall, either Ms. Dayton

8    or Ms. Wertz, disparaging were all women; is that what

9    I'm understanding?

10         A.    That's what I recall at this time.

11         Q.    You don't recall them ever saying anything

12   negative about a male co-worker?

13         A.    I don't recall.   And I don't remember

14   hearing that --

15         Q.    Okay.

16         A.    -- from them.

17         Q.    Do you recall them ever saying anything

18   about -- that is disparaging about the women because

19   they are women?

20         A.    I think I remember a comment that Sandy had

21   made.   And this was from another employee about the age

22   and how stupid this woman was.   So...

23         Q.    Because of her age or because of her --

24         A.    Both.

25         Q.    -- gender?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1        A.    She was a woman and she was stupid.

2        Q.    And that was made by Ms. Dayton?

3        A.    No -- well, allegedly.  It's like, I heard

4   that  from -- from another employee.

5        Q.    Okay.  So -- so you heard it second or

6   third-hand?

7        A.    Yeah, it was -- like, I was in the HR

8   department, so I heard -- you know, obviously, I was

9   the point person --

10       Q.    Okay.

11       A.    -- for issues.

12       Q.    But you're not aware of Ms. Dayton saying

13   such a thing about you, that -- disparaging you in that

14   way because you're a woman?

15       A.    Not that I remember specifically.   But the

16   fact that she came into my cubicle and treated me in

17   the manner that she did and spoke to me in the manner

18   that she did, I know that she did that to me.

19          And I did not see any indication that she

20   was doing that to -- or I never saw her doing that to

21   anybody or talking like that to a male in the corporate

22   office.

23       Q.    Okay.  But you don't know specifically that

24   she did that to you because you're a woman; is that

25   fair?

1          MS. PANZER: Objection.    Misstates  her

2    testimony.

3          MR. FRAZIER:  Actually, I'm not stating her

4    testimony.   I'm just asking her.

5    BY MR. FRAZIER:

6          Q.    You're not aware -- you don't know that she

7    did that to you because you are a woman; is that fair?

8    And what I mean, coming in and berating you and those

9    things.

10          A.    I -- I don't know.  I think the fact that

11    she was doing that continuously to women indicated to

12    me that **it** was women that she was doing **it** to

13    specifically.

14                And from what I saw, as I mentioned, the --

15    the males in the corporate office did not get treated

16    like that.   I did not see anything like that.   I did

17    not hear anything like that.

18          Q.    Other than this --

19          A.    I don't recall that.

20          Q.    -- report that you heard secondhand, were

21    you aware of Ms. Dayton saying anything disparaging

22    about  women?

23          A.    Yes.

24          Q.    Not -- not to women because you suspect

25    they are women.  I'm -- did you actually hear her

Page  102

1  denigrating the sex of women?

2       A.    Like, openly saying she is a female and she

3  is stupid?

4       Q.    Yeah.  Or even just saying, Women aren't as

5  good as men.  Or anything along those lines, anything

6  denigrating to women either about an individual or

7  as -- as a gender collectively?

8       A.    I heard Debbie -- Sandy Dayton make

9  denigrating, mocking, ridiculing remarks about several

10  women.  And it's like -- so I'm not really sure

11  exactly, you know, if I'm answering this question, but

12  when that was a pattern of behavior, you know, in the

13  corporate office by Sandy Dayton, there was the actions

14  and the words that she used with the woman -- with

15  women was -- was distinctly different than what she --

16  how she treated or how she acted towards and spoke

17  to -- about the male workers.

18            So I -- I -- that's -- that's what I

19  remember.

20       Q.    Okay.  Do you recall Ms. Wertz ever saying

21  anything negative about women?

22       A.    Well, this is the same question, isn't it?

23  It's the same --

24       Q.    Except now, instead of being Ms. Dayton, we

25  are asking about Ms. Wertz.

Page  103

1    A.    Right.    Once again, the same thing,

2    actions, as far as the treatment of women and the

3    treatment of men in the corporate office and probably,

4    really, outside of the corporate office, too.

5              It just didn't -- you know, it would -- it

6    would go through other offices, other employees.    What

7    I heard, generally speaking, was it was focused on

8    women.

9    Q.    Okay.    Do you know how old Ms. Wertz is?

10   A.    Pardon me?

11   Q.    Do you know how old Ms. Wertz is?

12   A.    I believe she's over 65.

13   Q.    Okay.    And do you know how old -- old

14   Ms. Dayton is?

15   A.    Like, right now?

16   Q.    Yeah.

17   A.    I don't know.    Debbie is retired, so I

18   assume she is over 65 years of age.    I don't know how

19   old Sandy is.

20   Q.    Okay.    Do you recall either one of them

21   ever making disparaging remarks about other employees

22   because of age?

23   A.    I believe that there were some remarks with

24   regard -- but this is not directly to me.    This was

25   through -- indirectly through another employee that the

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1　age of -- of one employee and that they weren't --

2　something about the age of an employee and how they

3　weren't able to do their job efficiently.

4　　　　Q.　And that was because of their age that they

5　couldn't do their job efficiently?

6　　　　A.　They mentioned their age.　They are older,

7　you know, unable to do the job.

8　　　　Q.　Now, do you recall Ms. Wertz ever using,

9　like, pervasively, like, constantly disparaging remarks

10　about people because of their age?

11　　　　A.　I can't remember that.

12　　　　Q.　Okay.

13　　　　A.　No, I don't recall.

14　　　　Q.　What about Ms. Dayton?　The same question.

15　　　　A.　Well, there were -- there were incidences

16　that I heard secondhand from other employees that she

17　was making disparaging comments about women and their

18　age in the office.

19　　　　Q.　Now, you said plural there.　You testified

20　about one previously.　Are you aware of others?

21　　　　A.　I think -- well, I believe I said that

22　there was maybe more than one.　There was one comment

23　indirectly, but I think there was a group of

24　individuals that were older females in the office.

25　　　　　　And I believe that there may have been

Page　105

1    additional comments about their age as well.

2         Q.    You're using the word "may."  Are you just

3    thinking there might be, but you really don't know?

4         A.    No, I remember comments being made about

5    female's ages in the office.

6         Q.    By Ms. Dayton?

7         A.    By -- no, not -- by another employee

8    talking about Ms. Dayton, making, basically, a

9    complaint to HR.

10        Q.    About something that Ms. Dayton said about

11   their age?

12        A.    Yes.

13        Q.    Okay.

14        A.    It bothered the employees that age was an

15   issue.

16        Q.    Okay.  But you don't remember any such

17   remarks directed at you?

18        A.    Not that I remember.

19        Q.    Okay.  Now, the next thing you say in here

20   is, "Denied equal employment opportunities."

21             What did you mean by that?

22        A.    Well, as I mentioned before, this was on

23   the onset of the 2017 transition of benefits.    And

24   starting in about -- it was after, actually, Chuck

25   Gonzales, the CEO, left and another CEO came aboard.    I

Page  106

1    noticed that, you know, we shifted our -- our insurance

2    plans, et cetera. We started moving towards -- from

3    Chronus to Paylocity.

4            It's like, I didn't have the opportunity --

5    equal opportunity to even perform my job.

6        Q.    Okay. Anything else?

7        A.    Not that I can remember right now.

8        Q.    Okay. The next one, you say, "undermining

9    my work."

10           How did Ms. Wertz undermine your work?

11        A.    Well, you know, when I don't have the

12    passwords required -- multiple passwords required to do

13    my job, I believe that's -- you know, that was

14    undermining my work. And, also, that I wasn't getting

15    the training that I needed to actually get onboard and

16    perform my responsibilities for the employees at

17    Bristol, because I was, like I said, one of the main

18    point people for benefits, FMLA, anything like that.

19           And there was a huge transition going on,

20    you know, of software and of new programs for medical.

21    And I just didn't have that information like I -- I

22    believe -- that I had had before and now I wasn't

23    getting.

24        Q.    And --

25        A.    And --

Page 107

1    Q.    -- it's your belief that you weren't

2  getting that information either because of your age or

3  your gender?

4    A.    I believe a main part of it was

5  retaliation, actually.

6    Q.    For what?

7    A.    For the Sandy -- complaint against Sandy

8  Dayton in -- at the beginning of 2017. I think that

9  never really got resolved by Sandy. I think her

10  behavior towards me was totally unprofessional and

11  actually, it undermined, you know, a positive -- having

12  a positive -- work in a -- a positive work environment.

13  And it -- it -- that behavior seemed to, in my opinion,

14  continue because, you know, I was not getting

15  information I needed to do my job.

16    Q.    Okay. Do you believe that Ms. Wertz was

17  also retaliating against you for the fact that you had

18  made an investigation --

19    A.    Yes.

20    Q.    -- or made a complaint against Ms. Dayton?

21    A.    Yes.

22    Q.    Now, this -- did there come a point when

23  you dropped this particular charge of discrimination?

24    A.    Yes.

25    Q.    And why did you do that?

Page 108

1    A.    Well, first of all, I put in a
2    discrimination because I wanted this retaliation and
3    this harassment to stop.    And, you know, so I put in
4    the charge, UALD. I went, I believe, and put it --
5    submitted the complaint.    And I think it was in March.
6    And they were probably notified pretty well after that.
7    And then we had a mediation.    I think it was on the
8    24th of April that year.

9         And we went to the mediation, and it was
10   not productive at all.    And I didn't see a way that
11   this process was going to, you know, go forward to get
12   any resolution.

13        So I went in to Debbie Wertz and I said,
14   you know, If we can -- is it possible if we can move
15   forward in good faith, you know, specifically, you
16   know, bringing to attention -- this is not verbatim.
17   It is, like, paraphrasing what I put on the document,
18   too.

19        If we can move forward in good faith, like,
20   trying to work out any concerns that we have, can we
21   move forward on this?    And she said, Absolutely we can
22   do that.

23        And with that, I -- with that assurance and
24   discussion -- and she said she was really excited for
25   me and the opportunities ahead.    You know, they were

Page  109

1    going to be buying out other hospices, et cetera.    So I

2    was going to have that opportunity, you know, for

3    growth in the company.

4                    And I was excited about that because, you

5    know, any opportunity was great, but at the same time,

6    it's like I decided with her -- her and I, in a

7    discussion, decided that yes, we can move forward.    And

8    we did.    And I dropped the UALD complaint.

9                    And I -- I signed the paperwork sometime, I

10   believe, in -- maybe April or May, but I think it was

11   ratified in June of 2018.

12        Q.    So you said that you -- you decided to drop

13   it based on the discussion that you had with Ms. Wertz

14   about moving forward in good faith; is that right?

15        A.    Generally, yes.

16        Q.    Okay.    And did you find then, after that,

17   that you and Ms. Wertz were able to have an amicable

18   relationship and move forward in good faith?

19        A.    I didn't have any -- I don't recall any

20   negative or any complaints, any concerns that she

21   brought towards me at all until the day I was

22   terminated from Bristol.

23        Q.    Okay.    What about from Ms. Dayton, did

24   she -- were you able to work with her after that point?

25        A.    I was always able to work with Ms. Dayton,

Page  110

1   but I don't -- I don't recall any issues at this
2   time --
3          Q.     Okay.
4          A.     -- with Sandy.
5                 MR. FRAZIER:   Let's go ahead and go off the
6   record.
7                 (Recess was taken.)
8                 MR. FRAZIER:   We can go ahead and go back
9   on the record.
10  BY MR. FRAZIER:
11         Q.     Lisa, as you recall, before we broke for
12  lunch, I had been asking you about a charge of
13  discrimination that you had dropped after you worked
14  things out with Ms. Wertz.
15                You didn't ever file a lawsuit based on the
16  age discrimination alleged in that charge of
17  discrimination, did you?
18         A.     Let's see.   Are you talking about this one
19  that we reviewed?
20         Q.     Yeah.   The one we were just talking about.
21         A.     The UALD one; correct?
22         Q.     Right.
23         A.     I think there was multiple.   I think there
24  was, like, gender, sex, retaliation, continuing action.
25         Q.     What I'm asking is:   Did you ever file a

Page  111

1    lawsuit?   So, like, we are in a lawsuit right now.

2         A.    Oh, No.

3         Q.    Did you ever file --

4         A.    For the UALD one?

5         Q.    -- a lawsuit based on the age

6    discrimination that you had alleged in the UALD?

7         A.    No, because I had dropped that -- that

8    complaint.

9         Q.    And the same thing with respect to gender

10   discrimination; correct?    You didn't file a lawsuit

11   based on what you had alleged in that charge that you

12   had dropped?

13        A.    No.

14        Q.    Okay.  Are you familiar --

15        A.    Pardon me --

16        Q.    Did you have something to add?

17        A.    No, I was just clearing my throat.

18        Q.    Are you familiar with an entity by the name

19   of Optima [sic] Hospice?

20        A.    Yes.

21        Q.    And how are you familiar with Optima?

22        A.    I think it was "Optimal," with an "L" at

23   the end.

24              I was familiar with that because it came to

25   our attention that the HR department -- that we were

Page  112

1    going to buy out Optimal Hospice along with -- I think

2    there was, like, a potential of three at the time that

3    they were looking at, one was in Denver, one was in

4    California, which was Optimal.

5         Q.   Okay.  And so to be clear, Bristol was

6    buying Optimal?

7         A.   I believe that's correct.

8         Q.   Okay.  And what was your involvement in

9    connection with Bristol's acquisition of Optimal?

10        A.   I wasn't involved in the acquisition.   I

11   was, like -- we were -- Bristol Hospice was owned by a

12   private equity firm.

13        Q.   Okay.  And you were never actually employed

14   by Optimal; is that correct?

15        A.   That's correct.

16        Q.   Now, did you have an understanding that

17   Optimal already had an existing human resources team?

18        A.   Yes, I did.

19        Q.   Okay.  And how did you have an

20   understanding of how it had structured its human

21   resources  team?

22        A.   Well, I was meeting with -- in my first

23   meeting with Faith Myers, I had a conference call on

24   July 5th.   And we went over the functions and

25   responsibilities of three Optimal employees in the HR

Page  113

1  department.    One was Kelly Binninger, who was the VP of

2  HR.    There was a manager of HR, Mia Warren.    And then

3  there was Faith Myers, who was benefits, that oversaw

4  benefits.    And each of these individuals had specific

5  functions.

6          Like, Kelly was the VP, but she also did

7  emergency preparedness and safety for -- for the

8  company at corporate -- at their corporate office.    Mia

9  was assigned to do FMLA, workers' compensation and LOA.

10  And then I understood that Faith Myers was doing mainly

11  the benefits portion of it.    And she also did

12  onboarding and orientation of new hires.

13          Q.    Okay.    And to your knowledge, there wasn't

14  anyone else in Optimal's HR department?

15          A.    Not that I was aware of.

16          Q.    Now, you mentioned Mia Warren.

17          When did you first have any contact or --

18  or involvement with Ms. Warren?

19          A.    The first time I met Mia Warren was in the

20  Bridges Conference Room on July 10th.    And I was

21  sitting beside -- and we were introduced.    I was

22  sitting beside -- to my right, I would --

23  Kelly Binninger was sitting beside me, to my right.

24  And she was sitting further right to Kelly.    And that

25  was the first time I met her.

Page  114

1    Q.    Okay.   Now, you mentioned a meeting where

2    you met her -- you were sitting next to Kelly and then

3    Kelly was sitting next to Mia; is that correct?

4         A.    (Witness nods head.)

5         Q.    Who else was in that meeting?

6         A.    It was a Krauter Insurance meeting.   There

7    was a representative, like Glenn Risso, was the point

8    person with the Krauter contract with Bristol Hospice.

9    I was sitting and to my left was sitting a

10   representative from New York City.   A Krauter

11   representative as well.   And then I believe that Lisa

12   Payne was in that meeting, Debbie Wertz was in that

13   meeting, Sandy Dayton was in that meeting and then I

14   already mentioned Glenn Risso.

15              And then wrapping around on the other side

16   was Faith Myers, Mia, Kelly Binninger, myself and then,

17   again, the rep from New York City.

18        Q.    Okay.  So -- and this was a meeting here in

19   Salt Lake City?

20        A.    Yes.

21        Q.    Okay.  Now -- so this was in connection

22   with -- or maybe I should not say in connection with --

23   but this was in follow-up to Bristol's acquisition of

24   Optimal; is that correct?

25        A.    I don't know that Bristol had made the

Page  115

1    acquisition at that time.

2        Q.    Okay.

3        A.    I wasn't aware of the -- you know, the --

4        Q.    The timing?

5        A.    Yeah, the timing of the merger or anything

6    like that.  I wasn't aware.  I think it was -- I

7    understood it was going to happen, but didn't

8    necessarily happen, but I'm not 100 percent sure.

9        Q.    Okay.  But you mentioned that these three

10   individuals traveled to Utah on behalf of Optimal to

11   meet with you and the others of the Bristol human

12   resources team; is that correct?

13       A.    Yeah.  They came to -- they were in Salt

14   Lake City, like, July 10th and half the day of July

15   11th.  So I guess they were, you know, in the corporate

16   office for about ten hours.

17       Q.    Okay.  And that was in 2018?

18       A.    That's correct.

19       Q.    Okay.

20       A.    July 10th and July 11th, 2018.

21       Q.    And what did you understand was the purpose

22   of them coming to Utah and meeting with you?

23       A.    The purpose was -- and first, the meeting

24   with the Krauter, this is a new insurance contract that

25   we would -- that we were working towards for -- with,

Page  116

1    for 2018.

2              So we were meeting -- the main key people

3    from the Krauter group, the insurance company, as well

4    as the Optimal group, the three that we have previously

5    mentioned from Optimal insurance -- Optimal Hospice.

6         Q.   Okay.  And they were here also to receive

7    some training, is that correct, in connection with

8    Bristol's acquisition of Optimal?

9         A.   I don't know what training was conducted by

10   the other HR group from my team.  But I was tasked to

11   conduct some training with Faith Myers.

12        Q.   Okay.  And what -- what did you understand

13   that you were -- what kind of training were you asked

14   to do with Faith Myers?

15        A.   I was asked to go over Bristol benefits,

16   workers' compensation, FMLA and Paylocity.

17        Q.   Anything else?

18        A.   No, not that I can recall.

19        Q.   Were you asked to provide training to any

20   of the others, such as Mia Warren --

21        A.   No.

22        Q.   -- or Kelly -- what is her last name?

23        A.   Binninger.  Yeah.

24             (Witness shakes head.)

25        Q.   Is that a no?

Page  117

1     A.     No, I was not assigned any training to

2     anybody else at that time.

3     Q.     Okay. And aside from the training to Faith

4     Myers, were you asked to do anything else in connection

5     with those meetings that were to take place with the

6     Optimal HR team?

7     A.     No. I -- I attended the Krauter meeting in

8     the morning of July 10th. And then I was invited to

9     both lunches -- the Krauter luncheon with the Optimal

10    team. And then I was assigned to do two hours on

11    July -- July 11th.

12    Q.     Okay. With Faith Myers?

13    A.     Correct.

14    Q.     Now, you had mentioned Faith Myers.

15           Were these meetings that you had with the

16    Optimal team the first time that you had any

17    correspondence or communication with her?

18    A.     Yes. When I came back from Hawaii, doing

19    an audit, I wanted -- Debbie and I sat down in her

20    office and went over -- she wanted to sort of get me --

21    get me up to speed of what was going on. And we went

22    over that I would be training Faith Myers.

23           And I asked if I could reach out to Faith

24    Myers, would that be okay to sort of get acquainted

25    with her to get started on just the, you know, general

Page 118

1     framework for the -- the training and -- or the

2     overview, so to speak, between both -- both teams.    And

3     I asked Debbie if it would be okay if I would reach out

4     to her and talk to her before they came on July 10th.

5         Q.     And how did that end up?

6         A.     She was fine with that.    Debbie emailed me

7     back contact information, her email.    I went ahead and

8     called Faith and we arranged a time on July 5th to meet

9     by conference call and we met.

10         Q.     Okay.    For how long?

11         A.     About an hour.

12         Q.     And that was telephonic?

13         A.     Just -- yeah.

14         Q.     Okay.    And what do you recall discussing

15     during that hour-long discussion?

16         A.     We went over -- let's see.    We went over

17     some of the, you know, orientation, onboarding, what --

18     what she did, you know, at the company.   We went over

19     basically the benefits in detail, all the different

20     main -- main benefits that we had, medical, vision, et

21     cetera,   supplementary.

22         We went over HSA, FSAs.    And we went step

23     by step through, you know, the benefits that -- that

24     both groups offered and just kind of compared what was

25     different between the two.    And we had a back-and-forth

Page   119

1    with that.

2        Q.    Okay.  Did you have any communication with

3    Mia Warren or Kelly Binninger before they arrived on

4    July 10th?

5        A.    No, I did not.

6        Q.    And was this one, one-hour telephone call

7    with Faith Myers the only communication that you had

8    with her prior to their arrival on July 10th?

9        A.    The call and the -- the -- the emails

10    following up and the emails after it as well.

11        Q.    Okay.  Do you -- do you recall what the

12    substance of the emails were?

13        A.    Yes, I do.

14        Q.    And what were they -- what did they regard?

15        A.    It was basically after the conversation we

16    had, I just reached out to her thanking her for meeting

17    with me and going over, you know, the -- the different

18    benefits.  And she replied back via email.  She thanked

19    me.  She said it was a pleasure and she is looking

20    forward to meeting me in Salt Lake City -- or, you

21    know, when we would be meeting in Salt Lake City.

22        And then, I think that was really it.  And

23    then I -- I met her in person on the 10th.

24        Q.    Okay.  So there wasn't any discussion of

25    benefits or -- or duties or even providing any training

Page 120

1    via email?

2         A.    No, not by email.  It was done during that

3    conference call.  And we went through all the, you

4    know, different -- we went all through the different,

5    you know, functions that each -- you know, Kelly --

6    Kelly, Mia and Faith were responsible to do.  So I

7    could understand at that time that all these functions

8    were really functions that I was doing.

9         Q.    For all three of them?

10         A.    Yes.  Well, I don't know if that was a

11    comprehensive list of what she provided.  But, for

12    instance, it's like, Faith was overseeing, basically,

13    benefits, which I did.  Mia was overseeing FMLA and

14    worker's comp, which I did.  And then Kelly Binninger

15    was overseeing, in part, I guess, safety and emergency

16    preparedness, which I did.  So there was some part of

17    their functions.  I don't know if that was a

18    comprehensive list.

19            I know that, for instance, Faith Myers did

20    orientation -- did -- I think she explained that she

21    did orientation.  She also did onboarding.

22         Q.    Okay.

23         A.    So that was something that I didn't do, but

24    the recruiters did, in Salt Lake.

25         Q.    Now, from the time that you dropped the --

Page 121

1    the charge of discrimination that we have already

2    looked at -- now, just remind me, when was that, again?

3         A.    Pardon me?

4         Q.    When did you drop the charge of

5    discrimination, again, the one we looked at?

6         A.    It was, like, ratified in June, at the

7    beginning of June, I believe.

8         Q.    Of which year?

9         A.    2018.

10         Q.    Okay.

11         A.    It was just, like, a month before I was

12    terminated.

13         Q.    Okay. So from the -- from the time of that

14    until this meeting, had you had any other issues with

15    Ms. Wertz or Ms. Dayton?

16         A.    No, because I was -- you know, my -- my

17    work went forward. I believe that I was in Clackamas,

18    Oregon doing an audit. I believe that was in May. So

19    that was after -- well, I guess that was before.

20         And then, as I said, at the end of June, up

21    to the 29th of June, I think, 2018, I was in Honolulu,

22    Hawaii doing training. I was doing auditing and then

23    doing emergency preparedness and the safety program.

24         Q.    Okay. Now, during the -- at some point on

25    July 10th, did you reach out to Mia Warren in an effort

1  to try to meet with her?

2      A.  No, I did not.

3      Q.  Did you reach out with her trying to get

4  her contact information?

5      A.  No, I did not.

6      Q.  Did you get her card?

7      A.  I did.

8      Q.  Okay.  And did you solicit that card?

9      A.  No, I did not.

10      Q.  She offered it to you?

11      A.  Yes, she did.

12      Q.  Did she ask you to reach out to her?

13      A.  No.

14      Q.  Why did she offer you her card?

15      A.  I don't know.  I -- it was in the -- we

16  were in the conference room.  We were introducing --

17  everybody was introducing themselves to the team.  This

18  was the initial, first thing in the morning during the

19  Krauter meeting.  The Krauter group, I don't believe,

20  was there at that point.  They came in a little bit

21  later.

22      And so we were going through, starting with

23  Faith, just introducing, you know, who they were and

24  what they did with the company.  Mia introduced

25  herself.  Kelly Binninger introduced of herself and I

Page  123

1    introduced myself.

2               And after that point, Mia Warren offered me

3    her business card and I accepted it.

4         Q.    Okay.  Had you -- did she give you the

5    business card during that meeting or later on in the

6    day?

7         A.    During that meeting in the morning.

8         Q.    Had you reached out trying to connect with

9    her at some point and get of her contact information in

10   the restroom?

11        A.    No, because she gave me the business card

12   in the conference room.

13        Q.    Did you have a discussion with her in the

14   restroom?

15        A.    I do remember going to the restroom on a

16   break with Kelly and Mia and -- and maybe Faith was

17   there.  I can't remember.  I remember, on the way to

18   the restroom, they were asking me specifically -- Kelly

19   was asking me where I lived and where Sandy and -- and

20   Debbie lived.

21               And I let them know, you know, Sandy and

22   Debbie live north of Salt Lake and I lived east of Salt

23   Lake, 20 minutes away.  And -- but I was basically

24   talking to Kelly Binninger.  I do believe that Mia was

25   there as well.

Page  124

1        I don't remember discussing anything once I
2   was in the restroom or over the stalls or anything like
3   that, if that's your question.
4        Q.   Well, specifically -- I had understood that
5   you had been soliciting her contact information while
6   in the restroom saying, Hey, we ought to connect.
7        A.   No, because she gave me -- the contact --
8   her business card.  She offered me her business card in
9   the Bridges Conference Room prior to that break.
10       Q.   Before the break?
11       A.   Yeah.
12       Q.   Did there come a time where you reached out
13  to her sometime in that day where you reached out to
14  her saying, Hey, we ought to connect?
15       A.   I don't recall any kind of -- no, no,
16  because, it's like -- first of all, you know, prior to
17  the team coming to Salt Lake, when I reported to Debbie
18  about the meeting -- I reported to Debbie about the
19  meeting and the conference call I had with Faith Myers.
20  I went through, you know, step by step, I provided my,
21  you know, page and a half notes of what we had
22  reviewed.
23       And I said, It looks like that, you know,
24  each of these people -- each of these employees have
25  some portion of my -- my job.  Would it be okay to

Page  125

1    reach out to -- to them prior to the -- you know, I

2    know there wasn't going to be enough time during the

3    time they were here because they were only here for a

4    very short time and they were -- they had meetings.

5    And I had meetings and I also had that training.   So I

6    knew that that was going to happen.

7              So I asked if I could do a similar thing,

8    to reach out to -- to Mia and Kelly prior to their

9    visit or after their visit.   And Debbie said -- you

10   know, Debbie said, There won't be time for that, so

11   probably after the visit would be more appropriate.   I

12   believe that's what she said.   It's in an email.

13        Q.    So your recollection is that Ms. Wertz told

14   you you could contact them after the meetings on

15   July 10th and 11th?

16        A.    I don't remember.  It's like, I remember

17   asking that and talking to her about it.   And it wasn't

18   until, I think it was July 11th, where I went in and I

19   was asking, Did she want me to reschedule the Paylocity

20   meeting?

21              And did she want me to reschedule the other

22   meetings with Mia and Kelly?   You know, to kind of

23   further discuss their functions and my functions that

24   were similar.

25        Q.    At any time prior to the July 10th and 11th

Page  126

1    meetings, had Ms. Wertz authorized you to speak to

2    Kelly and Mia?

3         A.    Authorize me to speak to them, like they

4    were guests at the corporate office?

5         Q.    Well, I mean, specifically reach out to

6    them and offer to provide training or --

7         A.    No.

8         Q.    Did she authorize you to speak to them in

9    that -- that regard?

10        A.    No. I wasn't -- it -- like I said, it's

11   like, we had already had that discussion.   I had

12   already got the information from -- and approval from

13   Debbie, you know, to meet with Faith.    And, you know,

14   after that, discussing their responsibilities,

15   Debbie -- Debbie decided that, you know -- before, no.

16             She -- and I got the impression it would be

17   after this day and a half meeting, you know, from

18   Optimal, that I would be able to, you know, follow up

19   with them at that point.

20        Q.    So is there something specifically that you

21   wanted to discuss with Mia Warren on July 10th?

22        A.    Well, from what I understood, Debbie --

23   what was it?

24        Q.    Was there something specific you wanted to

25   talk to Mia Warren about on July 10th?

Page  127

1  A.  No.

2  Q.  What about Kelly Binninger?

3  A.  No, other than the fact that, you know, it

4  was obvious that our -- our positions overlapped when

5  we were introducing each other.  And I think -- I think

6  they may have asked me a question about that, you know,

7  specifically, maybe about the emergency program, like

8  Kelly did.

9  And I knew that, you know, like, eventually

10  I would meet with them like I did with Faith because

11  Faith was focused on benefits, Mia was focused on FMLA

12  and LOA and workers' comp and Kelly was focused on

13  another portion of my position, which was safety and

14  emergency preparedness.

15  Q.  So is it your testimony that you were not

16  eagerly trying to reach out to Mia Warren to

17  communicate with her?

18  A.  No.

19  Q.  Now, going back to --

20  A.  I mean, I did speak -- you know, we were

21  in -- like, I mean, when we were in -- like, with Kelly

22  and everything, she was there and I spoke to her, but I

23  wasn't -- I wasn't -- Debbie didn't ask me not to speak

24  to people.

25  Q.  Okay.  Was there something in particular in

Page  128

1    mind, though, that you wanted to speak to Ms. Warren

2    about?

3         A.    On July 10th?

4         Q.    Yeah.

5         A.    No.

6         Q.    What about Kelly Binninger?

7         A.    No.

8         Q.    So you have this meeting that you discussed

9    in the morning, regarding the insurance, with the

10   entire group on the morning of July 10th.

11            Did you have any other meetings that

12   involved Mia Warren or Kelly Binninger during their

13   visit of July 10th and 11th?

14        A.    No.

15        Q.    So the only other person you were to meet

16   was Faith Myers; is that correct?

17        A.    Correct.

18        Q.    Okay.  Now, did you meet with Faith Myers

19   again on July 10th, 2018?

20        A.    Yes.

21        Q.    Okay.  And what did you understand was the

22   purpose of that meeting?

23        A.    Well, this was not -- this meeting was not

24   scheduled, but apparently in the afternoon, around

25   1:45, Debbie decided that -- that Faith was not going

                                        Page  129

1    to be a part of the afternoon meeting on the 10th.    So

2    she wanted me -- she wanted me to do some training with

3    Faith  Myers.

4          Q.    Okay.   And how did she communicate that to

5    you?

6          A.    Well, first of all, I had Lisa Anderson,

7    one of the HR department employees, come to my cubicle

8    with -- with  Faith  Myers.   And  she  said  that  Debbie

9    wanted  me  to  train  --  train  Faith  Myers  about  that.

10          So  it  was,  like,  unexpected  and  just  --  and

11    so what I did is I asked Lisa Anderson to please get

12    the  keys  for  Christie  Franklin's  office  because  my

13    cubicle  is  small.    And  having  two  people  in  there  was,

14    you  know,  a  very  tight  space.    So  she  went  ahead  and

15    opened  Christie  Franklin's  office.

16          I walked  Faith  over  to  that  office.    And  I

17    said, I'm just going to go back to confirm what Debbie

18    wants  me  to  train  you  on  just  to  make  clear  that,  you

19    know, we were on the same page.

20          So  I  went  back  into  the  conference  room,

21    the  Bridges  Conference  Room,  and  I  asked  Debbie,  you

22    know, What were the instructions?      And she said

23    workers'  compensation  --  workers'  --  no,  she  said

24    benefits.    She said workers' compensation and FMLA.

25    And  then  I  had  --  the  scheduling  of  the  Paylocity

Page  130

1    training was -- was scheduled for 9:00 to 11:00 the

2    next day, which is July 11th.

3            So I specifically asked her, I said, So

4    what I will do is I will just continue with, you know,

5    the conference call discussion that we had, elaborate

6    it more.   And then -- on those three particular areas.

7    And then I confirmed that on the 11th we would still

8    have the Paylocity training.   And she said, Yes, that's

9    what we were going to do.   So I went -- so that's what

10    I did for the afternoon.

11        Q.    So you had a specific discussion with her

12    as she was trying to meet with these other folks about

13    doing only worker's comp benefits and FMLA that

14    afternoon, and that you would specifically do Paylocity

15    the next morning?

16        A.    Yes.

17        Q.    You didn't have an understanding that she

18    had instructed you to move all of the trainings to --

19    to July 10th?

20        A.    No, because I specifically asked her that.

21    Because that's what I was concerned about.   I wasn't --

22    first of all, the -- the training wasn't scheduled

23    on -- there is no training scheduled on the 10th.

24            So I wasn't really sure what she wanted me

25    to do.   So that's why I went in and confirmed with

Page  131

1    Debbie exactly what she was -- what her expectations

2    were so I could do exactly what she asked me to do.

3          Q.    Okay.  And what did you actually train

4    Ms. Myers on, on the afternoon of July 10th?

5          A.    Okay.  So on the afternoon of July 10th, I

6    went over the benefits, I went over the mainland

7    benefits and also the Hawaii guidebook and went through

8    all the major benefits and also supplementary benefits

9    that were available for the mainland and also Hawaii.

10          And then I went over in -- and this was in

11    more detail that -- than we went into on our conference

12    call on the 5th.  And then secondly, I went over FMLA,

13    the procedure for the FMLA, the paperwork of the FMLA.

14    And then I went over, also, the workers' compensation

15    procedure with paperwork provided as well.  And we

16    stepped through all those activities.

17          And just briefly, at the end of it, I

18    mentioned -- you know, since we were preparing to do

19    Paylocity the next day at 9:00 in the morning for a

20    couple of hours, I just, once again, went over, That's

21    what we are going to be doing tomorrow.  And we will go

22    over Paylocity tomorrow.

23          Q.    How long did you meet with Faith Myers on

24    the afternoon of July 10th?

25          A.    Two hours.  We were in Christie Franklin's

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    room.  And we did not take a break.

2        Q.    So you met with her the entire two hours?

3        A.    That's correct.

4        Q.    And you didn't leave until the two hours

5    was over?

6        A.    That's correct.

7        Q.    And what did you do by way of training

8    regarding the Bristol benefits?

9        A.    Okay, so for the Bristol benefits, I

10    believe I started with the mainland guidebook.  And I

11    went step by step, page by page through that entire

12    guidebook so that she was aware of all the option

13    programs for medical, vision, et cetera.

14        And we went and we had a back-and-forth

15    discussion about, you know, what was available.  She

16    had questions.  And I went through that with her.

17        And the guidebooks were probably -- I don't

18    know, maybe 25, 30 pages and stepped through that --

19    all those benefits in more detail than we did, like I

20    said, during the conference call.  And then we also

21    went through all the benefits like this, as well, for

22    the mainland because -- or not mainland, for Hawaii

23    because Hawaii had a completely different program, or

24    part of it was a completely different program from the

25    rest of the company.  They had an HMSA program and it

Page  133

1    was -- it was something that was just, you know,

2    exclusive to Hawaii.

3           And then they also had the Kaiser insurance

4    program as well, which was -- you know, which was --

5    actually, the whole procedure was kind of different as

6    far as enrollment goes, as far as benefits go.  It was,

7    like, two different programs.

8        Q.    Okay.  Now, did you simply hand her copies

9    of brochures and other documents related to the --

10   those programs and --

11       A.    No.

12       Q.    -- tell her to review them?

13       A.    As I said, it's like, I went through step

14   by step with her, page by page and went over all

15   those -- all those specific, you know, major insurance

16   options that the employees had because, you know, these

17   are -- and I would -- and, you know, discussed some of

18   the questions that some employees have had in the past

19   with regard to it and went over it step by step with

20   her because it --

21          Essentially it was, like, you know,

22   training and updating her on the information that she

23   was going -- you know, that I imagine she was

24   eventually going to have to communicate with the

25   Bristol and Optimal group, whatever was going to

Page  134

1    happen.  Because it's -- up to that point, we didn't

2    know whether -- you know, what -- if they were going to

3    merge -- if Optimal was going to merge with our -- our

4    programs or not.

5           I don't think a decision had been made

6    there, but I was asked to sort of go through our

7    program.  So that's exactly what I did.

8           Q.    Okay.  And so is it your view that if

9    Ms. Myers said that you did not train her to the extent

10   that you are saying, that you would say that she is

11   lying?

12          A.    I don't -- I really can't speak for her.

13   She -- you know, I have my notes.   I know what I did.

14   And I can speak for myself.   And I trained her as per

15   Debbie's instructions that I was given.   And it flushed

16   out for -- in more detail, continuing with the

17   conference call.   I -- I really can't speak for, you

18   know, what she absorbed.

19          What I do know is that she didn't take any

20   notes during the entire two hours.

21          Q.    And how do you remember that?

22          A.    Well, I remember it because I was going

23   through the entire thing with her, and I was with her.

24   It's like, she didn't take a pen or pencil -- or a pen

25   and -- or on the computer, any notes at all.

Page  135

1    Q.    What did you train her on with respect to

2  FMLA?

3    A.    FMLA, I went through the whole procedure of

4  how we do it, centralized from, you know, the corporate

5  office, basically.    I managed that -- that program

6  with -- you know, supervised by Debbie, of course.

7         And it -- once again, I think I mentioned

8  it earlier, it's, like -- it started off with an

9  employee from one of the 13 locations requesting FMLA

10  and getting the paperwork, what they needed.    They

11  would -- the employee would sort of basically

12  coordinate with the executive director or the business

13  office manager and they would do their part.    And then

14  the information would funnel back to corporate.    And I

15  would   confirm   eligibility.

16         I would -- basically, if I had any

17  questions with regard to the -- or requests for FMLA,

18  just to make sure that they were eligible per the state

19  they were in.    Because every state had different, you

20  know, FMLA laws, like, Texas had it different than

21  California.    There was, like, a lot more detailed work

22  with California.

23         And let's see, Hawaii was different, too.

24  They had state laws for California, Oregon and also --

25  all those three, actually.    We had many more options as

Page  136

1    far as FMLA, like PDA, CFRA.  Hawaii had a separate

2    state program, too.    So it was really, basically, doing

3    some research, confirming eligibility, writing up a

4    letter, you know, to -- for the employee, which

5    included the financial responsibility that they would

6    have while they were on leave so that they could keep

7    up their benefits.

8                And that's how -- that's when I would

9    coordinate with the payroll department to make sure

10   that, you know, that was correct and that we were

11   giving the correct information and they were going to

12   be making those payments during that time.    Then that

13   would go back to the employee.  I believe it would be

14   signed.

15               The employee would go on leave and I would

16   be coordinating with the executive director, the

17   business office manager and the employee as well, until

18   they, you know, were firmly back into, you know,

19   onboard, working full-time or modified duty, so to

20   speak.   Some of them came back part-time rather than

21   full-time.

22        Q.    What did you specifically train her on,

23   with respect to workers' compensation?

24        A.    Workers' compensation, we went back and

25   forth.   You know, she was having -- she had some input

Page  137

1  as well because there was, you know, different -- there

2  was differences between, you know, what Optimal was

3  doing and what Bristol Hospice was doing.   It's like,

4  for Bristol Hospice, we started out with PMA.  And we

5  had the state workers' compensation fund that we used.

6  And we used Gallagher at that point.   And then we

7  transitioned over to Liberty.   And so I was kind of

8  focusing more -- I was giving her historical context,

9  but I also discussed the fact that we had just -- that

10  we started using Liberty Insurance.

11          And I was explaining the management -- the

12  workers' compensation management system that we were

13  implementing, some of the issues that we were having

14  that I was working with Debbie on, how we went about

15  it.   Again, it was centralized from the corporate

16  office.   Like FMLA, it's like, the employee would

17  initially go to the executive director about the

18  workers' compensation.  I would assist with the claim,

19  the adjusters.

20          If there is any legal issues, you know,

21  that needed followup, I would be involved in that, or

22  at least, you know, be apprised of what was going on

23  there.   And worked with the adjusters consistently and

24  the employees until they came back to, you know, a

25  full-time  work.  And you know, the philosophy at

Page  138

1    Bristol at the time was, you know, to get them back to

2    work as soon as possible, even if it was modified duty.

3    So there was always that option.

4                And we were always trying to, you know,

5    make an option for that so the employees could get back

6    into the swing of things as quickly as possible.

7         Q.    All right.   Now, you did not train her on

8    Paylocity that day, on July 10th; correct?

9         A.    That's correct.   I was just -- we just

10   discussed that briefly.   I had mentioned to her, when I

11   got back from the conference room with Debbie, I said,

12   We are going to go over benefits.   We are going to go

13   over FMLA.   We are going to go over workers'

14   compensation.   And then tomorrow at 9:00 we have two

15   hours for Paylocity.

16        Q.    Okay.   So did you meet with her the next

17   day, on July 11th, to train her?

18        A.    No, I did not.

19        Q.    Why not?

20        A.    I went to the conference room, the Bridges

21   Conference Room, to pick her up for training and Debbie

22   said that she had decided that she wanted Faith to

23   remain in the meeting, in the morning meeting, with the

24   rest of the Optimal HR team and the Salt Lake City

25   Bristol Hospice team.   And that -- that I wouldn't be

Page  139

1    training her during that time.  And I just -- so I went
2    back to my desk.
3        Q.    Okay.  Did you try to go into that meeting?
4        A.    I asked her if she wanted me to attend the
5    meeting.  She said no.  So I went back to my desk.
6        Q.    Did you do that in the meeting itself?
7        A.    It wasn't a meeting.  It was prior to the
8    meeting.  It was -- wait, what was the question?
9        Q.    Yeah, did you go in the meeting and ask
10   Debbie in front of the group, suggesting that you
11   thought you should be in the meeting?
12       A.    I never suggested that at all.  I just
13   simply asked if she wanted me to remain in the meeting
14   since Faith was going to be in the meeting as well.  I
15   didn't know.  It wasn't -- I wasn't scheduled to be in
16   any meeting on July 11th with the Optimal group.
17            I was only scheduled to train, for two
18   hours, Paylocity with Faith Myers and that -- Debbie
19   informed me that that was going to be canceled and that
20   Faith was going remain in the conference room with the
21   rest of the team to meet.
22       Q.    Did she give you a reason why?
23       A.    No, I don't believe she did.
24       Q.    And how did you react after you were asked
25   not to remain in the meeting?

Page  140

1      A.      There was no reaction.   It was simply:   I

2   went back to my desk.   If I wasn't going to do what I

3   was scheduled to do, as far as training, I simply went

4   back to my desk and started working.

5      Q.      Were you instructed by Debbie Wertz or

6   anyone else to limit your communication with -- with

7   Mia Warren and Kelly Binninger?

8      A.      Limit communication?

9      Q.      Yeah.

10      A.      I'm not sure what --

11      Q.      Communicating with them, talking to  them?

12      A.      Like, forbidding me to speak to them?

13      Q.      More or less.

14      A.      No.

15      Q.      You didn't understand that anybody had

16   asked you to not be soliciting them or reaching out to

17   them?

18      A.      Well, Debbie did mention, under oath, in

19   the UI deposition, that she had asked me not to -- I

20   don't know exactly -- I can't remember.

21           It was something like not to, you know -- I

22   don't know if it was meet with them or -- I can't

23   remember exactly, but she said -- she specifically

24   mentioned Kelly Binninger and Mia Warren.   And I did

25   not -- you know, there's no -- as far as.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1          Kelly Binninger, she is nowhere to be found

2    in any of the documentation, but she was -- the fact

3    is, is that I never requested her contact information.

4    I never requested to meet with Kelly.   And I never met

5    with Kelly, period, during that time that they were in

6    Salt Lake City.

7          As far as Mia goes, **it's**, like, I did not

8    solicit a meeting with her because I previously had

9    discussed this with Debbie.   And **it's** documented that

10   that was probably going to happen after the Salt Lake

11   City visit.

12         And frankly, there was no time to do **it**

13   during the Salt Lake City visit.   I was, you know,

14   only -- I was only in the Krauter meeting, and I was

15   then scheduled to do the Paylocity and the Paylocity

16   was canceled.   And I didn't really have anything to do

17   with -- and I did not meet with Mia while she was in

18   Salt Lake City.

19        Q.    Okay.   And -- but you don't recall any

20   specific direction or instruction not to talk to them?

21        A.    Not to speak -- you know, not not to speak

22   to them, no.   **It's like**, beforehand, on the 6th, we did

23   discuss that, you know, me following up, like, as I did

24   with Faith with regard to her functions, that I would

25   be following up at some point with -- with Kelly and

Page  142

1  also Mia at another point, but not during the time in
2  Salt Lake City.
3         Q.    Okay.  So you don't recall any such
4  instruction?
5         A.    What  instructions?
6         Q.    Not to talk to them about meeting or
7  discussing things with them, with Mia or Kelly?
8         A.    I don't remember Debbie specifically saying
9  that.   I remember her, like I said, on July 6th, you
10 know, when I asked her permission to sort of reach out
11 to them, prior to or after, she says, You -- there is
12 going to be no time when they are here.   You know,
13 maybe we can follow up afterwards.    I believe that's
14 how it went.
15             And then I did, after -- like I said, on
16 July 11th, I did go into Debbie's office and -- and ask
17 her did she want me to reschedule the Paylocity --
18 Paylocity training.   And did she -- and did she want me
19 to follow up with Mia and then also Kelly Binninger.
20 Because --
21        Q.    So that was a verbal communication that you
22 had with -- with Debbie Wertz on July 11th, after they
23 left?
24        A.    I think it was actually -- she emailed me
25 on the 11th, and I emailed her back on the 12th.    And

Page  143

1    then I went into her office on the 12th and discussed

2    that verbally.

3         Q.    Okay. So perhaps this is your email back.

4    Let's do this and then we will follow up on that.

5         A.    Sure.

6             MR. FRAZIER:  Let's mark this as the next

7    exhibit.

8                 (Exhibit No. 5 was marked

9                    for identification.)

10   BY MR. FRAZIER:

11        Q.    Lisa, you have been handed what has been

12   marked as Deposition Exhibit No. 5.

13           Do you recognize this document?

14        A.    I do.

15        Q.    What is it?

16        A.    It's a document from Debbie Wertz that --

17   and she was asking me to provide a summary of the

18   training I provided to Optimal during their visit over

19   the last couple of days, which would include July --

20   well, I guess it would include July 10th and July 11th.

21        Q.    Okay. So this is an email from you to

22   Ms. Wertz; right?

23        A.    No, this is an email from Debbie to me and

24   Sandy.

25           We are looking at the bottom portion of it?

Page  144

1    Q.    No, I'm looking at the top.

2    A.    Oh, I see.   Okay.

3          Yes, this is in response to Debbie's email

4    request.

5    Q.    Okay.  So she -- so Debbie sent the email

6    on the bottom, is that correct, it was sent on July

7    11th?

8    A.    Yes.

9    Q.    And that was the date of the meetings,

10   correct, the day the meetings concluded?

11   A.    Yes.

12   Q.    So you had -- so she asked for a summary of

13   the training that you did; is that right?

14   A.    Yes.

15   Q.    Okay.  And your response to that is the

16   email above, the top email?

17   A.    Yes.

18   Q.    Okay.

19   A.    With the -- with the followup meeting with

20   her in her office, verbally.

21   Q.    Okay.  So let's look at this.

22   A.    Mm-hmm.

23   Q.    In the second paragraph, you state, "As per

24   your instructions, I met with Faith on 7/10/2018 in the

25   afternoon and reviewed Bristol's Benefits, Workers'

Page  145

1  Compensation, FMLA processes and briefly reviewed

2  Paylocity."

3             What -- what -- I think we already talked

4  about the benefits, workers' compensation and FMLA.

5  Did you, in fact, briefly review Paylocity that day?

6        A.    Yeah.  Well, I just -- just -- it was just,

7  like, a basic introduction.    Tomorrow, for the two

8  hours -- it was like a preview.  It was like, We are

9  going to be reviewing Paylocity.

10       Q.    So really just saying, Hey, we will cover

11  that  tomorrow?

12       A.    Yeah.

13       Q.    But you didn't get into it?

14       A.    Actually, I did give her some -- I think I

15  did give her some documentation about Paylocity.    I

16  think that there was a general fact sheet, so to speak,

17  that I did give to her.

18       Q.    And was that a fact sheet that you just

19  found on the Internet or --

20       A.    No.

21       Q.    -- where did you come up with that?

22       A.    It was -- it was a fact sheet that was

23  probably provided -- that I understood was provided by

24  the Paylocity team or contract.

25       Q.    Okay.

Page  146

1    A.    You know, I think they provided some

2    training material.   And I believe that was one of the

3    items.

4    Q.    But you didn't spend any time sitting down

5    her with on the Paylocity software to go over it?

6    A.    No, I did not.

7    Q.    Okay.  And then you go on and say, "We were

8    scheduled to meet the following morning for two hours

9    for Paylocity training; however, the Paylocity training

10   was canceled so Faith and I never met for her scheduled

11   training."

12   A.    Correct.

13   Q.    Okay.  And then you say, "I didn't have an

14   opportunity to review Bristol's Workers' Compensation,

15   FMLA/LOA, or Safety/Emergency Preparedness processes

16   with Mia or Kelly since I was not scheduled to meet

17   with either of them and I was not invited to attend any

18   of the Bristol meetings with Optimal aside from our

19   joint Bristol/Optimal 2109 benefit meeting with Krauter

20   and the other two lunches."

21         Is that a correct statement?

22   A.    Yeah.  That was referring back to the

23   July 6th statement that there was going to be no time

24   for scheduled meetings with either me or Kelly, you

25   know, during that portion of -- of their visit.

1    Q.    Okay.

2    A.    And it was true, I did not -- I wasn't

3  invited to any of the additional Bristol meetings with

4  Optimal, aside from "joint Bristol/Optimal" 2019 -- I

5  guess that's a typo -- 2019 "benefit meeting with

6  Krauter and the two lunches."   Yeah, that's correct.

7    Q.    So you go on and you state, "If you would

8  like me to reschedule the Paylocity training with

9  Faith; Bristol's FMLA/LOA and workers' compensation

10  overview with Mia and Safety and Emergency Preparedness

11  with Kelly, I'm happy to follow up."

12         How did Ms. Wertz respond to this email?

13  Did she, to your recollection, send back a reply?

14    A.    You know, I remember her sending a reply

15  that just said, Thank you.  Basically, that was it.

16    Q.    Okay.

17    A.    But then, like I said, I went into her

18  office.   And then sat down verbally and went through

19  this as well because it was determined that, you know,

20  that I would be following up with -- first of all, the

21  training was -- Paylocity training was canceled.  I had

22  every intention to, you know, do the Paylocity

23  training, but it was canceled, you know, in the morning

24  of the 11th.  So I didn't do it.  So I -- I was asking

25  her, you know, to make sure that I would follow up and

Page  148

1  complete that last part of training.

2          And, you know, when we sat together or we

3  discussed on July 6th that we were going to go over --

4  that I was going to follow up with the other -- with

5  Kelly and also Mia, that we would be able to sort of go

6  over the functions that I do as well.  And that's it.

7  That was my intention is to complete the Paylocity

8  training and to follow up with what we had discussed on

9  the 12th, that she -- or pardon me, July 6th.

10      Q.    So you said you had a meeting with -- after

11  you had sent this email to her?

12      A.    Well, yeah.

13      Q.    How did she -- how did that meeting -- tell

14  me about that meeting.  How did it go?

15      A.    I think it was -- I just wanted to make

16  sure -- well, first of all, I wanted to give her the

17  documentation that I took for the meeting, so I gave

18  her the -- the -- you know, the documentation.  And

19  this was, like, routine.

20          It's like, I would go to an audit.  I would

21  do a training.  I would go to Merced.  And I would go

22  to, you know, Clackamas, Oregon or Honolulu, Hawaii and

23  I would provide a report.  But, you know, the summary

24  that she asked for was just, like, very minimal here,

25  obviously, of what I did.  So I did provide her with

Page  149

1    the -- I think it was almost four pages of notes on

2    that training that I provided on the 10th from 2:00 to

3    4:00 with Faith Myers.

4           Q.    You mentioned some notes that you provided

5    to her.

6           How did you provide her those notes?

7           A.    I handed them to her.

8           Q.    Okay.  Did you keep a copy for yourself?

9           A.    Yes.  I provided it.  It's in the

10   documentation.  The notes for the July 5th meeting

11   Debbie had and also the notes of the July 11th

12   meeting -- no -- July 10th meeting with Faith Myers.

13   She received both of those notes and she -- when we

14   were in the UI, under oath, she did refer back to

15   seeing both of those notes and referring to my notes.

16          Q.    And that was Ms. Wertz that said that?

17          A.    Correct.

18          Q.    Okay.  And you provided copies of those

19   notes in this lawsuit?

20          A.    Pardon me?

21          Q.    You provided copies of those notes in this

22   lawsuit?

23          A.    I did.

24          Q.    Were they typewritten or were they

25   handwritten?

Page  150

1      A.      They were typewritten.

2      Q.      And that is something that you would

3  customarily do is typewrite notes?

4      A.      Absolutely, yeah.  Well, it was notes, but

5  it was, like, more of a report because I anticipated

6  that I would be training Faith more.  You know, to have

7  those notes, it was like a foundation.

8          It was, like, This is what we talked about.

9  Let's take a -- you know, go through it and then go to

10  the next step rather than keep repeating everything.

11  And that's what I did for all, you know, my audits.

12  Training was to, you know, give back a more detailed

13  report.   Whether she, you know -- that was just a

14  routine thing that I did.

15      Q.      So when you met with --

16      A.      Excuse me.

17      Q.      When you met with Ms. Wertz on July 12th,

18  in which you discussed the training that you provided

19  to Faith Myers and the other things, when you

20  essentially elaborated on this --

21      A.      Yeah.

22      Q.      -- how did she react?

23      A.      There was no reaction.   I said, If you, you

24  know, read through -- you know, here are the notes.   If

25  you read through them and if there is any further

Page  151

1    questions, just let me know.  I also had, I believe,

2    some question about USERRA, some military benefit

3    question with her as well.  And we discussed that.  And

4    that was the end of the conversation, I believe.

5            I don't remember anything else except that

6    USERRA then, you know, just going over -- when I went

7    in with my email, I -- you know, usually, I would email

8    her and go into her office and sort of talk about it.

9    Here is, you know, additional notes if you want it.  If

10    there is any questions, let me know.  I did the same

11    thing with this one.  Here is my email.  We went over

12    that.  Here's the notes that I took.  If there's any

13    additional information that you want or need, just let

14    me know.  If you want me to follow up with the

15    scheduled -- or to reschedule Paylocity, I can do that.

16            And I can also, further, you know, get in

17    contact with Mia and Kelly to, you know, meet with them

18    as well, as we had discussed on the 6th.  And she said

19    that there was not going to -- that it wasn't necessary

20    to do that right at this time, but because they would

21    probably start training in August.

22        Q.    So how long did this meeting last --

23        A.    Not very long.

24        Q.    -- on July 12th?

25        A.    It wasn't --

Page  152

1    Q.    It sounds like, the way you are describing

2    it, it was a three-minute or less conversation?

3    A.    No, it wasn't three minutes or less.

4  Because it was, like, going through this whole thing,

5  asking about the Paylocity.    It was canceled.

6            Do you want me to reschedule?    What about

7  Mia?   What about Kelly Binninger?    We went on about the

8  USERRA, which I wasn't really sure of, and she was

9  going -- and she was explaining and kind of coaching

10  some of that.

11    Q.    And so, did -- what did she say about you

12  rescheduling  Paylocity?

13    A.    She said not to.   And she said not to

14  follow up with Mia or Kelly because further training

15  would probably be taking place in August.

16    Q.    Okay.  Did you -- she didn't express any

17  displeasure --

18    A.    No.

19    Q.    -- in the fact that you had not trained her

20  on Paylocity, during that meeting?

21    A.    Zero.

22    Q.    Okay.

23    A.    It's like, as far as Paylocity goes, that

24  was another thing that you, like, addressed where, you

25  know, where I expressly said, it's like, It was

Page  153

1  canceled?    **I** was asked who **it** was canceled by.    She

2  said, **It** was Debbie Wertz.    And she was in the meeting.

3  And we were under oath.

4            And there was no, you know, pushback or

5  anything during that -- that meeting.    So that kind of,

6  you know, backs up exactly what, you know, the

7  documentation says and the verbal back-and-forth that **I**

8  had with Debbie as well.

9        Q.    So this was the day before your employment

10  came to an end; correct?

11        A.    Yes.

12              (Exhibit No. 6 was marked

13                for identification.)

14  BY MR. FRAZIER:

15        Q.    You have been handed what has been marked

16  as Deposition Exhibit No. 6.

17              Have you seen this document before?

18        A.    Yes, I have.

19        Q.    And what do you understand this document to

20  be?

21        A.    This was my termination document that was

22  handed to me on July 13th at about 8:30 in the morning.

23        Q.    Who handed **it** to you?

24        A.    Debbie Wertz.

25        Q.    Okay.    Were you called into a meeting -- or

Page  154

1   how was this presented to you?

2          A.    I was asked to come into her office.    And

3   then I noticed that the CEO was also asked to come into

4   the office with me.

5          Q.    And what were you told by Ms. Wertz at the

6   time the when you were presented this letter?

7          A.    She handed me this letter.    And I was, you

8   know -- I was, like, hurriedly going through it.    And I

9   was absolutely shocked that this was a termination

10  letter because I had zero information about anything,

11  as far as anyone being -- about Debbie, first of all,

12  number one, no conversation whatsoever, prior to this

13  letter being delivered to me.  And I immediately did

14  say, This is not accurate.

15                And I said, These are false allegations.

16  And I think that, you know, first of all, as far as me

17  doing my -- me doing my training, I did my training.

18  The one training I didn't do was Paylocity.

19                I followed up with you to reschedule.

20  And -- and then -- and then, I remember it was -- it

21  was just, like, a shock because it was, like, I wasn't

22  expecting it.   There was no indication, you know, from

23  anyone, that there were any issues whatsoever.

24         Q.    Okay.  So looking at this letter, you said

25  you believe there are things in it that are false.

1    Let's go through **it** and talk about **it**.

2          A.    Sure.

3          Q.    So you note **it** was handed to you on

4    July 13th, 2018; correct?

5          A.    Yes.

6          Q.    Okay.  And she starts, in the first

7    paragraph, "On Thursday, July 5, 2018, we discussed an

8    upcoming meeting with the HR Group from Optimal.    We

9    discussed their current positions as well as the

10   training that I wanted provided during the upcoming

11   visit scheduled July 10th and 11.   During that

12   discussion, I directed you to provide training to

13   Optimal's HR Analyst, Faith Myers, on Paylocity,

14   Benefits, Workers' Compensation and the Family and

15   Medical Leave Act.   You were also directed not to reach

16   out to Optimal's HR manager, Mia Warren, nor the Sr. VP

17   of HR, Kelly" -- she says, "Binninger."

18         A.    Mm-hmm.

19         Q.    "As **it** has not been decided what role they

20   would play in the transition of our departments."

21               Is that an accurate representation of what

22   she had discussed with you on July 5th, 2018?

23         A.    No, No.

24         Q.    What is incorrect about that?

25         A.    The date is incorrect.    This is a

Page  156

1    discussion, I believe, that took place -- initially

2    discussing the upcoming meeting with the HR group from

3    Optimal.

4              This was on the 2nd, because that was the

5    day I was -- because during that discussion was the

6    time I was asking if I could reach out to Faith Myers.

7    And you know, start a discussion, start the training,

8    so to speak, you know, prior to their visit.

9        Q.    Okay.  So aside from an apparent error, in

10   your view, of the date in which this was communicated,

11   is the content of the communication correct?

12       A.    The dates -- first of all, the date -- the

13   first sentence is July 5th.  And I don't remember --

14   "discussed their current positions" -- because we

15   didn't -- I didn't know their current positions until I

16   met with Faith on the phone.  That was the first time I

17   understood the division of functions, on the 5th.

18             So this would seem that we discussed their

19   current positions.  She and I did discuss them.  And I

20   told her about the divisions on the 6th.

21       Q.    Okay.

22       A.    I believe.

23       Q.    Okay.  Is it correct, though, that she had

24   directed you to "provide training to Optimal's HR

25   Analyst, Faith Myers, on Paylocity, Benefits, Workers'

Page  157

1    Compensation and the Family Medical Leave Act"?

2        A.    She asked me to train Faith Myers. And

3    Faith was the only person I was supposed to train

4    during that time.

5        Q.    Okay. And then she indicates next that

6    "You were also directed not to reach out to Optimal's

7    HR Manager, Mia Warren, nor the Sr. VP of HR, Kelly

8    Binninger"; was that correct?

9        A.    I don't remember her, you know, making a

10    direct -- that was a discussion that we had in reply to

11    my asking her, Would it be -- can I reach out to them

12    prior or after?

13        And she suggested that there was going to

14    be no time during the Salt Lake, obviously, because

15    those meetings were all scheduled. So I don't know

16    what she is referring to, actually, here about reaching

17    out to "Optimal's HR Manager, Mia Warren, nor the Sr.

18    VP of HR, Kelly Binninger." Reach out, like, for what.

19        Q.    Well, you -- is it your view that what she

20    is saying here is a misrepresentation of fact?

21        A.    No, I'm not saying that.

22        Q.    Did you challenge anything in that first

23    paragraph during your -- the meeting in which your

24    employment was terminated?

25        A.    I didn't even get the opportunity to

Page 158

1    really, fully read this -- this entire letter

2    thoroughly because it was such a rushed meeting.   And

3    it was hard to, you know, take in what was happening

4    because what was happening, I was being terminated.

5    And I -- and, I believe, falsely accused.   And I had no

6    idea, you know, until this very -- until that very

7    moment I walked into the office that I was -- that

8    there was any issues involved at all.

9          Q.    Okay.

10         A.    So I was -- it was, like, kind of --

11         Q.    Are you -- when you say, being "falsely

12   accused," do you believe it was Debbie Wertz that was

13   falsely accusing you?

14         A.    Well, yeah, because it's like I -- I was

15   asked to train.   I trained.   There was one training

16   that I did not do because Debbie Wertz canceled it.   I

17   asked Debbie Wertz to follow up and to have that --

18   that training rescheduled.   And I -- I wasn't allowed

19   to do that.

20         So, you know, for them to say that I -- I

21   didn't follow directives, I was being falsely accused,

22   I believe.

23         Q.    Do you believe that Ms. Wertz had reason to

24   make false accusations about you?

25         A.    Well, I believe that there was --

Page  159

1    unfortunately, after, you know, the incident with the

2    UALD, you know, complaint.

3              And me withdrawing that complaint, I

4    believe that there -- you know, it can be interpreted

5    that it was a retaliation from that.   I mean, it was

6    only a month after I -- you know -- that we -- in

7    April, we had discussed, you know, how we were going to

8    proceed forward.

9              We were going to proceed in good faith.   We

10   were going to proceed in open discussions if there was

11   any concerns, you know, with regard to work issues.

12   And -- and immediately, I'm seeing this as I'm being

13   walked out the door.   So yes, I think that was she

14   retaliating and I think it was -- I think it was, like,

15   totally deceptive and -- and it was -- she did it --

16   she just suspended all of her policies and procedures,

17   HR manual directives, without proceeding in the proper

18   manner that -- that was expected at Bristol Hospice

19   and, actually, from the CHAP organization that oversaw

20   the compliance of, you know, the hospice.

21             And so I think it was -- yes, I think it

22   was -- she didn't give me a -- she didn't give me any

23   chance to -- first of all, I hadn't -- I cannot deal

24   with the situation I don't even know exists.   I mean,

25   there was no discussion about there was any concerns

Page  160

1    from herself.    There was no discussion from Mia Warren

2    or Faith Myers or anybody from the Optimal team or

3    anybody from the Salt Lake City team.

4             I had zero information on anything of this.

5    I walked in.    This was given to me.   And I didn't get

6    it -- even a chance to defend myself.    Even during the

7    meeting of the termination, you know, clearly, it's

8    like, this is the first time that I was reviewing this

9    information.   And a lot of it was false.

10    Q.       So you said you believe that it was in

11    retaliation for the charge of discrimination?

12    A.       I think it was -- I think it was the UALD.

13    I think it was probably -- I -- I believe it would --

14    had something -- clearly, you know, in 2017, when I

15    made that internal complaint against Sandy Dayton, that

16    just, you know, kind of -- kind of unruffled, you know,

17    the foundation, you know, of that.    And it seemed to

18    never die down.   It was, like, you know, silent

19    treatment, et cetera, et cetera.

20             I wasn't getting information for my job.

21    And then, of course, when I participated in the EEOC

22    investigation with Leeya Sengthavichithy, that was a

23    definite -- you know, the amount of, you know, anger

24    and, you know, frustration that Debbie had with that

25    was -- was -- you know, her being a VP of HR, it was --

Page  161

1    you know, she was not -- she was definitely more

2    involved in it than, you know, a neutral party, so to

3    speak.

4         Q.    So what evidence do you have that ties your

5    termination to the UALD charge of discrimination that

6    you filed?

7         A.    Well, I -- yeah.   Okay.   Could you rephrase

8    that?

9         Q.    Sure.

10        A.    I'm not exactly sure of the question.

11        Q.    Sure.   Sure.   So you have testified that

12   you believe that the charge of discrimination that had

13   been filed, the one that we looked at -- if it's easier

14   for you, I will bring it to your attention.    It's

15   specifically -- we are talking about Exhibit 4, that's

16   in front of you.  So that's the one I'm referring to.

17             What evidence do you have that the filing

18   and pursuit of the charge of discrimination, that is

19   Exhibit 4, led to your termination?

20        A.    Well, I think it was because of the -- you

21   know, the total betrayal of, you know, when we sat

22   together in April.

23             And we, you know, discussed and agreed upon

24   how we were going to proceed.    And she -- you know, she

25   indicated to me, which I believed at the time, that she

                                           Page  162

1    would go forth in good faith.   And if there were any

2    concerns about my employment, going forward, she would

3    bring those up and we would discuss it and resolve it

4    directly with me, which she didn't do.

5            So her actions to me were implicit that,

6    you know, there was something not quite right there.

7    Because if, in fact, in April she made this -- we had

8    this discussion and I went ahead -- which is a

9    significant action to, you know, release that UALD

10   complaint, I believed that -- I had the expectation

11   that there was going to be fair -- and going forward --

12   you know, treatment of myself.

13           And then, when I discovered -- when I was

14   handed that piece of -- you know, my termination

15   letter, I realized that, you know, there couldn't have

16   been any intention to that because she suspended, you

17   know, policies, procedures -- policies and procedures,

18   HR directives.   And it's interesting because, it's

19   like, in fact, my job was to go in -- in part, to go in

20   and look at these, you know, HR files or -- you know,

21   personnel files.   And in -- you know, you could look

22   at -- in every location, you would see there was a

23   procedure in place.

24           There was a verbal warning, there was

25   counseling, there was a, you know, written warning,

Page  163

1   there was, like, more counseling or a decision of

2   suspension, for instance.   And the next step, maybe,

3   would be termination.   But there was, like, this long,

4   you know, process that the employees went through.   And

5   it was clearly documented in personnel files, you know,

6   that -- you know, that -- where employees were, you

7   know, getting a personal improvement plan implemented

8   or whatever.   But there was absolutely nothing -- she

9   went from one -- one moment, there was no -- no issues

10  and the next moment, I'm fired.

11             And -- and that, first of all, number one

12  was the agreement that we had in April in good faith.

13  And number two, just in the context of, you know, what

14  was done at Bristol Hospice.   I believe it was a

15  compliance issue, actually, for CHAP. And then, you

16  know, thirdly, it's like having -- being -- you know,

17  with the background of, you know, the complaints,

18  the -- the participation in the EEOC investigation to

19  Leeya Sengthavichithy and the -- you know, the reaction

20  that she gave.   I believe it was connected.

21       Q.    Okay.

22       A.    I think it was her actions and her -- you

23  know, her -- her saying one thing and doing another, so

24  to speak.

25       Q.    Okay.   So to be clear, from what I'm

Page  164

1   understanding, the reason why you believe there is a

2   tie between the fact that you filed the charge of

3   discrimination that is "4" and the termination, if I

4   can kind of boil it down, it sounds like -- because you

5   believe there was some deal, that she would work

6   something out with you and not just jump to a

7   termination, which you believe was somewhat in

8   violation of this agreement, tacit, as it was, that you

9   had with her, that you believe that she suspended

10  normal protocols and that she should have given you

11  something like a performance improvement plan or the

12  like, prior to termination, if there really was an

13  issue; is that fair?

14          A.    No.

15          Q.    Okay.  What did I miss?

16          A.    Well, I think that it was not based on

17  this, like, tacit agreement.  I mean, obviously it

18  wasn't a contract.   But what was expected in the HR

19  guidelines, policies and procedures in the HR manual,

20  and what was happening as procedures that were

21  happening in -- in -- you know, in the personnel files,

22  that was something that was supposed to be done.   And

23  was done continually.

24          I don't know of -- aside from maybe Eric

25  Payne, who was not working there at the time, you know,

Page  165

1    somebody getting fired on the spot like I was,

2    without -- and I was there for two and a half years.   I

3    had no verbal warnings.  I had no written warnings.   I

4    was never on a performance improvement plan.

5              The historical context of it was just

6    completely ignored.   And I do not think that, you

7    know -- you know -- you know, the process of having the

8    employee involved in -- in any of these processes was

9    just suspended.

10              And I do think that it was prejudicial and

11    I think it was done on purpose.

12          Q.    So --

13          A.    I mean -- you know --

14          Q.    So in that, it sounds like what your

15    concern is the fact that you feel that Ms. Wertz did

16    not follow the normal policies and protocols that would

17    be associated with, what I would term to be,

18    progressive discipline of an employee, prior to

19    termination; is that right?

20          A.    In part.

21          Q.    Okay.

22          A.    But I also think that Debbie was determined

23    to fire me.  I mean, she did not -- she did not go

24    through -- you know, there was -- you know, when

25    somebody -- I was in the HR department.   She was in EVP

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    for six years.   She knew full well, you know, her

2    responsibility to, you know, to -- you know, to the

3    employees and to the policies and procedures and the

4    CHAP organization.     And, you know, what was -- what was

5    done procedurally.     And, you know, just on the very

6    bottom level of fairness.

7              It's like, I don't know of -- you know, of

8    people getting fired without any indication that there

9    is some problem at all.

10        Q.    So is it your understanding -- well, as an

11   HR generalist, do you believe that you had a

12   familiarity with the -- with Bristol's policies and

13   procedures relative to employee discipline?

14        A.    Generally speaking, I did, because I

15   reviewed -- I reviewed those in all 13 locations for

16   employees when I audited their personnel files.

17        Q.    Okay.   And in that, is it your

18   understanding that a progressive discipline regarding

19   multiple write-ups or different -- putting people on

20   a -- you know, a personal improvement plan and such was

21   required under Bristol's policies prior to termination?

22        A.    I don't know if it was required, but it was

23   certainly  suggested.   And I believe, in the HR manual

24   in the policies and procedures, those were the

25   directives that -- that were, in fact, followed by the

                                      Page  167

1    organization.    And, I believe, you know, for the CHAP

2    organization, it was required, you know, as far as

3    compliance goes.   And it's like -- there were -- there

4    were some people that, you know, certainly did -- I

5    know of one employee that -- you know, that did

6    something egregious, but, you know, firing on the spot

7    wasn't an option.

8           I mean, even in the UI procedure, it was,

9    like, you know -- the question is, Why would you jump

10   immediately to immediate termination rather than

11   anything else?   And Debbie's answer was that she

12   felt -- her feelings were -- it wasn't based on facts.

13   It wasn't based on, you know, what I had provided.

14   That I deliberately did not train.   Which is false.

15       Q.   So if I can get this straight, so the

16   reasons why you -- what you believe is the evidence

17   that proves that the -- your termination was caused by

18   retaliation, resulting from the filing of this charge

19   of discrimination, is the fact that there was no

20   progressive discipline followed, but that you were just

21   immediately terminated?

22       A.   I -- I'm not saying that it was just

23   exclusively with this UALD. It had to do with the

24   internal investigation with Sandy Dayton.   There was a

25   lot of retaliation afterwards after that.   There was

Page 168

1  retaliation after I participated in the EEOC

2  investigation for Leeya Sengthavichithy. And then

3  there was also, to some degree, retaliation after, you

4  know, I -- I submitted this until we came to, like you

5  say, a tacit agreement, you know, to move forward.

6          Q.    So now, are you the only employee, that

7  you're aware of, that has been fired who participated

8  in the investigation of Leeya's complaint?

9          A.    I don't know.

10         Q.    Okay. Are you aware of any of the others?

11  Because I think you testified there were multiple

12  people who testified -- who provided input or answered

13  questions in the investigation of Leeya's complaint; is

14  that right?

15         A.    Yes.

16         Q.    Are you aware of any of the others being

17  terminated?

18         A.    No.

19         Q.    And with respect to -- with respect to

20  Sandy, do you know whether Sandy has had any input in

21  whether your employment was terminated as a result of

22  the events on July 10th and 11th, 2018?

23         A.    I don't know what her -- how she was

24  involved, but I do know that she wrote up part of the

25  UI explanation of why I was terminated. So, you know,

Page  169

1    I'm not sure of what her, you know, behind the scenes

2    situation was, but I do know that she was involved with

3    completing the UI documentation for -- for the

4    unemployment insurance.

5         Q.    But it may have just been she was

6    instructed to prepare that; correct?

7         A.    I don't know.

8         Q.    Okay.  You just don't know either way?

9         A.    Well, she did complete the form.

10        Q.    Right.   But you don't know the reasons why

11   she did that?

12        A.    No.

13        Q.    Now, you also said something as evidence

14   that the charge of discrimination, that is 4, is

15   retaliation for that, is what led to your termination.

16   And what you said the evidence was is you said -- and

17   correct me if I am mistaking your testimony, but I

18   wrote it down on purpose.

19        A.    Mm-hmm.

20        Q.    You said, "She was determined to fire me."

21             How do you know that Ms. Wertz was

22   determined to fire you?

23        A.    Well, I think it was unusual -- well, first

24   of all, you know, in the -- in the followup to all

25   these things, there was -- there was ongoing -- you

Page  170

1    know, very clear indications that, you know, my -- I

2    was -- I was not involved -- not getting the

3    information I needed, not getting the passport -- the

4    passwords I needed to do my job.    There was, you know,

5    petty things where, you know, I had the keys to

6    Debbie Wertz's office.

7            And then in December, you know, I came back

8    from Thanksgiving vacation and it was, like, I was no

9    longer allowed to have the keys to her office.    But

10   everybody else in the HR department had them,

11   apparently.    She suspended overtime at one point.    And

12   I did, you know, check just to see, you know, and

13   apparently it only impacted me.    And I was in the

14   middle of, you know, finishing up that year-long

15   emergency preparedness project, plus the enrollment.

16   There was all these little things going on, but all of

17   the larger things going on as well.

18            And I think that the fact that she didn't

19   proceed like she does with -- that was -- you know,

20   that was usual behavior.    This was very unusual what

21   happened to me, especially in light of the fact that I

22   had, you know, historical -- which she, you know,

23   affirmed under oath that I had no problems like this

24   before, that I had no verbal warnings, written warnings

25   or -- I was never on any kind of performance

Page  171

1   improvement plan.   So, I mean, at some point you have

2   to -- where I was questioning is, like, why -- why

3   didn't she go through that process.

4                    I mean, she made a choice and it was -- it

5   was a definite choice that she was -- that I was going

6   to be fired and I wasn't going to get due course to

7   sort of even respond to any of the allegations or --

8   and the fact is that she had all the information, my

9   emails, my notes, my documentation, which she

10  confirmed, under oath, that she had looked at both my

11  notes.

12                   And -- and she just decided that she felt

13  that, you know, I was deliberately not trying to train

14  somebody, which was not true.   I had every intention of

15  training.   I did -- I did -- I did train.   The only

16  training I didn't do was Paylocity.

17                   And then I followed up, because my

18  intention was to complete that training.   And so it

19  was, to me, very -- it was disingenuous.   And it was,

20  like, how can you not come to the conclusion that this

21  was, like, a very clear decision for her to suspend,

22  you know, policies, procedures, HR directives and, you

23  know, a historical culmination, so to speak, of all

24  these employees that went through, you know, a

25  termination situation.

Page  172

1       Q.      A  couple  things  and  then  we  will  take  a

2   break.   You  mentioned  there  that  part  of  this  was --

3   was  reaching  back  to -- you  had  not  been  given  access

4   and  the  passwords  and  things  and  hadn't  been  invited  to

5   meetings.   You  believe  that  that's  all  part  and  parcel

6   of  the  way  you  were  being  treated  differently;  isn't

7   that  correct?

8       A.      I  think  that  was  part  of  the  retaliation.

9   But  it  was  not  just  a  matter  of  not  being  invited  to

10  meetings.   It  was -- the  issue  was  I  did  not  get  the

11  information  I  needed  to  do  my  job.

12      Q.      And --

13      A.      That  was,  like,  a  critical  situation  for

14  me.   Because  it's,  like,  I  was  inundated.   We  had  500

15  employees  at  the  time  I  was  working  there.   And  I  was

16  one  of  the  main  point  people  that  people  would  reach

17  out  to  and  ask  questions  on  benefits,  on  FMLA,  on

18  workers'  compensation.   I  was,  like,  the  main  contact,

19  so  to  speak,  on  a  daily  basis.   And  it  was  difficult  to

20  do  my  job  because  when  these  incoming  calls  came  in,

21  incoming  mail  was  coming  in,  I  didn't  have  information

22  to  respond  to  them.

23      Q.      Now,  in  that,  you  just  mentioned  you

24  thought  it  was  part  of  the  retaliation.   That  was  all

25  at  the  end  of  2017;  correct?   Because  that  was -- you

Page  173

1    wanted the information during the open enrollment

2    period for the 2018-year; is that correct?

3            A.      Well, in February of 2017 was when I was

4    involved in the EEOC investigation.

5            Q.      Right.   But I didn't -- you kind of

6    side-stepped my question.   My question is a little

7    different.   My question is:   That all of that was at

8    the end of 2017; correct?

9            A.      The portion of not getting information on

10   my job?

11           Q.      Right.

12           A.      Yeah, generally speaking, that's correct.

13           Q.      Okay.   And that was prior to the filing of

14   the charge of discrimination; correct?

15           A.      Yes, because I filed this at the beginning

16   of March, but it was actually as a result of, you know,

17   not being able to do my -- information not getting my

18   job -- especially in January, when I had no pass --

19   when I had missing passcodes for, you know, essentially

20   most of my main functions.   And then also, it was -- it

21   was after -- let's see -- what was the question?

22           Q.      Well, I think you answered that.   I just

23   said it was before -- that was in -- the date -- that

24   all occurred -- happened before the filing of the --

25           A.      Yeah, because this --

Page  174

1     Q.    It was just a yes-or-no question.

2     A.    Yeah.  It was basically, at this point I

3 was, like, you know, I'm trying to do my job.   I can't

4 do my job without this information.   I don't have the

5 passcodes.  I'm begging for these passcodes.   And it

6 was -- it was ongoing.  It was escalating to the point

7 where I just said, I -- I'm -- that's it.   I -- you

8 know, the retaliation is too much.

9     MR. FRAZIER:  Okay.  Let's go ahead and

10 take one more break and see if we can wrap it up after

11 the break.

12     THE WITNESS:  Okay.   Sounds good.

13     (Recess was taken.)

14 BY MR. FRAZIER:

15     Q.    Before we broke, we were talking about this

16 Exhibit No. 6, which is the termination letter.

17     A.    Okay.

18     Q.    And I want to continue through that.

19 Before we do, just one quick question, I asked you what

20 evidence you have that ties the Exhibit 4 charge of

21 discrimination to, you know, the retaliation for that,

22 as being the cause for the termination.   And I think

23 you have gone through that.

24     The only thing I want to ask is:   Are you

25 aware of any evidence that explicitly ties the two

Page  175

1    together, like some statement that says, We are firing

2    her because she filed the charge of discrimination?

3         A.    I haven't seen a statement like that.

4         Q.    Okay. So you're not aware of any direct

5    evidence that ties the two together?

6         A.    I'm -- I don't recall specifically --

7         Q.    Okay.

8         A.    -- anything like that.

9         Q.    Now, going on to the second paragraph of

10   Exhibit 6. She states, "On Thursday, July 5, 2018, an

11   e-mail was sent regarding the itinerary for the

12   upcoming meeting."

13              Was that correct, to your knowledge?  Do

14   you recall seeing an email with an itinerary in advance

15   of the July 10 and 11 meetings?

16         A.    A draft itinerary.

17         Q.    Okay. It goes on and says, "Per the

18   itinerary, you were to meet with Faith Myers to train

19   her from 9:00 a.m. to 11:00 a.m. on July 11, 2018.   On

20   July 10, 2018, the training session was moved to the

21   afternoon of July 10, 2018, from 1:45 to 4:00 p.m."

22              Was that correct?

23         A.    No.

24         Q.    What is not correct about that?

25         A.    The training session wasn't moved, as far

Page  176

1    as I understood, per Debbie's direction.

2         Q.    It was not moved?

3         A.    No.

4         Q.    So it was not moved to the afternoon of

5    July 10th?

6         A.    Not that I -- no.

7         Q.    So --

8         A.    Not that I understood.

9         Q.    I thought, earlier today, you testified

10    that you did perform training on July 10th.

11         A.    Yes, I did.

12         Q.    And that was at Debbie's direction?

13         A.    Yes.  But she is talking about the

14    Paylocity training.  She directed me to go over

15    benefits, FMLA and worker's comp.

16         Q.    Okay.  Help me, where -- where does it say

17    that that's just the Paylocity training, in that

18    paragraph 2?

19         A.    It doesn't say it in this paragraph.

20         Q.    Okay. So it was just your understanding

21    that she is only referring to Paylocity and not

22    training generally?

23         A.    No.  There was an invite sent out, I

24    believe, by Sandy Dayton for the July 11th Paylocity

25    training from 9:00 to 11:00 a.m.

Page 177

1        Q.    Did you understand, on July 10th, that

2   Ms. Wertz was asking you to meet with Faith Myers on

3   the afternoon of July 10th to provide training?

4        A.    Yes.

5        Q.    It goes on and says, "On July 11, 2018, I

6   was informed that you made the comment to a co-worker

7   that you could not believe that you were expected to

8   'babysit' the Optimal employee."

9            Do you believe that that was false?

10      A.    Yes.

11      Q.    And do you believe that Ms. Wertz created

12   that statement as a fiction?

13      A.    I don't know. It says she "was informed."

14      Q.    Do you know who informed her that you had

15   made the comment --

16      A.    Not at this --

17      Q.    -- about having to babysit?

18      A.    Not at this time.

19      Q.    Had you ever heard that it was -- that it

20   came from a co-worker by the name of Annette Biesinger?

21      A.    Eventually, yes.

22      Q.    When did you find that out?

23      A.    When I read her statement.

24      Q.    Whose statement?

25      A.    Annette's statement.

Page 178

1        Q.    Annette, as you understood it, reported

2 that she had advised Ms. Wertz that you had told her

3 you could not -- you did not believe that you had to

4 babysit an employee?

5        A.    I don't understand your question.

6        Q.    Well, you told me that -- just now, that

7 you read a statement from Annette stating that that's

8 how you understood she was the individual to which

9 Ms. Wertz was referring, that to whom you had

10 supposedly made the comment that you could not believe

11 that you are expected to babysit the Optimal employee;

12 is that correct?

13        A.    Correct.

14        Q.    Did you make that statement to Annette?

15        A.    I did not.

16        Q.    Okay. Do you believe that -- or do you

17 have reason to believe that Annette has made a

18 misrepresentation regarding that fact?

19        A.    I don't know.

20        Q.    Do you know whether Annette actually told

21 Ms. Wertz, prior to July 13th, 2018, --

22        A.    I don't know the conversation between

23 Annette and Debbie Wertz.

24        Q.    And so it may be that -- irrespective of

25 whether you made that statement -- that Annette may

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1  have, in fact, informed Ms. Wertz that you had made

2  that statement?

3  　　　A.　I don't know.

4  　　　Q.　Okay. Do you believe that Ms. Wertz made

5  up that Annette told her that?

6  　　　A.　I saw -- I simply saw the statement that

7  Annette wrote saying that she said I said that.

8  　　　Q.　Right. So I'm asking: Do you believe that

9  Ms. Wertz invented that?

10  　　　A.　It was a statement written by Annette. It

11  wasn't a statement written by Debbie.

12  　　　Q.　Well, that's my point.

13  　　　A.　Indicating that -- yeah.

14  　　　Q.　My point is --

15  　　　A.　Well, what's the question? I'm not quite

16  sure.

17  　　　Q.　Do you believe that -- I'm trying to get to

18  the bottom of whether you believed these statements

19  that Ms. Wertz included in this termination letter were

20  true, from her point of view, on July 13th, 2018.

21  　　　A.　I don't know what Debbie believed or didn't

22  believe. And I don't -- I have no idea about the

23  conversations between Debbie and Mia Warren, Faith

24  Myers or Annette Biesinger.

25  　　　Q.　Did you talk to Ms. Wertz about either

Page 180

1    paragraph 2 or this first sentence in paragraph 3

2    during that meeting, the termination meeting?

3         A.    I believe I did.

4         Q.    Do you recall what you said?

5         A.    I believe I said, I didn't say that.

6         Q.    How did she respond, do you recall?

7         A.    I don't remember her responding to that.

8         Q.    Do you think if, in fact, Ms. Annette

9    Biesinger had, in fact, told her that, that Ms. Wertz

10   had a reason to disbelieve what Annette had told her?

11        A.    I don't know anything about the

12   conversation between Annette and Debbie Wertz.

13        Q.    Okay.  Going on and maybe you have already

14   answered this part, but she says, "When I asked Faith

15   how she felt about the training, she reported that she

16   had not received training and that her conversation

17   with you was very uncomfortable."

18             Do you have any reason to believe that

19   Ms. Wertz is lying about that?

20        A.    I don't know what the conversation with

21   Faith and Debbie Wertz was either.

22        Q.    Okay.

23        A.    I -- you know, I wasn't privy to it.   I

24   didn't have any information as far as that goes.

25        Q.    So you have no reason to believe that what

Page  181

1    Ms. Wertz wrote here was false in any way?

2         A.    Well, I do think that there was a

3    contradiction between Debbie Wertz soliciting

4    information and -- and Faith volunteering information

5    because, I think, she made a contradictory statement in

6    her -- there was a contradictory statement in her UI

7    testimony versus her -- this -- this letter, actually.

8    Because she says here, she "was informed" and, I

9    believe, in the UI statement, she said it was -- these

10   people came and voluntarily told her -- gave her

11   information.

12         So I'm not really quite sure what -- there

13   seems to be some kind of contradiction there.

14         Q.    I mean, wouldn't you agree with me that

15   that could just be the fact that when they voluntarily

16   approached her, she asked the -- asked Faith that

17   question?

18         A.    No, I think it's two different things.

19         Q.    And then she goes on and she says, "When I

20   asked you to report a summary of the training that you

21   provided, you reported that you had trained on 'Bristol

22   Benefits, Workers' Compensation, FMLA processes and

23   briefly reviewed on Paylocity.'"

24         Now that was correct; is that right?

25         A.    Well, it's taken out of context because

Page  182

1    it -- because it doesn't explain the Paylocity training

2    cancellation and me following up, trying to reschedule

3    that Paylocity training with Faith.

4         Q.    So assuming that Faith, in fact, made this

5    report, that she did not feel she had been trained and

6    that contradicts what you believe to be the facts, do

7    you believe Ms. Wertz had any reason to believe you

8    over Faith Myers?

9         A.    Well, I don't know.  I'm not aware of a

10   report from Faith in this paragraph.  I don't know what

11   report this is referring to.

12        Q.    Well, I think that she's referring to,

13   "When I asked Faith how she felt about the training,

14   she reported that she had not received training and

15   that her conversation with you was very uncomfortable."

16        A.    Well, in the July 5th training, there was

17   no verbal or written indication of any uncomfortable

18   situation.  In fact, it was the opposite.  She thanked

19   me.  She was -- it was a pleasure to, you know, be on

20   the conference call with me.  And she was looking

21   forward to meeting me in person.  She wrote that in an

22   email.

23              On the telephone -- on the phone that we

24   went back and forth.  And she was also positive.  And

25   it -- it appears now that what she said and what she

Page  183

1    wrote does not match up to the report that she was

2    giving Debbie.

3         Q.    Except this is talking about the training

4    that was done on July 10 and 11, correct, not

5    information that was relayed on July 5th?

6         A.    Well, I didn't train Faith on the 10th and

7    the 11th.

8         Q.    Did you provide training either of those

9    days?

10         A.    I provided training on the 10th.

11         Q.    That's what I thought you had testified to.

12    So I think that's what the report from Faith was about.

13           Would you agree?

14         A.    I'm not sure what -- what Faith was

15    referring to.

16         Q.    Okay.

17         A.    Because I did the training for Bristol

18    benefits, workers' compensation, FMLA on July 10th.

19    My -- my notes document it.    I went through that

20    summary report by email to Debbie.    And I also provided

21    my notes.    That's what I did.

22         Q.    So going on, you say -- or Ms. Wertz says,

23    "Also, on July 11th, 2018, it was reported that you

24    requested several times for Mia Warren's contact

25    information after you had been specifically directed

Page 184

1    not to reach out to her."

2        A.    No.

3        Q.    Do you believe that -- do you have reason

4    to believe that Ms. Wertz made that up?

5        A.    I don't know the conversations between Mia

6    and Debbie Wertz, what they were.   But on -- I had

7    the -- I was handed Mia's business card on the 10th.

8    So this doesn't seem to work with the timeline of -- of

9    me requesting her business card several times at a

10   different date.

11       Q.    So assuming that these reports from Mia and

12   Faith are as they are recorded here, in other words,

13   that Ms. Wertz is correctly reporting what she

14   understood from Faith Myers and Mia Warren, are you

15   aware of any reason that Faith Myers and Mia Warren

16   would have to lie about what their interactions were

17   with you on July 10 and 11?

18       A.    Well, I think, you know, there may have

19   been confusion in the HR department, there was three

20   Lisas.   And I think that there -- there may have been

21   some confusion.   There often was.   There is Lisa Payne,

22   Lisa Anderson and Lisa Graham, myself.   And, you know,

23   perhaps, there was confusion with Mia Warren as to

24   which Lisa she was referring to.   I don't know.

25       Q.    Okay.   But assuming she was referring to

1  you and that there was no confusion, are you aware of

2  any reason of why she would have to lie about you?

3      A.    No, just like there really is no reason for

4  me to lie about, you know, what I documented in my

5  notes or reported to Debbie in my emails.

6      Q.    And --

7      A.    And verbally, as well.

8      Q.    And neither Faith nor -- let me ask this:

9  Are you aware of any reason why either Faith or Mia

10  would have to retaliate against you for any of the

11  things that you have alleged in this case, the charge

12  of discrimination as it pertains to the actions of

13  Sandy Dayton or Ms. Wertz or the prior actions, that

14  you believe, including the investigation of sexual

15  harassment charges brought by Leeya?  Would Mia or

16  Faith have any reason to retaliate against you for

17  those things?

18      A.    I don't know.  But I do know that Faith

19  Myers was very concerned and very anxious about the

20  merger because she was the youngest member to be hired.

21  And she -- I think she was only working with Optimal

22  for one year.   And she did discuss with me that

23  anxiety.   And that she had gone to Kelly Binninger to,

24  you know, say she would probably be the one that would

25  be let go because she was there the least amount of

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    time.

2        Q.    Okay.  And you believe that is why she

3    would lie about her interactions with you?

4        A.    I don't know.  But she had great anxiety

5    about losing her position.

6        Q.    Okay.  Now, going on to the next page, that

7    there are three reasons they're giving for your

8    termination, do you see that, that are spelled out in

9    1, 2, 3?

10       A.    I do.

11       Q.    "Failure to present positive behaviors

12   toward your work, coworkers and management.

13              "Refusal or failure to carry out a

14   reasonable and lawful job direction assigned by your

15   supervisor.

16              "Knowingly make a false statement either

17   written or verbal when asked to describe a work-related

18   incident."

19              Now, do you have any evidence that any of

20   those things are false, other than what you have

21   already described?

22       A.    Yes.

23       Q.    What is that?

24       A.    "Failure to present positive behaviors

25   toward your work, co-workers and management.

Page  187

1          "Refusal or failure to carry out a
2     reasonable and lawful job direction assigned by your
3     supervisor."
4          And "Knowingly make a false statement
5     either written or verbal when asked to describe a
6     work-related incident."
7          Those are all false.
8     Q.    Right.   And what I'm asking is what -- what
9     is your basis for claiming they are false?   We have
10    obviously talked about your view of the contents of the
11    letter.    But other than what we have discussed in this
12    letter, do you have any other reason to believe that
13    they are false?
14    A.    Well, it's -- you know, as far as the --
15    what I had was -- you know, was -- where my emails, my
16    discussions prior to and after -- during and after,
17    there's no evidence that -- that I presented that
18    showed that I failed to carry out my training.   Because
19    I had all evidence there and provided it verbally and
20    in writing that I did do the training and that my
21    intention was to do the training, complete it well and
22    to follow up once the training was canceled, and to
23    continue to follow up after the Optimal visit to
24    complete meeting with the -- with Kelly Binninger and
25    also Mia Warren.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    Q.    Would you agree with me, though, that if

2    she believed Faith Myers' report that you did not train

3    her after having been instructed to do so that she

4    would have grounds for saying that you refused "to

5    carry out a reasonable and lawful job direction

6    assigned by your supervisor"?

7    A.    No.  I think that it was the fact that she

8    was simply taking Faith's word for it.   This is a

9    person that I met with for three hours.  I had two and

10   a half hours in historical context, which is very

11   strange to me that, you know -- of, you know, good

12   work.  There was none of these issues, like she had

13   mentioned under -- Debbie Wertz mentioned under oath.

14   It's like, all of a sudden, not to investigate it, not

15   to talk to me, not to give me the opportunity to even

16   ask me, you know, what happened during that meeting.

17   She had my notes.

18        She could have, you know, easily had me

19   come into the office.   You know, I was right outside

20   her office and there was just absolutely zero.   Radio

21   silence.

22   Q.    So, again, assuming for a moment that, in

23   fact, Faith reported to Ms. Wertz what Ms. Wertz said

24   she reported --

25   A.    I don't --

Page  189

1      Q.      -- are you calling Faith a liar?

2      A.      I don't know what Faith said to Debbie.

3   And I don't know what Debbie said to Faith.

4      Q.      Right, but my question is:   Assuming that

5   Faith actually did report what Ms. Wertz said, are you

6   calling her a liar?   In other words --

7      A.      All I --

8      Q.      -- do you believe Faith lied if what

9   Ms. Wertz said she said was what was said?

10      A.      I --

11            MS. PANZER: Object as to form.   That

12   doesn't make any sense.

13            MR. FRAZIER: I think that it makes sense.

14   BY MR. FRAZIER:

15      Q.      What I'm basically saying is:   If Faith

16   told Ms. Wertz what Ms. Wertz said she said, are you

17   saying Ms. Myers lied?

18      A.      Well, that's, like, hypothetical.   I can't

19   really know that -- I can't really answer that

20   question.   It's like, because all I know is that --

21   what I did, that's a fact.

22      Q.      Well -- and to the point; right?   That if

23   Ms. -- if Faith Myers reported that you did not train

24   her and Ms. Wertz believed it, I mean, either she lied

25   or she didn't.   And I'm asking you, if that's what she

Page  190

1    reported, are you saying she lied?

2         A.    I don't know if it was Faith or if it was

3    Debbie.   And, you know, how it was -- how it was

4    communicated and how it was taken, that information,

5    how it was conveyed as far as communication goes.

6         Q.    Okay.  And what is the -- and is it your

7    belief then that that is, in fact, what Faith reported,

8    that you did not train her?

9         A.    I --

10        Q.    That still, Ms. Wertz would not have

11   grounds to believe that you made a false statement

12   about what you did?

13        A.    I think it was imperative.

14             (Clarification by the reporter.)

15             THE WITNESS:  I think that it was

16   imperative that Debbie Wertz fact-check what Faith

17   said, which she did not.  And the fact that

18   Debbie Wertz had all of the information before her

19   since, you know, July 5th, in emails, in verbal

20   communication, in my documentation for both trainings,

21   that's -- that was my -- that's the fact there, from my

22   point of view.  I -- I can't know what, you know,

23   Debbie believed.

24             Debbie -- all I know is that she did not

25   fact-check what they said.

BY MR. FRAZIER:

Q.     And what, in your view, should Ms. Wertz have done to fact-check?

A.     Well, I think that she should have followed -- you know, she was the EVP for six years. She -- there was a procedure in place.   I think that --

Q.     Which was what?

A.     Pardon me?

Q.     Which was what?

A.     Which was what, what?

Q.     Well, you said there was a procedure in place.   And so I said, "Which is what?"

A.     In the HR manual, in the policies and procedures, in our procedures for CHAP.

Q.     That sets forth a procedure for fact checking?

A.     Procedures for termination.

Q.     Okay.  So your --

A.     Or a problem or grievance or immediate termination.

Q.     Okay.  And my question is, what did -- what should she have done to have fact-checked what she was told by Faith Myers?

A.     I believe she should have followed the procedure that was in place in the HR manual.   The

Page  192

1   policies and procedures.  The procedures for the CHAP

2   organization and -- and in doing what was done with all

3   employees -- or the employees that I knew that went

4   through any kind of verbal -- you know, any kind of --

5   what is it called?  You know, verbal, written warnings

6   of any sort, which was documented in, you know,

7   employee records.  I think I should have been treated

8   just equally to those employees.  And I wasn't.

9        Q.    So I think that you may be answering a

10   slightly different question than my question is.  I

11   think you're talking about progressive discipline

12   again.  And my question is, you had indicated she has a

13   duty to fact-check.  And you did say that she should

14   have followed the procedures in the manual and the

15   policies and that CHAP has something.

16             Is that all with regard to fact-checking?

17        A.    Well, I think that just -- you know, like,

18   in fairness to me, I had been there two and a half

19   years, like I said.  Historical background was that I

20   had no issues of any sort with -- with these three that

21   I was terminated for.

22             I had no written, verbal or any progressive

23   discipline, as far as work performance.  It's like --

24   it just seems that it -- it's quite a jump from, you

25   know -- you know, a -- you know, a -- you know, a known

Page  193

1 entity employee that has followed, you know -- has good

2 evaluations. You know, no issues, essentially, going

3 through this. And -- and then suddenly, I'm

4 terminated.

5   Q. Okay.  But again, my question -- because I

6 don't know that I'm ever getting an answer to the

7 question, which is: What should she have done to

8 fact-check?

9   A. Well, I think the first thing she should

10 have done is ask me in. And -- and to sort of -- first

11 of all, it would have been nice if I was -- if she had

12 given me any indication whatsoever that -- verbally or

13 in writing, that there was a concern.

14    There was no verbal or written concern at

15 all, across the board.  It was, like, I heard nothing.

16 And, it's like -- so, if there is a grievance or there

17 is a problem, you can't really solve it if you are not

18 going to speak directly to the person that is being

19 accused of some issue at hand.

20   Q. Okay.  Anything else that she should have

21 done to fact-check?

22   A. Well, I think there should have been some

23 kind of investigation if she wanted to go through that

24 procedure and that -- that I be a part of it. Because

25 I was, you know -- in fact, she had time to, you know,

Page  194

1  speak to everybody else.  She didn't have time to speak

2  to me, who was the -- the main person for the

3  situation.

4       Q.    Aside from speaking to you, though, what

5  else should she have done to fact-check, if anything?

6       A.    I think she should have reviewed all the --

7  you know, the emails and all of the --

8       Q.    Which emails are those?

9       A.    Emails from probably -- emails starting

10 from giving me Faith Myers' information, my email sent

11 to her after the conference call, my verbal

12 communication after the conference call with her, my

13 documentation that I handed her with regard to the

14 conference call notes, my -- my notes after -- that I

15 gave her on the 12th from the notes from July 11th.

16      Q.    Okay.

17      A.    And I'm just trying to think.  Other facts?

18 I think that she should have considered historical

19 context.  I think, you know, she should have given me

20 the opportunity to at least know what I was being

21 accused of and to defend myself.

22      Q.    So you said that she should have been able

23 to review certain materials.   Now, you provided her

24 your email on November -- or excuse me, on July 12th,

25 in which you explained what you had done; correct?

Page  195

1    A.    Well, I provided an email.

2    Q.    Right.

3    A.    With the summary.

4    Q.    Correct.

5    A.    I went into her office and discussed that

6    email.

7    Q.    Right.

8    A.    And then I handed her the three and a half

9    pages of notes from my meeting with Faith.

10    Q.    And so, she would have been able -- and

11    would -- so she spoke with you.   She had your email,

12    and she had your three and a half pages of notes.    Now

13    you said she should have talked to you.   It sounds like

14    she did.

15    A.    No, she didn't.   Because we didn't go over

16    those notes.   And we didn't go over the notes from the

17    conference call either.

18    Q.    Okay.  So --

19    A.    She basically -- what I understand is,

20    like, Faith basically said something and I didn't get a

21    chance to say anything.   She believed Faith.   And I was

22    terminated.

23    Q.    So is it your view, then, that what you

24    said in your July 12th email, what you told her

25    verbally on July 12th and the three and a half pages of

1    notes that you handed to her were insufficient to

2    advise her on what you actually did?

3        A.    I think she was well advised of what I had

4    done.

5        Q.    Okay.

6        A.    And I had documented it.

7        Q.    If she -- and follow what I'm trying to get

8    at.  So you're telling me that she should have talked

9    to you, but at the same time, you are telling me you

10    told her everything she needed to know.

11        So what I'm trying to do is reconcile those

12    two.  I mean, you are saying you didn't get to respond,

13    but you did respond.  And because you are telling me

14    you told her everything you did in training, but you're

15    telling me that's not enough.  That she should have

16    come back.

17        Let me ask you this --

18        A.    We didn't -- we didn't discuss the notes.

19        Q.    Well --

20        A.    So -- she didn't have any questions about

21    the notes.  And I wasn't aware that she even read the

22    notes until we were in the UI where she indicated that

23    she had read the notes and that she -- and I don't know

24    when she read the notes.  But she read the notes at

25    some point both for the conference call and the --

Page  197

1       Q.    So let me -- let me ask you --

2       A.    -- training.

3       Q.    -- this:   Other than disputing what Faith

4 Myers said and just saying I dispute, what else would

5 you have told her besides what was contained in your

6 July 12th email, in the three and a half pages of notes

7 and what you told her verbally when you met with her in

8 her office to report what you had done?

9       A.    I had --

10      MS. PANZER: Let him finish his question.

11      THE WITNESS:  Okay.   Go ahead.

12 BY MR. FRAZIER:

13       Q.    Well, that is my question.   What, besides

14 those things, would you have told her more to refute

15 Faith Myers?

16       A.    I would have mentioned the April meeting I

17 had with her.   I would have --

18       Q.    With whom?

19       A.    Pardon me?

20       Q.    With whom?

21       A.    Debbie Wertz, when I -- when we discussed

22 me withdrawing the UALD.

23       Q.    So what does that have to do with refuting

24 what Faith Myers said?

25       A.    The fact that I didn't -- that she and I

Page 198

1　　agreed tacitly that we were going to -- if there was

2　　any concerns with my employment, that we would discuss

3　　it directly and resolve it.　So that didn't -- that

4　　discussion and that understanding didn't happen.

5　　　　　Q.　　Okay. But again, my question is -- so even

6　　if you -- even if you had told her that and she said,

7　　Okay, let's do that, what would you have told her in

8　　such a meeting that would have been beyond what you

9　　conveyed to her through your July 12th email, your

10　　meeting with her on July 12th when you reported what

11　　you had done and then the three and a half pages of

12　　notes that you handed to her, in which you've

13　　acknowledged she read?

14　　　　　A.　　Well, I would have -- I would have -- I

15　　told her I felt that it was retaliation.

16　　　　　Q.　　Why would you have told her that it was

17　　retaliation -- that you believed that Faith Myers was

18　　retaliating against you?

19　　　　　A.　　No, I believe that after the UALD was kind

20　　of ratified in June and a month later, I was terminated

21　　under a very unusual procedure experience.　That --

22　　that there was -- to me, there was other issues

23　　involved with just what she was -- what was going on

24　　here.

25　　　　　Q.　　I'm really struggling to understand.

Page　199

1          A.      What is it that you're --

2          Q.      Well, you would have told her that you

3 think it's retaliation.

4          A.      Yes, I did.

5          Q.      But what you are doing is refuting what

6 Faith Myers said.  And you told me that you don't

7 believe Faith retaliated against you.  So I'm --

8          A.      I'm not --

9          Q.      I'm not seeing a connection with -- you

10 need to explain to me how what Faith Myers is telling

11 her is in retaliation for you filing a charge of

12 discrimination, which parenthetically is with a

13 completely different company, one is with Bristol and

14 one is with Optimal.

15          So explain to me how Faith Myers telling

16 Debbie Wertz she didn't get trained is in retaliation

17 for you filing a charge of discrimination against

18 Bristol?  I'm -- I don't see a connection there.  So

19 you need to really connect those dots for me.

20          A.      I don't --

21          Q.      Sometimes I'm --

22          A.      I don't -- I don't understand the timeline

23 or how you are trying to connect the two.

24          Q.      Okay. Well, I think you're -- I think you

25 are actually missing what I'm missing then.  And so

Page  200

1    maybe the answer is **it's not.** But...

2           A.    Well, I'm not saying that.

3           Q.    So I'm asking you:  What should Ms. Wertz

4    have asked you or done, in communicating with you, to

5    find out whether -- what more you would have told

6    Ms. Wertz in response to Faith Myers?  And you said

7    that **it** was retaliation.

8                 And I'm trying to understand how you would

9    have gone in to Ms. Wertz and said, Well, what Faith is

10   saying to you is in retaliation for the charge of

11   discrimination?

12          A.    No, I'm not saying **it** had Faith -- **I** don't

13   know what the discussions were, once again --

14          Q.    Okay.

15          A.    -- between Faith --

16          Q.    So you wouldn't have said that?

17          A.    Said  what?

18          Q.    Okay. I'm trying to understand what **it** --

19   you told me that Ms. Wertz should have followed up, she

20   should have investigated the facts more.  And so I'm

21   trying to say, Okay, what should she have done?  And

22   you gave me a litany of things.   And the paramount

23   thing was talk to you.

24                And so I said, Okay, well she -- you gave

25   her the July 12th email; right?   You talked to her, you

                                              Page  201

1    met with her, you told her what you did.   And you gave

2    her three and a half pages of notes.   And you

3    represented to me that that was all pretty detailed,

4    that it should have provided information.   And I said,

5    Okay.   But then you said, But no, she should not have

6    believed Faith.

7              So I'm asking:   What more --

8         A.    I never said that.

9         Q.    -- should you have told her?   What more

10   should she have come and talk to you about?   And then

11   your answer was, I would have told Ms. Wertz that it

12   was in retaliation for the UALD complaint.   And I'm

13   trying to figure out why you would have gone and

14   responded to what Faith Myers said by telling Ms. Wertz

15   that what Faith said was in retaliation.   That doesn't

16   make any sense to me.

17             MS. PANZER: Objection.   That misstates her

18   testimony.

19             MR. FRAZIER: Well, that's what I'm

20   understanding her testimony to be.

21             THE WITNESS:   Huh-uh.

22   BY MR. FRAZIER:

23        Q.    Okay.   When you said it was in retaliation,

24   what are you talking about?

25        A.    I was -- it had nothing to do with Faith

Page  202

1    Myers.

2         Q.     Okay.  But my question has everything to do

3    with Faith Myers.  So maybe that's the disconnect.    My

4    question to you, the whole time, has been -- I asked

5    you what Ms. Wertz needed to do to follow up, because

6    you're saying, Hey, she should have fact-checked what

7    Ms. Myers said.

8         A.     Mm-hmm.

9         Q.     And I said, Okay, what should she have

10   done?  And you said, She should have talked to me.   And

11   I said, Well, she did talk to you.   She did a bunch of

12   things.

13              She -- she had the July 12th email;

14   correct?

15        A.     Huh-uh.

16        Q.     She didn't have it?   I thought you told me

17   earlier she did.

18        A.     Well, I --

19        Q.     Didn't -- let's do it this way, let's go

20   through what you communicated to Ms. Wertz about the

21   training you provided.   I think we have already done

22   it, but let's redo it just so we have got a clear

23   record; okay?  So let's go and let's look at Exhibit

24   No. 5.  You should have it there in front of you.   It's

25   an email dated July 12th.   You sent that email, right,

                                              Page  203

1    to Ms. Wertz?

2        A.    Mm-hmm.

3        Q.    And it advised her what you did in training

4    Ms. Myers; is that correct?

5        A.    Correct.

6        Q.    Okay.  And you have no reason to believe

7    she didn't read it?

8        A.    I don't know if she read it or not.

9        Q.    Okay.  But then you followed it up by going

10    into the room and talking to her about the training you

11    provided; is that correct?

12        A.    Correct.

13        Q.    Okay.  And so you verbally relayed to

14    Ms. Myers what you had done -- or, excuse me, not Ms.

15    Myers -- to Ms. Wertz?

16        A.    Yes.

17        Q.    And then you handed her a three and a half

18    page set of notes in more detail -- in much more

19    detail, setting forth the training that you claimed to

20    have done for Ms. Myers?

21        A.    Correct.

22        Q.    Okay.  And then Ms. Myers comes in and

23    says, I don't believe I was trained very well; is that

24    right?

25        MS. PANZER: Objection.   Calls for

Page  204

1    speculation.

2    BY MR. FRAZIER:

3        Q.    Well, that's -- if we look at the letter,

4    right, she says -- the termination letter says, "When I

5    asked Faith how she felt about the training, she

6    reported that she had not received training."

7            So that's what Ms. Wertz says Faith told

8    her; correct?

9        A.    With --

10       Q.    So --

11       A.    With regard to what training?

12       Q.    I think all of it.

13       A.    Well --

14       Q.    Just training generally.   So you did those

15   things, that is what Faith said.   And you said, Now she

16   needs to fact-check.   I'm asking you what more should

17   Ms. Wertz have talked to you about that you would have

18   relayed, beyond what you had already told her, that she

19   needed to consider to determine that Faith was lying?

20       A.    I think I needed to know that there was a

21   concern to begin with.   I -- because I didn't know of

22   any concerns whatsoever or what the concerns were.

23       Q.    How would that have changed the information

24   supplied?

25       A.    Because that -- you know, in order to

Page  205

1　resolve something -- there were -- there was -- there

2　was two -- there was two different presentations, mine

3　and Faith's.

4　　　　　　　And so the fact that, you know, I didn't

5　even know that there was an issue of concern in any

6　way, from July 5th to July -- until, I guess, I got the

7　termination letter on July 13th.

8　　　　Q.　Well, let me ask you this.　Let's assume

9　she had advised you that there was a concern.　What

10　more information would you have supplied to her that

11　would have disabused her of the thought that Faith was

12　telling the truth?

13　　　　　　　In other words, what more could you have

14　told her, assuming you had been advised that there was

15　a concern?

16　　　　A.　But I wasn't advised that there was a

17　concern.

18　　　　Q.　I understand your testimony.　I'm asking --

19　I'm trying to understand.　You're telling me that she

20　should have followed up.　And I'm trying to figure out

21　what she should have done.　So now I'm asking you:

22　Assuming she had said to you, Hey, I'm calling you in.

23　This is Ms. Wertz.　I'm calling you in.　Faith said you

24　didn't train her.　There is a concern.　You've -- you

25　supplied me these other materials about what you did.

Page  206

1    What more would you then say in your
2 defense, beyond what you had already communicated to
3 her, that she should have considered?
4    A.    Well, I think I would have walked through
5 the entire timeline of events and connected the dots so
6 she could clearly see that my intention, the emails,
7 the verbal communications, all evidence that I did the
8 training that was requested of me.    And that my
9 intention was always to complete that training.    And
10 there was really no evidence that it wasn't done.
11    And in the context of all my past two and a
12 half years, you know, this was a -- you know, an
13 anomaly.  And to find out exactly how it -- you know --
14 you know, to sort of fire somebody immediately is, you
15 know, for a very egregious behavior.    And -- and I
16 would have, you know, just gone through everything in
17 detail with her, which is what I think is fair, you
18 know, when somebody makes allegations against you that
19 are false.
20    Q.    Okay.  So are you suggesting that the
21 information you had supplied previously, including the
22 three and a half pages of notes, was not sufficiently
23 detailed?
24    A.    No, I'm not saying it was not sufficiently
25 detailed.   It was detailed to the best of my ability.

Page  207

1        Q.    Okay.  And **it** would have contained much of

2 this information that you're talking about; is that

3 correct?

4        A.    Probably so.

5        Q.    All right.  Let's -- I want to run through

6 your complaint real quickly and talk to you about

7 damages and then we can wrap up.

8            MR. FRAZIER:  So **let's** have this marked as

9 the next exhibit.

10            (Exhibit No. 7 was marked

11              for identification.)

12 BY MR. FRAZIER:

13        Q.    Lisa, you have been handed what has been

14 marked as Deposition Exhibit No. 7.

15        A.    Mm-hmm.

16        Q.    Do you recognize this document?

17        A.    Yes.

18        Q.    What do you understand **it** to be?

19        A.    Notes taken -- just allegations between

20 myself and Bristol.

21        Q.    Okay.  So do you understand this to be the

22 complaint by which you started the lawsuit and made

23 allegations against Bristol that are the substance of

24 what is at issue in this lawsuit?

25        A.    It appears to be, but I'm not really sure.

Page  208

1    Q.    Okay.   Do you know whether you reviewed and

2    approved this document before it was filed?

3    A.    Well, I would have to sort of read the

4    whole thing, but it looks familiar.   And it looks like

5    it has -- it looks like there is a timeline.

6    Q.    Okay.  I'm going to ask you a few questions

7    about it.   So, if we can go -- now, again, you have

8    got -- in paragraphs 12 and 13, you say, "In

9    February 2017, Ms. Graham complaint" -- I think it

10   means "complained," a typo -- "that her supervisor,

11   Sandy Dayton, Payroll Director, subjected her to a

12   hostile work environment.

13           "Bristol's VP of Human Resources,

14   Debbie Wertz, investigated Ms. Graham's complaint and

15   determined that Ms. Dayton's behavior was a one-time

16   issue, not a general behavioral concern, and dismissed

17   the complaint."

18           Do you recall Ms. Wertz saying that

19   Ms. Dayton's behavior was a one-time issue?

20   A.    No, I believe it was Rich Dahlquist, if I

21   remember correctly.

22   Q.    Who made that determination?

23   A.    Yes.

24   Q.    Okay.

25   A.    I believe that's correct.

Page  209

1    Q.    And that was an internal complaint; is that

2    right?

3          A.    That's correct.

4          Q.    Okay.  And when you complained about a

5    hostile work environment -- are you familiar -- again,

6    being -- having worked as a -- in human resources, are

7    you familiar with what I mean when I refer to

8    "protected classes"?

9          A.    Yes.

10         Q.    Okay.  That would be, like, race, gender,

11   sex, religion, disability, national origin, age,

12   et cetera; correct?

13         A.    Mm-hmm.

14         Q.    Okay.  Did Sandy Dayton subject you to a

15   hostile work environment that was based upon a -- any

16   one of a number of protected classes?

17         A.    Well, I -- I believe it was sex, gender.

18         Q.    Okay.  Is this what you were talking about

19   earlier or do you have some other basis?

20         A.    For this particular hostile environment

21   complaint?

22         Q.    Yes.

23         A.    Yes.

24         Q.    And what is it?

25         A.    What is what?

Page  210

1    Q.    The basis.    You said, Yes, you have a

2    different  basis.    So I'm asking you what it is.

3        A.    Just that she came into my cubicle and was

4    very  hostile  and --

5        Q.    Do  you  have  --  you're  saying  that's  because

6    of  sex;  right?

7        A.    Well,  the  pattern  was  that  Sandy  Dayton,

8    you  know,  routinely  --  routinely,  basically,  caused  a

9    hostile  environment  with  the  females  in  the  office,

10   from  what  I  saw  with  her  behavior  and  her  --  and  what

11   she  talked  about.

12       Q.    Did  she  --  when  she  came  in  and  you  had

13   this  --  I  don't  know  if  you  call  it  an  altercation  or

14   just  this  --  this  moment  of  conflict  in  your  cubicle,

15   did  she  say  anything  to  you  about  your  gender?

16       A.    Not  specifically.

17       Q.    And  so  other  than  the  fact  that  you  are  a

18   woman  and  that  you  observed,  in  your  view,  that  she  was

19   somehow  hostile  to  women  in  the  office  generally,  do

20   you  have  anything  else  that  specifically  ties  that

21   event,  when  she  came  in  and  you  had  this  moment  of

22   conflict  in  your  cubicle,  that  ties  it  to  your  gender?

23       A.    Just  her  ongoing  behavior,  her  actions  and

24   her  verbal  communications  with  females  in  the  office.

25       Q.    Okay.  I  --

Page  211

1    A.    The most --

2    Q.    I may ask you to be more specific.    Because

I'm not sure what you mean by "her ongoing behavior,

her actions."    I'm not sure what that means; right?    I

need you to be more explicit as to what you are talking

about when you say "her ongoing behavior" and "her

actions."

8    A.    Okay, for -- for example, you know, her

explicit sexual, you know, comments, specifically about

women and their -- you know, their physical appearance,

their -- you know, their weight, their -- just what she

had basically -- what Leeya Sengthavichithy had

relayed, you know, that -- you know, there was women in

the office that looked like a clown because, you know,

the makeup was applied so poorly and how obese and fat,

you know, some of the women were in the office.    And

that they should not wear tight clothing, et cetera.

Those are the kind of comments that were

specifically -- I didn't hear any comments as far as

the males and her comments to -- about males in the

office.    It was just female.

22    Q.    Okay.

23    A.    And it was basically mocking and ridiculing

the physical appearance of females.

25    Q.    Right.    And so, in that, was anything said

Page  212

1    during the cubicle incident, is what I will refer to

2    it, this confrontation in the cubicle --

3        A.    Sure.

4        Q.    -- about your physical appearance?

5        A.    No.

6        Q.    She mentioned that you wore makeup that

7    made you look like a clown?

8        A.    No.

9        Q.    Did she say anything to you that could be

10   construed as sexually harassing?

11       A.    I don't recall.

12       Q.    Okay.  So, is it fair to say that you --

13   the reason why you believed that it was based on your

14   gender is just because what you had observed her say to

15   others and that you hadn't noticed her use such

16   confrontational -- or engage in such conflict with

17   males?

18       A.    Yes, in part.  And then, also -- and then,

19   also, all the information I got from the multiple

20   employees that basically communicated that same pattern

21   of behavior.

22       Q.    Okay.  Now, how many other people -- are

23   you aware of other people in the office having

24   complained about Sandy Dayton's sexual harassment?

25       A.    Not specifically.    Leeya was the only one

Page  213

1   that I know made the EEOC complaint about sexual

2   harassment.

3         Q.    Okay.  Does Leeya still work at Bristol?

4         A.    No.

5         Q.    What happened to Leeya?

6         A.    She resigned.  She just couldn't take it

7   anymore.

8         Q.    Okay.  Are you aware of anyone else having

9   complained about the things that she was saying about

10   women's appearance or calling them clowns?

11         A.    I don't recall or remember.

12         Q.    Are you aware of anyone else having

13   complained that they felt like they had been subjected

14   to gender discrimination by Sandy Dayton?

15         A.    I believe that maybe -- Melany Zoumadakis,

16   she submitted an -- I think it was a -- I don't know if

17   it was a UALD complaint or an EEOC complaint --

18   somewhere in the beginning of 2018.  And she may

19   have -- she may have indicated gender as well.  I'm not

20   100 percent sure.

21         Q.    Okay.

22         A.    I think that also there's an executive

23   director in Honolulu, Hawaii.

24         Q.    Mm-hmm.

25         A.    Ladonna Chung.  And I believe that there

Page  214

1  was some -- some issue with gender discrimination in

2  that office for something.

3       Q.    Relating to Sandy Dayton?

4       A.    No, I don't think it was related to Sandy

5  Dayton.

6       Q.    Okay.  Do you know whether Melany still

7  works for Bristol?

8       A.    No, Melany has passed away this past April.

9       Q.    Okay. That's unfortunate.  Was -- to your

10  knowledge, was she still working at Bristol?

11       A.    I was the -- the last I -- when I was

12  terminated, I believe she was still working with -- she

13  was still working with Bristol, I believe.

14       It's like, she did submit a complaint

15  against Sandy Dayton and Debbie Wertz because she felt

16  she was being bullied and harassed by them.  And so she

17  requested that somebody else deal with her, as far as

18  her FMLA goes.  And so Rich Dahlquist asked if I would

19  step in to assist with that employee relation issue,

20  which I did.  And I -- I worked with Melany, I believe,

21  until the time I was terminated.

22       Q.    Okay.  To your knowledge, was Melany ever

23  terminated from Bristol?

24       A.    I -- I don't know.

25       Q.    Okay.  What about this employee that you

Page  215

1  mentioned in Hawaii, who had alleged sexual harassment,

2  do you know whether she **still** works there?

3      A.   No.  She was -- she is -- no longer works

4  there, Ladonna Chung.  She had mentioned the sexual

5  harassment, but I can't remember what exactly her claim

6  was, but I know that there -- there was a claim there.

7  So, I guess, in the beginning of 2018, there was

8  myself, there was Melany Zoumadakis, and Leeya

9  Sengthavichithy that had EEOC complaints submitted.

10      Q.   Okay.

11          Do you recall who participated in the

12  investigation of the sexual harassment complaint

13  brought by Leeya Sengthavichithy?

14      A.   Who participated in it?

15      Q.   Yeah.  Who the individuals were that

16  were --

17      A.   Yes.

18      Q.   -- part of the investigation?

19      A.   **I think that -- I don't know if it** is a

20  comprehensive list --

21      Q.   Okay.

22      A.   -- but I do know others that were involved

23  **in it.**

24      Q.   Who else participated, besides you and

25  Leeya?

Page  216

1          A.    Let's see.   Lisa Payne, Annette Biesinger,

2     maybe Lisa Anderson.  I don't remember exactly.   Myself

3     and -- I don't -- I think maybe Sandy Dayton was on

4     that list, but I'm not 100 percent sure.

5          Q.    Okay. Is Lisa Payne still with Bristol, to

6     your knowledge?

7          A.    No, she is not.

8          Q.    What happened to her employment?

9          A.    She -- I'm not -- I just know that she is

10     not working at Bristol Hospice any longer.

11          Q.    Do you know whether her employment was

12     terminated?

13          A.    Not that I'm aware of.

14          Q.    Okay.

15          A.    I'm not aware of what happened.

16          Q.    What about Annette?

17          A.    Annette, I believe, is still working there.

18          Q.    Okay.  Do you know whether she was

19     disciplined in any way for having participated in the

20     investigation of sexual harassment brought by Leeya?

21          A.    Not that I -- I don't know.

22          Q.    What about Leeya Anderson -- excuse me,

23     Lisa Anderson?

24          A.    I don't know.

25          Q.    Do you know whether she is still working

Page  217

1    there?

2          A.    I don't believe that she is working there.

3          Q.    Do you know whether she was terminated?

4          A.    I don't know.

5          Q.    Okay.  Do you know whether she was

6    disciplined for having participated in the

7    investigation?

8          A.    I don't know.

9          Q.    Okay.  What about Sandy Dayton?

10         A.    She no longer works at Bristol.

11         Q.    Was she terminated for participating in the

12   investigation?

13         A.    I don't know.  I'm not sure.

14         Q.    You have no reason to believe that she was?

15         A.    No.  I just know that I did see notes that

16   Debbie wrote for the EEOC investigation.

17               And I know that those notes were not

18   comprehensive of actually what took place during the

19   investigation, like, with myself, as far as her

20   reporting to the EEOC what happened during that

21   interview or investigation.

22         Q.    Okay.  Now, are you aware of other

23   individuals having filed a charge of discrimination

24   with the -- either with the UALD or the EEOC, other

25   than those you've described?

Page  218

1      A.    I think that there was another IT employee.

2   I can't remember his name.  He -- it wasn't

3   discrimination, though.  I think it was, like, just

4   wrongful termination.

5      Q.    So he had already been terminated prior to

6   filing the complaint?

7      A.    I don't know that he filed the complaint.

8      Q.    Okay.  Are you aware of anyone else being

9   disciplined for having participated in the

10  investigation of the sexual harassment brought by Leeya

11  Sengthavichithy?

12     A.    I don't know of the fallout of -- of

13  anybody else as far as that goes with her -- with their

14  investigation.

15     Q.    Are you aware of anybody else having been

16  terminated or disciplined for complaining about Sandy

17  Dayton?

18     A.    I think that there was Debbie Barry, the

19  executive director of the Utah location.  She had

20  complaints and her staff had complaints about Sandy

21  Dayton.  And she was eventually terminated.

22     Q.    And you believe -- you have got evidence

23  that it was because of complaining about Sandy Dayton?

24     A.    I'm not sure, but that was one of the

25  elements that Debbie Barry indicated that she talked to

Page  219

1    Debbie about -- Debbie Wertz about.

2         Q.    Okay.  And as far as that goes, are you

3    aware of anybody else having been terminated or

4    disciplined for having filed a charge of discrimination

5    with either the EEOC or the UALD?

6         A.    I'm not aware of all the complaints that

7    were filed.

8         Q.    So is it fair to say you're not aware of

9    any?

10        A.    I -- I'm not aware.  I'm not sure if there

11   was anybody else fired.

12        Q.    So the answer is no, you're not aware of

13   any others?

14        A.    I'm not aware, no.

15        Q.    Now, you say -- if you notice in paragraph

16   23, it's on page 4 of the complaint, it says, "On

17   July 13, 2018, Ms. Wertz terminated Ms. Graham without

18   warning, based on false" -- statements [sic].

19             When you say, "false statements," do you

20   believe those are false statements attributable to

21   Ms. Wertz or do you believe they were false statements

22   attributable to Faith Myers and Mia Warren?

23        A.    Well, Ms. Wertz ultimately terminated me.

24        Q.    I understand that.  That's not my question.

25   In fact, your allegation says that.  What I'm asking --

Page  220

1    you said, "based on false allegations."    And I'm trying

2    to understand who made the false allegations.

3                      Was it Ms. Wertz?    Was it Faith Myers?    Was

4    it Mia Warren?  Who made the false accusations -- the

5    false allegations that resulted in your termination?

6            A.    I believe that it was based on Faith Myers.

7            Q.    Okay.

8            A.    Her allegations.

9            Q.    So you believe that Faith Myers falsely

10   represented things to Ms. Wertz, which resulted in your

11   termination?

12           A.    I don't know.

13           Q.    Okay.  Going on, I want to talk to you now

14   about your damages.

15           A.    Mm-hmm.

16           Q.    So let's look at paragraph 32.  So it says,

17   "The retaliatory conduct by Bristol caused Ms. Graham

18   significant damages that she is entitled to recover,

19   including  but not limited to her lost wages, benefits,

20   and front  pay in lieu of reinstatement."

21                      Let me ask you this:    Are you hoping to be

22   reinstated  at Bristol as a result of this lawsuit?

23           A.    No.

24           Q.    And why is that?

25           A.    Because I have a great job right now with

Page  221

1    Resource Innovations.

2         Q.    Okay.  So you're not seeking to be

3    reinstated?

4         A.    No.

5         Q.    And **it** doesn't have anything to do with the

6    fact that you don't think you could **still fit** in there?

7         A.    No, I would not go back to a company that

8    conducted themselves like they did towards me.

9         Q.    Just because they fired you without

10   warning?

11        A.    No, because they -- because they made false

12   allegations about me and harmed me in a way of my

13   reputation and good name.

14        Q.    How --

15        A.    I would not --

16        Q.    How was your reputation and good name

17   harmed?

18        A.    Well, those -- maybe those are not things

19   that, you know, as far as monetarily goes, but I work

20   hard, you know, to have a good reputation.    And I have

21   a good name.  And the allegations were very damaging

22   towards me.

23        Q.    Do you --

24        A.    That's why I'm here.

25        Q.    Do you believe that the reasons for your

Page  222

1  termination were publicly published?

2      A.    I'm not -- I'm not aware that they were

3  published.

4      Q.    Okay.

5      A.    But there was 500 people in the

6  organization.    And, invariably, you know, information

7  goes out about, you know, why people are fired.

8      Q.    Are you aware of any anybody at the company

9  having seen your termination letter, other than as they

10  may have seen **it** in connection with either your UI

11  proceedings or this lawsuit?

12      A.    The UI proceedings, Department of Labor,

13  EEOC investigations, everyone I talked to, you know,

14  with regard to witnesses, yeah, they were aware of why

15  I was fired.

16      Q.    In connection with those proceedings,

17  though; correct?

18      A.    Yes.

19      Q.    This --

20      A.    In connection with being falsely accused.

21      Q.    **It's not like -- it's** not like Bristol ran

22  over to the unemployment agency and said, Hey, I have

23  got a great letter for you to read.    You ought to see

24  how bad this lady **is.**    There was none of that; correct?

25      A.    Well, not directly, but indirectly

Page  223

1    information went out.   First of all, the  fact -- the

2    fact that I was falsely accused, in and of itself, is

3    harmful to my reputation.    And --

4           Q.     But to be fair, I mean, you filed the

5    unemployment insurance proceedings; correct?

6           A.     No.

7           Q.     Bristol  sought them?

8           A.     I --

9           Q.     Who sought the  unemployment  compensation?

10          A.     I appealed the  unemployment  compensation.

11          Q.     Right.   And so  --

12          A.     I was denied unemployment insurance.

13          Q.     Right.   But you would have to have

14   initially requested it; correct?

15          A.     I don't recall requesting it.

16          Q.     Okay.  But --

17          A.     I probably had paperwork, but I -- I --

18   what I do recall is not -- you know, not being eligible

19   for it because -- in the -- because of the way that I

20   was terminated --

21          Q.     But in fairness, though --

22          A.     -- for allegedly --

23          Q.     -- the only reason why the unemployment

24   insurance investigator would have been aware of any of

25   this is because you were appealing and pursuing it;

Page  224

1    correct?

2         A.    I believe so, but I don't know.

3         Q.    And the only reason why witnesses would

4    have seen these letters and things in this lawsuit is

5    because you are suing Bristol; right?

6         A.    I believe so.

7         Q.    So to the extent the letter has been shared

8    with others as a result of this lawsuit, that wasn't

9    Bristol voluntarily harming your reputation; correct?

10        A.    Well, I believed that Bristol did

11   voluntarily harm my reputation --

12        Q.    Are you --

13        A.    -- by making false allegations against me.

14        Q.    But that was communicated to you, not the

15   general public; correct?

16        A.    And multiple other people.

17        Q.    Let me ask you this --

18        A.    When I go --

19        Q.    -- are you aware of Bristol publicly

20   communicating the reasons for your termination?

21        A.    I'm not.   I don't know.

22        Q.    Okay.  So it's fair to say that there's not

23   some generalized harm to your reputation because

24   Bristol has published false statements about you; is

25   that fair?

Page  225

1      A.    I don't think so.  I think that the fact
2  that they -- they made false statements and allegations
3  against me is very harmful to my reputation.
4      Q.    But just to be clear, and I want to move on
5  from this point --
6      A.    Sure.
7      Q.    Those were made to you, correct, not to the
8  public?
9      A.    Well, it wasn't -- I don't --
10     Q.    And I'm not -- by the way, I'm not agreeing
11 that they are false.  I'm just saying, those statements
12 were made to you, not to the general public?
13     A.    Not that I'm aware of.
14     Q.    Okay.  Because you're alleging that it
15 harmed your reputation, but you would agree with me,
16 reputation is not your own view of yourself, but
17 others' view of you; correct?
18     A.    Well, it's -- it's the view of myself, too.
19 It's like, I know who I am.  I know what I did and
20 didn't do.
21     Q.    Right.   So --
22     A.    And it's harmful.
23     Q.    You couldn't --
24     A.    To me personally.
25     Q.    If they lied to you about what you did, you

Page  226

1    wouldn't believe it?

2              Never mind, **it** is a dumb question because

3    **it's** obvious.   I'm not going to waste my time on **it**.

4              So, lost wages.   What are you claiming in

5    lost wages?

6         A.    I think there was documentation with regard

7    to that, but I don't remember exactly a specific

8    amount.  Like, a total amount? Is that what you are

9    asking about, or the Department of Labor?

10        Q.    To the extent you know.  Maybe this

11   document will help.

12             MR. FRAZIER:   Let's mark this as the next

13   exhibit.

14                  (Exhibit No. 8 was marked

15                   for identification.)

16   BY MR. FRAZIER:

17        Q.    Lisa, you have been handed what has been

18   marked as Deposition Exhibit No. 8.

19             Do you recognize this document?

20        A.    Yes.

21        Q.    What is it?

22        A.    **It** sounds like **it's** a **list** of those that

23   would be witnesses on my behalf.

24        Q.    Okay.   And then you will see there is a

25   number 3 down at the bottom on page 4.

                              Page  227

1       A.    I do.

2       Q.    And that regards your -- your damages; is

3 that correct?

4       A.    I believe it does.

5       Q.    Okay. So let's go through this. Did you

6 supply the information for this, to your knowledge?

7       A.    I believe that there was -- there was a

8 discussion about this.

9       Q.    Okay. Let's go through it. So it says,

10 "Plaintiff's damages are continuing to accrue, and the

11 precise economic amounts will be the subject of

12 discovery. Her current estimates are based on the

13 following: During her last full year working for

14 Defendant (2017), she earned $61,225."

15       Where did that number come from?

16       A.    I believe from my tax return.

17       Q.    And you supplied that information to -- to

18 your counsel?

19       A.    Yes. And I believe it was sent on to --

20 sent on for review as well. Yeah, there was, like,

21 several tax returns.

22       Q.    Okay.

23       MR. FRAZIER: Let's go ahead and have this

24 marked as the next exhibit. I'm going to be flipping

25 through exhibits here for a minute.

Page  228

1          (Exhibit No. 9 was marked

2                for identification.)

3    BY MR. FRAZIER:

4          Q.    You have been handed what has been marked

5    as Deposition Exhibit No. 9.

6                Do you recognize this document?

7          A.    It appears to be my tax return for 2016, my

8    1040.

9          Q.    Okay.  And then if you will flip back, it

10   appears there is also a 2017.  And then following up

11   with that, there's some other documents for the 2018,

12   2019 tax years.

13               Do you see that?    And 2021, so 2020 and

14   2021 as well, do you see that?

15         A.    2016, 2017.  And then -- yeah, additional

16   1095s, et cetera.

17         Q.    So, do you see that?

18         A.    I do.

19         Q.    Okay.  I want to ask you a little bit about

20   your compensation there.   So do you see that you have

21   got -- for 2016, it seems to reflect $65,590 as your

22   gross income?

23               Do you see that?

24         A.    I do.

25         Q.    Okay.   Would all of that have come from

Page  229

1    Bristol in 2016?

2         A.    I believe there is a UI document as well

3    there, so --

4         Q.    A UI --

5         A.    Or --

6         Q.    -- for 2016?  Were you receiving

7    unemployment insurance in 2016?

8         A.    No, it looks like it was wages, fifty-five.

9         Q.    Yes.

10        A.    Yes, so that was it.

11        Q.    And that would have been from Bristol?

12        A.    What is this, 2016?  Yes, correct.  I was

13   working for Bristol.

14        Q.    And was that your only compensation that

15   year?

16        A.    I believe.

17        Q.    Okay.  And then if you turn to the document

18   that's on page -- I think it's 2241, it's in white, but

19   it's half cut off.  But it is for tax year 2017.

20              Do you see that?

21        A.    Yes, I do.

22        Q.    Okay. Now, it appears that it lists your

23   total income, the "Adjusted Gross Income" is 60,020, if

24   I'm reading that correctly; is that right?

25        A.    I believe it is.

Page  230

1      Q.    Okay.   Now, when we look at your wages, it

2   looks like it is 59,734.

3          Do you see that?

4      A.    On page 4, are you referring to?

5      Q.    On the -- on the 2017 tax return.   It's the

6   third page of this document?

7      A.    Yep, it says 60,020.

8      Q.    Right.   That's the total adjusted gross

9   income; right?

10     A.    Correct.

11     Q.    But under "Wages, salaries, tips, etc.,"

12  it's 59,734; is that right?

13     A.    I believe it is.

14     Q.    Okay.   So that seems to be higher than the

15  amount on here by a little bit; right?   The amount

16  listed on your initial disclosures is 61,225?

17     A.    Yeah.

18     Q.    So do you understand what the additional

19  compensation reflected there is and why it's not on

20  your tax return?

21     A.    So, are you saying the variance between

22  60,020 and 61,225?

23     Q.    Well, I think -- let me ask you this:

24  Wouldn't you agree with me that the 60,020 is the

25  aggregate of the lines above it, which are the

Page  231

1    59,734.23, if I'm reading this correctly?    It's hard to
2    read.    And 263 -- I guess?
3         A.    Mm-hmm.
4         Q.    So assuming that math is correct, you would
5    agree that is the aggregate of those amounts; right?
6         A.    I believe that's correct.
7         Q.    Okay.    And was the 59,734 the compensation
8    that you received from -- from Bristol?
9         A.    Yes, I believe --
10        Q.    Okay.
11        A.    This is, like, 2017, so yes.
12        Q.    Okay.
13        A.    I was working for Bristol.
14        Q.    So it looks like it is a little bit lower
15   than what you have listed here; is that correct?    On
16   your disclosure?
17        A.    There appears to be a variance.
18        Q.    Do you know where the number came from
19   that's on your --
20        A.    The number four?
21        Q.    -- disclosure?    Yeah.
22        A.    I believe it was from -- is it 2017 --
23   earned 61,225 as compared to the 60,020.
24        Q.    Do you know why there is a difference
25   between those two numbers?

Page  232

```
 1          A.    It could be a typo.  I'm not -- I'm not
 2    sure.
 3          Q.    Okay.
 4          A.    But, what is the variance, like -- it looks
 5    like it's, like, 1,220.05.
 6          Q.    Yeah.  It's somewhere between 1 and $2,000,
 7    I would say.
 8          A.    Just over 1,000.
 9          Q.    But you don't know what the discrepancy is?
10          A.    I don't, unless it was just transcribed
11    incorrectly.   I'm not 100 percent sure.
12          Q.    And so you had indicated that you thought
13    that the 61,225 came from your tax filings.   I'm not
14    seeing that it lines up.  So I guess I'm going to ask
15    again, do you know what the source is for the 61,225?
16          A.    I believe it should have been this.
17          Q.    Okay.
18          A.    It's like, the 60 -- what's on my tax
19    return, I believe, is correct.
20          Q.    Okay.  So it appears that these numbers on
21    your disclosure are incorrect for some reason?
22          A.    Well, I mean -- let's see, there's 1,000 --
23    yeah, there's a variance of 1,000.
24          Q.    Well, I'm not sure it's the.  I mean, I
25    think it's the 59,734, not a huge difference in
```

Page  233

1  numbers, but it's even a little lower because that's

2  the wages and tips and salary, correct, on line --

3        A.    Well, my W-2 is actually out -- I think

4  it -- the W-2 is requested as well.   So --

5        Q.    And I'm not seeing the W-2 in the materials

6  that were provided, candidly.

7        A.    Well, it's right here -- oh, this is 2019.

8        MR. FRAZIER:  Perhaps the way we could cure

9  this, counsel, is if we get a copy of that.  I don't

10  see it in the documents that were produced.

11        MS. PANZER:  For 2017?

12        MR. FRAZIER:  Yeah.  The only thing I see

13  for her tax filings -- and maybe I'm wrong, is what you

14  see here.  In other words, this is all I'm aware of

15  that were produced.

16        THE WITNESS:  No, I think there was two

17  sets of tax documents that were produced.  I think --

18        MS. PANZER:  Hang on.  Hang on.  There is

19  no pending question.  We will look and see if she has

20  it, but that seems like a document that your client

21  would probably have as well.

22        MR. FRAZIER:  May or may not.  I don't

23  know.

24        MS. PANZER:   Okay.

25        MR. FRAZIER:  But I know I don't have it.

Page 234

1    So...

2                    MS. PANZER:   Okay.

3                    MR. FRAZIER:  But I believe it was

4    requested.   So...

5                    MS. PANZER:  We will look and see if she

6    still has it.

7                    MR. FRAZIER:  Yeah.   Because that may shed

8    light on this.

9    BY MR. FRAZIER:

10        Q.    But otherwise, you're not aware of where

11   this number came from, the 61,225, is that fair, other

12   than speculating where it might have come from?

13        A.    I'm not 100 percent sure.

14        Q.    Okay.  Going on, it says, "Following her

15   termination, she earned $34,129 in 2018."

16              What was the basis of the 34,129?

17        A.    It was a tax return, I believe.

18        Q.    And that was based on -- I'm assuming

19   you're claiming that that was your W-2 that you

20   received from Bristol?

21        A.    I believe so.

22        Q.    Okay.

23        A.    And it may have been -- there may have been

24   some -- what year was it, 2018?

25        Q.    2018?

                                              Page  235

1       A.     There may have been some UI.

2       Q.     Well, I believe there was, but I think this

3 is -- so it says, "Following her termination, she

4 earned $34,129."

5            So actually, I don't believe it would be

6 your 10 -- or your W-2 from Bristol, I think it would

7 have been other compensation because you are saying

8 after termination.

9       A.     Well, I worked for half the year.

10      Q.     Right.  But this is saying that after you

11 were fired, you made this much.

12      A.     I don't think that's how it -- I -- you

13 know, I --

14      Q.     I'm just reading what your statement says;

15 right?  It says, "Following her termination," so would

16 you agree with me that is after your termination?

17      A.     I'm not sure how it's -- what it's

18 referring to.

19      Q.     Okay.  So when it says, "Following her

20 termination," you're not sure what that means?

21      A.     Well, I don't have the 2018 tax return to

22 review.

23      Q.     I agree.

24      A.     You know, to cross-check it.

25      Q.     Mm-hmm.

Page 236

1    MR. FRAZIER:   Let's have this marked as the

2  next exhibit.   This is the closest thing we have got.

3                 (Exhibit No. 10 was marked

4                      for identification.)

5  BY MR. FRAZIER:

6       Q.    I have handed you what has been marked as

7  Deposition Exhibit No. 10.

8              Do you recognize these documents?

9       A.    It looks like my tax return for 2018.

10      Q.    Okay.  And if we look on the second page,

11  which is marked as GRAHAM 1829.

12              Do you see that?

13      A.    I do.

14      Q.    It says, "Wages, salaries, tips, etc.

15  Attach Form(s) W-2."  And it says 32,708.

16              Do you see that?

17      A.    Mm-hmm.

18      Q.    Now, is it your testimony that the only

19  place from which you would have received wages,

20  salaries, tips, etc. and have received a W-2 would have

21  been from Bristol?

22      A.    I believe it was in 2018.

23      Q.    Okay.  Now, you will agree with me that

24  that is less than what is on the disclosure, right,

25  which is 34,139?

                                          Page  237

1       A.      Yes.

2       Q.      In fact, I don't see the number 34,139

3    anywhere on this tax report -- on this tax filing.

4       A.      The only thing that I have a question about

5    is the UI would have started at this point, too.

6       Q.      Okay.  And I suspect that may be -- you

7    have also got total income, add lines 1 to 9, add any

8    amount from Schedule 1, line 22.

9            Do you see that?

10      A.      Mm-hmm.

11      Q.      If you go back to Exhibit 9.  Sorry, I know

12   it's confusing.  It is confusing to me, too.  It took

13   me a minute to figure all of this out.  You will see

14   that there, on page -- what appears to be 2,244.  For

15   2018, there is an 11,000 -- what appears to be 946,

16   which would match that line on line 6.  And it's from

17   the Utah Department of Workforce Services.

18           Let me put it this way, does $11,946 seem

19   consistent with what you understood you were receiving

20   from unemployment for 2018?

21      A.      I believe that this is the statement that I

22   got for 2018 from UI.  It says UI -- Department of

23   Workforce Services.

24      Q.      So do you know -- you will notice then, it

25   shows that with the unemployment, that it comes to a

Page  238

1    total of $44,722 of total income.

2          Do you see that?

3    A.    Line 7, correct.

4    Q.    Yeah.

5    A.    Yes.

6    Q.    Okay.  Did you have any other wages in 2018

7    besides Bristol?

8    A.    Not that I'm aware of.

9    Q.    Okay.  So do you know where the number came

10   from that said, "Following her termination, she earned

11   $34,139 in 2018"?

12   A.    34,139 --

13   Q.    It appears to me that what you earned after

14   was only from unemployment and that was 11,946;

15   correct?

16   A.    So you're saying 34,139 plus the 11,946?

17   Q.    I'm just talking the 11,946.

18         I mean, other than the 11,946, did you make

19   any other money the rest of the year?

20   A.    No, aside from -- in 2018, aside from

21   Bristol and UI, that was -- those were -- that's the

22   money I had -- I earned.

23   Q.    Okay.  So again, you're not -- those

24   numbers don't seem to tie to this 34,139.

25         Any idea what the basis of that number is?

Page 239

1        A.    I think the basis of **it** is the line 1,
2    "Wages, salaries, tips, etc."
3        Q.    But you will agree with me, the -- what is
4    stated in the disclosure is there's approximately 1,500
5    more?
6        A.    Yes.   There's a variance.
7        Q.    Yeah.   And you don't know what the cause of
8    the variance is; is that fair?
9        A.    I'm not sure.
10        Q.    Okay.   Now **let's** go to the next one, **it**
11    says $32,010 in 2019.
12              Now, you were not working for Bristol at
13    that point; is that correct?
14        A.    No, I was not working for Bristol in 2019.
15        Q.    So this would have been compensation from
16    other sources; is that correct?
17        A.    Correct.
18        Q.    Where were you working in 2019?
19        A.    Nextant.
20        Q.    Is Nextant the same as the -- what was **it**
21    called?   Resource --
22        A.    Resource Innovations, correct.
23        Q.    **It's** the same entity?
24        A.    Yep, the same thing.
25              MR. FRAZIER:  So **let's** have this marked as

Page  240

1    the next exhibit.

2                    (Exhibit No. 11 was marked

3                        for identification.)

4    BY MR. FRAZIER:

5        Q.    Lisa, you have been handed what has been

6    marked as Deposition Exhibit No. 11.

7                Do you recognize this document?

8        A.    Yes, it appears to be my tax return for

9    2019.

10       Q.    Okay.  So for the tax year 2019, so that's

11   the year we are looking at here, is that correct, on

12   the disclosure?

13       A.    2019, 32,010.

14       Q.    Now, here, I see "Wages, salaries, tips" in

15   the amount of 31,834.

16       A.    Mm-hmm.

17       Q.    Again, slightly less.

18                Do you know -- is that what you earned from

19   Nextant?

20       A.    I believe it is, but there might have been,

21   in 2019, because I was a temporary employee -- there

22   should be another document here, I believe --

23       Q.    So --

24       A.    -- for a temporary employment.

25       Q.    So let's go to -- because I'm trying to

                                                Page  241

1    follow these -- these numbers through, to be quite

2    honest.

3                    So if we look at -- go back to Exhibit

4    No. 9.

5            A.      Mm-hmm.

6            Q.      Okay.

7            A.      Mm-hmm.

8            Q.      There are some W-2s for the tax year 2019.

9    And they start on page 2245.

10           A.      Okay.

11           Q.      GRAHAM 2245, do you see that?

12           A.      I do.

13           Q.      Okay.  First one says that it's from Robert

14   Half International.

15                   What is that?

16           A.      That's a staffing agency.

17           Q.      Okay.  And it -- this is for the work that

18   you were doing for Nextant?

19           A.      Yes.

20           Q.      Okay.  And it looks like there you were

21   paid 12,544; is that right?

22           A.      I believe it's correct.

23           Q.      Okay.  Now, I'm just going to do some quick

24   math here.  So 12,544; okay?  The next one is -- that's

25   from the Utah Department of Workforce Services, 2,172.

                                            Page  242

1    That would have been unemployment continuing into 2019;

2    correct?

3            A.      Correct.

4            Q.      And that's -- that's listed on line 7(a)?

5            A.      Just a minute.  I have to get this back up.

6    The 2019 one?

7            Q.      Yeah.

8            A.      Yes, 2,172.

9            Q.      That one we can see where it is.  And then

10   the next one is Trinet HR III, Inc.

11                   Do you know what that entity is?

12           A.      I believe that's --

13           Q.      Would that be Nextant?

14           A.      Yes, I believe it is Nextant.

15           Q.      Okay.  Now, I will say that if you add up

16   the Trinet HR and the Robert Half International, that

17   it does come to 31,834, which is consistent with the

18   tax return.

19           A.      Okay, so the 2019 is -- the number is

20   correct there.

21           Q.      Well, except it says 3,210.

22           A.      Okay.

23           Q.      So I'm still not following where these

24   numbers come from.

25                   Do you know why there is a discrepancy

Page  243

1    between the 2019 there and the 2019 on the tax return?

2        A.    Yeah, there seems to be a small variance

3    there.

4        Q.    Okay.  Then if we go to the next one -- if

5    we go to the disclosure, again, which is Exhibit 8, it

6    says $42,529 in 2020.

7            Do you see that?

8        A.    In 2020?  42,529.  That's 2020?  I have a

9    2020 W-2.

10       Q.    Right.  And that's on page 2248; correct?

11       A.    Yes, correct.

12       Q.    And that is from Trinet HR again?

13       A.    Yes.

14       Q.    Okay.  So that would be your current

15   employer?

16       A.    I believe it is.

17       Q.    Okay.  Now, let's look at this next

18   document.  I'm going to mark this as Exhibit -- the

19   next exhibit.

20            (Exhibit No. 12 was marked

21             for identification.)

22   BY MR. FRAZIER:

23       Q.    Now, it appears that the line there for

24   wages, salaries and tips, line 1, is 42,095.

25            Do you see that?

Page  244

1          A.     This is for 2020?

2          Q.     Yes.

3          A.     I see 42,529.

4          Q.     Right.   As compared to the 42,095 on the

5    tax return; is that right?

6          A.     Yes, line 1.

7          Q.     So it seems to be inconsistent again; is

8    that right?

9          A.     There appears to be a variance there.

10         Q.     And again, you don't know why the variance

11   exists?

12         A.     I'm not sure.

13         Q.     Okay.  Let's go to the next one.   So then

14   you say in 2021, you started earning a salary of

15   61,000.

16                What's the basis for that?

17         A.     Do you have a tax return here to refer to?

18                MR. FRAZIER:  Let's mark this as the next

19   exhibit.

20                      (Exhibit No. 13 was marked

21                       for identification.)

22   BY MR. FRAZIER:

23         Q.     You have been handed what has been marked

24   as Deposition Exhibit No. 13.

25                Do you recognize this document?

Page 245

1    A.    I believe this is the tax return for 2021.

2    Q.    Okay. And it seems to suggest that you

3    earned, that year, 46,689; is that right?

4    A.    I believe that's correct.

5    Q.    Do you know why, if you were earning a

6    salary of $61,000, that you only ended up receiving

7    46,689?

8    A.    I think it was because in midyear, in 2021,

9    I -- I believe I was promoted in --

10   Q.    So you were receiving a smaller amount

11   prior to that time in midyear?

12   A.    Yes.

13   Q.    Okay. But, again, the tax return, I'm

14   assuming, is the correct reflection of your

15   compensation?

16   A.    The 46,689?

17   Q.    Mm-hmm.

18   A.    Yeah, I think that this was earning a

19   yearly salary of 61,000, perhaps after my promotion, is

20   when I started earning that 61,000. But, in fact, the

21   W-2 for this -- yep, it matches up the 2021 -- 20 1040,

22   and also the W-2 matches, 46,689.

23   Q.    Okay. So now, I want to compare that to

24   the compensation that you were receiving while you were

25   at -- at Bristol.

Page  246

1              So I think you testified you were making

2    $27 an hour at the time that your employment came to an

3    end; is that correct?

4         A.    I think it was, like, $28-and-some-cents.

5         Q.    Okay.

6         A.    It is documented in --

7         Q.    So is what you reported to DWS, the

8    Department of Workforce Services, would that be a

9    correct  amount?

10        A.    Me reporting to DWS?

11        Q.    Mm-hmm.  Did you report to DWS how much you

12   were receiving while you were at Bristol?

13        A.    Yeah, I believe I did.  It's like, I was --

14   I was paid by UI; right?   And I got a document from

15   the -- to support that amount.

16        Q.    The number that I saw that was reported to

17   DWS in connection with the unemployment was $27.39.

18        A.    Was what?

19        Q.    $27.39 per hour.

20        A.    Oh, maybe it was, like, $27 and then it --

21   calculate it with the 3 percent raise, was 28.  I think

22   that's  why.

23        Q.    Okay.

24        A.    You know, so the ending -- the ending

25   hourly wage I had didn't include the 3 percent salary

Page  247

1    increase.

2         Q.    Okay.  So does 27.39 seem correct, without

3    the three percent you have in your mind?

4         A.    It -- it sounds correct.

5         Q.    Okay.

6         A.    But I'm not 100 percent sure.

7         Q.    How frequently would you work overtime at

8    Bristol?

9         A.    I worked overtime quite often at Bristol.

10   But of the -- yeah, it's like, because there was --

11   yeah, I definitely did some overtime.

12        Q.    Because I'm assuming, just doing some quick

13   math, if you work 40 hours a week at that rate for

14   52 weeks a year, it comes out to $56,971.20.

15             Does that seem like an accurate amount?

16        A.    Yeah, that's possibly right.

17        Q.    Okay.  Now, you also allege, if we go back

18   to your complaint, which is  Exhibit  7  --

19        A.    Mm-hmm.

20        Q.    -- you state in there -- you state that you

21   are also seeking "emotional distress, pain, and

22   suffering"; is that right?

23        A.    On what page is this?

24        Q.    It's on page 5 of your complaint.

25        A.    Yes.

Page  248

1       Q.    Okay.  Have you seen a psychiatrist,

2  psychologist or other therapist in connection with the

3  loss of your job from Bristol?

4       A.    No.

5       Q.    Okay.  Have you had anyone diagnose you

6  with depression, anxiety or any other disorders as a

7  result of the loss of your job with Bristol?

8       A.    No, but I have discussed it with -- with my

9  nephrologist.

10       Q.    Okay.  And what does your nephrologist do?

11       A.    Kidney transplant.

12       Q.    Okay.  So that doesn't have to do with any

13  emotional distress, pain or suffering; correct?

14       A.    Yes, it does.  I mean, I have a transplant.

15  I have a graft.  So it's -- you know, going through

16  this whole ordeal of being, you know, falsely accused

17  and terminated was very distressful because, you know,

18  one of the -- first of all, the first thing it was, it

19  was like, Well, this is wrong.  This is false.  You

20  know, I have been falsely accused and terminated

21  unfairly.

22       And naturally, my second, you know, concern

23  was my -- really, along with the first, was my health.

24  Not having --

25       Q.    So are you claiming that your -- you needed

Page 249

1  a kidney transplant because you lost your job from

2  Bristol?

3       A.    Certainly not.

4       Q.    Okay.  So explain to me how -- or explain

5  to me why you discussed with your nephrologist the fact

6  that you had -- that you had lost your job?

7       A.    I lost -- you know, I had -- you know, I

8  have my kidney right now, I have -- the transplant is

9  16 years old.  As time went on at Bristol, I was --

10  there was a lot of stress involved in the job because

11  of the retaliation.    And, you know, the allegations

12  that were being made against me.

13            And I believe, at the end of 2017, I lost

14  about 10 pounds, which is really significant when you

15  have a graft because the immunosuppressants work in

16  balance with your weight and, you know, can affect, you

17  know, the -- the intake of the medications and just

18  your physical health and -- and whatnot.  So that

19  weight decline was, you know, really worrisome to me.

20  Because it does impact my -- my health.    It impacts,

21  especially, like I said, the immunosuppressant

22  medication that I take.

23            And you know, there's always that concern

24  that if you are under an enormous amount of stress, you

25  could lose your graft.

Page  250

1    Q.    Did you lose your graft?

2    A.    I did not.

3    Q.    Okay.  To your knowledge, is there anything

4    medically, relating to your transplant or anything,

5    that was caused by you losing your job with Bristol?

6    A.    Well, I believe that, you know, the stress

7    that I -- that I endured there, especially towards the

8    end of 2017, was -- and the weight that I lost during

9    that time, I was -- I was really concerned that my

10   health was going in a direction that it -- it couldn't

11   go.

12          And it's like -- and I did go to -- I

13   believe I went to my nephrologist during that time and

14   that -- and that kind of was a precursor to the FMLA

15   leave that I took in February of 2018, that feeling of,

16   like, emotional distress under, you know, not having

17   information from -- to do my job, kind of begging for

18   information to do my job.

19          The episode with, you know, Leeya

20   Sengthavichithy, working on you know, Melany

21   Zoumadakis's FMLA, that was additional work.  There was

22   just, like, an enormous amount of stress.  The first

23   thing I did is -- just, like, when you have that, I'm

24   really grateful for, you know, the graft that I got.

25   But I also have a responsibility to, you know, manage a

Page  251

1    chronic illness.   And it's, like, that's just, you

2    know, a life -- a lifestyle, so to speak, for myself.

3    And -- and I was very concerned that -- that was, you

4    know, really difficult for me to sort of manage that

5    amount of stress and, you know, balance it out with --

6    in a healthy way with my chronic illness.

7         Q.    The FMLA leave that you just described, was

8    that while you were still at Bristol?

9         A.    Yes, it was.

10        Q.    Okay.  So that was prior to the termination

11   of your employment?

12        A.    That's right.

13        Q.    Okay.  So is it fair to say that the stress

14   that you are describing, that resulted in you needing

15   to take FMLA leave, was not caused by the termination

16   of your employment?

17        A.    Well, the stress of the FMLA leave was

18   before the termination.

19        Q.    Right.   That's what I'm getting at.

20   Timeline-wise, it couldn't be; right?

21        A.    Yeah.   The retaliation, you know, starting

22   at the end of -- you know, that kind of cascaded from

23   the time period of internal investigations, Leeya

24   Sengthavichithy, EEOC, some tense, you know, reaction

25   and not able to get my job done because there was no

Page  252

1    information.    And then there was increased, you know,

2    kind of monitoring, you know, from Debbie during this

3    time, too.    She was asking me to do things that, you

4    know, I never had to do before.    And that amount -- it

5    was just an ongoing emotional, stressful situation for

6    me.

7                    I think -- it would be -- it was -- it was

8    emotional just because of the situation that I was in,

9    but it was, like, magnified because I was really

10   concerned about my -- my health and -- and my

11   transplant because I had never been in a situation -- I

12   think it was about 12 years into the transplant at that

13   time.

14                   And I had never been in a situation where I

15   felt that emotionally distressed after my transplant.

16   This is, like, a really, you know, difficult element of

17   the whole process of being terminated unfairly like

18   that because it was, you know, aside from the fact that

19   it -- you have that termination, that I believe was,

20   you know, incorrect, it was -- it impacted the -- my --

21   I believe it impacted my physical well-being.

22           Q.    So are there any, to your knowledge,

23   physical manifestations of increased stress after the

24   termination that are more than the stress that you were

25   suffering prior to your termination such as that which

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

1    required you to go out on FMLA?

2         A.    I -- I -- after the -- after the

3    termination, I continued to lose weight.  And I was,

4    you know, trying to find -- you know, trying to get

5    another -- first of all, I had to fight for my

6    unemployment insurance.

7              I went to the Department of Labor with

8    regard to the PTO that was, like -- I believe it was

9    $3,100, plus.  And then also the wage increase that I

10   didn't get.  So I was trying to recoup all of that.

11   And at the same time, find another job and prepare the

12   EEOC documentation that I believe I submitted, I think,

13   in September of 2018.  So there was, you know -- there

14   was a -- you know, enormous amount of activities going

15   on.  And yes, it was extremely stressful.

16             I was following up with people, you know,

17   getting their testimonies and notarized information

18   with that.

19        Q.    So I guess what I'm asking, though, is

20   there anything that was new or different in the way

21   that the stress was impacting you, more than stress you

22   had been enduring prior to your termination?

23        A.    Well, I think it was ongoing.  I think once

24   I was terminated, it was, like -- until I was, you

25   know -- I didn't have, like, health insurance for a

Page 254

1    year.   That was an enormous stress until July 1st of --

2    essentially, I was out of health insurance for one

3    year.

4           Q.    Now, you -- you were aware that you had the

5    ability to purchase COBRA, too, after the end of your

6    employment; is that correct?

7           A.    Yes.

8           Q.    Okay.   And you opted not to do that?

9           A.    I opted not to do that because I had to pay

10   for the immunosuppressant medication.    And in order to

11   qualify for a charity, you know, immunosuppressants

12   from IMC, I -- I had -- it -- there was an income level

13   that you had to meet.   And I knew that I wasn't going

14   to be able to afford both paying the -- I believe it

15   was around $640 a month for COBRA, so it was

16   significantly higher than just, you know, what I was

17   paying previously.    But my main concern was getting

18   my -- being able to get my medication, my

19   immunosuppressant  medication.

20          Q.    Okay.   So what -- help me understand how

21   paying for COBRA would have precluded you from getting

22   the immunosuppressive medication?

23          A.    I wouldn't have been able to afford it on

24   the UI that -- you know, immediately after July 31st.

25   You know, first of all, I didn't even have UI until

Page  255

1    August.  So I was -- I was not able to -- I did not

2    have the funds coming in to continue to pay 640 a month

3    at that time because I had no job at that point and I

4    was not approved at that point until I appealed to get

5    my unemployment insurance.

6         Q.   Well --

7         A.   And then that was a very small amount of

8    money.

9         Q.   Would the COBRA insurance have covered your

10   immunosuppressive  medications?

11        A.   I don't know that they would have covered

12   it in the same way that the health insurance that was

13   being provided from Bristol Hospice would have.

14        Q.   Do you think the COBRA would have been

15   different?

16        A.   Yeah, I do.

17        Q.   And what's your basis for that?

18        A.   Because I just -- I understand that when I

19   did apply for the -- when I -- when I applied for the

20   charity program to get my immunosuppressants, I -- I

21   did talk to a specialist at IMC and I believe that, you

22   know, we were looking at all of the financial documents

23   and everything.   And the eligibility requirements in

24   order to get the three medications -- or actually, it

25   was only two medications.   The other one, I could get

Page  256

1    myself at a very, you know, minimal amount.   But those

2    are really expensive medications.   And so, I worked

3    through it with the charity representative, IMC.   And

4    this was the way, you know, that -- under -- as far as

5    eligibility goes, it was the best way for me to go --

6    that I believed.  So that's the direction I went in.

7          Q.    Okay.

8          A.    And I took -- I hit that -- I hit that

9    charity medication from -- I believe I had to get on it

10   almost immediately because -- because there was so much

11   medication that you have in advance.

12              Obviously, you had to continue to have the

13   medication ready for -- what was the question?

14         Q.    We were just talking about the

15   immunosuppressives and whether the -- whether you knew

16   that COBRA wouldn't cover it when your insurance did.

17         A.    Well, I believe that Cobra would have

18   covered it, but financially -- and just reorganizing

19   what I had to do, the best alternative or the best

20   option of the options was for me to decide not to have

21   the insurance, but to be able to get the charity

22   medication, which I took for -- which I had for a year.

23   And then, as soon as July 1st hit and I was a full-time

24   employee, I was able to buy that medication through

25   Nextant's --

Page  257

1    Q.    Insurance?

2    A.    Yes.

3    Q.    Okay.   A few more questions here.

4    Paragraph 34 of your complaint, you say, "Bristol acted

5    with malice and reckless disregard of Ms. Graham's

6    federally protected right to complain about

7    discrimination."

8              What is your factual basis for alleging

9    that they acted with malice?

10             MS. PANZER: Objection to the extent that

11    calls for a legal conclusion.

12             THE WITNESS:   What is it?

13    BY MR. FRAZIER:

14    Q.    Where you say, "Bristol acted with malice

15    and reckless disregard of Ms. Graham's federally

16    protected right to complain about discrimination."

17             So I'm asking what evidence you have or

18    what your basis is for saying that Bristol acted with

19    malice?

20    A.    Well, with the -- you know, with the

21    retaliation that I experienced ongoing, it was -- it

22    was a choice.   And then, when I was terminated --

23    falsely accused and then terminated, I believe that --

24    you know, they did have to -- I believe that they did

25    act with malice.   And I believe that it was, in part,

Page  258

1    due to the fact that -- you know, that I participated

2    in the EEOC complaint -- investigation for Leeya

3    Sengthavichithy.   And I provided information that they,

4    you know, they didn't want to hear.

5              And I also believed that when I submitted

6    my claim to the UALD, that -- that there was -- you

7    know, that was another part, too, where -- it's like --

8    I just -- I understood that -- you know, at the end --

9    and at the end of it, I believed the manner in which

10   they fired me, you know, I had no heads-up at all.   I

11   think that it -- that was really malicious of how they

12   did it.   And it was very harmful to me in so many

13   different  ways.

14             And, you know, they made a choice.   You

15   know, Utah is an at-will state.   They could have just

16   flat-out  fired  me.  But instead, you know, they

17   alleged -- falsely accused me of three violations and

18   then terminated me without any warning whatsoever.   It

19   was  very  disrespectful  and  harmful  to  me.

20         Q.    Any other evidence that you believe shows

21   malice?

22         A.    I think I was treated very differently.

23   You  know, there  was  one  executive  director  that  put

24   down that -- in Hawaii that -- that put down her

25   partner  as  her  spouse.   And her spouse, that she had

Page  259

1   put down, was actually **still** married to somebody else.

2   And you know, I remember Debbie saying, **it's** like, Oh,

3   I **don't** want to fire her. And she -- you know,

4   discussed that with the CEO. And they decided that she

5   was not going to be terminated.

6            There was not going to be any -- I don't

7   know **if** there was any, you know, written warnings or

8   verbal warnings of any sort. But I know that there was

9   no financial, you know -- that she had to sort of

10  provide in that. And I know that the carriers were not

11  notified of that. And I thought that was an egregious,

12  you know, situation.

13           And yet, you know, I look toward that and I

14  look towards my situation and I felt that, you know, I

15  wasn't being treated fairly. I wasn't -- was treated

16  differently from other employees.

17      Q.   Okay, you gave one example. Any other

18  examples of how you were treated differently from other

19  employees?

20      A.   Well, there was a lot of **little**, like,

21  issues that I mentioned where -- you know, cutting off

22  overtime during a period of time that would, you

23  know -- that only impacted me negatively and

24  impacted -- you know, during a time of really high --

25  high work performance that I had to do, deadlines, open

Page  260

1    enrollment.

2                    I was not -- it was humiliating to suddenly

3    not be able to go into Debbie's office where all the HR

4    files were, which I needed to get into on a daily

5    basis.    And she made, you know, no indication why I

6    was, you know -- you know, no longer allowed to be in

7    her office.

8                    And, you know, everybody in the HR

9    department -- or, as I'm aware, most of them had access

10   to Debbie's office, but I didn't anymore.    And I always

11   had access to it until 2017 and something like

12   November.

13                   There was these, like -- I was treated

14   differently in the HR department where, suddenly, on a

15   daily basis for two months, April and May, I had to

16   record everything that I did, minute by minute, through

17   the day.    And I know I was the only one in the HR

18   department that had to do that.    And I, you know,

19   provided documentation daily for that for April, which

20   was basically -- you know, it was just asked of me.    It

21   was delivered.    And there was no reason why, but

22   suddenly, it was after -- after I did that for another

23   entire month, you know, Debbie said I could stop.    So I

24   could -- you know, they started it.    They stopped it.

25   And it was -- it was on.

Page  261

1       And I did check with the other employees in
2  the department if, in fact, you know, they were
3  doing -- if they had to do something similar.   And they
4  did not have to do anything like that at all.
5       So there was little ongoing things that --
6  of that nature that made me aware that I was being
7  treated differently and in a way that, you know,
8  increased my work and the -- the amount that I had to
9  deliver, not only just with my regular work but also
10 then all of these, like, additional responsibilities,
11 you know, that were, you know, just basically
12 thank-you-less details.   And that was the end of that,
13 you know, experience.   So, yeah, there was a lot.   I
14 can't remember probably everything right at this
15 moment, but those were some of the, you know,
16 additional ways in which I was -- I was treated
17 differently.
18    Q.   Okay. Finally, you state in 35, you
19 allege, "Ms. Graham is also entitled to recover her
20 attorneys' fees and other costs of this action."
21       Have your attorneys taken this on a
22 contingency basis or are you paying an hourly rate?
23    A.   It's  contingency.
24    Q.   Okay. And that includes all of the
25 attorneys that you have working on the case?

Page  262

1      A.      I believe so.

2      Q.      Okay.  You're not paying hourly for anyone?

3      A.      No.

4              MR. FRAZIER:  All right.   I don't believe I

5      have any other questions.

6              MS. PANZER:  I don't have any follow up.

7              COURT REPORTER:   Do you want electronic?

8              MR. FRAZIER:  I would.

9              COURT REPORTER:   Do you want electronic?

10             MS. PANZER:  No.   We won't take a copy.   We

11     would like to read and sign, though.

12                  (Concluded at 5:02 p.m.)

13                            -o0o-

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page  263

REPORTER'S CERTIFICATE

STATE OF UTAH       )

                    )

COUNTY OF SALT LAKE )

          **I**, ABIGAIL D.W. JOHNSON, a Certified Shorthand Reporter and Registered Professional Reporter, hereby certify:

          THAT the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was placed under oath to tell the truth, the whole truth, and nothing but the truth; that the proceedings were taken down by me in shorthand and thereafter my notes were transcribed through computer-aided transcription; and the foregoing transcript constitutes a full, true, and accurate record of such testimony adduced and oral proceedings had, and of the whole thereof.

          **I** FURTHER CERTIFY that I am not a relative or employee of any attorney of the parties, nor do I have a financial interest in the action.

          (X) Review and signature was requested.

          ( ) Review and signature was waived.

          ( ) Review and signature was not requested.

I have subscribed my name on this 4th day of October, 2023.

*Abigail D.W. Johnson*

ABIGAIL D.W. JOHNSON, RPR, CRR, CRC

Page 264

1   Katie  Panzer

2   Katie@aprilhollinsworthlaw.com

3                        October  5th,  2023

4   RE:     Graham,  Elizabeth  v.  Bristol  Hospice  Holdings,  Inc.

5           9/22/2023,  Elizabeth  Graham  (#6086491)

6        The  above-referenced  transcript  is  available  for

7   review.

8        Within  the  applicable  timeframe,  the  witness  should

9   read  the  testimony  to  verify  its  accuracy.  If  there  are

10  any  changes,  the  witness  should  note  those  with  the

11  reason,  on  the  attached  Errata  Sheet.

12       The  witness  should  sign  the  Acknowledgment  of

13  Deponent  and  Errata  and  return  to  the  deposing  attorney.

14  Copies  should  be  sent  to  all  counsel,  and  to  Veritext  at

15  (Calendar-utah@veritext.com).

16

17   Return  completed  errata  within  28  days  from

18  receipt  of  testimony.

19   If  the  witness  fails  to  do  so  within  the  time

20  allotted,  the  transcript  may  be  used  as  if  signed.

21

22                  Yours,

23                  Veritext  Legal  Solutions

24

25

                                        Page  265

1  Graham, Elizabeth v. Bristol Hospice Holdings, Inc.

2  Elizabeth Graham (#6086491)

3                E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____          _____

24  Elizabeth Graham                                    Date

25

                                     Page 266

1  Graham, Elizabeth v. Bristol Hospice Holdings, Inc.

2  Elizabeth Graham (#6086491)

3  ACKNOWLEDGEMENT OF DEPONENT

4     I, Elizabeth Graham, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____    _____

12  Elizabeth  Graham                              Date

13  *If notary is required

14                          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                          _____ DAY OF _____, 20___.

16

17

18                          _____

19                          NOTARY  PUBLIC

20

21

22

23

24

25

Page  267

**[& - 2017]**

| & |
|---|
| **&**   90:12 |

| 0 |
|---|
| **000102**   39:17 |
| **00754**   1:7 |

| 1 |
|---|
| **1**   3:7 12:7,22 |
| 13:25 187:9 |
| 233:6 238:7,8 |
| 240:1 244:24 |
| 245:6 |
| **1,000**   233:8,22 |
| 233:23 |
| **1,100**   52:15 |
| 53:21 54:1 |
| **1,220.05.**   233:5 |
| **1,500**   240:4 |
| **1,700**   52:15 |
| 53:20 54:1 |
| **10**   3:17 56:6 |
| 176:15,20,21 |
| 184:4 185:17 |
| 236:6 237:3,7 |
| 250:14 |
| **100**   40:22 |
| 116:8 214:20 |
| 217:4 233:11 |
| 235:13 248:6 |
| **1040**   229:8 |
| 246:21 |
| **1095s**   229:16 |
| **10th**   114:20 |
| 116:14,20 |
| 118:8 119:4 |

120:4,8,23
122:25 126:15
126:25 127:21

129:10,13,19
130:1 131:19
131:23 132:4,5
132:24 139:8
144:20 150:2
150:12 156:11
169:22 177:5
177:10 178:1,3
184:6,10,18
185:7

**11**   3:18 156:11
176:15,19
178:5 184:4
185:17 241:2,6

**11,000**   238:15
**11,946**   238:18
239:14,16,17
239:18

**1100**   2:4
**11:00**   131:1
176:19 177:25

**11th**   116:15,20
118:11 126:15
126:18,25
129:13 131:2,7
139:17 140:16
143:16,22,25
144:20 145:7
148:24 150:11
169:22 177:24
184:7,23

195:15

**12**   3:7,19 43:21
209:8 244:20
253:12

**12,544**   242:21
242:24

**12th**   143:25
144:1 149:9
151:17 152:24
195:15,24
196:24,25
198:6 199:9,10
201:25 203:13
203:25

**13**   3:20 41:22
43:21 136:9
167:15 209:8
220:17 245:20
245:24

**13th**   50:14,15
154:22 156:4
179:21 180:20
206:7

**14**   16:24
**144**   3:12
**15**   61:13,14
**154**   3:13
**16**   250:9
**1829**   237:11
**1881**   2:4
**1900**   1:20 2:10
**1:45**   129:25
176:21

**1st**   27:20 37:25
38:15 40:2,12

52:4 255:1
257:23

| 2 |
|---|
| **2**   3:9 24:15,19 |
| 90:11 177:18 |
| 181:1 187:9 |
| 234:3,4,5 |
| 235:19 236:6 |
| 237:15,20 |
| 244:9 246:21 |
| 246:22 |
| **2,000**   233:6 |
| **2,172**   242:25 |
| 243:8 |
| **2,244**   238:14 |
| **20**   10:22 67:7 |
| 124:23 246:21 |
| 267:15 |
| **2005**   34:12 |
| **2009**   34:12 |
| **2011**   32:12 |
| **2014**   32:12,21 |
| 33:1 |
| **2015**   30:2 |
| 37:20 |
| **2016**   3:16 38:2 |
| 38:15 40:2,12 |
| 52:4 61:9 |
| 62:12 74:18,22 |
| 75:18 80:25 |
| 229:7,15,21 |
| 230:1,6,7,12 |
| **2017**   53:11 |
| 65:2,7,12,16,25 |
| 66:9 67:7 |

Page 1

**[2017 - 5]**

77:19 81:3,19 84:11 90:11 91:11 92:11,24 94:5,10 106:23 108:8 161:14 173:25 174:3,8 209:9 228:14 229:10,15 230:19 231:5 232:11,22 234:11 250:13 251:8 261:11

**2018** 3:17 30:3 30:7 49:6,7,24 50:13,16 51:18 67:8 89:12 91:11 92:24 110:11 116:17 116:20 117:1 122:9,21 129:19 156:4,7 156:22 169:22 174:2 176:10 176:19,20,21 178:5 179:21 180:20 184:23 214:18 216:7 220:17 229:11 235:15,24,25 236:21 237:9 237:22 238:15 238:20,22 239:6,11,20 251:15 254:13

**2019** 3:18 27:2 27:19 29:23 31:20 148:4,5 229:12 234:7 240:11,14,18 241:9,10,13,21 242:8 243:1,6 243:19 244:1,1

**2020** 3:19 229:13 244:6,8 244:8,9 245:1

**2021** 3:20 229:13,14 245:14 246:1,8 246:21

**2022** 26:5

**2023** 1:16 4:1 26:24 264:23 265:3

**208** 3:14

**2109** 147:19

**22** 4:1 238:8

**2241** 230:18

**2245** 242:9,11

**2248** 244:10

**227** 3:15

**229** 3:16

**23** 220:16

**237** 3:17

**24** 1:16 3:9 9:14 22:20

**241** 3:18

**244** 3:19

**245** 3:20

**24th** 109:8

**25** 133:18

**263** 232:2

**27** 51:19 247:2 247:20

**27.39** 247:19 248:2

**27.39.** 247:17

**28** 51:19 247:4 247:21 265:17

**28932** 264:25

**28th** 37:20

**29th** 122:21

**2:00** 150:2

**2:21** 1:7

**2nd** 91:3 157:4

**2s** 242:8

**3**

**3** 3:10 39:2,6 39:14 52:11,19 52:23 53:1,6 53:17 181:1 187:9 227:25 247:21,25

**3,100** 254:9

**3,210** 243:21

**30** 133:18

**31,834** 241:15 243:17

**31st** 255:24

**32** 221:16

**32,010** 240:11 241:13

**32,708** 237:15

**328-3600** 2:11

**34** 258:4

**34,129** 235:15 235:16 236:4

**34,139** 237:25 238:2 239:11 239:12,16,24

**35** 262:18

**36** 1:19 2:9

**39** 3:10

**4**

**4** 3:3,11 88:18 88:23 162:15 162:19 165:3 170:14 175:20 220:16 227:25 231:4

**40** 248:13

**415-9909** 2:6

**42,095** 244:24 245:4

**42,529** 244:6,8 245:3

**44,722** 239:1

**46,689** 246:3,7 246:16,22

**4:00** 150:3 176:21

**4th** 264:23

**5**

**5** 3:12 14:3,5 14:12 144:8,12 156:7 176:10 203:24 248:24

Page 2

**[50 - accused]**

**50** 22:9 49:1
**500** 41:19 67:3
173:14 223:5
**52** 248:14
**56,971.20.**
248:14
**59,734** 231:2,12
232:7 233:25
**59,734.23** 232:1
**5:02** 1:17
263:12
**5th** 113:24
119:8 132:12
150:10 156:22
157:13,17
183:16 184:5
191:19 206:6
265:3

**6**

**6** 3:13 154:12
154:16 175:16
176:10 238:16
**60** 233:18
**60,020** 230:23
231:7,22,24
232:23
**6086491** 265:5
266:2 267:2
**61,000** 245:15
246:6,19,20
**61,225** 228:14
231:16,22
232:23 233:13
233:15 235:11

**640** 255:15
256:2
**65** 104:12,18
**65,590** 229:21
**6th** 142:22
143:9 147:23
149:3,9 152:18
157:20

**7**

**7** 3:14 208:10
208:14 239:3
243:4 248:18
**7/10/2018**
145:24
**7/12/2018** 3:12
**7/13/2018** 3:13

**8**

**8** 3:15 227:14
227:18 244:5
**80** 48:25
**801** 2:6,11
**80s** 6:7
**82,500** 26:18
**84,975** 26:13
**84105** 2:5
**84111** 1:20
2:10
**88** 3:11
**8:30** 154:22

**9**

**9** 3:16 14:13,13
14:19,25 229:1
229:5 238:7,11
242:4

**9/22/2023**
265:5
**90s** 6:7
**946** 238:15
**9:00** 131:1
132:19 139:14
176:19 177:25
**9:38** 1:17 4:1

**a**

**a.m.** 1:17 4:1
176:19,19
177:25
**abigail** 1:25
264:4,25
**abilities** 95:18
**ability** 9:14,16
9:21 207:25
255:5
**able** 50:1 85:7
85:16 92:23
105:3 110:17
110:24,25
127:18 149:5
174:17 195:22
196:10 252:25
255:14,18,23
256:1 257:21
257:24 261:3
**aboard** 106:25
**above** 39:21
145:16 231:25
265:6 267:7
**absolutely**
109:21 151:4
155:9 164:8

189:20
**absorbed** 83:22
135:18
**abused** 93:22
**abusive** 93:22
**accepted** 57:6
74:12 124:3
**access** 57:25
92:10,10,11,12
92:13,13,16
93:10 94:1
173:3 261:9,11
**accesses** 92:15
**accommodati...**
44:23
**accomplished**
93:2
**account** 28:12
28:12 29:12
**accounts** 48:12
**accrue** 228:10
**accuracy** 265:9
**accurate** 15:11
16:9 155:14
156:21 248:15
264:14
**accurately** 9:15
**accusations**
159:24 221:4
**accused** 30:24
159:5,12,21
194:19 195:21
223:20 224:2
249:16,20
258:23 259:17

**[accusing - ahead]**

accusing
159:13
acknowledged
199:13
acknowledge...
267:3
acknowledg...
265:12
acquainted
118:24
acquisition
113:9,10
115:23 116:1
117:8
act 156:15
158:1 258:25
acted 103:16
258:4,9,14,18
action 7:9
111:24 163:9
262:20 264:19
actions 94:19
99:23 103:13
104:2 163:5
164:22 186:12
186:13 211:23
212:4,7
activities
132:16 254:14
actual 75:14
actually 18:9
23:3 26:3 31:6
33:18 42:14
46:14 49:18
53:12 73:8

74:10 82:23
92:17 98:20
102:3,25
106:24 107:15
108:5,11
113:13 132:3
134:5 136:25
143:24 146:14
158:16 160:19
164:15 174:16
179:20 182:7
190:5 197:2
200:25 218:18
234:3 236:5
256:24 260:1
ada 41:4 43:15
43:17 44:8,9
44:10,11,13,16
44:19 45:8
adamant 79:19
add 25:13
112:16 238:7,7
243:15
addition 8:15
9:1 52:6,7
additional
35:18 40:16
106:1 148:3
152:9,13
229:15 231:18
251:21 262:10
262:16
additions 267:6
addressed
153:24

adduced
264:15
adjusted
230:23 231:8
adjusters
138:19,23
administering
47:8
administrative
6:20
administrator
34:1,6
admit 78:10,11
79:18
admonitions
7:21
advance 176:14
257:11
advise 197:2
advised 179:2
197:3 204:3
206:9,14,16
affect 9:16,20
250:16
affirmed
171:23
afford 255:14
255:23
aftermath
93:24
afternoon
129:24 130:1
131:10,14
132:4,5,24
145:25 176:21

177:4 178:3
age 94:15
100:21,23
104:18,22
105:1,2,4,6,10
105:18 106:1
106:11,14
108:2 111:16
112:5 210:11
agency 27:7,9,9
27:11,15 37:3
37:5,10 223:22
242:16
ages 106:5
aggregate
231:25 232:5
agitated 77:23
ago 88:6
agree 78:15,20
182:14 184:13
189:1 226:15
231:24 232:5
236:16,23
237:23 240:3
agreed 162:23
199:1
agreeing
226:10
agreement
164:12 165:8
165:17 169:5
ahead 18:12
56:5,10 109:25
111:5,8 119:7
130:14 163:8

Page 4

**[ahead - apply]**

175:9 198:11
228:23
**aided** 264:13
**alcohol** 9:15,17
**allegation**
83:25 220:25
**allegations**
19:8,11 59:9
59:25 60:7
73:2,5,7
155:15 172:7
207:18 208:19
208:23 221:1,2
221:5,8 222:12
222:21 225:13
226:2 250:11
**allege** 94:15
248:17 262:19
**alleged** 75:15
111:16 112:6
112:11 186:11
216:1 259:17
**allegedly** 72:8
101:3 224:22
**alleging** 7:7
71:4 226:14
258:8
**allotted** 265:20
**allowed** 159:18
171:9 261:6
**allowing** 71:5
**altercation**
81:4 84:4
90:25 92:1
93:19 211:13

**altercations**
84:6
**alternative**
257:19
**amicable**
110:17
**amount** 26:20
52:14 54:1,7,8
54:15,17 81:10
81:17 161:23
186:25 227:8,8
231:15,15
238:8 241:15
246:10 247:9
247:15 248:15
250:24 251:22
252:5 253:4
254:14 256:7
257:1 262:8
**amounts**
228:11 232:5
**analyst** 156:13
157:25
**anderson** 130:6
130:11 185:22
217:2,22,23
**anger** 161:23
**angry** 59:3,21
**annette** 178:20
179:1,7,14,17
179:20,23,25
180:5,7,10,24
181:8,10,12
217:1,16,17

**annette's**
178:25
**annual** 26:14
55:5
**anomaly**
207:13
**answer** 9:2,3,7
9:16 168:11
190:19 194:6
201:1 202:11
220:12
**answered**
169:12 174:22
181:14
**answering**
103:11 193:9
**antagonistic**
58:18,19 59:24
**anticipated**
151:5
**anticipation**
87:22
**anxiety** 186:23
187:4 249:6
**anxious** 186:19
**anybody** 10:12
101:21 118:2
141:15 161:2,3
219:13,15
220:3,11 223:8
**anymore** 74:11
214:7 261:10
**apparent** 157:9
**apparently**
22:5 23:5,6

62:15 72:14
74:18 80:7
89:11 129:24
171:11,13
**appeal** 31:10
31:11
**appealed** 30:25
30:25 224:10
256:4
**appealing**
224:25
**appearance**
212:10,24
213:4 214:10
**appeared** 59:21
**appears** 40:1,3
89:1 183:25
208:25 229:7
229:10 230:22
232:17 233:20
238:14,15
239:13 241:8
244:23 245:9
**appended**
267:7
**applicable**
265:8
**applications**
47:10
**applied** 30:19
31:3 62:24
64:16 71:10
212:15 256:19
**apply** 63:15
256:19

**[applying - auditing]**

applying   31:7
64:10
apprised
138:22
approached
182:16
appropriate
126:11
approval
127:12
approved
14:21 209:2
256:4
approximately
48:21 53:20
240:4
april   15:3
37:25 38:15
40:2,12 52:4
82:5 109:8
110:10 160:7
162:22 163:7
164:12 198:16
215:8 261:15
261:19
aprilhollinsw...
2:5 265:2
area   25:24
areas   131:6
arranged   119:8
arrival   120:8
arrived   120:3
arts   32:3,10
aside   6:17
31:16 35:10

74:15 118:3
147:18 148:4
157:9 165:24
195:4 239:20
239:20 253:18
asked   9:4 17:25
18:11 21:2,18
21:21 22:19
23:7 24:1 45:5
58:6,13,22
62:14 66:8
69:16 70:6,7
70:15,21 77:11
80:3,4 82:6,14
92:16 96:11
117:13,15,19
118:4,23 119:3
126:7 128:6
130:11,21
131:3,20 132:2
135:6 140:4,13
140:24 141:16
141:19 143:10
145:12 149:24
154:1 155:2,3
158:2 159:15
159:17 175:19
181:14 182:16
182:16,20
183:13 187:17
188:5 201:4
203:4 205:5
215:18 261:20
asking   22:7
66:24 70:1

98:7,23 102:4
103:25 111:12
111:25 124:18
124:19 126:17
126:19 144:17
148:24 153:5
157:6 158:11
178:2 180:8
188:8 190:25
201:3 202:7
205:16 206:18
206:21 211:2
220:25 227:9
253:3 254:19
258:17
asserted   4:16
assigned   66:18
114:9 118:1,10
187:14 188:2
189:6
assist   138:18
215:19
assistance   41:5
46:5
assisted   6:15
assisting   27:24
28:3 41:24
42:6 93:5
associate   25:15
26:1 28:24
29:12
associated
166:17
assume   9:3
64:21 104:18

206:8
assumed   87:21
assuming   183:4
185:11,25
189:22 190:4
206:14,22
232:4 235:18
246:14 248:12
assurance
109:23
attach   237:15
attached   97:10
265:11
attacking   94:21
attend   67:12
140:4 147:17
attendant   26:7
attended   118:7
attention   16:18
24:10 109:16
112:25 162:14
attorney   4:13
10:14 11:2,4
24:1 264:18
265:13
attorneys
262:20,21,25
attributable
220:20,22
audit   118:19
122:18 149:20
audited   167:16
auditing
122:22

**[audits - behalf]**

audits 151:11
august 26:5
  53:9,11 152:21
  153:15 256:1
australia 6:16
authorize
  127:3,8
authorized
  127:1
available 42:3
  49:17 132:9
  133:15 265:6
avoids 12:16
award 53:25
aware 19:18,25
  20:24 36:25
  37:2 41:11
  62:20 64:1
  66:8 67:5 76:7
  76:9 83:3,4,24
  92:23 97:16
  98:13,18 99:15
  101:12 102:6
  102:21 105:20
  114:15 116:3,6
  133:12 169:7
  169:10,16
  175:25 176:4
  183:9 185:15
  186:1,9 197:21
  213:23 214:8
  214:12 217:13
  217:15 218:22
  219:8,15 220:3
  220:6,8,10,12

220:14 223:2,8
223:14 224:24
225:19 226:13
234:14 235:10
239:8 255:4
261:9 262:6

**b**

b 1:9 2:8 3:5
  4:22
babysit 178:8
  178:17 179:4
  179:11
bachelor's
  35:11,19
bachelors
  34:24
back 14:4 16:9
  16:16 23:20
  24:11 43:24
  44:1,2,6,21
  45:19,21 56:10
  57:22 67:19
  70:13 77:6,9
  81:11 84:10
  92:9,19 94:11
  111:8 118:18
  119:7,25
  120:18 128:19
  130:17,20
  133:14 136:14
  137:13,18,20
  137:24 138:24
  139:1,5,11
  140:2,5 141:2
  141:4 143:25

144:3 147:22
148:13 150:14
151:12 154:7
171:7 173:3
183:24 197:16
222:7 229:9
238:11 242:3
243:5 248:17
background
  24:11 46:13
  62:11,20,22
  164:17 193:19
backs 154:6
bad 223:24
balance 250:16
  252:5
barry 96:10
  97:9 219:18,25
based 110:13
  111:15 112:5
  112:11 165:16
  168:12,13
  210:15 213:13
  220:18 221:1,6
  228:12 235:18
basic 146:7
basically 10:10
  28:3 41:20
  43:19 44:5
  45:15,20 47:18
  49:14 62:22
  67:4 70:24
  79:15 97:19
  106:8 119:19
  120:15 121:12

124:23 136:5
136:11,16
137:2 148:15
175:2 190:15
196:19,20
211:8 212:12
212:23 213:20
261:20 262:11
basis 46:1
  50:18 57:8
  87:20 98:14,15
  173:19 188:9
  210:19 211:1,2
  235:16 239:25
  240:1 245:16
  256:17 258:8
  258:18 261:5
  261:15 262:22
bates 39:15
becoming
  27:15
beet 59:2
begging 175:5
  251:17
beginning 14:6
  27:21 31:10
  42:15,21 49:24
  108:8 122:7
  174:15 214:18
  216:7
begins 13:25
behalf 13:2
  89:3 97:15
  116:10 227:23

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

# [behavior - benefits]

**behavior** 68:14
68:24 71:20
75:23 79:8
94:6 103:12
108:10,13
171:20 207:15
209:15,19
211:10,23
212:3,6 213:21

**behavioral**
209:16

**behaviors**
187:11,24

**belief** 108:1
191:7

**believe** 5:18 6:5
6:6 7:3,15 12:9
14:23 15:21
17:1 18:9,20
18:20 20:20
25:3 26:4
27:21 28:11
29:1 30:16
31:21 32:19,24
33:6 34:14
37:2 38:10,12
39:8,12 40:7
41:9,10 43:8
44:12 45:7,7
49:16 50:7,21
52:4,25 53:19
54:25 55:11,21
55:23 58:17
59:3,14,16,18
60:3 61:9

62:13,23 63:2
64:8 65:7,22
65:24 67:14
70:4 71:17
73:8 74:21,22
76:5 79:13
84:10 85:10
87:24 88:16
89:21,22 92:1
92:1,9,21
93:19 97:14
99:6 104:12,23
105:21,25
107:13,22
108:4,16 109:4
110:10 113:7
115:11 122:7
122:17,18
123:19 124:24
126:12 133:10
137:13 140:23
143:13 147:2
152:1,4 155:25
157:1,22 159:5
159:12,22,23
159:25 160:4
161:10,13
162:12 164:14
164:20 165:1,5
165:7,9 167:11
167:23 168:1
168:16 173:5
177:24 178:7,9
178:11 179:3
179:10,16,17

180:4,8,17,22
181:3,5,18,25
182:9 183:6,7
183:7 185:3,4
186:14 187:2
188:12 190:8
191:11 192:24
199:19 200:7
204:6,23
209:20,25
210:17 214:15
214:25 215:12
215:13,20
217:17 218:2
218:14 219:22
220:20,21
221:6,9 222:25
225:2,6 227:1
228:4,7,16,19
230:2,16,25
231:13 232:6,9
232:22 233:16
233:19 235:3
235:17,21
236:2,5 237:22
238:21 241:20
241:22 242:22
243:12,14
244:16 246:1,4
246:9 247:13
250:13 251:6
251:13 253:19
253:21 254:8
254:12 255:14
256:21 257:9

257:17 258:23
258:24,25
259:20 263:1,4

**believed** 63:13
162:25 163:10
180:18,21
189:2 190:24
191:23 196:21
199:17 202:6
213:13 225:10
257:6 259:5,9

**benefit** 20:18
62:16 92:25
147:19 148:5
152:2

**benefits** 20:16
38:6,19 40:14
41:4,17,24
42:2,8,12,16,24
43:1,4,6,7,8,12
47:25 48:14
60:12,19,20
61:24 62:9,22
63:3,23 64:1
64:13,22 65:3
65:5 66:18
67:5,24 81:12
81:20 86:18
87:16 90:12
91:17 106:23
107:18 114:3,4
114:11 117:15
119:19,20,23
120:18,25
121:13 128:11

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[benefits - brought]**

130:24 131:13 132:6,7,8,8 133:8,9,19,21 134:6 137:7 139:12 145:25 146:4 156:14 157:25 173:17 177:15 182:22 184:18 221:19
**berating** 102:8
**best** 15:12 207:25 257:5 257:19,19
**betrayal** 162:21
**better** 62:10 63:22 70:2
**beyond** 199:8 205:18 207:2
**biesinger** 178:20 180:24 181:9 217:1
**binninger** 114:1,23 115:16 117:23 120:3 121:14 123:25 124:24 128:2 129:6,12 141:7,24 142:1 143:19 153:7 156:17 158:8 158:18 186:23 188:24
**birthday** 82:6

**bit** 24:11 36:22 38:13 69:4 78:21 90:7 123:20 229:19 231:15 232:14
**block** 89:7
**board** 46:13 194:15
**boil** 165:4
**bonus** 29:4 55:13,24
**bonuses** 52:9 55:1,3,5,6,7,10 55:12,20,21,23 56:3
**boost** 26:7
**bothered** 72:11 106:14
**bottom** 14:5 15:2 55:19 89:6 144:25 145:6 167:6 180:18 227:25
**boxes** 89:15
**boyfriend** 71:5
**break** 9:4,7 16:5 56:6 69:3 124:16 125:9 125:10 133:1 173:2 175:10 175:11
**bridges** 114:20 125:9 130:21 139:20

**briefly** 132:17 139:10 146:1,5 182:23
**bring** 162:14 163:3
**bringing** 109:16
**bristol** 1:7 4:15 4:18 18:6,19 19:7,11,23 20:1,5,13,16,21 21:23 29:25 30:20 31:19,24 33:1 36:23 37:1,3,12,19,22 38:4,16,22 39:11 41:1,6 41:18,19 42:12 48:17,19,24 49:10 50:12,17 56:15 61:7,11 69:14,22 72:1 79:5 84:22 85:14 107:17 110:22 113:5 113:11 115:8 115:25 116:11 117:15 133:8,9 134:25 138:3,4 139:1,25 147:18,19 148:3,4 160:18 164:14 182:21 184:17 200:13 200:18 208:20

208:23 214:3 215:7,10,13,23 217:5,10 218:10 221:17 221:22 223:21 224:7 225:5,9 225:10,19,24 230:1,11,13 232:8,13 235:20 236:6 237:21 239:7 239:21 240:12 240:14 246:25 247:12 248:8,9 249:3,7 250:2 250:9 251:5 252:8 256:13 258:4,14,18 265:4 266:1 267:1
**bristol's** 52:19 113:9 115:23 117:8 145:25 147:14 148:9 167:12,21 209:13
**brochures** 134:9
**broke** 111:11 175:15
**brought** 38:7 88:21 110:21 186:15 216:13 217:20 219:10

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[bullied - charge]**

**bullied** 215:16
**bullying** 74:21
  75:23 76:14
  77:1 79:18
  80:24
**bunch** 203:11
**business** 35:22
  37:13 42:1
  44:3 81:15
  124:3,5,11
  125:8,8 136:12
  137:17 185:7,9
**buy** 113:1
  257:24
**buying** 110:1
  113:6

---

**c**

**c** 2:1 4:2
**calculate** 48:6
  247:21
**calendar**
  265:15
**california**
  113:4 136:21
  136:22,24
**call** 39:15
  113:23 119:9
  120:6,9 121:3
  125:19 131:5
  132:12 133:20
  135:17 183:20
  195:11,12,14
  196:17 197:25
  211:13

**called** 4:6 13:4
  14:6 67:9
  74:22 75:21
  76:3,6,8,10
  94:4 119:8
  154:25 193:5
  240:21
**calling** 71:2
  190:1,6 206:22
  206:23 214:10
**calls** 54:22
  173:20 204:25
  258:11
**calm** 72:24
**canada** 6:13,16
**canceled**
  140:19 142:16
  147:10 148:21
  148:23 153:5
  154:1,1 159:16
  188:22
**cancellation**
  183:2
**candidly** 234:6
**capacity** 34:4
  40:14 48:1
  60:13 69:8
  70:2 72:1 95:6
  95:17
**card** 123:6,8,14
  124:3,5,11
  125:8,8 185:7
  185:9
**care** 37:15,16

**carriers** 260:10
**carry** 187:13
  188:1,18 189:5
**cascaded**
  252:22
**case** 1:7 4:25
  82:9 89:20
  186:11 262:25
**categories** 43:9
**cause** 175:22
  240:7
**caused** 168:17
  211:8 221:17
  251:5 252:15
**central** 1:2
**centralized**
  43:19 45:14
  136:4 138:15
**cents** 247:4
**ceo** 23:12 67:17
  74:1 106:25,25
  155:3 260:4
**certain** 55:9
  195:23
**certainly** 60:22
  167:23 168:4
  250:3
**certificate**
  264:1
**certification**
  35:23 36:4,8
  52:16,17,21,22
  52:23 53:1,8
  53:13 85:10

**certifications**
  35:18,21,25
  36:17,21 53:14
**certified** 264:4
**certify** 264:6,17
**cetera** 71:14
  107:2 110:1
  119:21 133:13
  161:19,19
  210:12 212:17
  229:16
**cfo** 83:14
**cfra** 137:1
**chair** 47:3,4
  77:9
**challenge**
  158:22
**chance** 160:23
  161:6 196:21
**change** 28:8,16
  29:8,10 56:25
  266:4,7,10,13
  266:16,19
**changed**
  205:23
**changes** 265:10
  267:6
**chap** 160:19
  164:15 167:4
  168:1 192:14
  193:1,15
**charge** 3:11
  89:2 90:22
  93:14 94:15
  98:11 108:23

**[charge - comment]**

109:4 111:12
111:16 112:11
122:1,4 161:11
162:5,12,18
165:2 168:18
170:14 174:14
175:20 176:2
186:11 200:11
200:17 201:10
218:23 220:4
**charged** 10:3
72:1
**charges** 186:15
**charging** 89:8
**charity** 255:11
256:20 257:3,9
257:21
**check** 171:12
191:16,25
192:3 193:13
194:8,21 195:5
205:16 236:24
262:1
**checked** 89:16
192:22 203:6
**checking**
192:16 193:16
**chicago** 25:18
25:21,23
**choice** 172:4,5
258:22 259:14
**christensen**
83:14
**christie** 130:12
130:15 132:25

**chronic** 252:1,6
**chronus** 47:12
47:12 65:1
92:11 94:12
107:3
**chuck** 74:1
106:24
**chung** 214:25
216:4
**circling** 100:4
**circumstances**
54:10
**city** 1:20 2:5,10
25:18 33:11
115:10,17,19
116:14 120:20
120:21 139:24
142:6,11,13,18
143:2 161:3
**civil** 1:7
**clackamas**
122:17 149:22
**claim** 23:4
45:20 54:19
138:18 216:5,6
259:6
**claimed** 204:19
**claiming** 188:9
227:4 235:19
249:25
**clarification**
191:14
**classes** 210:8
210:16

**classic** 98:25
**clean** 7:22
**clear** 7:22 8:16
8:23 9:21 25:1
70:14 71:23,24
87:3,9 113:5
130:18 164:25
171:1 172:21
203:22 226:4
**clearing** 112:17
**clearly** 8:19
77:23 161:7,14
164:5 207:6
**clerk** 11:5
**client** 4:17
234:20
**close** 67:20
99:25
**closed** 82:9
**closest** 237:2
**clothes** 71:12
71:13
**clothing** 212:17
**clown** 71:9
212:14 213:7
**clowns** 214:10
**coach** 49:15
**coaching** 153:9
**cobra** 255:5,15
255:21 256:9
256:14 257:16
257:17
**collaborating**
49:19

**collect** 54:14
**collectively**
103:7
**college** 32:4,7
32:15 33:9,24
34:18,21 35:4
35:23
**colloquially**
8:18
**come** 8:18 14:4
16:8,16 32:15
61:6 70:7 77:7
77:8,20 84:21
85:6 108:22
125:12 130:7
146:21 155:2,3
172:20 189:19
197:16 202:10
228:15 229:25
235:12 243:17
243:24
**comed** 25:16
**comes** 204:22
238:25 248:14
**comfortable**
73:23,24
**coming** 21:5
94:21 102:8
116:22 125:17
173:21 256:2
**comment**
100:20 105:22
178:6,15
179:10

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[comments - computer]**

**comments**
71:16 94:24
96:4 105:17
106:1,4 212:9
212:18,19,20
**commission**
52:13
**committee** 47:3
85:18
**common** 8:17
**communicate**
128:17 130:4
134:24
**communicated**
19:6,14 20:1
21:8 87:20
157:10 191:4
203:20 207:2
213:20 225:14
**communicating**
141:11 201:4
225:20
**communication**
57:22 118:17
120:2,7 141:6
141:8 143:21
157:11 191:5
191:20 195:12
**communicati...**
21:13 22:24
207:7 211:24
**community**
32:4,7,15 33:9
33:24 34:18,21
35:23 46:25

**comp** 121:14
128:12 131:13
177:15
**company** 34:7
110:3 114:8
117:3 119:18
123:24 133:25
200:13 222:7
223:8
**compare**
246:23
**compared**
119:24 232:23
245:4
**comparison**
99:9
**compensated**
33:13,14 56:19
**compensation**
26:7,11 28:15
28:20,22 29:7
30:6 31:12,17
31:18 35:24
36:4,5,13 41:4
45:10,12,13,18
46:3 52:7 85:9
85:20 87:12
114:9 117:16
130:23,24
132:14 137:23
137:24 138:5
138:12,18
139:14 146:1,4
147:14 148:9
156:14 158:1

173:18 182:22
184:18 224:9
224:10 229:20
230:14 231:19
232:7 236:7
240:15 246:15
246:24
**complain** 258:6
258:16
**complained**
209:10 210:4
213:24 214:9
214:13
**complaining**
68:17,18
219:16,23
**complaint** 3:14
59:19,19 60:4
60:8 69:18
73:25 74:20
75:7,17 76:1
76:10,11 79:2
79:3,8 80:2
81:2 82:4,13
88:7,13,15,21
88:24 90:24
94:5 106:9
108:7,20 109:5
110:8 112:8
160:2,3 161:15
163:10 169:8
169:13 202:12
208:6,22 209:9
209:14,17
210:1,21 214:1

214:17,17
215:14 216:12
219:6,7 220:16
248:18,24
258:4 259:2
**complaints**
76:25 88:12,17
110:20 164:17
216:9 219:20
219:20 220:6
**complete** 92:6
149:1,7 170:9
172:18 188:21
188:24 207:9
267:8
**completed**
265:17
**completely**
98:16 133:23
133:24 166:6
200:13
**completing**
170:3
**compliance**
160:20 164:15
168:3
**components**
13:22
**comprehensive**
18:21 23:14
24:1 47:23
50:9 121:11,18
216:20 218:18
**computer**
47:10 135:25

**[computer - continues]**

264:13
**concern** 166:15
194:13,14
205:21 206:5,9
206:15,17,24
209:16 249:22
250:23 255:17
**concerned**
131:21 186:19
251:9 252:3
253:10
**concerns** 21:23
57:7 109:20
110:20 160:11
160:25 163:2
199:2 205:22
205:22
**concluded**
145:10 263:12
**conclusion**
54:22 172:20
258:11
**concurrently**
20:22
**conduct** 117:11
221:17
**conducted**
74:21 117:9
222:8
**conducting**
69:8,15,25
70:11,15 73:1
73:4
**conference**
113:23 114:20

119:9 121:3
123:16 124:12
125:9,19
130:20,21
131:5 132:11
133:20 135:17
139:11,20,21
140:20 183:20
195:11,12,14
196:17 197:25
**conferring**
49:19
**confidential**
7:14
**confirm** 130:17
136:15
**confirmed**
131:7,25
172:10
**confirming**
137:3
**conflict** 211:14
211:22 213:16
**confrontation**
58:21 83:17
213:2
**confrontational**
84:6 213:16
**confusing**
238:12,12
**confusion**
12:16 185:19
185:21,23
186:1

**connect** 81:17
124:8 125:6,14
200:19,23
**connected**
164:20 207:5
**connection**
5:20,21 10:19
12:2 26:6
36:18 41:17
43:16 44:7
45:11 74:16
76:23 81:13
93:14 113:9
115:21,22
117:7 118:4
200:9,18
223:10,16,20
247:17 249:2
**consider** 17:13
85:22 205:19
**considered**
50:22 64:7,9
88:8 195:18
207:3
**consistent**
28:23 238:19
243:17
**consistently**
138:23
**constant** 52:1
**constantly**
105:9
**constituted**
55:13

**constitutes**
264:14
**construed**
213:10
**contact** 20:8,10
21:6 114:17
119:7 123:4
124:9 125:5,7
126:14 142:3
152:17 173:18
184:24
**contained**
14:22 198:5
208:1
**content** 157:11
**contents** 15:10
188:10
**context** 138:8
164:13 166:5
182:25 189:10
195:19 207:11
**contingency**
262:22,23
**continually**
165:23
**continue** 48:6,7
77:12 108:14
131:4 175:18
188:23 256:2
257:12
**continued**
79:20 92:7
94:7 254:3
**continues** 14:3

**[continuing - courses]**

| | | | |
|---|---|---|---|
| **continuing** | **convicted** 10:1 | 39:25 48:11 | 230:12 231:10 |
| 14:12 71:22 | **coo** 79:2 80:6 | 50:21 51:9,10 | 232:4,6,15 |
| 111:24 135:16 | **cookbook** | 54:15 76:4 | 233:19 234:2 |
| 228:10 243:1 | 33:15 | 80:19 87:7 | 239:3,15 |
| **continuously** | **coordinate** | 89:4,5,13,25 | 240:13,16,17 |
| 102:11 | 48:10 136:12 | 98:11 111:21 | 240:22 241:11 |
| **contract** 32:13 | 137:9 | 112:10 113:7 | 242:22 243:2,3 |
| 32:16,17,20 | **coordinated** | 113:14,15 | 243:20 244:10 |
| 34:17 115:8 | 43:21 | 115:3,24 | 244:11 246:4 |
| 116:24 146:24 | **coordinating** | 116:12,18 | 246:14 247:3,9 |
| 165:18 | 137:16 | 117:7 118:13 | 248:2,4 249:13 |
| **contracts** 42:23 | **copies** 17:15 | 129:16,17 | 255:6 267:8 |
| **contradiction** | 23:9 134:8 | 133:3,6 137:10 | **corrections** |
| 182:3,13 | 150:18,21 | 137:11 139:8,9 | 267:6 |
| **contradictory** | 265:14 | 145:6,10 | **correctly** 36:12 |
| 182:5,6 | **copy** 17:25 | 147:12,21 | 51:21 185:13 |
| **contradicts** | 23:8 150:8 | 148:6 150:17 | 209:21 230:24 |
| 183:6 | 234:9 263:10 | 154:10 156:4 | 232:1 |
| **control** 39:16 | **corporate** | 157:11,23 | **corresponden...** |
| **conversation** | 43:18,20,24 | 158:8 170:6,17 | 3:12 118:17 |
| 22:5 44:13 | 44:2 45:14 | 173:7,25 174:2 | **costs** 262:20 |
| 61:22 63:24 | 99:10 101:21 | 174:8,12,14 | **counsel** 10:15 |
| 65:12,16,17,21 | 102:15 103:13 | 176:13,22,24 | 12:9 13:3 19:9 |
| 86:12,19 87:24 | 104:3,4 114:8 | 179:12,13 | 19:9 228:18 |
| 120:15 152:4 | 114:8 116:15 | 182:24 184:4 | 234:9 265:14 |
| 153:2 155:12 | 127:4 136:4,14 | 195:25 196:4 | **counseling** |
| 179:22 181:12 | 138:15 | 203:14 204:4,5 | 163:25 164:1 |
| 181:16,20 | **correct** 5:13 | 204:11,12,21 | **county** 264:3 |
| 183:15 | 7:13 15:23 | 205:8 208:3 | **couple** 27:25 |
| **conversations** | 25:2,25 26:15 | 209:25 210:3 | 42:10 132:20 |
| 44:10 68:12,19 | 26:21 27:2,3,8 | 210:12 223:17 | 144:19 173:1 |
| 69:10 74:15 | 29:25 30:4,20 | 223:24 224:5 | **course** 136:6 |
| 180:23 185:5 | 31:3,14,25 | 224:14 225:1,9 | 161:21 172:6 |
| **conveyed** 191:5 | 33:2 34:2,13 | 225:15 226:7 | **courses** 36:15 |
| 199:9 | 35:7,9 37:9 | 226:17 228:3 | 49:17 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[court - debbie]**

**court** 1:1 6:19
8:4,7,13 17:14
263:7,9
**cover** 48:24
146:10 257:16
**covered** 256:9
256:11 257:18
**coworkers**
187:12
**crc** 1:25 264:25
**created** 91:1
178:11
**creating** 90:18
90:21
**creation** 91:24
**crime** 10:1
**critical** 173:13
**cross** 236:24
**crr** 1:25 264:25
**crying** 72:23
**cubicle** 77:6,8
77:13,20,25
78:23,24 79:6
79:24 81:4
84:4 90:25,25
92:2 93:19
101:16 130:7
130:13 211:3
211:14,22
213:1,2
**culmination**
172:23
**cure** 234:8
**curious** 81:7

**current** 25:11
25:12,14 26:11
156:9 157:14
157:15,19
228:12 244:14
**curve** 50:4
**customarily**
151:3
**customer** 50:10
91:21
**cut** 230:19
**cutting** 260:21
**cv** 1:7

**d**

**d** 3:1 4:2
**d.w.** 1:25 264:4
264:25
**dahlquist** 79:2
79:4 80:6,21
82:9 88:9
209:20 215:18
**daily** 173:19
261:4,15,19
**damages** 208:7
221:14,18
228:2,10
**damaging**
222:21
**date** 40:4 48:13
67:6 145:9
156:25 157:10
157:12 174:23
185:10 266:24
267:12

**dated** 203:25
**dates** 34:13
157:12
**day** 89:12
110:21 116:14
124:6 125:13
127:17 131:2
132:19 139:8
139:17 145:10
146:5 154:9
157:5 261:17
264:23 267:15
**days** 144:19
184:9 265:17
**dayton** 59:20
60:5,8,10,16
61:7 63:14
64:21 65:9
66:10,18 67:23
68:5,12,23
70:23 71:1
72:9,19 73:20
74:17 77:1
80:11 81:5,8
81:10 86:7
88:7,12,16
90:13,21 91:2
94:19 95:25
96:20 97:17
98:18 100:7
101:2,12
102:21 103:8
103:13,24
104:14 105:14
106:6,8,10

108:8,20
110:23,25
115:13 122:15
161:15 168:24
177:24 186:13
209:11 210:14
211:7 214:14
215:3,5,15
217:3 218:9
219:17,21,23
**dayton's** 63:25
209:15,19
213:24
**dba** 47:13
92:13
**dbi** 92:14
**deadlines**
260:25
**deal** 84:16
160:23 165:5
215:17
**debbie** 22:6,7
22:17,20 23:11
44:10,25 60:15
61:1,21,25
62:12 64:3
65:6,8,18,22
66:11,11 67:14
67:15 68:23
69:14,23,25
70:7,10,21,25
71:1 72:25
73:1,4,13,15,25
74:21 76:10
80:2 82:5,24

Page 15

**[debbie - describe]**

83:19 84:1,13
84:13,19 85:8
87:5,25 88:16
90:16 92:18
96:8,10,12
97:9 99:13
103:8 104:17
109:13 115:12
118:19 119:3,6
124:20,22
125:17,18
126:9,10
127:13,15,15
127:22 128:23
129:25 130:8
130:17,21
132:1 136:6
138:14 139:11
139:21 140:10
140:18 141:5
141:18 142:9
143:8,22
144:16,23
145:5 150:11
154:2,8,24
155:11 159:12
159:16,17
161:24 166:22
171:6 179:23
180:11,21,23
181:12,21
182:3 184:2,20
185:6 186:5
189:13 190:2,3
191:3,16,18,23

191:24 198:21
200:16 209:14
215:15 218:16
219:18,25
220:1,1 253:2
260:2 261:23
**debbie's** 65:24
80:1 135:15
143:16 145:3
168:11 177:1
177:12 261:3
261:10
**debra** 3:13
57:11
**december**
37:20 61:13
171:7
**deceptive**
160:15
**decide** 257:20
**decided** 21:5
110:6,7,12
127:15 129:25
139:22 156:19
172:12 260:4
**decision** 31:1
135:5 164:1
172:21
**declare** 267:4
**decline** 250:19
**deemed** 267:6
**deescalate**
78:16,19
**defend** 161:6
195:21

**defendant** 1:9
2:7 228:14
**defendant's** 3:7
**defense** 207:2
**definite** 59:1
161:23 172:5
**definitely** 42:22
50:3 162:1
248:11
**degree** 34:24
35:6,11,19
169:3
**degrees** 35:10
**deliberately**
168:14 172:13
**deliver** 262:9
**delivered**
155:13 261:21
**denial** 93:1
**denied** 31:3,9
54:3,4,12,12,13
106:20 224:12
**denigrating**
95:17 97:5,12
99:14 103:1,6
103:9
**denver** 113:3
**departed** 34:16
**department**
10:9 11:21
17:10,11 32:9
48:11 50:5
53:24,25 54:5
71:17 72:7
73:13 83:14,20

101:8 112:25
114:1,14 130:7
137:9 166:25
171:10 185:19
223:12 227:9
238:17,22
242:25 247:8
254:7 261:9,14
261:18 262:2
**departments**
156:20
**depends** 19:4
**deponent**
265:13 267:3
**deposing**
265:13
**deposition** 1:12
5:15,19 6:3,18
7:20 10:6,13
10:19 11:16
12:10,14,22
24:19 39:6
88:23 141:19
144:12 154:16
208:14 227:18
229:5 237:7
241:6 245:24
**depression**
249:6
**derive** 87:21
**derogatory**
77:14,17
**describe** 57:16
71:8 81:7
187:17 188:5

Page 16

**[described - disconnect]**

described
    11:14 35:16
    48:15 187:21
    218:25 252:7
describing
    66:16 153:1
    252:14
description    3:6
    3:10 22:8,8,14
    22:16,22 39:9
    40:9 87:14
    92:7
descriptions
    69:21 72:13
desk    140:2,5
    141:2,4
detail    119:19
    132:11 133:19
    135:16 204:18
    204:19 207:17
detailed    136:21
    151:12 202:3
    207:23,25,25
details    16:23
    55:7 262:12
determination
    209:22
determine
    15:18 18:2,3
    53:22 205:19
determined
    54:6 74:5
    148:19 166:22
    170:20,22
    209:15

develop    85:9,13
    85:17
developing
    50:8
development
    6:15 32:8 34:8
    85:23
diagnose    249:5
die    161:18
difference
    232:24 233:25
differences
    138:2
different    16:25
    20:20 29:15
    41:7 43:9
    54:19 73:12
    103:15 119:19
    119:25 120:17
    121:4,4 133:23
    133:24 134:5,7
    136:19,20,23
    138:1 167:19
    174:7 182:18
    185:10 193:10
    200:13 206:2
    211:2 254:20
    256:15 259:13
differently
    173:6 259:22
    260:16,18
    261:14 262:7
    262:17
difficult    8:12
    67:2 77:24

173:19 252:4
    253:16
difficulties
    21:19
digital    32:3,9
direct    37:22
    38:16 57:21
    65:6 86:21,25
    98:4 158:10
    176:4
directed    18:12
    95:15,19 97:4
    106:17 156:12
    156:15 157:24
    158:6 177:14
    184:25
direction    90:3
    90:3 142:20
    177:1,12
    187:14 188:2
    189:5 251:10
    257:6
directives
    159:21 160:17
    163:18 167:25
    172:22
directly    60:15
    60:21 65:5
    70:9,10 79:25
    84:14 97:18
    104:24 163:4
    194:18 199:3
    223:25
director    33:10
    33:15 44:3

60:11 61:18
    63:8,15 67:24
    90:12 96:10
    136:12 137:16
    138:17 209:11
    214:23 219:19
    259:23
directors    42:1
    43:22 45:16
    47:6 81:14
disability
    210:11
disabused
    206:11
disagree    78:16
    78:20
disbelieve
    181:10
discipline
    166:18 167:13
    167:18 168:20
    193:11,23
disciplined
    217:19 218:6
    219:9,16 220:4
disclosing    71:3
disclosure
    232:16,21
    233:21 237:24
    240:4 241:12
    244:5
disclosures
    3:15 231:16
disconnect
    203:3

**[discovered - documented]**

**discovered**
163:13
**discovery**
228:12
**discrepancy**
233:9 243:25
**discretionary**
55:6
**discrimination**
3:11 5:22 6:23
7:8 89:3 90:23
93:15 94:15,16
94:16 98:6,10
98:25 108:23
109:2 111:13
111:16,17
112:6,10 122:1
122:5 161:11
162:5,12,18
165:3 168:19
170:14 174:14
175:21 176:2
186:12 200:12
200:17 201:11
214:14 215:1
218:23 219:3
220:4 258:7,16
**discuss**   126:23
127:21 142:23
157:19 163:3
186:22 197:18
199:2
**discussed**   70:8
95:15 129:8
134:17 138:9

139:10 142:9
144:1 149:3,8
151:18 152:3
152:18 156:7,9
156:22 157:14
157:18 160:7
162:23 188:11
196:5 198:21
249:8 250:5
260:4
**discussing**
119:14 125:1
127:14 143:7
157:2
**discussion**
62:14 66:10
109:24 110:7
110:13 119:15
120:24 124:13
127:11 131:5
131:11 133:15
156:12 157:1,5
157:7 158:10
160:25 161:1
163:8 199:4
228:8
**discussions**
68:22 73:10
160:10 188:16
201:13
**disingenuous**
172:19
**dismissed**
209:16

**disorders**   249:6
**disparaging**
94:20 95:16
97:23,25 99:3
100:8,18
101:13 102:21
104:21 105:9
105:17
**displeasure**
153:17
**dispute**   198:4
**disputing**   198:3
**disregard**
258:5,15
**disrespectful**
71:8 259:19
**dissatisfaction**
86:1
**dissatisfied**
84:22
**distinctly**
103:15
**distress**   248:21
249:13 251:16
**distressed**
253:15
**distressful**
249:17
**district**   1:1,2,8
**dive**   16:23
**division**   1:2
157:17
**divisions**
157:20

**document**
12:24 13:12,16
13:18,23 14:22
17:6,9 24:21
25:4 39:7,14
39:16 40:9,13
89:25 90:4
109:17 144:13
144:16 154:17
154:19,21
184:19 208:16
209:2 227:11
227:19 229:6
230:2,17 231:6
234:20 241:7
241:22 244:18
245:25 247:14
**documentation**
10:9,10 11:19
11:21,22 21:1
21:17 23:12
46:17 96:15
142:2 146:15
149:17,18
150:10 154:7
170:3 172:9
191:20 195:13
227:6 254:12
261:19
**documented**
92:16 142:9
164:5 186:4
193:6 197:6
247:6

**[documents - email]**

documents   3:8
  4:24 12:2 13:4
  13:25 16:20
  17:2,6,10
  23:21,23 134:9
  229:11 234:10
  234:17 237:8
  256:22
doing   27:24
  34:3,7 37:14
  38:4,5,6 41:13
  46:17 60:23
  61:25 63:6
  64:25 76:12
  85:12 86:14
  87:18,19 99:20
  101:20,20
  102:11,12
  114:10 118:18
  121:8 122:18
  122:22,22,23
  131:13 132:21
  137:2 138:3,3
  155:17,17
  164:23 193:2
  200:5 242:18
  248:12 262:3
door   160:13
dots   200:19
  207:5
dotted   60:16,17
  65:8
draft   176:16
drop   110:12
  122:4

dropped
  108:23 110:8
  111:13 112:7
  112:12 121:25
dsp   1:7
due   172:6
  259:1
duly   4:6
dumb   97:1
  227:2
dustin   1:9
duties   28:8
  29:9,10 38:9
  38:12 40:13
  64:22 120:25
duty   137:19
  139:2 193:13
dws   247:7,10
  247:11,17

**e**

e   2:1,1 3:1,5 4:2
  4:2,22,22
  176:11 266:3,3
  266:3
eagerly   128:16
earlier   26:4
  136:8 177:9
  203:17 210:19
early   6:7 62:4
earned   54:17
  228:14 232:23
  235:15 236:4
  239:10,13,22
  241:18 246:3

earning   245:14
  246:5,18,20
easier   162:13
easily   189:18
east   2:4 124:22
easy   22:22
economic
  228:11
economics
  34:24
education
  35:15
eeoc   10:8 11:19
  17:9 18:11
  21:2,16,17
  23:4,8 58:8,23
  68:21 69:6,12
  69:13 70:13
  73:4 88:15,22
  161:21 164:18
  169:1 174:4
  214:1,17 216:9
  218:16,20,24
  220:5 223:13
  252:24 254:12
  259:2
effective   67:8
efficiently
  105:3,5
effort   122:25
egregious
  168:6 207:15
  260:11
either   64:9
  94:19 95:24

97:17 98:18
  99:19 100:7
  103:6 104:20
  108:2 147:17
  147:24 170:8
  180:25 181:21
  184:8 186:9
  187:16 188:5
  190:24 196:17
  218:24 220:5
  223:10
elaborate   131:5
elaborated
  151:20
electronic   15:3
  263:7,9
element   253:16
elements
  219:25
eligibility
  136:15 137:3
  256:23 257:5
eligible   30:24
  43:25 53:5
  136:18 224:18
elizabeth   1:4
  1:12 3:9,13,16
  3:17,18,19,20
  4:5,22 265:4,5
  266:1,2,24
  267:1,2,4,12
email   3:12 20:5
  119:7 120:18
  121:1,2 126:12
  144:3,21,23

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[email - environment]**

145:3,5,16,16
148:12 149:11
152:7,7,11
176:14 183:22
184:20 195:10
195:24 196:1,6
196:11,24
198:6 199:9
201:25 203:13
203:25,25
**emailed** 119:6
143:24,25
**emails** 10:7
17:18,23 23:11
84:10,12 120:9
120:10,12
172:9 186:5
188:15 191:19
195:7,8,9,9
207:6
**emergency**
47:1 85:19
114:7 121:15
122:23 128:7
128:14 147:15
148:10 171:15
**emotional**
248:21 249:13
251:16 253:5,8
**emotionally**
253:15
**employed**
32:11 36:23
39:10 45:3
113:13

**employee** 27:3
27:5,16,20,23
28:24 29:17
30:8 37:8,19
37:22 38:4,8
38:16 39:21
40:6 41:5
43:11,23 44:5
44:6 45:5,8
46:5 50:23
56:15 57:4
59:10 71:4,4
78:1 79:12,13
100:21 101:4
104:25 105:1,2
106:7 136:9,11
137:4,13,15,17
138:16 166:8
166:18 167:13
168:5 169:6
178:8 179:4,11
193:7 194:1
215:19,25
219:1 241:21
257:24 264:18
**employees**
11:21 18:13
21:3 41:20,24
42:2 43:2,5,6,7
43:8 44:12,15
44:19,21 45:18
48:16,20 50:10
58:10 66:23
67:3 68:2,8,13
68:15,17 69:22

71:9,17 73:11
74:23 75:19
76:15,20 77:15
81:14 91:21
99:14 104:6,21
105:16 106:14
107:16 113:25
125:24 130:7
134:16,18
138:24 139:5
164:4,6 167:3
167:16 172:24
173:15 193:3,3
193:8 213:20
260:16,19
262:1
**employer** 6:8
48:18 244:15
**employment**
21:23 24:11
28:7,17 30:5
30:19 31:19
32:14 33:4
34:16,20 50:12
84:22 106:20
154:9 158:24
163:2 169:21
199:2 217:8,11
241:24 247:2
252:11,16
255:6
**encourage** 9:1
**ended** 7:11
32:16,20 38:6
86:16,17 246:6

**endured** 251:7
**enduring**
254:22
**energy** 28:14
**engage** 213:16
**enormous**
42:15 250:24
251:22 254:14
255:1
**enraged** 78:5
**enrollment**
41:23,23 42:6
67:7 134:6
171:15 174:1
261:1
**entire** 38:21
42:19 50:4,20
129:10 133:2
133:11 135:20
135:23 159:1
207:5 261:23
**entitled** 43:11
51:8 52:19
54:6,8 55:1
221:18 262:19
**entity** 112:18
194:1 240:23
243:11
**entrance** 77:7
**environment**
90:19,22 91:2
91:24 92:3
93:2,4,9,16,20
93:23 94:3,14
108:12 209:12

**[environment - expect]**

210:5,15,20
211:9
**episode** 251:19
**epithets** 95:25
**equal** 106:20
107:5
**equally** 193:8
**equity** 113:12
**eric** 20:8,11
21:4 22:12,18
23:19 27:12
62:1,17 63:10
64:4,17 86:12
165:24
**errata** 265:11
265:13,17
**error** 157:9
**escalated** 80:20
**escalating**
175:6
**especially**
46:11 61:2
72:11 171:21
174:18 250:21
251:7
**essential** 38:12
**essentially**
20:13 38:5
74:6 86:14
134:21 151:20
174:19 194:2
255:2
**establish** 47:2
**established**
46:9,12

**estimates**
228:12
**et** 71:14 107:2
110:1 119:20
133:13 161:19
161:19 210:12
212:17 229:16
**evaluations**
23:11 194:2
**event** 80:14
211:21
**events** 11:24
19:12 91:1
169:22 207:5
**eventually** 38:6
47:4 128:9
134:24 178:21
219:21
**everybody**
123:17 171:10
195:1 261:8
**evidence** 12:3
18:1 162:4,17
168:16 170:13
170:16 175:20
175:25 176:5
187:19 188:17
188:19 207:7
207:10 219:22
258:17 259:20
**evp** 57:14
166:25 192:5
**exact** 66:2
**exactly** 6:5
23:14 55:13,24

78:2 92:22
103:11 132:1,2
135:7 141:20
141:23 154:6
162:10 207:13
216:5 217:2
227:7
**examination**
3:3 4:9
**examinations**
3:2
**example** 17:16
19:4 58:8
70:24 96:23
97:20 212:8
260:17
**examples** 72:10
72:11 77:3
96:6 260:18
**except** 31:22
41:9 61:25
103:24 152:5
184:3 243:21
**excited** 109:24
110:4
**exclusive** 134:2
**exclusively**
168:23
**excuse** 27:21
52:10 83:17
151:16 195:24
204:14 217:22
**executive** 42:1
43:22 44:3
45:16 47:5

81:14 96:10
136:12 137:16
138:17 214:22
219:19 259:23
**exempt** 51:1,2
**exhibit** 3:6,7,9
3:10,11,12,13
3:14,15,16,17
3:18,19,20
12:6,7,22
24:14,15,19
39:1,2,6 88:18
88:23 144:7,8
144:12 154:12
154:16 162:15
162:19 175:16
175:20 176:10
203:23 208:9
208:10,14
227:13,14,18
228:24 229:1,5
237:2,3,7
238:11 241:1,2
241:6 242:3
244:5,18,19,20
245:19,20,24
248:18
**exhibits** 12:14
12:14 228:25
**existing** 113:17
**exists** 160:24
245:11
**expanse** 42:19
**expect** 85:2

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[expectation - faith]**

expectation
  88:3,5 163:10
expectations
  132:1
expected  57:1
  160:18 165:18
  178:7 179:11
expecting
  155:22
expensive
  257:2
experience
  23:16 61:25
  62:16 63:19,25
  64:2,4 72:2
  76:19 199:21
  262:13
experienced
  21:22 75:24
  76:17,20 77:2
  258:21
experiences
  21:4 81:25
  82:1
experiencing
  99:17
explain  30:22
  183:1 200:10
  200:15 250:4,4
explained
  21:16,19 65:8
  76:11 121:20
  195:25
explaining
  138:11 153:9

explanation
  169:25
explicit  68:12
  68:19 69:21
  72:13 73:9
  94:24,24 95:16
  212:5,9
explicitly
  175:25
exploring
  98:12
express  85:25
  153:16
expressed
  63:21 67:22
  71:7 86:7
expressing
  63:12 66:17
  68:7 72:7
expressly
  153:25
extended  32:18
extent  54:21
  135:9 225:7
  227:10 258:10
external  33:10
  33:15
extremely
  254:15

**f**

face  77:22 78:6
facing  77:7
fact  20:12
  36:23 57:7
  73:11 83:3,4

83:16 94:4
99:22 101:16
102:10 108:17
128:3 138:9
142:2 146:5,16
146:18,22
153:19 158:20
163:7,19 165:2
166:15 167:25
168:19 171:18
171:21 172:8
179:18 180:1
181:8,9 182:15
183:4,18 189:7
189:23 190:21
191:7,16,17,21
191:25 192:3
192:15,22
193:13,16
194:8,21,25
195:5 198:25
203:6 205:16
206:4 211:17
220:25 222:6
224:1,2 226:1
238:2 246:20
250:5 253:18
259:1 262:2
facts  168:12
  183:6 195:17
  201:20
factual  258:8
failed  188:18
fails  265:19

failure  187:11
  187:13,24
  188:1
fair  32:21
  55:17 59:11
  74:3 93:6
  95:24 101:25
  102:7 163:11
  165:13 207:17
  213:12 220:8
  224:4 225:22
  225:25 235:11
  240:8 252:13
fairly  49:22
  260:15
fairness  167:6
  193:18 224:21
faith  109:15,19
  110:14,18
  113:23 114:3
  114:10 115:16
  117:11,14
  118:3,12,14,22
  118:23 119:8
  120:7 121:6,12
  121:19 123:23
  124:16 125:19
  127:13 128:10
  128:11 129:16
  129:18,25
  130:3,8,9,16
  132:23 139:22
  140:14,18,20
  142:24 145:24
  147:10 148:9

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[faith - filing]**

150:3,12 151:6
151:19 156:13
157:6,16,25
158:2,3 160:9
161:2 163:1
164:12 176:18
178:2 180:23
181:14,21
182:4,16 183:3
183:4,8,10,13
184:6,12,14
185:12,14,15
186:8,9,16,18
189:2,23 190:1
190:2,3,5,8,15
190:23 191:2,7
191:16 192:23
195:10 196:9
196:20,21
198:3,15,24
199:17 200:6,7
200:10,15
201:6,9,12,15
202:6,14,15,25
203:3 205:5,7
205:15,19
206:11,23
220:22 221:3,6
221:9
**faith's** 189:8
206:3
**fallout** 219:12
**false** 155:15,25
159:24 161:9
168:14 178:9

182:1 187:16
187:20 188:4,7
188:9,13
191:11 207:19
220:18,19,20
220:21 221:1,2
221:4,5 222:11
225:13,24
226:2,11
249:19
**falsely** 30:24
159:5,11,13,21
221:9 223:20
224:2 249:16
249:20 258:23
259:17
**familiar** 49:12
57:10 112:14
112:18,21,24
209:4 210:5,7
**familiarity**
167:12
**family** 19:14
156:14 158:1
**far** 9:9 11:15
18:23 21:20
35:17 43:18
44:18 46:2,22
48:4,14 61:24
63:18 66:22
81:1,12 82:1
95:9 104:2
134:6,6 137:1
141:3,25 142:7
153:23 155:11

155:16 168:2
176:25 181:24
188:14 191:5
193:23 212:19
215:17 218:19
219:13 220:2
222:19 257:4
**fast** 78:23
**fat** 71:11,13
212:15
**february** 81:3
90:11 91:3,9
91:11 174:3
209:9 251:15
**federal** 36:9
46:24
**federally** 258:6
258:15
**feel** 49:21 57:3
61:19 73:20,23
73:24 74:2
93:24 166:15
183:5
**feeling** 251:15
**feelings** 168:12
**fees** 262:20
**felony** 10:3
**felt** 22:19 57:25
58:25 59:20
73:14 78:9
85:20 92:25
93:22,23 94:5
168:12 172:12
181:15 183:13
199:15 205:5

214:13 215:15
253:15 260:14
**female** 95:1,9
96:25 97:11
98:5 99:16
103:2 212:21
**female's** 106:5
**females** 95:4,12
95:13,15 99:16
105:24 211:9
211:24 212:24
**fiction** 178:12
**fifty** 230:8
**fight** 254:5
**figure** 78:1
98:12,15 99:4
202:13 206:20
238:13
**file** 23:4,6 78:1
111:15,25
112:3,10
**filed** 98:14
162:6,13 165:2
174:15 176:2
209:2 218:23
219:7 220:4,7
224:4
**files** 163:20,21
164:5 165:21
167:16 261:4
**filing** 21:18
75:6 162:17
168:18 174:13
174:24 200:11
200:17 219:6

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[filing - forms]**

| | | | |
|---|---|---|---|
| 238:3 | 259:16 | **flipping** 228:24 | 188:22,23 |
| **filings** 233:13 | **firing** 168:6 | **flsa** 51:5 | 197:7 203:5 |
| 234:13 | 176:1 | **flushed** 135:15 | 242:1 263:6 |
| **filled** 89:19 | **firm** 4:14 | **fmla** 41:4 43:15 | **followed** 18:15 |
| **filling** 62:1 | 113:12 | 43:16,18,19,20 | 155:19 167:25 |
| 64:18 | **firmly** 137:18 | 45:6,13,13 | 168:20 172:17 |
| **finally** 262:18 | **first** 3:7 4:6 | 48:4 81:15,17 | 192:5,24 |
| **finance** 83:14 | 12:5,10 13:23 | 107:18 114:9 | 193:14 194:1 |
| **financial** 137:5 | 16:19 26:23,24 | 117:16 121:13 | 201:19 204:9 |
| 256:22 260:9 | 27:22 36:25 | 128:11 130:24 | 206:20 |
| 264:19 | 37:2,18 40:22 | 131:13 132:12 | **following** 37:25 |
| **financially** | 85:1 87:8 | 132:13,13 | 44:15 45:17 |
| 257:18 | 109:1 113:22 | 136:2,3,9,17,20 | 82:5 120:10 |
| **find** 18:10,12 | 114:17,19,25 | 137:1 138:16 | 142:23,25 |
| 21:5 98:17 | 116:23 118:16 | 139:13 146:1,4 | 147:8 148:20 |
| 110:16 178:22 | 123:18 125:16 | 147:15 148:9 | 183:2 228:13 |
| 201:5 207:13 | 130:6 131:22 | 173:17 177:15 | 229:10 235:14 |
| 254:4,11 | 148:20 149:16 | 182:22 184:18 | 236:3,15,19 |
| **fine** 5:6,7 9:5 | 155:11,16 | 215:18 251:14 | 239:10 243:23 |
| 119:6 | 156:6 157:12 | 251:21 252:7 | 254:16 |
| **finish** 198:10 | 157:13,16 | 252:15,17 | **follows** 4:8 |
| **finishing** | 158:22 160:23 | 254:1 | **followup** 45:6 |
| 171:14 | 161:8 164:11 | **focused** 19:16 | 138:21 145:19 |
| **fire** 166:23 | 170:23 181:1 | 104:7 128:11 | 170:24 |
| 170:20,22 | 194:9,10 224:1 | 128:11,12 | **forbidding** |
| 207:14 260:3 | 242:13 249:18 | **focusing** 138:8 | 141:12 |
| **fired** 22:23 | 249:18,23 | **folks** 131:12 | **foregoing** |
| 74:5,7,9 83:2,5 | 251:22 254:5 | **follow** 44:5 | 264:7,13 267:5 |
| 83:11,19,25 | 255:25 | 45:20 115:23 | **foremost** 7:24 |
| 84:2 164:10 | **fit** 62:10 222:6 | 127:18 143:13 | **form** 98:25 |
| 166:1 167:8 | **five** 230:8 | 143:19 144:4 | 170:9 190:11 |
| 169:7 172:6 | **flat** 259:16 | 148:11,25 | 237:15 |
| 220:11 222:9 | **flesh** 85:17 | 149:4,8 152:14 | **former** 20:12 |
| 223:7,15 | **flip** 229:9 | 153:14 159:17 | **forms** 31:17 |
| 236:11 259:10 | | 159:21 166:16 | |

**[forth - getting]**

forth   57:22
  81:11 84:10
  92:19 94:11
  119:25 133:14
  137:25 154:7
  163:1 183:24
  192:15 204:19
  264:9
forward   5:4
  9:23 109:11,15
  109:19,21
  110:7,14,18
  120:20 122:17
  160:8 163:2,11
  169:5 183:21
found   142:1
  146:19
foundation
  151:7 161:17
four   29:15
  150:1 232:20
framework
  119:1
francis   35:1,2,5
franklin's
  130:12,15
  132:25
frankly   142:12
frazier   2:8 3:3
  4:10,13 12:5,9
  12:19,20 16:3
  16:12,15 24:13
  24:17 38:25
  39:4 54:24
  56:5,10,13

88:20 102:3,5
  111:5,8,10
  144:6,10
  154:14 175:9
  175:14 190:13
  190:14 192:1
  198:12 202:19
  202:22 205:2
  208:8,12
  227:12,16
  228:23 229:3
  234:8,12,22,25
  235:3,7,9
  237:1,5 240:25
  241:4 244:22
  245:18,22
  258:13 263:4,8
french   6:13
frequently   56:2
  248:7
friday   1:16
friends   82:18
friendship
  73:19
front   140:10
  162:16 203:24
  221:20
frustrated
  77:23
frustration
  66:17 67:23
  68:1,8 72:7
  86:1,7 161:24
fsas   42:18
  119:22

full   27:15,20
  28:4,7,17,24
  38:16 40:6
  43:5,6,11
  48:15 61:17
  64:10,13
  137:19,21
  138:25 167:1
  228:13 257:23
  264:14
fully   9:15 159:1
functions   34:8
  40:17 113:24
  114:5 121:5,7
  121:8,17
  126:23,23
  142:24 149:6
  157:17 174:20
fund   138:5
funds   256:2
funnel   136:14
further   78:4
  114:24 126:23
  151:25 152:16
  153:14 264:17

**g**

g   4:2,23
gallagher   138:6
gap   32:25
  34:15
gather   17:6
gender   5:22
  6:23 7:8 94:16
  94:22 96:1,21
  97:6,8,18,23

98:5,6,10,21
  99:5,7,24
  100:25 103:7
  108:3 111:24
  112:9 210:10
  210:17 211:15
  211:22 213:14
  214:14,19
  215:1
general   20:4
  80:25 118:25
  146:16 209:16
  225:15 226:12
generalist
  20:16,16,18
  38:6,19 40:15
  64:14 86:18
  87:9,16 90:8
  167:11
generalized
  225:23
generally   60:24
  60:25 95:4
  99:4 104:7
  110:15 167:14
  174:12 177:22
  205:14 211:19
generous   85:8
gestures   8:14
getting   22:19
  61:18,19,23
  64:4,11 82:16
  83:19 86:8
  90:2 92:5 97:8
  98:9 107:14,23

**[getting - graham]**

108:2,14
136:10 161:20
164:7 166:1
167:8 171:2,3
174:9,17 194:6
252:19 254:17
255:17,21
**give** 72:20 77:3
97:20 124:4
140:22 146:14
146:15,17
149:16 151:12
160:22,22
189:15
**given** 40:19
62:6 135:15
161:5 165:10
173:3 194:12
195:19 267:9
**giving** 85:8
92:4 93:25
94:1 137:11
138:8 184:2
187:7 195:10
**glenn** 115:7,14
**go** 5:2,4,8,12
7:21,22 9:23
16:4,7 18:12
18:23 40:21
43:24,25 44:4
45:19 48:14
52:13 53:23
56:5,10,10
70:7 72:1
73:12,13,14

82:21 84:15
86:3 89:14
90:10 104:6
109:11 111:5,5
111:8,8 117:15
130:17 132:21
134:6 135:6
137:13,15
138:17 139:12
139:12,13
140:3,9 143:16
147:5,7 148:7
149:3,5,14,20
149:21,21
151:9,9 152:8
156:1 163:1,19
163:19 166:23
172:3 175:9
177:14 186:25
194:23 196:15
196:16 198:11
203:19,23
209:7 222:7
225:18 228:5,9
228:23 238:11
240:10 241:25
242:3 244:4,5
245:13 248:17
251:11,12
254:1 257:5
261:3
**goes** 21:20
46:22 63:18
82:2 134:6
142:7 153:23

168:3 176:17
178:5 181:24
182:19 191:5
215:18 219:13
220:2 222:19
223:7 257:5
**going** 6:12 14:4
14:12 22:10
23:20 42:5
57:2,5 64:11
64:15 73:23,25
74:1,2,4 76:7
81:13 82:7,15
84:10,13 86:16
87:18 90:19
100:1 107:19
109:11 110:1,2
113:1 116:7
118:21 120:17
123:22 124:15
126:2,6 128:19
129:25 130:17
131:9 132:21
134:23,24,25
135:2,3,22
137:11 138:22
139:12,12,13
140:14,19,20
141:2 142:10
143:12 146:9
147:23 149:3,4
152:6,19 153:4
153:9 155:8
158:13 160:7,9
160:10 162:24

163:2,11,11
171:16,17
172:5,6 176:9
181:13 184:22
187:6 194:2,18
199:1,23 204:9
209:6 221:13
227:3 228:24
233:14 235:14
242:23 244:18
249:15 251:10
254:14 255:13
260:5,6
**gonzales** 74:2
106:25
**good** 4:11,12
50:5,10 82:1
85:15 103:5
109:15,19
110:14,18
160:9 163:1
164:12 175:12
189:11 194:1
222:13,16,20
222:21
**graft** 249:15
250:15,25
251:1,24
**graham** 1:4,12
3:13,16,17,18
3:19,20 4:5,11
4:22 5:1 39:17
40:22 185:22
209:9 220:17
221:17 237:11

**[graham - healthy]**

242:11 262:19 265:4,5 266:1 266:2,24 267:1 267:2,4,12

**graham's** 3:9 209:14 258:5 258:15

**grant** 32:3,9,10

**grateful** 251:24

**great** 110:5 187:4 221:25 223:23

**grievance** 192:19 194:16

**gross** 229:22 230:23 231:8

**ground** 7:21

**grounds** 189:4 191:11

**group** 7:9 75:25 81:1 105:23 117:3,4 117:10 123:19 129:10 134:25 140:10,16 156:8 157:2

**groups** 119:24

**growth** 84:23 85:16 86:1 110:3

**guess** 17:13 24:24 31:6 71:23 116:15 121:15 122:19 144:20 148:5

206:6 216:7 232:2 233:14 254:19

**guests** 127:4

**guidance** 90:3

**guidebook** 132:7 133:10 133:12

**guidebooks** 133:17

**guidelines** 165:19

**guy** 97:2

**guys** 97:2

| h |
| --- |

**h** 3:5 4:22,23 266:3

**hag** 71:2

**half** 116:14 125:21 127:17 166:2 189:10 193:18 196:8 196:12,25 198:6 199:11 202:2 204:17 207:12,22 230:19 236:9 242:14 243:16

**hand** 101:6 134:8 194:19

**handed** 12:21 24:18 39:5 88:22 144:11 150:7 154:15 154:22,23

155:7 156:3 163:14 185:7 195:13 196:8 197:1 199:12 204:17 208:13 227:17 229:4 237:6 241:5 245:23

**handled** 44:23

**handling** 45:2

**handwritten** 150:25

**hang** 234:18,18

**happen** 26:22 27:18 85:4 116:7,8 126:6 135:1 142:10 199:4

**happened** 21:20 26:23 30:22 78:13 79:5 80:5 89:20 171:21 174:24 189:16 214:5 217:8,15 218:20

**happening** 92:23 159:3,4 165:20,21

**happy** 9:5 148:11

**harassed** 215:16

**harassing** 69:17 213:10

**harassment** 58:24 69:19 73:6 74:17 109:3 186:15 213:24 214:2 216:1,5,12 217:20 219:10

**hard** 159:3 222:20 232:1

**harm** 225:11 225:23

**harmed** 222:12 222:17 226:15

**harmful** 224:3 226:3,22 259:12,19

**harming** 225:9

**hawaii** 41:25 79:13 118:18 122:22 132:7,9 133:22,23 134:2 136:23 137:1 149:22 214:23 216:1 259:24

**head** 8:13 115:4 117:24

**heads** 259:10

**health** 48:15,17 249:23 250:18 250:20 251:10 253:10 254:25 255:2 256:12

**healthy** 252:6

hear 102:17,25 212:19 259:4
heard 69:17 83:8,16 95:1,2 95:10 101:3,5 101:8 102:20 103:8 104:7 105:16 178:19 194:15
hearing 6:20 95:3 100:14
heart 100:2
held 36:16
help 177:16 227:11 255:20
helped 89:24
hereto 267:7
hesitant 22:12
hey 125:6,14 146:10 203:6 206:22 223:22
high 35:13,15 260:24,25
higher 231:14 255:16
hindsight 63:5
hired 27:22,23 30:7 37:21 38:3 52:3 61:16 62:22 85:2,3 90:8 186:20
hires 114:12
historical 138:8 166:5 171:22

172:23 189:10 193:19 195:18
hit 257:8,8,23
hmm 12:23 13:8 15:1 16:21 29:21 49:8 53:18 89:17 145:22 156:18 170:19 203:8 204:2 208:15 210:13 214:24 221:15 232:3 236:25 237:17 238:10 241:16 242:5,7 246:17 247:11 248:19
hmsa 133:25
hoe 71:2
holdings 1:8 4:15 265:4 266:1 267:1
hollingsworth 2:4 15:4
homecare 41:2
honest 242:2
honolulu 122:21 149:22 214:23
hoping 85:4 221:21
hospice 1:7 4:15 18:6 20:14 21:24 37:15 41:2

48:19 69:14,22 79:5 85:14 112:19 113:1 113:11 115:8 117:5 138:3,4 139:25 160:18 160:20 164:14 217:10 256:13 265:4 266:1 267:1
hospices 110:1
hostile 59:17 90:18,21 91:2 91:24 92:3 93:2,4,9,16,20 93:23 94:3,13 94:20 209:12 210:5,15,20 211:4,9,19
hostility 59:1
hotline 74:1
hour 16:7 51:19 119:11 119:15 120:6 247:2,19
hourly 50:18 50:19 51:17 52:8 56:14 57:4,8 87:10 87:14 247:25 262:22 263:2
hours 9:14 22:20 116:16 118:10 132:20 132:25 133:2,4

135:20 139:15 140:18 146:8 147:8 189:9,10 248:13
hr 20:16,18 34:7,9 36:21 38:6 40:14 47:16,21,24 50:4 57:14 64:12,13 71:17 72:6 73:13 83:21 86:17,17 87:15 101:7 106:9 112:25 113:25 114:2,2 114:14 117:10 118:6 130:7 139:24 156:8 156:13,16,17 157:2,24 158:7 158:7,17,18 160:17 161:25 163:18,20 165:18,19 166:25 167:11 167:23 171:10 172:22 185:19 192:13,25 243:10,16 244:12 261:3,8 261:14,17
hsa 119:22
hsas 42:18 47:14

**[huge - indicative]**

huge   107:19
233:25
huh   8:17,17
202:21 203:15
human   33:25
34:5 36:18
38:19 90:14
113:17,20
116:11 209:13
210:6
humiliating
72:15 261:2
hurriedly
155:8
hypothetical
190:18

**i**

idea   159:6
180:22 239:25
identification
12:8 24:16
39:3 88:19
144:9 154:13
208:11 227:15
229:2 237:4
241:3 244:21
245:21
identities   18:3
idiot   97:1
idiots   97:3
ignored   166:6
iii   243:10
illness   252:1,6
imagine   8:16
134:23

imc   255:12
256:21 257:3
immediate
168:10 192:19
immediately
74:13 80:17
155:13 160:12
168:10,21
207:14 255:24
257:10
immunosupp...
250:21 255:10
255:19
immunosupp...
9:18 250:15
255:11 256:20
immunosupp...
255:22 256:10
immunosupp...
257:15
impact   250:20
impacted
171:13 253:20
253:21 260:23
260:24
impacting
254:21
impacts   250:20
impair   9:14
imperative
191:13,16
impertinent
8:22
implementati...
32:9 41:1

46:10 61:4
implemented
46:10 49:23
164:7
implementing
47:6 138:13
implicit   163:5
impression
127:16
improvement
164:7 165:11
166:4 167:20
172:1
incentive   29:4
incidences
105:15
incident   77:19
80:8,11 160:1
187:18 188:6
213:1
incidents   84:6
include   29:16
91:16 144:19
144:20 247:25
included   22:9
137:5 180:19
includes   262:24
including   41:3
68:13 186:14
207:21 221:19
income   229:22
230:23,23
231:9 238:7
239:1 255:12

incoming
173:20,21
inconsistent
245:7
incorrect
156:24,25
233:21 253:20
incorrectly
233:11
increase   29:3,4
52:11 248:1
254:9
increased
28:18 253:1,23
262:8
increases   29:7
52:3,5
indicated   100:6
102:11 162:25
193:12 197:22
214:19 219:25
233:12
indicates   158:5
indicating
180:13
indication
75:22 101:19
155:22 167:8
183:17 194:12
261:5
indications
171:1
indicative
99:23

**[indirect - internal]**

indirect   98:3
indirectly
    104:25 105:23
    223:25
individual
    18:15 40:25
    93:5 103:6
    179:8
individually
    90:19 99:19
individuals
    105:24 114:4
    116:10 216:15
    218:23
inferior   99:2
informally
    69:11
information
    11:20 13:7
    18:10 20:8,10
    23:22,24 25:13
    43:24 44:4
    46:13 59:22
    66:23 68:25
    69:1 70:8
    74:16 82:22
    90:4 91:18,20
    92:5,19 93:1
    93:11 94:2
    107:21 108:2
    108:15 119:7
    123:4 124:9
    125:5 127:12
    134:22 136:14
    137:11 142:3

152:13 155:10
161:4,9,20
171:3 172:8
173:11,21
174:1,9,17
175:4 181:24
182:4,4,11
184:5,25 191:4
191:18 195:10
202:4 205:23
206:10 207:21
208:2 213:19
223:6 224:1
228:6,17
251:17,18
253:1 254:17
259:3
informed
    140:19 178:6
    178:13,14
    180:1 182:8
initial   3:15
    123:18 231:16
initially   31:2
    138:17 157:1
    224:14
initiate   69:12
initiated   73:10
innovations
    24:25 25:7,9
    25:10,17 26:2
    26:12 27:2,16
    29:16,23 30:8
    31:20 222:1
    240:22

input   76:13
    137:25 169:12
    169:20
inquire   72:2
inquiry   76:23
instance   35:17
    48:4 67:2,6
    68:10 71:1
    82:3 121:12,19
    164:2
instructed
    131:18 141:5
    170:6 189:3
instruction
    142:20 143:4
instructions
    130:22 135:15
    143:5 145:24
insufficient
    197:1
insurance
    10:10 17:12
    30:9,16,25
    31:22 42:3,4,5
    42:16,17,18,20
    42:22 43:3
    45:24 48:6,7
    48:15,17 52:16
    81:18 107:1
    115:6 116:24
    117:3,5 129:9
    134:3,15
    138:10 170:4
    224:5,12,24
    230:7 254:6,25

255:2 256:5,9
256:12 257:16
257:21 258:1
insure   48:11
intake   89:19,21
    250:17
intellectual
    95:5,17
intense   78:18
    93:22
intensity   79:20
intention
    148:22 149:7
    163:16 172:14
    172:18 188:21
    207:6,9
intentional
    91:14
intentionally
    24:6
interaction
    61:4 81:19
interactions
    185:16 187:3
interest   264:19
interested   63:7
    63:8,9
interesting
    163:18
interim   62:1
internal   58:9
    69:9 70:1
    74:19 161:15
    168:24 210:1
    252:23

**[international - job]**

international
5:22 6:12,15
35:22 242:14
243:16
internet 146:19
interpreted
160:4
interrogatories
3:8 13:5 14:7
14:21 15:9,11
15:18
interview 80:8
218:21
interviewed
80:15
intimidating
79:22
introduced
114:21 123:24
123:25 124:1
introducing
123:16,17,23
128:5
introduction
146:7
inundated
173:14
invariably
223:6
invented 180:9
investigate
189:14
investigated
201:20 209:14

investigation
58:23,25 68:22
69:6,9,13,13,15
70:1,11,16,19
73:2,4 74:17
74:19,20,22,25
75:17 76:7,12
80:7,24 81:1
108:18 161:22
164:18 168:24
169:2,8,13
174:4 186:14
194:23 216:12
216:18 217:20
218:7,12,16,19
218:21 219:10
219:14 259:2
investigations
58:6,9,9,12,14
223:13 252:23
investigator
75:15 224:24
invite 177:23
invited 66:21
66:22 91:19,23
118:8 147:17
148:3 173:4,9
involved 5:14
7:16,20 19:18
41:7,23 43:15
44:24 45:1
47:9 58:5,11
58:13 65:3,5
65:12,20,20
66:25 67:15,16

67:18 81:20
113:10 129:12
138:21 159:8
162:2 166:8
169:24 170:2
171:2 174:4
199:23 216:22
250:10
involvement
46:6 113:8
114:18
irrespective
179:24
issue 11:24
31:24 68:21
78:1 79:10,12
79:13 86:11
106:15 164:15
165:13 173:10
194:19 206:5
208:24 209:16
209:19 215:1
215:19
issues 19:23
21:19,22 22:1
22:2 42:7 44:9
44:13,16,19
45:8,18 58:2,5
84:18 99:11,13
99:15 101:11
111:1 122:14
138:13,20
155:23 159:8
160:11 164:9
189:12 193:20

194:2 199:22
260:21
items 147:3
itinerary
176:11,14,16
176:18

**j**

january 27:2
27:19 29:23
30:17 31:20
92:9 174:18
jerry 83:14,15
83:18
job 22:7,8,14
22:15,21 23:11
39:8 40:21,23
64:5,7,11,11
66:22 87:13
91:18 92:6,7
92:17 93:2,10
93:11 94:2
105:3,5,7
107:5,13
108:15 125:25
161:20 163:19
171:4 173:11
173:20 174:10
174:18 175:3,4
187:14 188:2
189:5 221:25
249:3,7 250:1
250:6,10 251:5
251:17,18
252:25 254:11
256:3

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[johnson - know]**

johnson 1:25
264:4,25
joint 147:19
148:4
judge 1:8,9
july 27:20,20
27:21 28:7
30:3,7,16
32:12,21 33:1
50:13,14 51:17
113:24 114:20
116:14,14,20
116:20 118:8
118:11,11
119:4,8 120:4
120:8 122:25
126:15,18,25
127:21,25
129:3,10,13,19
131:2,19 132:4
132:5,24 139:8
139:17 140:16
143:9,16,22
144:19,20,20
145:6 147:23
149:3,9 150:10
150:11,12
151:17 152:24
154:22 156:4,7
156:11,22
157:13 169:22
176:10,15,19
176:20,21
177:5,10,24
178:1,3,5

179:21 180:20
183:16 184:4,5
184:18,23
185:17 191:19
195:15,24
196:24,25
198:6 199:9,10
201:25 203:13
203:25 206:6,6
206:7 220:17
255:1,24
257:23
jump 165:6
168:9 193:24
june 110:11
122:6,7,20,21
199:20
junior 33:11

**k**

kaiser 134:3
katie 2:3,5 11:2
265:1,2
katrina 46:23
keep 7:22 72:24
77:9 137:6
150:8 151:10
kelly 114:1,6
114:23,24
115:2,3,16
117:22 120:3
121:5,6,14
123:25 124:16
124:18,24
126:8,22 127:2
128:2,8,12,21

129:6,12 141:7
141:24 142:1,4
142:5,25 143:7
143:19 147:16
147:24 148:11
149:5 152:17
153:7,14
156:17 158:7
158:18 186:23
188:24
kept 23:6 78:13
key 117:2
keys 130:12
171:5,9
kidney 9:18
249:11 250:1,8
kind 42:21 70:7
71:15,15,20
73:19 74:3
75:17,23 78:4
79:17,19 85:22
89:19 90:3
92:3 96:12
98:12 99:23,25
100:4 117:13
119:24 125:15
126:22 134:5
138:7 153:9
154:5 159:10
161:16,16
165:4 171:25
174:5 182:13
193:4,4 194:23
199:19 212:18
251:14,17

252:22 253:2
kirton 1:19 2:9
4:14
kmclaw.com
2:11
knew 20:9 59:8
70:21 126:6
128:9 167:1
193:3 255:13
257:15
know 7:18 9:22
14:20 15:14
17:13,15 19:9
19:17 21:23
22:10,13,19,21
23:13 24:3
42:19 44:4
45:15,25 46:1
46:11,17,19
48:5,5 49:25
50:4,5,7,9 52:2
54:11,12,23
55:13 57:18,24
58:20 59:1,9
62:4,11,12
63:10 64:13,24
65:1,2,5,11,11
66:12,24 67:3
67:6,10,12,17
68:1,11,14,24
69:17,20 70:8
70:10,22,25,25
71:3,7,9,13,16
71:18,20 72:12
72:13,14,17,18

**[know - know]**

| | | | |
|---|---|---|---|
| 72:21 73:15 | 107:13,20 | 147:1,25 | 169:24,25 |
| 74:3,4 75:4,11 | 108:11,14 | 148:14,19,22 | 170:1,2,7,8,10 |
| 75:12,19 76:13 | 109:3,11,14,15 | 148:23,25 | 170:21,24 |
| 77:8,11,11,15 | 109:16,25 | 149:2,18,22,23 | 171:1,1,4,5,7 |
| 77:18,20 78:2 | 110:2,5 115:25 | 151:6,9,11,12 | 171:12,12,14 |
| 78:4,8,15,17,18 | 116:3,15 117:9 | 151:13,24,24 | 171:19,22,22 |
| 78:20,22,24 | 118:25 119:17 | 152:1,6,7,9,10 | 172:13,22,23 |
| 79:23 80:2,10 | 119:18,23 | 152:14,16,17 | 172:24 174:16 |
| 80:12,13 81:10 | 120:17,21 | 153:25 154:4,6 | 174:19 175:3,8 |
| 81:11,12,13,22 | 121:4,5,5,10,17 | 154:6 155:8,16 | 175:21 178:13 |
| 81:24,24,25 | 121:19 122:16 | 155:22 157:7,8 | 178:14 179:19 |
| 82:3,5,13,18,19 | 123:15,23 | 157:15 158:9 | 179:20,22 |
| 82:21,23,24 | 124:21,21 | 158:15 159:3,6 | 180:3,21 |
| 83:15,16,20,21 | 125:16,20,21 | 159:20 160:1,2 | 181:11,20,23 |
| 83:25 84:12,15 | 125:23 126:1,2 | 160:4,6,7,11,20 | 183:9,10,19 |
| 84:16 85:6,12 | 126:10,22 | 160:24 161:7 | 185:5,18,22,24 |
| 85:21,22 86:5 | 127:13,13,15 | 161:14,16,16 | 186:4,18,18,24 |
| 86:10,14,22 | 127:17,18 | 161:17,18,23 | 187:4 188:14 |
| 90:4,7 91:14 | 128:3,6,9,20 | 161:23,24,25 | 188:15 189:11 |
| 91:25 92:2,22 | 130:14,19,22 | 162:1,2,21,21 | 189:11,16,18 |
| 92:25 93:1,18 | 131:4 132:18 | 162:23,24 | 189:19 190:2,3 |
| 93:21,22 94:5 | 133:15,18 | 163:6,9,12,14 | 190:19,20 |
| 94:6 95:1,6,10 | 134:1,4,15,16 | 163:15,17,20 | 191:2,3,19,22 |
| 95:11,20,22 | 134:17,21,23 | 163:20,21,25 | 191:22,24 |
| 96:6,11,12 | 135:2,2,13,13 | 164:4,5,6,7,13 | 192:5 193:4,5 |
| 97:2 98:3,4,5,6 | 135:18,19 | 164:16,16,17 | 193:6,17,25,25 |
| 98:25 99:9,22 | 136:4,6,20 | 164:19,23 | 193:25,25 |
| 99:23,24 100:1 | 137:4,10,18,18 | 165:21,24,25 | 194:1,2,6,25,25 |
| 100:3 101:8,18 | 137:25 138:1,2 | 166:7,7,7,13,24 | 195:7,19,20 |
| 101:23 102:6 | 138:20,22,24 | 166:24 167:1,2 | 197:10,23 |
| 102:10 103:11 | 138:25 139:1,4 | 167:2,4,5,7,7 | 201:13 204:8 |
| 103:12 104:5,9 | 140:15 141:20 | 167:20,22 | 205:20,21,25 |
| 104:11,13,17 | 141:21,22,25 | 168:1,2,4,5,5,6 | 206:4,5 207:12 |
| 104:18 105:7 | 142:13,21,23 | 168:9,13 169:4 | 207:12,13,14 |
| 106:3 107:1,11 | 143:10,12 | 169:5,9,20,23 | 207:15,16,18 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[know - leeya]**

209:1 211:8,13
212:8,9,10,11
212:13,13,14
212:16 214:1
214:16 215:6
215:24 216:2,6
216:19,22
217:9,11,18,21
217:24,25
218:3,4,5,8,13
218:15,17
219:7,12
221:12 222:19
222:20 223:6,7
223:13 224:18
225:2,21
226:19,19
227:10 232:18
232:24 233:9
233:15 234:23
234:25 236:13
236:24 238:11
238:24 239:9
240:7 241:18
243:11,25
245:10 246:5
247:24 249:15
249:16,17,20
249:22 250:7,7
250:11,16,17
250:19,23
251:6,16,19,20
251:24,25
252:2,4,5,21,22
252:24 253:1,2

253:4,16,18,20
254:4,4,13,14
254:16,25
255:11,16,24
255:25 256:11
256:22 257:1,4
258:20,24
259:1,4,7,8,10
259:14,15,16
259:23 260:2,3
260:7,7,8,9,10
260:12,13,14
260:21,23,24
261:5,6,6,8,17
261:18,20,23
261:24 262:2,7
262:11,11,13
262:15
**knowingly**
187:16 188:4
**knowledge**
15:12,22 18:16
19:21 23:22
24:5 44:20
62:8 77:16
114:13 176:13
215:10,22
217:6 228:6
251:3 253:22
**known** 193:25
**krauter** 115:6,8
115:10 116:24
117:3 118:7,9
123:19,19
142:14 147:19

148:6

**l**

**l** 4:22 112:22
**labor** 10:9
11:22 17:10,11
32:9 52:13
53:24,25 54:5
223:12 227:9
254:7
**lack** 70:2
**ladonna** 214:25
216:4
**lady** 223:24
**laid** 40:13
**lake** 1:20 2:5
2:10 25:17,24
29:2 32:3,6,15
33:9,11,24
34:18,21 35:22
115:19 116:14
120:20,21
121:24 124:22
124:23 125:17
139:24 142:6
142:10,13,18
143:2 158:14
161:3 264:3
**language** 73:10
**larger** 171:17
**late** 6:6
**laughing** 71:2
**law** 2:4 4:14
8:4 11:5 51:14
**lawful** 187:14
188:2 189:5

**laws** 136:20,24
**lawsuit** 5:21,23
5:24 6:23,25
7:5,10 11:24
12:2,10 17:3
19:19 23:2
31:25 54:15,20
58:24 111:15
112:1,1,5,10
150:19,22
208:22,24
221:22 223:11
225:4,8
**lawsuits** 7:17
**league** 33:11
**leap** 92:13
**learn** 49:13
**learning** 50:3
**leave** 48:8
133:4 137:6,15
156:15 158:1
251:15 252:7
252:15,17
**leaving** 79:23
**led** 162:19
170:15
**leeya** 58:24
68:10,13,21,24
68:25 69:2,7
69:17 70:8,22
70:25 71:6,16
71:25 72:2,4
72:14,23 73:3
73:7,11,20,23
74:8 161:22

Page 34

**[leeya - looking]**

164:19 169:2
186:15 212:12
213:25 214:3,5
216:8,13,25
217:20,22
219:10 251:19
252:23 259:2
**leeya's** 169:8
169:13
**left** 12:15 24:8
31:18 51:17
52:4,12 63:10
74:13 106:25
115:9 143:23
**legal** 54:22
138:20 258:11
265:23
**letter** 3:13
137:4 155:6,7
155:10,13,24
159:1 163:15
175:16 180:19
182:7 188:11
188:12 205:3,4
206:7 223:9,23
225:7
**letters** 44:1
225:4
**level** 79:20
167:6 255:12
**liaison** 45:15
**liar** 190:1,6
**liberty** 45:24
138:7,10

**lie** 185:16
186:2,4 187:3
**lied** 190:8,17
190:24 191:1
226:25
**lieu** 221:20
**life** 42:17 252:2
**lifestyle** 252:2
**light** 81:6
171:21 235:8
**limit** 141:6,8
**limited** 41:3
82:23 221:19
**line** 60:16,18
65:9 234:2
238:8,16,16
239:3 240:1
243:4 244:23
244:24 245:6
266:4,7,10,13
266:16,19
**lines** 103:5
231:25 233:14
238:7
**linkedin** 18:10
**lisa** 5:1,6,7
12:21 24:18
39:5 79:4
82:12 111:11
115:11 130:6
130:11 144:11
185:21,22,22
185:24 208:13
217:1,2,5,23
227:17 241:5

**lisas** 185:20
**list** 24:2 121:11
121:18 216:20
217:4 227:22
**listed** 29:24
30:2 31:23
231:16 232:15
243:4
**listen** 72:12
**listening** 80:1
**lists** 230:22
**litany** 201:22
**literally** 57:24
**little** 24:10
36:22 38:13
69:3 78:21
90:7 91:10
123:20 171:16
174:6 229:19
231:15 232:14
234:1 260:20
262:5
**live** 124:22
**lived** 124:19,20
124:22
**lives** 37:16
**llc** 2:4
**loa** 114:9
128:12 147:15
148:9
**location** 44:2
46:1,2,19
96:11 163:22
219:19

**locations** 41:21
41:21 45:16
46:16 47:6
136:9 167:15
**long** 10:21 16:4
119:10,15
132:23 152:22
152:23 164:3
171:14
**longer** 25:8,17
171:9 216:3
217:10 218:10
261:6
**look** 15:17,19
24:22 29:20
39:13 89:6
145:21 163:20
163:21 203:23
205:3 213:7
221:16 231:1
234:19 235:5
237:10 242:3
244:17 260:13
260:14
**looked** 18:24
71:11 87:13
95:5 122:2,5
162:13 172:10
212:14
**looking** 13:10
19:2,8 20:8,10
28:4 29:22
71:9 79:6
94:18 113:3
120:19 144:25

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[looking - manager]**

145:1 155:24
183:20 241:11
256:22
**looks** 13:20
32:11,25 33:7
33:8,24 34:11
34:15 125:23
209:4,4,5
230:8 231:2
232:14 233:4
237:9 242:20
**loop** 67:20
99:25
**lose** 250:25
251:1 254:3
**losing** 187:5
251:5
**loss** 45:25
249:3,7
**lost** 221:19
227:4,5 250:1
250:6,7,13
251:8
**lot** 46:10 57:22
60:20 61:5
81:9,12 85:12
92:15 136:21
161:9 168:25
250:10 260:20
262:13
**lower** 232:14
234:1
**lunch** 16:7 82:5
111:12

**luncheon** 118:9
**lunches** 118:9
147:20 148:6
**lying** 135:11
181:19 205:19

**m**

**m** 4:23
**macy's** 33:25
34:4,16,20
46:14 63:6
**made** 13:7 17:7
17:20 19:12
28:16 59:10
60:4,7 73:2,20
76:1 79:3 80:2
90:24 94:5
98:10 100:21
101:2 106:4
108:18,20
115:25 135:5
161:15 163:7
172:4 178:6,15
179:10,17,25
180:1,4 182:5
183:4 185:4
191:11 208:22
209:22 213:7
214:1 221:2,4
222:11 226:2,7
226:12 236:11
250:12 259:14
261:5 262:6
267:5
**magistrate** 1:9

**magnified**
253:9
**mail** 173:21
176:11
**main** 42:16
67:4 81:13
107:17 108:4
117:2 119:20
119:20 173:16
173:18 174:20
195:2 255:17
**mainland**
41:25 132:6,9
133:10,22,22
**major** 132:8
134:15
**make** 8:22
22:22 25:14
77:14,16 79:1
82:4 88:11
98:24 99:3
103:8 130:18
136:18 137:9
139:5 148:25
149:15 159:24
179:14 187:16
188:4 190:12
202:16 239:18
**makes** 90:20
190:13 207:18
**makeup** 55:24
71:10 212:15
213:6
**making** 46:16
46:19 48:12

54:20 59:25
69:18 73:25
94:24 95:25
96:21 104:21
105:17 106:8
137:12 158:9
225:13 247:1
**male** 95:3,11
96:25 97:1
99:1,14 100:12
101:21 103:17
**males** 95:12
99:10,11
102:15 212:20
212:20 213:17
**malice** 258:5,9
258:14,19,25
259:21
**malicious**
259:11
**manage** 251:25
252:4
**managed** 136:5
**management**
45:24 47:16
138:11,12
187:12,25
**manager** 6:11
25:16 26:2
28:25 29:12,13
44:3 46:14
62:23 63:9
64:16,22 85:2
86:13,16,21,24
87:15,19 114:2

**[manager - meeting]**

136:13 137:17
156:16 158:7
158:17
**managers** 42:2
81:15
**manifestations**
253:23
**manner** 68:2
93:21 101:17
101:17 160:18
259:9
**manual** 160:17
165:19 167:23
192:13,25
193:14
**march** 89:12
91:7,9,11
109:5 174:16
**mark** 12:5
38:25 144:6
227:12 244:18
245:18
**marked** 12:7
12:22 24:13,15
24:19 39:2,6
88:18,23 144:8
144:12 154:12
154:15 208:8
208:10,14
227:14,18
228:24 229:1,4
237:1,3,6,11
240:25 241:2,6
244:20 245:20
245:23

**market** 6:12
**marketing**
33:10,15
**markets** 6:16
**married** 260:1
**match** 184:1
238:16
**matches** 246:21
246:22
**material** 147:2
**materials** 17:2
195:23 206:25
234:5
**math** 232:4
242:24 248:13
**matter** 4:15
12:12 96:25
173:9
**mcconkie** 1:19
2:9 4:14
**mean** 15:24
16:4 19:4
48:24 54:16
57:17 58:19
68:6,9 75:1
79:21 81:22
82:1 86:6
93:16 94:14
96:7 98:13
102:8 106:21
127:5 128:20
128:21 160:5
160:24 165:17
166:13,23
168:8 172:1,4

182:14 190:24
197:12 210:7
212:3 224:4
233:22,24
239:18 249:14
**meaning** 27:5
96:3
**means** 8:2 30:6
209:10 212:4
236:20
**meant** 90:22
**mechanically**
57:17
**media** 21:7
**mediation**
109:7,9
**medical** 37:16
42:4,14,16
43:3 46:24
107:20 119:20
133:13 156:15
158:1
**medically**
251:4
**medication**
250:22 255:10
255:18,19,22
257:9,11,13,22
257:24
**medications**
9:16,20 250:17
256:10,24,25
257:2
**meet** 10:21
116:11 119:8

123:1 127:13
128:10 129:15
129:18 131:12
132:23 139:16
140:21 141:22
142:4,17 147:8
147:16 152:17
176:18 178:2
255:13
**meeting** 10:23
11:1 63:21
66:9,13,15
67:22 113:22
113:23 115:1,5
115:6,12,13,13
115:18 116:22
116:23 117:2
118:7 120:16
120:20,21
122:14 123:19
124:5,7 125:18
125:19 126:20
127:17 129:8
129:22,23
130:1 139:23
139:23 140:3,5
140:6,7,8,9,11
140:13,14,16
140:25 142:8
142:14 143:6
145:19 147:19
148:5 149:10
149:13,14,17
150:10,12,12
152:22 153:20

**[meeting - mocking]**

154:2,5,25
156:8 157:2
158:23 159:2
161:7 176:12
181:2,2 183:21
188:24 189:16
196:9 198:16
199:8,10
**meetings** 66:21
67:1,9,11,13,15
86:6 91:19,23
92:22 118:5,15
126:4,5,14,22
127:1 129:11
145:9,10
147:18,24
148:3 158:15
173:5,10
176:15
**melany** 45:5
214:15 215:6,8
215:20,22
216:8 251:20
**member** 19:14
36:20 186:20
**memorandum**
80:14
**men** 103:5
104:3
**mention** 71:6
141:18
**mentioned** 6:22
11:18 42:9,10
64:2 76:25
80:16 84:1

87:2 88:6 92:4
93:18,25 99:10
102:14 105:6
106:22 114:16
115:1,14 116:9
117:5 118:14
132:18 136:7
139:10 141:24
150:4 173:2,23
189:13,13
198:16 213:6
216:1,4 260:21
**merced** 149:21
**merge** 135:3,3
**merged** 34:7
**merger** 116:5
186:20
**message** 19:2
**messages** 17:19
17:23,25 18:4
18:17,23,24
19:20 20:5
**met** 10:15,18
21:15 23:19
66:17 114:19
114:25 115:2
119:9 120:23
133:2 142:4
145:24 147:10
151:15,17
157:16 189:9
198:7 202:1
**mia** 114:2,8,16
114:19 115:3
115:16 117:20

120:3 121:6,13
122:25 123:24
124:2,16,24
126:8,22 127:2
127:21,25
128:11,16
129:12 141:7
141:24 142:7
142:17 143:1,7
143:19 147:16
148:10 149:5
152:17 153:7
153:14 156:16
158:7,17 161:1
180:23 184:24
185:5,11,14,15
185:23 186:9
186:15 188:25
220:22 221:4
**mia's** 185:7
**midamerican**
28:1,14
**middle** 5:10,11
171:14
**midyear** 246:8
246:11
**military** 152:2
**mind** 97:20
129:1 227:2
248:3
**mine** 18:14
206:2
**minimal** 149:24
257:1

**minimum** 51:8
**minute** 56:6
94:17 153:2
228:25 238:13
243:5 261:16
261:16
**minutes** 10:22
56:6 124:23
153:3
**misrepresent...**
158:20 179:18
**missed** 24:3
52:14
**missing** 92:13
92:16 174:19
200:25,25
**misstates** 102:1
202:17
**mistaking**
170:17
**mm** 12:23 13:8
15:1 16:21
29:21 49:8
53:18 89:17
145:22 156:18
170:19 203:8
204:2 208:15
210:13 214:24
221:15 232:3
236:25 237:17
238:10 241:16
242:5,7 246:17
247:11 248:19
**mocking** 71:7
72:15 103:9

212:23
**modified**
137:19 139:2
**moment** 14:4
15:25 36:2
79:9 88:6
159:7 164:9,10
189:22 211:14
211:21 262:15
**monetarily**
222:19
**money** 81:18
239:19,22
256:8
**monitored** 46:2
**monitoring**
253:2
**month** 33:17
66:2 122:11
160:6 199:20
255:15 256:2
261:23
**monthly** 45:25
48:5
**months** 49:25
62:17 261:15
**morning** 4:11
4:12 10:14,16
118:8 123:18
124:7 129:9,10
131:15 132:19
139:23 147:8
148:23 154:22
**move** 27:14
109:14,19,21

110:7,18
131:18 169:5
226:4
**moved** 6:14
82:8 176:20,25
177:2,4
**moving** 107:2
110:14
**multiple** 35:18
70:6 72:5
107:12 111:23
167:19 169:11
213:19 225:16
**myers** 113:23
114:3,10
115:16 117:11
117:14 118:4
118:12,14,22
118:24 120:7
121:19 125:19
129:16,18
130:3,8,9
132:4,23 135:9
140:18 150:3
150:12 151:19
156:13 157:6
157:25 158:2
161:2 176:18
178:2 180:24
183:8 185:14
185:15 186:19
189:2 190:17
190:23 192:23
195:10 198:4
198:15,24

199:17 200:6
200:10,15
201:6 202:14
203:1,3,7
204:4,14,15,20
204:22 220:22
221:3,6,9

**n**

**n** 2:1 3:1 4:2
**name** 4:13,20
5:2,10,11,12
21:4 27:10
57:11 60:5,8
112:18 117:22
178:20 219:2
222:13,16,21
264:23
**named** 88:17
**national** 210:11
**naturally**
249:22
**nature** 8:14
20:6 21:12,13
57:18,19 262:6
**necessarily**
52:22 78:25
116:8
**necessary**
152:19 267:6
**need** 9:4 152:13
200:10,19
212:5
**needed** 48:7
58:1 66:21
82:21 91:20

92:6,12,20
94:2 107:15
108:15 136:10
138:21 171:3,4
173:11 197:10
203:5 205:19
205:20 249:25
261:4
**needing** 252:14
**needs** 205:16
**negative** 59:17
96:1,13,20
97:5,5,7,18
98:21 100:12
103:21 110:20
**negatively**
98:19 260:23
**neither** 186:8
**nelson** 2:13
**nephrologist**
249:9,10 250:5
251:13
**neutral** 73:15
162:2
**never** 21:15
23:18,18 95:2
95:2 101:20
108:9 113:13
140:12 142:3,4
142:4 147:10
161:18 166:4
171:25 202:8
227:2 253:4,11
253:14

Elizabeth Graham - September 22, 2023

**[new - office]**

new 6:16 42:23
107:20 114:12
115:10,17
116:24 254:20
nextant 240:19
240:20 241:19
242:18 243:13
243:14
nextant's
257:25
nice 194:11
nods 8:13
115:4
non 27:15
33:13
nonexempt
50:22,24 51:11
normal 165:10
166:16
north 124:22
notarized
11:19,20 17:15
23:8,9,18
254:17
notary 267:13
267:19
note 14:24
16:22,24 26:25
89:15 156:3
265:10
noted 33:14
36:24 69:5
267:7
notes 10:7,11
11:18 125:21

135:13,20,25
150:1,4,6,10,11
150:13,15,15
150:19,21
151:3,4,7,24
152:9,12 172:9
172:11 184:19
184:21 186:5
189:17 195:14
195:14,15
196:9,12,16,16
197:1,18,21,22
197:23,24,24
198:6 199:12
202:2 204:18
207:22 208:19
218:15,17
264:12
notice 94:14
220:15 238:24
noticed 4:25
107:1 155:3
213:15
notified 109:6
260:11
notion 88:2,4
november 66:6
66:9 195:24
261:12
number 14:13
39:15,16
155:12 164:11
164:13 210:16
227:25 228:15
232:18,20

235:11 238:2
239:9,25
243:19 247:16
numbering
12:13
numbers 39:16
232:25 233:20
234:1 239:24
242:1 243:24
numerous
42:20,21
nuskin 5:22 6:1
6:8,10,23 7:5

**o**

o 4:2
o0o 3:21 4:3
263:13
oath 7:25 14:8
141:18 150:14
154:3 171:23
172:10 189:13
264:9
obese 71:11
212:15
object 190:11
objection 54:21
102:1 202:17
204:25 258:10
objections 15:7
obligation 8:3
oblige 9:5
observed
211:18 213:14
obtained 52:20
52:25

obtaining 30:6
obvious 128:4
227:3
obviously 20:9
81:11 82:22
93:13 97:11
98:13 101:8
149:25 158:14
165:17 188:10
257:12
occasions 5:17
occurred
174:24
october 264:23
265:3
offer 87:9
123:14 127:6
offered 43:2,4
57:6 119:24
123:10 124:2
125:8
office 2:4 25:24
29:2 42:1
43:18,20 44:2
44:3 45:14
57:25 65:24
80:1 81:15
82:18,21 99:10
101:22 102:15
103:13 104:3,4
105:18,24
106:5 114:8
116:16 118:20
127:4 130:12
130:15,16

Page 40

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[office - okay]**

| | | | |
|---|---|---|---|
| 136:5,13 | 21:10,12 23:17 | 59:15 60:2,10 | 117:6,12 118:3 |
| 137:17 138:16 | 24:5,20 25:1,4 | 60:13,17,21 | 118:12,24 |
| 143:16 144:1 | 25:11,13,23 | 61:6 62:2,19 | 119:3,10,14 |
| 145:20 148:18 | 26:16,19,25 | 62:24 63:20 | 120:2,11,24 |
| 152:8 155:2,4 | 27:4,10 28:6 | 64:6,21 65:15 | 121:22 122:10 |
| 159:7 171:6,9 | 28:15,19,22 | 65:19,23,25 | 122:13,24 |
| 189:19,20 | 29:5,14,20 | 66:5,8,15 67:9 | 123:8 124:4 |
| 196:5 198:8 | 30:5,18,22 | 67:12,19 68:6 | 125:25 128:25 |
| 211:9,19,24 | 31:2,5,8,16,23 | 69:3,24 70:12 | 129:18,21 |
| 212:14,16,21 | 32:6,11,14,17 | 70:14 71:21 | 130:4 132:3,5 |
| 213:23 215:2 | 32:20,23 33:7 | 74:9,14,24 | 133:9 134:8 |
| 261:3,7,10 | 33:16,20,23 | 75:10,25 76:3 | 135:8 139:16 |
| **offices**  41:22 | 34:3,11,23 | 76:16,22 77:3 | 140:3 142:19 |
|   43:21 104:6 | 35:6,20 36:3,6 | 80:16,20,23 | 143:3 144:3,21 |
| **official**  69:8 | 36:14,17,22 | 82:8 83:23 | 145:2,5,15,18 |
|   72:1 | 37:4,7,12,21 | 84:3,17 85:25 | 145:21 146:25 |
| **oftentimes** | 38:7,11,14,18 | 87:1 88:1,14 | 147:7,13 148:1 |
|   72:22 | 38:24 39:10,13 | 89:2,6,11,14 | 148:16 150:8 |
| **oh**  51:1 61:14 | 39:20,24 40:4 | 90:6,17 93:3 | 150:18 153:16 |
|   112:2 145:2 | 40:8,11,18,21 | 93:12 94:8,13 | 153:22 154:25 |
|   234:7 247:20 | 40:25 41:13 | 97:16 98:2 | 155:24 156:6 |
|   260:2 | 42:9,24 43:1 | 99:8,18,21 | 157:9,21,23 |
| **okay**  4:17,20 | 43:10,14 44:7 | 100:15 101:5 | 158:5 159:9 |
|   5:10,12,14,19 | 44:17,20 45:2 | 101:10,23 | 162:7 164:21 |
|   6:3,10,17,22 | 45:22 46:4,21 | 103:20 104:9 | 164:25 165:15 |
|   7:4,10 8:2,6,24 | 47:8,17,20 | 104:13,20 | 166:21 167:17 |
|   9:11,13,23 | 48:9,14,21,24 | 105:12 106:13 | 169:10 170:8 |
|   10:12,15,23 | 49:3,21 50:11 | 106:16,19 | 174:13 175:9 |
|   11:9,23 12:11 | 50:17 51:20,24 | 107:6,8 108:16 | 175:12,17 |
|   12:19 13:1,15 | 52:6,25 53:4,7 | 110:16,23 | 176:4,7,17 |
|   13:19 14:11,18 | 53:19 54:3,14 | 111:3 112:14 | 177:16,20 |
|   14:24 15:17,22 | 54:18,25 55:5 | 113:5,8,13,19 | 179:16 180:4 |
|   16:17 17:5,18 | 55:9,14,25 | 114:13 115:1 | 181:13,22 |
|   17:22 18:16,22 | 56:5,8,24 57:3 | 115:18,21 | 184:16 185:25 |
|   20:15,21,24 | 57:7,10 58:17 | 116:2,9,17,19 | 187:2,6 191:6 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[okay - organizations]**

192:18,21
194:5,20
195:16 196:18
197:5 198:11
199:5,7 200:24
201:14,18,21
201:24 202:5
202:23 203:2,9
203:23 204:6,9
204:13,22
207:20 208:1
208:21 209:1,6
209:24 210:4
210:10,14,18
211:25 212:8
212:22 213:12
213:22 214:3,8
214:21 215:6,9
215:22,25
216:10,21
217:5,14,18
218:5,9,22
219:8 220:2
221:7,13 222:2
223:4 224:16
225:22 226:14
227:24 228:5,9
228:22 229:9
229:19,25
230:17,22
231:1,14 232:7
232:10,12
233:3,17,20
234:24 235:2
235:14,22

236:19 237:10
237:23 238:6
239:6,9,23
240:10 241:10
242:6,10,13,17
242:20,23,24
243:15,19,22
244:4,14,17
245:13 246:2
246:13,23
247:5,23 248:2
248:5,17 249:1
249:5,10,12
250:4 251:3
252:10,13
255:8,20 257:7
258:3 260:17
262:18,24
263:2
**old** 104:9,11,13
104:13,19
250:9
**older** 105:6,24
**onboard**
107:15 137:19
**onboarding**
92:24 114:12
119:17 121:21
**once** 30:19 65:1
83:11 104:1
125:1 132:20
136:7 188:22
201:13 254:23
**ones** 36:1 40:16
57:23

**ongoing** 170:25
175:6 211:23
212:3,6 253:5
254:23 258:21
262:5
**onset** 106:23
**ooooo** 1:3 2:14
**open** 67:6
160:10 174:1
260:25
**opened** 130:15
**opening** 6:15
**openly** 103:2
**operations**
33:25 34:6,9
**opinion** 108:13
**opportunities**
84:23 85:9,15
85:24 86:2
106:20 109:25
**opportunity**
39:11 74:3
107:4,5 110:2
110:5 147:14
158:25 189:15
195:20
**opposite**
183:18
**opted** 255:8,9
**optima** 112:19
112:21
**optimal** 112:22
113:1,4,6,9,14
113:17,25
115:24 116:10

117:4,5,5,8
118:6,9,16
127:18 134:25
135:3 138:2
139:24 140:16
144:18 147:18
147:19 148:4,4
156:8 157:3
161:2 178:8
179:11 186:21
188:23 200:14
**optimal's**
114:14 156:13
156:16 157:24
158:6,17
**option** 133:12
139:3,5 168:7
257:20
**options** 134:16
136:25 257:20
**oral** 264:15
**ordeal** 249:16
**order** 48:6
91:20 92:6
205:25 255:10
256:24
**oregon** 122:18
136:24 149:22
**organization**
160:19 167:4
168:1,2 193:2
223:6
**organizations**
46:25

**[orientation - particulars]**

orientation
114:12 119:17
121:20,21
origin 210:11
originally 37:7
osha 35:25 36:6
46:11,15,18
81:15 85:13,17
ought 125:6,14
223:23
outside 20:2
57:25 100:5
104:4 189:19
overheard
68:18
overlapped
128:4
overlapping
33:8
oversaw 32:8
114:3 160:19
overseeing 34:5
121:12,13,15
overtime 51:8
171:11 248:7,9
248:11 260:22
overview 119:2
148:10
own 23:15
226:16
owned 113:11

**p**

p 2:1,1 4:2
p.m. 1:17
176:21 263:12

page 3:2,6
13:25 14:3,5
14:12,13,13,13
14:19,25 39:13
39:14,20 40:22
93:3 125:21
130:19 133:11
133:11 134:14
134:14 187:6
204:18 220:16
227:25 230:18
231:4,6 237:10
238:14 242:9
244:10 248:23
248:24 266:4,7
266:10,13,16
266:19
pages 16:19
23:15,16
133:18 150:1
196:9,12,25
198:6 199:11
202:2 207:22
paid 48:19,20
48:22 50:18,19
242:21 247:14
pain 248:21
249:13
panzer 2:3
12:17 16:11
54:21 56:8,12
102:1 190:11
198:10 202:17
204:25 234:11
234:18,24

235:2,5 258:10
263:6,10 265:1
paper 88:8
paperwork
20:25 23:5
44:1 110:9
132:13,15
136:10 224:17
par 95:6
paragraph
90:11 145:23
156:7 158:23
176:9 177:18
177:19 181:1,1
183:10 220:15
221:16 258:4
paragraphs
209:8
paramount
201:22
paraphrasing
109:17
parcel 173:5
pardon 60:6
104:10 112:15
122:3 149:9
150:20 192:8
198:19
pared 42:22
parenthetically
200:12
part 13:23
22:13 28:13
34:5 43:7 58:6
58:7 68:21

69:19 70:9,18
75:20,25 85:22
91:23 108:4
121:15,16
130:1 133:24
136:13 137:20
149:1 163:19
166:20 169:24
173:2,5,8,24
181:14 194:24
213:18 216:18
258:25 259:7
partially 33:8
participate
70:15
participated
161:21 169:1,7
216:11,14,24
217:19 218:6
219:9 259:1
participating
218:11
participation
164:18
particular
13:15 36:18
52:20 53:8
54:1 64:18
74:25 92:11
93:17 108:23
128:25 131:6
210:20
particulars
77:4

**[parties - phone]**

parties 19:10
264:18
partner 259:25
party 5:24 27:9
89:8 162:2
pass 174:18
passcodes
174:19 175:5,5
passed 215:8
passport 171:3
passwords
107:12,12
171:4 173:4
past 134:18
207:11 215:8
patients 37:16
pattern 103:12
211:7 213:20
pay 48:5,7,18
221:20 255:9
256:2
paying 255:14
255:17,21
262:22 263:2
paylocity 47:13
47:19 49:4,9
49:15,22 50:6
61:4 65:2,13
92:12 94:12
107:3 117:16
126:19 130:25
131:8,14
132:19,22
139:8,15
140:18 142:15

142:15 143:17
143:18 146:2,5
146:9,15,24
147:5,9,9
148:8,21,22
149:7 152:15
153:5,12,20,23
155:18 156:13
157:25 172:16
177:14,17,21
177:24 182:23
183:1,3
payments
48:12 137:12
payne 20:11,17
20:22 21:8,14
22:12,18,25
38:9 56:18
62:1,17 63:10
64:4,17 79:4
82:12 86:12
87:19 115:12
165:25 185:21
217:1,5
payne's 20:8
21:4
payroll 47:24
48:2,10 53:24
60:11,20 62:23
63:18,19 67:24
83:13,21,22
90:12 137:9
209:11
pda 137:1

pead 1:9
pen 135:24,24
pencil 135:24
pending 234:19
people 19:17
67:5 69:22
70:6 72:6,6
73:12 74:21
77:1 81:2
100:7 105:10
107:18 117:2
125:24 128:24
130:13 167:8
167:19 168:4
169:12 173:16
173:16 182:10
213:22,23
223:5,7 225:16
254:16
percent 22:9
48:25 52:11,20
52:23 53:1,6
53:17 116:8
214:20 217:4
233:11 235:13
247:21,25
248:3,6
percentage
48:22
perform 107:5
107:16 177:10
performance
165:11 166:4
171:25 193:23
260:25

period 142:5
174:2 252:23
260:22
periodically
67:17
permanently
61:16
permission
143:10
person 10:23
17:25 41:20
44:22 46:15
49:14 56:18
59:12 101:9
115:8 120:23
129:15 158:3
183:21 189:9
194:18 195:2
personal 164:7
167:20
personally
226:24
personnel
163:21 164:5
165:21 167:16
persons 18:2,3
pertains 186:12
pervasively
105:9
pet 42:20
petty 171:5
philosophy
138:25
phone 157:16
183:23

Page 44

**[phoning - preparedness]**

phoning 96:8
physical 212:10
212:24 213:4
250:18 253:21
253:23
physically 59:2
pick 12:15
139:21
piece 163:14
piecemeal
90:20
place 6:4,19
65:23 66:1
118:5 153:15
157:1 163:23
192:6,12,25
218:18 237:19
264:8
placed 264:9
plaintiff 1:5 2:2
6:1,24
plaintiff's 3:7
3:15 228:10
plaintiffs 7:4,7
plan 164:7
165:11 166:4
167:20 172:1
plans 107:2
plate 81:12
play 156:20
please 4:20
77:12 130:11
pleasure
120:19 183:19

plural 105:19
plus 52:15
53:21 171:15
239:16 254:9
pma 138:4
point 16:5,8
17:17 22:11
26:19 27:14
32:18 33:19
37:21 38:18
41:20 43:19,20
46:15 49:4,14
65:3 67:4
71:18 81:21
82:12 84:1,21
95:22 96:5
101:9 107:18
108:22 110:24
115:7 122:24
123:20 124:2,9
127:19 135:1
138:6 142:25
143:1 171:11
172:1 173:16
175:2,6 180:12
180:14,20
190:22 191:22
197:25 226:5
238:5 240:13
256:3,4
pointing 8:14
policies 52:19
160:16 163:17
163:17 165:19
166:16 167:3

167:12,21,24
172:22 192:13
193:1,15
political 34:24
poorly 212:15
portion 48:18
48:19,20,25
49:1 64:17
114:11 125:25
128:13 144:25
147:25 174:9
portions 61:1
position 3:10
6:14 20:13,15
26:2,17 29:11
29:23,24 31:23
31:24 33:12,21
37:1,3 40:9
41:18 56:19
57:6 61:8,10
61:20 62:15,18
62:25 63:4,6,7
63:9,9,11,14,16
63:23 64:12,13
64:23 67:23
83:22 84:24
86:13,16 87:10
87:15,23 90:9
92:5 128:13
187:5
positions 28:4
28:5 29:15
128:4 156:9
157:14,15,19

positive 108:11
108:12,12
183:24 187:11
187:24
possible 109:14
139:2,6
possibly 248:16
post 35:13,15
posted 62:15
posting 46:17
potential 12:3
113:2
pounds 250:14
precise 228:11
precluded
255:21
precursor
251:14
prefer 5:5
preference
12:17
prejudicial
166:10
premium 48:22
preparation
10:13 21:2
prepare 10:5
11:15 44:1
80:4,5 89:24
92:24 170:6
254:11
prepared 25:4
89:18
preparedness
47:1 85:19

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[preparedness - projects]**

114:7 121:16
122:23 128:14
147:15 148:10
171:15
**preparing** 93:6
132:18
**prepping** 41:23
**present** 2:13
10:25 11:7
187:11,24
**presentations**
206:2
**presented**
155:1,6 188:17
**pretend** 82:20
**pretty** 50:1
51:25 78:18
109:6 202:3
**preview** 146:8
**previous** 11:20
18:7,8,13 21:3
67:1,1
**previously** 5:15
10:8,18 11:19
13:12 20:9
38:9 92:21
93:25 105:20
117:4 142:8
207:21 255:17
**prior** 6:8 29:24
32:2 33:23
40:9 61:11
76:8 120:8
125:9,16 126:1
126:8,25 140:7

143:11 155:12
157:8 158:12
165:12 166:18
167:21 174:13
179:21 186:13
188:16 219:5
246:11 252:10
253:25 254:22
**private** 113:12
**privy** 181:23
**probably** 10:22
12:11 26:3
45:25 53:10
61:3 63:5 66:3
93:5 104:3
109:6 126:11
133:17 142:10
146:23 152:21
153:15 161:13
186:24 195:9
208:4 224:17
234:21 262:14
**problem** 167:9
192:19 194:17
**problems**
171:23
**procedurally**
167:5
**procedure**
132:13,15
134:5 136:3
163:23 168:8
192:6,11,15,25
194:24 199:21

**procedures**
41:3 160:16
163:17,17
165:19,20
167:3,13,24
172:22 192:14
192:14,17
193:1,1,14
**proceed** 9:11
160:8,9,10
162:24 171:19
**proceeding**
160:17
**proceedings**
223:11,12,16
224:5 264:7,11
264:15
**process** 30:22
109:11 164:4
166:7 172:3
253:17
**processes** 41:2
146:1 147:15
166:8 182:22
**produce** 22:24
24:1
**produced** 12:1
234:10,15,17
**production** 3:7
13:4,14,24
16:20 17:2
23:20
**productive**
109:10

**professional**
79:21 81:23
85:23 264:5
**proficient**
49:22 50:1,8
**program** 25:15
25:16 26:2
27:25 28:13,14
28:25 29:13
41:5,11,14
43:6 46:5,18
46:20 47:7
49:4,13 66:19
67:5 85:14,17
85:18,18,19
122:23 128:7
133:23,24,25
134:4 135:7
136:5 137:2
256:20
**programs**
27:25 41:2,5,7
42:3 46:7 47:9
47:10 107:20
133:13 134:7
134:10 135:4
**progression**
85:5
**progressive**
166:18 167:18
168:20 193:11
193:22
**project** 171:15
**projects** 85:16
85:20

**[promote - race]**

promote  99:1
promoted
    25:15 26:1,17
    61:8,10,20,23
    62:4 86:8
    246:9
promotion
    61:18 84:23
    246:19
promotions
    29:1,6
prompt  8:20
proper  160:17
protected
    210:8,16 258:6
    258:16
protocols
    165:10 166:16
proves  168:17
provide  9:21
    10:6 11:12
    13:7 18:1 23:7
    23:10 48:17
    50:9 66:23
    117:19 127:6
    144:17 149:23
    149:25 150:6
    156:12 157:24
    178:3 184:8
    260:10
provided  6:18
    12:1 17:2,9,11
    27:5,6 68:25
    74:16 121:11
    125:20 132:15

144:18 146:23
146:23 147:1
150:2,4,9,18,21
151:18 156:10
168:13 169:12
182:21 184:10
184:20 188:19
195:23 196:1
202:4 203:21
204:11 234:6
256:13 259:3
261:19
providing  6:17
    37:15,15 42:11
    42:13 59:23
    120:25
psychiatrist
    249:1
psychologist
    249:2
pto  254:8
public  225:15
    226:8,12
    267:19
publicly  223:1
    225:19
published
    223:1,3 225:24
purchase  255:5
purported  15:2
purports  15:7
    39:20
purpose  116:21
    116:23 129:22
    166:11 170:18

pursuant  52:18
pursuing  78:14
    78:14 224:25
pursuit  162:18
pushback
    154:4
put  39:16 81:2
    82:13 109:1,3
    109:4,17
    238:18 259:23
    259:24 260:1
putting  21:17
    167:19

**q**

qualified  53:16
    63:3,22
qualify  52:23
    98:7 255:11
quarter  26:24
question  9:2,4
    9:7,7 54:18
    55:18 70:18
    72:21 86:4
    97:21 98:23
    103:11,22
    105:14 125:3
    128:6 140:8
    152:2,3 162:10
    168:9 174:6,6
    174:7,21 175:1
    175:19 179:5
    180:15 182:17
    190:4,20
    192:21 193:10
    193:10,12

194:5,7 198:10
198:13 199:5
203:2,4 220:24
227:2 234:19
238:4 257:13
questioning
    172:2
questionnaire
    89:19,22
questions  8:12
    9:11 13:14
    14:7,15 41:25
    42:7 71:24
    133:16 134:18
    136:17 152:1
    152:10 169:13
    173:17 197:20
    209:6 258:3
    263:5
quick  175:19
    242:23 248:12
quickly  139:6
    208:6
quite  23:13
    70:17 75:1
    100:4 163:6
    180:15 182:12
    193:24 242:1
    248:9
quitting  71:19

**r**

r  2:1 4:2,23
    266:3,3
race  210:10

**[radio - recall]**

radio   189:20
raise   26:9
 52:20,24 53:2
 53:6,17 247:21
raised   26:20
raises   51:25
ran   223:21
rate   51:17 52:8
 248:13 262:22
rather   12:15
 63:14 137:20
 151:10 168:10
ratified   110:11
 122:6 199:20
reach   18:8 96:9
 118:23 119:3
 122:25 123:3
 123:12 126:1,8
 127:5 128:16
 143:10 156:15
 157:6 158:6,11
 158:18 173:16
 185:1
reached   21:9
 92:18 120:16
 124:8 125:12
 125:13
reaching
 141:16 158:16
 173:3
react   140:24
 151:22
reaction   59:11
 59:12 141:1
 151:23 164:19

252:24
reactions   78:18
read   80:13
 151:24,25
 159:1 178:23
 179:7 197:21
 197:23,24,24
 199:13 204:7,8
 209:3 223:23
 232:2 263:11
 265:9 267:5
reading   230:24
 232:1 236:14
ready   257:13
real   208:6
realize   12:11
 22:13
realized   163:15
really   19:16
 36:10 42:19
 45:4 46:8,9,12
 47:15 49:18
 53:12 58:1
 61:5,21,23
 62:11,20 65:5
 68:20 78:24
 79:14,19,24
 81:9 83:9,12
 85:15 87:25
 95:23 97:9,20
 99:4 100:1
 103:10 104:4
 106:3 108:9
 109:24 120:22
 121:8 131:24

135:12,17
137:2 142:16
146:10 153:8
159:1 165:12
182:12 186:3
190:19,19
194:17 199:25
200:19 207:10
208:25 249:23
250:14,19
251:9,24 252:4
253:9,16 257:2
259:11 260:24
reason   9:23
 14:14 22:4
 140:22 159:23
 165:1 179:17
 181:10,18,25
 183:7 185:3,15
 186:2,3,9,16
 188:12 204:6
 213:13 218:14
 224:23 225:3
 233:21 261:21
 265:11 266:6,9
 266:12,15,18
 266:21
reasonable
 187:14 188:2
 189:5
reasoning
 86:23
reasons   71:18
 168:16 170:10
 187:7 222:25

225:20
rebate   27:24,25
recall   6:21
 13:15 15:15
 21:7 22:2
 23:25 37:4,18
 37:24 40:8,10
 41:13 42:12,24
 44:10 45:2
 47:16 48:21
 49:2 51:16,22
 51:24 53:7
 55:2,6,12,24
 56:2 61:21
 62:21 63:12,17
 63:20 65:15,25
 66:5,17 67:21
 74:14 84:8
 86:19 88:3,4
 95:3,10,11,24
 96:2,19 99:13
 100:7,10,11,13
 100:17 102:19
 103:20 104:20
 105:8,13
 110:19 111:1
 111:11 117:18
 119:14 120:11
 125:15 142:19
 143:3 176:6,14
 181:4,6 209:18
 213:11 214:11
 216:11 224:15
 224:18

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[receipt - remark]**

receipt  265:18
receive  26:7
  31:17 52:7
  55:11,12 56:3
  117:6
received  13:2
  17:15 22:15
  26:16 29:6
  30:15 31:12
  34:23 35:10,14
  35:18,20 51:24
  52:16 53:7
  55:2,10 87:8
  94:6 150:13
  181:16 183:14
  205:6 232:8
  235:20 237:19
  237:20
receiving  230:6
  238:19 246:6
  246:10,24
  247:12
recently  34:7
recess  9:5 56:9
  111:7 175:13
reckless  258:5
  258:15
recognizable
  24:22
recognize
  12:24 39:7
  89:9 144:13
  208:16 227:19
  229:6 237:8
  241:7 245:25

recollection
  13:11 48:16
  126:13 148:13
recommend
  12:12
reconcile
  197:11
record  4:21
  7:23 8:18,23
  56:11 111:6,9
  203:23 261:16
  264:15
recorded  8:7
  185:12
records  193:7
recoup  254:10
recover  221:18
  262:19
recruiter  79:5
recruiters
  121:24
recruitment
  34:8
red  59:2
redo  203:22
refer  4:17 5:5
  150:14 210:7
  213:1 245:17
referenced
  265:6
references
  77:14,17
referred  80:6
  88:25

referring  68:4
  90:24 147:22
  150:15 158:16
  162:16 177:21
  179:9 183:11
  183:12 184:15
  185:24,25
  231:4 236:18
refers  4:25
reflect  229:21
reflected
  231:19
reflection
  246:14
refresh  13:11
refusal  187:13
  188:1
refused  189:4
refute  198:14
refuting  198:23
  200:5
regard  23:12
  58:5 63:25
  95:3 104:24
  120:14 127:9
  134:19 136:17
  142:24 160:11
  193:16 195:13
  205:11 223:14
  227:6 254:8
regarding  19:7
  19:21 20:1
  88:12 129:9
  133:8 167:18
  176:11 179:18

regards  228:2
registered
  264:5
regular  262:9
regularly  57:23
reinstated
  221:22 222:3
reinstatement
  221:20
relate  69:23
related  69:25
  134:9 187:17
  188:6 215:4
relating  215:3
  251:4
relation  215:19
relations  45:6
relationship
  57:17 58:18
  59:16 73:19
  81:8,23 110:18
relative  167:13
  264:18
relatively  29:14
relayed  184:5
  204:13 205:18
  212:13
release  163:9
religion  210:11
relocate  25:19
remain  28:15
  28:22 139:23
  140:13,20,25
remark  99:3

**[remarks - reschedule]**

**remarks** 95:14 96:1 103:9 104:21,23 105:9 106:17
**remember** 6:5 13:13,17 15:16 17:17 20:3 23:14 28:19 31:6 33:18 34:22 44:9,13 48:23 51:21 52:2 55:16,21 61:16,17 63:24 64:24,25 65:2 65:4,14 66:3,7 66:20 67:25 79:14 84:13,13 86:11,20,22 87:25 88:1 90:2 95:22 96:2,4,5,8 99:12,14,16 100:13,20 101:15 103:19 105:11 106:4 106:16,18 107:7 124:15 124:17,17 125:1 126:16 126:16 135:21 135:22 141:20 141:23 143:8,9 148:14 152:5 155:20 157:13 158:9 181:7

209:21 214:11 216:5 217:2 219:2 227:7 260:2 262:14
**remembered** 21:4
**remembering** 36:12
**remind** 122:2
**remote** 25:22
**reorganizing** 257:18
**rep** 115:17
**repeating** 151:10
**rephrase** 162:7
**replaced** 20:13 20:17
**replied** 22:18 70:13 120:18
**reply** 72:22 148:13,14 158:10
**report** 57:21 60:22 77:4 86:25 102:20 149:23 151:5 151:13 182:20 183:5,10,11 184:1,12,20 189:2 190:5 198:8 238:3 247:11
**reported** 1:25 60:15 76:16,17

80:17 125:17 125:18 179:1 181:15 182:21 183:14 184:23 186:5 189:23 189:24 190:23 191:1,7 199:10 205:6 247:7,16
**reporter** 8:8,13 191:14 263:7,9 264:5,6
**reporter's** 264:1
**reporting** 46:16 59:8,13 60:25 69:6 73:21 75:12 185:13 218:20 247:10
**reports** 45:25 86:21 185:11
**represent** 4:14 13:1
**representation** 156:21
**representative** 18:11 21:2 23:8 49:15,20 89:23 90:1 115:7,10,11 257:3
**represented** 202:3 221:10
**reputation** 222:13,16,20

224:3 225:9,11 225:23 226:3 226:15,16
**request** 8:11,15 19:5 43:23 44:23,25 145:4
**requested** 23:23,24 53:23 142:3,4 184:24 207:8 215:17 224:14 234:4 235:4 264:20 264:22
**requesting** 136:9 185:9 224:15
**requests** 3:7 13:4,7,14,24 16:20,23,25 17:6,19 23:21 136:17
**required** 46:12 46:20 48:18 53:1 58:23 69:14 107:12 107:12 167:21 167:22 168:2 254:1 267:13
**requirement** 46:24
**requirements** 46:18 66:22 256:23
**reschedule** 126:19,21

**[reschedule - rich]**

143:17 148:8
152:15 153:6
155:19 183:2
**rescheduled**
159:18
**rescheduling**
153:12
**research** 18:14
137:3
**resign** 22:18
**resignation**
74:12
**resigned** 74:10
74:12 214:6
**resigning** 22:21
**resolution**
109:12
**resolve** 73:12
163:3 199:3
206:1
**resolved** 108:9
**resolving** 78:24
**resource** 24:25
25:7,8,10,16
26:2,12 27:1,6
27:8,16 29:15
29:22 30:8
31:20 34:5
222:1 240:21
240:22
**resources**
33:25 36:18
38:19 90:14
113:17,21
116:12 209:13

210:6
**respect** 63:3,23
112:9 136:1
137:23 169:19
169:19
**respond** 8:12
15:25 21:10,25
148:12 172:7
173:22 181:6
197:12,13
**responded** 14:8
23:21 202:14
**responding**
13:13 181:7
**response** 15:8
17:6 73:15
145:3,15 201:6
**responses** 3:7
8:16,17 9:21
13:2,3,9,24
14:14,21 15:11
15:18,20 16:19
**responsibilities**
92:6 107:16
113:25 127:14
262:10
**responsibility**
137:5 167:2
251:25
**responsible**
41:1 121:6
**responsive**
17:19
**rest** 133:25
139:24 140:21

239:19
**restroom**
124:10,14,15
124:18 125:2,6
**result** 169:21
174:16 221:22
225:8 249:7
**resulted** 221:5
221:10 252:14
**resulting**
168:18
**resume** 3:9
**retaliate**
186:10,16
**retaliated**
200:7
**retaliating**
108:17 160:14
199:18
**retaliation** 94:4
108:5 109:2
111:24 160:5
161:11 168:18
168:25 169:1,3
170:15 173:8
173:24 175:8
175:21 199:15
199:17 200:3
200:11,16
201:7,10
202:12,15,23
250:11 252:21
258:21
**retaliatory**
221:17

**retired** 104:17
**retroactive**
31:13,15
**return** 228:16
229:7 231:5,20
233:19 235:17
236:21 237:9
241:8 243:18
244:1 245:5,17
246:1,13
265:13,17
**returned** 44:6
**returns** 228:21
**review** 15:15
16:6 22:21
39:11 134:12
146:5 147:14
195:23 228:20
236:22 264:20
264:21,22
265:7
**reviewed** 14:20
15:17,24 96:16
111:19 125:22
145:25 146:1
167:15,15
182:23 195:6
209:1
**reviewing** 40:8
146:9 161:8
**reviews** 16:14
**rfrazier** 2:11
**rich** 79:2,4 80:6
82:9 88:9
209:20 215:18

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[ridiculing - sandy]**

**ridiculing**
103:9 212:23
**ridiculous**
71:11
**right** 12:21
15:24 16:13
19:5 31:2,10
34:19 36:2
40:1 45:9
47:16 48:23
49:5 51:1,1,2
51:15 54:11
57:16,24 61:14
63:2 69:2
72:18 75:6,8
76:18 77:20
78:5,6,7 80:1
80:18,24 84:8
87:4 88:9
89:20 91:1,7
91:10 96:6
97:22 98:22
99:2 104:1,15
107:7 110:14
111:22 112:1
114:22,23,24
139:7 144:22
145:13 152:20
163:6 166:19
169:14 170:10
174:5,11 180:8
182:24 188:8
189:19 190:4
190:22 196:2,7
201:25 203:25

204:24 205:4
208:5 210:2
211:6 212:4,25
221:25 224:11
224:13 225:5
226:21 230:24
231:8,9,12,15
232:5 234:7
236:10,15
237:24 242:21
244:10 245:4,5
245:8 246:3
247:14 248:16
248:22 250:8
252:12,19,20
258:6,16
262:14 263:4
**risso** 115:7,14
**robert** 242:13
243:16
**role** 64:19
156:19
**roles** 40:13
**room** 114:20
123:16 124:12
125:9 130:20
130:21 133:1
139:11,20,21
140:20 204:10
**roughly** 29:15
**routine** 149:19
151:14
**routinely** 211:8
211:8

**rpr** 1:25 264:25
**rules** 7:21
**run** 20:4,7
45:25 208:5
**rushed** 159:2
**ryan** 2:8 4:13
97:1,3
**résumé** 24:24
25:2,11,14
27:1 29:20
36:24 62:21

**s**

**s** 2:1 3:5 4:2
237:15 266:3
**safety** 41:4
46:4,8,11,14,18
46:20,22 85:12
85:18,18 114:7
121:15 122:23
128:13 147:15
148:10
**salaried** 51:2
56:23 57:2
85:2 86:13,16
87:19
**salaries** 231:11
237:14,20
240:2 241:14
244:24
**salary** 26:14
50:18,25 234:2
245:14 246:6
246:19 247:25
**salt** 1:20 2:5,10
25:17,24 29:2

32:3,6,15 33:9
33:11,23 34:17
34:21 35:22
115:19 116:13
120:20,21
121:24 124:22
124:22 125:17
139:24 142:6
142:10,13,18
143:2 158:14
161:3 264:3
**sandy** 23:11
59:19 60:5,8
60:10,16 63:25
65:9,12 66:10
66:18 67:16,23
68:5,5,12,17,23
69:10,20 70:23
71:1,7 72:9,13
72:19,21,21
73:5,7,10,16,17
73:23 74:13,20
75:18,22 76:15
77:1,5,19
78:12 79:7,10
80:3,10 81:2,4
81:8,10 82:4,7
82:15,16 83:11
83:15,22 84:7
84:15,16,20
88:7,16 90:13
90:21 91:2
92:18 93:19
94:7,11,23
95:10,10 99:13

**[sandy - seems]**

100:20 103:8
103:13 104:19
108:7,7,9
111:4 115:13
124:19,21
144:24 161:15
168:24 169:20
169:20 177:24
186:13 209:11
210:14 211:7
213:24 214:14
215:3,4,15
217:3 218:9
219:16,20,23
**sandy's** 73:5
**sat** 69:1 89:22
118:19 148:18
149:2 162:21
**saw** 70:10
101:20 102:14
180:6,6 211:10
247:16
**saying** 68:14,17
69:24 72:15
73:22 75:11
86:22 96:25
97:19 98:18
100:11,17
101:12 102:21
103:2,4,20
125:6,14
135:10 143:8
146:10 158:20
158:21 164:23
168:22 180:7

189:4 190:15
190:17 191:1
197:12 198:4
201:2,10,12
203:6 207:24
209:18 211:5
214:9 226:11
231:21 236:7
236:10 239:16
258:18 260:2
**says** 22:17 27:1
32:2 34:23
39:14,17,21
40:23,25 82:24
89:7 143:11
154:7 156:17
176:1,17 178:5
178:13 181:14
182:8,19
184:22 204:23
205:4,4,7
220:16,25
221:16 228:9
231:7 235:14
236:3,14,15,19
237:14,15
238:22 240:11
242:13 243:21
244:6
**scenes** 170:1
**schedule** 238:8
**scheduled**
129:24 131:1
131:22,23
140:15,17

141:3 142:15
147:8,10,16,24
152:15 156:11
158:15
**scheduling**
130:25
**school** 35:14,15
**science** 34:24
**search** 17:5,18
17:23 18:9,17
**searched** 18:4
**searches** 20:4,7
**second** 35:4
82:13 90:10
101:5 145:23
176:9 237:10
249:22
**secondary**
35:13
**secondhand**
102:20 105:16
**secondly**
132:12
**see** 6:6 14:1,6,9
14:16 15:5,12
17:8 29:18
35:24 39:18,22
39:23 40:23
43:25 72:17
74:5,7 75:10
75:22 77:22
82:14 91:12
94:2 101:19
102:16 109:10
111:18 119:16

136:23 145:2
163:22 171:12
174:21 175:10
187:8 200:18
207:6 217:1
218:15 223:23
227:24 229:13
229:14,17,20
229:23 230:20
231:3 233:22
234:10,12,14
234:19 235:5
237:12,16
238:2,9,13
239:2 241:14
242:11 243:9
244:7,25 245:3
**seeing** 13:15
62:21 94:17
150:15 160:12
176:14 200:9
233:14 234:5
**seeking** 222:2
248:21
**seem** 157:18
185:8 238:18
239:24 248:2
248:15
**seemed** 78:21
108:13 161:17
**seems** 15:15
95:23 100:1
182:13 193:24
229:21 231:14
234:20 244:2

Page 53

**[seems - sitting]**

245:7 246:2
**seen** 13:11 22:8
  24:21 75:22
  154:17 176:3
  223:9,10 225:4
  249:1
**selected** 93:5
**selection** 42:15
  42:21
**send** 19:20 44:1
  44:2 148:13
**sending** 148:14
**sengthavichit...**
  58:24 68:11,13
  68:21,24 69:2
  70:23 74:8
  161:22 164:19
  169:2 212:12
  216:9,13
  219:11 251:20
  252:24 259:3
**senior** 79:5
**sense** 47:24
  62:9 85:8
  90:20 94:20
  96:21 97:5,18
  190:12,13
  202:16
**sent** 13:16
  145:5,6 149:11
  176:11 177:23
  195:10 203:25
  228:19,20
  265:14

**sentence**
  157:13 181:1
**separate** 137:1
**september** 1:16
  4:1 26:3,4 66:4
  254:13
**sequence** 52:2
**sequential**
  12:13
**service** 50:10
  91:20
**services** 238:17
  238:23 242:25
  247:8
**session** 176:20
  176:25
**set** 3:7 32:17
  50:8 204:18
  264:8
**sets** 192:15
  234:17
**setting** 204:19
**settle** 78:21
**settlement** 7:12
  7:14
**seven** 41:21,21
  49:25
**several** 16:22
  74:23 75:19
  76:20,25 103:9
  184:24 185:9
  228:21
**sex** 98:19 103:1
  111:24 210:11
  210:17 211:6

**sexual** 58:24
  59:9 69:17,19
  73:6 74:17
  186:14 212:9
  213:24 214:1
  216:1,4,12
  217:20 219:10
**sexually** 68:12
  68:19 69:19,20
  69:21 72:13
  73:9 94:24,24
  95:16 213:10
**shakes** 117:24
**shaking** 77:10
**shared** 71:16
  72:5 225:7
**sharing** 72:2,4
**shed** 235:7
**sheet** 146:16,18
  146:22 265:11
**shifted** 107:1
**shock** 155:21
**shocked** 155:9
**short** 126:4
**shorthand**
  264:5,12
**showed** 188:18
**shows** 238:25
  259:20
**shrm** 36:20
**sic** 112:19
  220:18
**side** 115:15
  174:6

**sign** 22:7,12,18
  263:11 265:12
**signature** 15:3
  15:3 39:21,21
  39:23 89:7,8,9
  89:10 264:20
  264:21,22,25
**signed** 11:23
  15:14 40:1,11
  89:11 93:15
  110:9 137:14
  265:20
**significant**
  51:25 85:21
  163:9 221:18
  250:14
**significantly**
  255:16
**signing** 15:16
  22:21 40:9
**signs** 76:14
**silence** 189:21
**silent** 72:20
  82:17 92:4
  94:1 161:18
**similar** 18:14
  21:3,22 126:7
  126:24 262:3
**simply** 134:8
  140:13 141:1,3
  180:6 189:8
**sit** 96:3
**sitting** 16:13
  78:6 114:21,22
  114:23,24

**[sitting - spot]**

115:2,3,9,9
147:4
**situation** 21:19
45:6 70:22
79:7 93:17
160:24 170:2
172:25 173:13
183:18 195:3
253:5,8,11,14
260:12,14
**situations**
18:14
**six** 7:3,4 167:1
192:5
**skill** 50:8
**skills** 62:8 85:9
**slightly** 54:18
193:10 241:17
**small** 130:13
244:2 256:7
**smaller** 49:1
246:10
**software** 45:23
47:13,14,15
49:19 107:20
147:5
**solicit** 123:8
142:8
**soliciting** 125:5
141:16 182:3
**solutions**
265:23
**solve** 194:17
**somebody** 19:6
57:10 60:5,8

64:18 75:3,6
75:11,14 87:20
166:1,25
172:14 207:14
207:18 215:17
260:1
**somewhat**
165:7
**son** 19:18 20:2
**soon** 61:15
139:2 257:23
**sorry** 65:10
78:12 238:11
**sort** 17:22
18:12 21:22
22:21 69:9
78:21 85:13,16
118:20,24
135:6 136:11
143:10 149:5
152:8 172:7
193:6,20
194:10 207:14
209:3 252:4
260:8,9
**sought** 62:24
224:7,9
**sounds** 7:19
55:20 153:1
165:4 166:14
175:12 196:13
227:22 248:4
**source** 233:15
**sources** 240:16

**south** 1:19 2:4
2:9
**space** 77:21
78:5,8 79:24
130:14
**speak** 10:12
11:11 44:16
72:19,20 82:19
84:9 97:9,15
119:2 127:1,3
127:8 128:20
128:23 129:1
135:12,14,17
137:20 141:12
142:21,21
146:16 157:8
162:3 164:24
172:23 173:19
194:18 195:1,1
252:2
**speaking** 19:10
60:24,25 95:5
95:11,12 104:7
167:14 174:12
195:4
**specialist** 28:11
28:12,12 29:11
32:3 86:18
256:21
**specific** 13:7,17
44:9 52:22
85:16 96:6
114:4 127:24
131:11 134:15
142:20 212:2

227:7
**specifically**
32:7 36:21
67:25 91:2
95:4 97:12
101:15,23
102:13 109:15
124:18 125:4
127:5,20 128:7
131:3,14,20
137:22 141:23
143:8 162:15
176:6 184:25
211:16,20
212:9,19
213:25
**specifics** 79:14
**speculating**
235:12
**speculation**
205:1
**speed** 118:21
**spell** 4:21
**spelled** 187:8
**spend** 147:4
**spent** 33:17
35:4
**spoke** 6:13
21:15 80:10
101:17 103:16
128:22 196:11
**spoken** 36:22
**spot** 22:3 166:1
168:6

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[spouse - sufficiently]**

**spouse** 259:25
259:25
**sr** 156:16 158:7
158:17
**st** 35:1,2,5
**staff** 34:9
219:20
**staffing** 27:6,9
27:9,11,15
37:3,4,10
242:16
**stalls** 125:2
**standard** 25:16
**start** 152:21
157:7,7 242:9
**started** 6:11,14
20:15 24:25
26:18 27:1,19
28:14 29:23
31:19 33:1
34:17 37:7,18
51:22 61:12
62:5 64:9
83:21 92:3,22
107:2 118:25
133:10 136:8
138:4,10 141:4
208:22 238:5
245:14 246:20
261:24
**starting** 12:15
14:12 106:24
123:22 195:9
252:21

**starts** 156:6
**state** 1:19 2:9
4:20 36:8,11
41:21 46:24
136:18,19,24
137:2 138:5
145:23 148:7
248:20,20
259:15 262:18
264:2
**stated** 240:4
**statement**
23:15,16 96:14
96:14,17,19
97:13 98:10
147:21,23
176:1,3 178:12
178:23,24,25
179:7,14,25
180:2,6,10,11
182:5,6,9
187:16 188:4
191:11 236:14
238:21
**statements**
11:20,24 17:14
19:11 23:9
97:7 180:18
220:18,19,20
220:21 225:24
226:2,11
**states** 1:1
176:10
**static** 28:23

**stating** 96:19
102:3 179:7
**stenographic...**
8:11
**step** 50:5,5 85:5
119:22,23
125:20,20
133:11,11
134:13,14,19
134:19 151:10
164:2 215:19
**stepped** 83:19
132:16 133:18
174:6
**stewart** 1:8
**stipulate** 12:13
**stop** 77:12 94:9
109:3 261:23
**stopped** 261:24
**straight** 168:15
**strange** 189:11
**street** 1:19 2:9
**stress** 250:10
250:24 251:6
251:22 252:5
252:13,17
253:23,24
254:21,21
255:1
**stressful** 253:5
254:15
**structured**
113:20
**struggle** 92:19

**struggling**
199:25
**stubs** 53:24
**stuff** 75:23
**stupid** 100:22
101:1 103:3
**subject** 51:4,13
210:14 228:11
**subjected**
209:11 214:13
**submit** 215:14
**submitted** 10:8
20:25 59:18
69:18 75:18
88:8 89:3 91:6
91:7 109:5
169:4 214:16
216:9 254:12
259:5
**subscribed**
264:23 267:14
**substance**
11:12 59:13
120:12 208:23
**substantial**
48:25
**sudden** 189:14
**suddenly** 194:3
261:2,14,22
**suffering**
248:22 249:13
253:25
**sufficiently**
207:22,24

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[suggest - talking]**

suggest 246:2

suggested 23:9
140:12 158:13
167:23

suggesting
73:18,22 91:22
140:10 207:20

suing 54:14
225:5

suite 1:20 2:10

summary 40:21
40:23 144:17
145:12 149:23
182:20 184:20
196:3

summer 53:11

supervised
60:22 136:6

supervisor
57:15,21 60:14
65:6 187:15
188:3 189:6
209:10

supervisors
97:2

supplemental
42:5,17

supplementary
119:21 132:8

supplied 12:3
205:24 206:10
206:25 207:21
228:17

supply 228:6

support 50:6
247:15

supposed 52:11
158:3 165:22

supposedly
179:10

sure 8:22 13:21
13:22 15:25
16:2,4,11 19:1
24:12 33:13
46:16,19 53:12
54:9 55:15,19
61:23 66:14
70:17,20 72:6
75:1 98:8
103:10 116:8
131:24 136:18
137:9 141:10
144:5 148:25
149:16 153:8
156:2 162:9,10
162:11,11
170:1 180:16
182:12 184:14
208:25 212:3,4
213:3 214:20
217:4 218:13
219:24 220:10
226:6 233:2,11
233:24 235:13
236:17,20
240:9 245:12
248:6

surprise 83:7

surprised 83:1
83:9

suspect 102:24
238:6

suspend 172:21

suspended
160:16 163:16
165:9 166:9
171:11

suspension
164:2

swing 139:6

sworn 4:7 6:18
267:14

synopsis 42:11

system 138:12

systems 41:3,8

**t**

t 3:5 4:22 266:3
266:3

tacit 165:8,17
169:5

tacitly 199:1

take 6:3 9:17
16:5 56:6
65:23 71:20
74:11 77:9
83:20 118:5
133:1 135:19
135:24 151:9
159:3 173:1
175:10 214:6
250:22 252:15
263:10

taken 1:12,16
9:13 12:10
56:9 111:7
175:13 182:25
191:4 208:19
262:21 264:8
264:11

talk 22:20
84:15 90:6
94:17 119:4
127:25 142:20
143:6 152:8
156:1 180:25
189:15 201:23
202:10 203:11
208:6 221:13
256:21

talked 86:6
146:3 151:8
188:10 196:13
197:8 201:25
203:10 205:17
211:11 219:25
223:13

talking 14:16
62:13 66:13,16
71:25 72:25
78:2 84:14,19
87:3 96:24
97:12 101:21
106:8 111:18
111:20 124:24
126:17 141:11
162:15 175:15
177:13 184:3

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[talking - thanksgiving]**

193:11 202:24
204:10 208:2
210:18 212:5
239:17 257:14
**tasked** 117:10
**tax** 228:16,21
229:7,12
230:19 231:5
231:20 233:13
233:18 234:13
234:17 235:17
236:21 237:9
238:3,3 241:8
241:10 242:8
243:18 244:1
245:5,17 246:1
246:13
**taxes** 3:16,17
3:18,19,20
**team** 34:10
50:4,6 113:17
113:21 116:12
117:10 118:6
118:10,16
123:17 125:17
139:24,25
140:21 146:24
161:2,3
**teams** 119:2
**technically**
83:13
**ted** 1:8
**telephone**
120:6 183:23

**telephonic**
119:12
**tell** 4:7 8:3 16:9
41:18 59:7
68:8 76:22
134:12 149:13
264:10
**telling** 75:4
79:15 197:8,9
197:13,15
200:10,15
202:14 206:12
206:19
**temp** 27:19
29:17 30:7
**temporary** 27:3
27:4,15,23
29:11 37:8,19
38:3,8 241:21
241:24
**ten** 23:16
116:16
**tendency** 78:17
**tense** 252:24
**term** 32:17
70:2 93:13,15
94:13 166:17
**terminated**
22:3 30:23
53:10 54:9,10
96:9 110:22
122:12 158:24
159:4 168:21
169:17,21,25
193:21 194:4

196:22 199:20
215:12,21,23
217:12 218:3
218:11 219:5
219:16,21
220:3,17,23
224:20 249:17
249:20 253:17
254:24 258:22
258:23 259:18
260:5
**termination**
21:20 154:21
155:9 161:7
162:5,19
163:14 164:3
165:3,7,12
166:19 167:21
168:10,17
170:15 172:25
175:16,22
180:19 181:2
187:8 192:17
192:20 205:4
206:7 219:4
221:5,11 223:1
223:9 225:20
235:15 236:3,8
236:15,16,20
239:10 252:10
252:15,18
253:19,24,25
254:3,22
**terms** 20:5
32:21

**terrific** 81:10
**testified** 4:8
17:1 40:5
105:19 162:11
169:11,12
177:9 184:11
247:1
**testifies** 15:10
**testify** 9:14
**testimonies**
254:17
**testimony** 6:17
6:18 10:6
11:12 93:14
102:2,4 128:15
170:17 182:7
202:18,20
206:18 237:18
264:15 265:9
265:18 267:8
**texas** 136:20
**text** 17:19,23
17:24 18:4,17
18:23,24 19:2
19:20 20:5
**texting** 21:9
**thank** 148:15
262:12
**thanked** 120:18
183:18
**thanking**
120:16
**thanksgiving**
171:8

**[therapist - three]**

| | | | |
|---|---|---|---|
| **therapist** 249:2 | **think** 9:21 | 143:24 146:3 | 236:2,6,12 |
| **thereof** 264:16 | 11:17 12:16 | 146:14,16 | 240:1 246:8,18 |
| **thermwise** 28:1 | 17:16 20:7 | 147:1 149:15 | 247:1,4,21 |
| **thing** 9:6 14:24 | 21:9 23:15 | 150:1 155:16 | 253:7,12 |
| 38:5 84:25 | 26:23 27:12,12 | 160:13,14,14 | 254:12,23,23 |
| 86:14 101:13 | 28:2 29:2,18 | 160:21,21 | 256:14 259:11 |
| 104:1 106:19 | 36:2,11,19 | 161:12,12,13 | 259:22 |
| 112:9 123:18 | 40:5 41:22 | 162:20 164:22 | **thinking** 30:11 |
| 126:7 135:23 | 42:10 44:24,25 | 165:16 166:6 | 106:3 |
| 151:14 152:11 | 45:4 46:23 | 166:10,11,22 | **third** 27:9 |
| 153:4,24 | 47:2,14,15 | 169:11 170:23 | 39:13 89:12 |
| 164:23 175:24 | 50:11,24 51:19 | 171:18 173:8 | 101:6 231:6 |
| 194:9 201:23 | 52:9,14 53:13 | 174:22 175:22 | **thirdly** 164:16 |
| 209:4 234:12 | 53:14 54:16 | 181:8 182:2,5 | **thoroughly** |
| 237:2 238:4 | 58:4,22,25 | 182:18 183:12 | 159:2 |
| 240:24 249:18 | 61:2,15,21 | 184:12 185:18 | **thought** 57:2 |
| 251:23 | 62:4 66:3,9 | 185:20 186:21 | 62:6,9 63:11 |
| **things** 4:25 | 67:14,19 69:18 | 189:7 190:13 | 64:15 79:23 |
| 8:14 47:9 | 76:9 77:19 | 191:13,15 | 140:11 173:24 |
| 57:19 60:22 | 80:4,12 82:16 | 192:4,6 193:7 | 177:9 184:11 |
| 77:5 81:17 | 84:25 86:3,9,9 | 193:9,11,17 | 203:16 206:11 |
| 82:7,15 90:8 | 86:10,11 87:2 | 194:9,22 195:6 | 233:12 260:11 |
| 97:25 102:9 | 90:2 91:5 93:4 | 195:17,18,19 | **three** 9:17 |
| 111:14 139:6 | 93:8,8,20 | 197:3 200:3,24 | 29:18,19 53:14 |
| 143:7 151:19 | 94:23 95:21,22 | 200:24 203:21 | 113:2,25 116:9 |
| 155:25 170:25 | 99:1,22 100:20 | 205:12,20 | 117:4 121:9 |
| 171:5,16,17 | 102:10 105:21 | 207:4,17 209:9 | 131:6 136:25 |
| 173:1,4 182:18 | 105:23 108:8,9 | 214:16,22 | 153:2,3 185:19 |
| 186:11,17 | 109:5,7 110:10 | 215:4 216:19 | 187:7 189:9 |
| 187:20 198:14 | 111:23,23 | 217:3 219:1,3 | 193:20 196:8 |
| 201:22 203:12 | 112:22 113:1 | 219:18 222:6 | 196:12,25 |
| 205:15 214:9 | 116:6 120:22 | 226:1,1 227:6 | 198:6 199:11 |
| 221:10 222:18 | 121:20 122:21 | 230:18 231:23 | 202:2 204:17 |
| 225:4 253:3 | 126:18 128:5,5 | 233:25 234:3 | 207:22 248:3 |
| 262:5 | 135:5 136:7 | 234:16,17 | 256:24 259:17 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[throat - towards]**

throat 112:17
thursday 156:7
176:10
tie 98:24 165:2
239:24
tied 60:20 97:8
97:18
ties 162:4
175:20,25
176:5 211:20
211:22
tight 71:12,14
130:14 212:17
time 7:19 9:5
16:13 22:11
23:12 27:15,20
28:4,7,17,20,23
28:24 29:3,16
30:7 31:18,19
33:5,8,9,16,23
34:16 36:19
38:16,21 40:6
41:11,19 42:13
42:22,25 43:5
43:6,7,11,22
45:3 48:15,23
50:20 51:25
52:3 55:12
56:1 58:1,17
61:5,6,11,17
62:12,17 64:10
64:13,25 67:21
74:1 76:8 80:7
81:21,24 82:20
85:7 91:6 92:8

96:5 100:10
110:5 111:2
113:2 114:19
114:25 116:1
118:2,16 119:8
121:7,25
122:13 125:12
126:2,3,4,10,25
137:12,19,20
137:21 138:25
139:1 140:1
142:5,12 143:1
143:12 147:4
147:23 152:20
155:6 157:6,16
158:4,14 161:8
162:25 165:25
173:15 178:18
187:1 194:25
195:1 197:9
203:4 209:15
209:19 215:21
227:3 246:11
247:2 250:9
251:9,13
252:23 253:3
253:13 254:11
256:3 257:23
260:22,24
264:8,9 265:19
timeframe
265:8
timeline 84:9
185:8 200:22
207:5 209:5

252:20
times 8:20
59:15 83:10
95:21 184:24
185:9
timing 116:4,5
tips 231:11
234:2 237:14
237:20 240:2
241:14 244:24
tired 72:12
title 20:20 28:8
29:8,10 38:19
38:21,23 87:15
today 4:18 5:4
7:25 9:24 10:6
11:12 12:11
16:4 36:23
93:14 177:9
together 21:17
46:25 74:4
98:24 99:19
149:2 162:22
176:1,5
told 69:7,10
73:24 74:11
84:14 86:5
126:13 155:5
157:20 179:2,6
179:20 180:5
181:9,10
182:10 190:16
192:23 196:24
197:10,14
198:5,7,14

199:6,7,15,16
200:2,6 201:5
201:19 202:1,9
202:11 203:16
205:7,18
206:14
tomorrow
132:21,22
139:14 146:7
146:11
took 38:8 47:1
47:2 64:22
66:1 75:20
82:5 149:17
152:12 157:1
218:18 238:12
251:15 257:8
257:22
top 145:1,16
toronto 34:25
35:8
total 162:21
227:8 230:23
231:8 238:7
239:1,1
totally 108:10
160:15
toward 94:9
95:17 187:12
187:25 260:13
towards 21:1
61:2 63:11
68:24 72:22
81:19 103:16
107:2 108:10

**[towards - turner]**

110:21 116:25
222:8,22 251:7
260:14
**traditional**
82:6
**train** 49:20
130:9,9,18
132:3 135:9
136:1 137:22
139:7,17
140:17 158:2,3
159:15 168:14
172:13,15
176:18 184:6
189:2 190:23
191:8 206:24
**trained** 135:14
153:19 159:15
182:21 183:5
200:16 204:23
**training** 34:8
35:14,25 36:6
42:1 49:15,16
49:18 81:15
107:15 117:7,9
117:11,13,19
118:1,3,22
119:1 120:25
122:22 126:5
127:6 130:2
131:1,8,22,23
133:7 134:22
139:21 140:1
141:3 143:18
144:18 145:13

147:2,9,9,11
148:8,21,21,23
149:1,8,21
150:2 151:6,12
151:18 152:21
153:14 155:17
155:17,18
156:10,12
157:7,24
159:15,18
172:15,16,18
176:20,25
177:10,14,17
177:22,25
178:3 181:15
181:16 182:20
183:1,3,13,14
183:16 184:3,8
184:10,17
188:18,20,21
188:22 197:14
198:2 203:21
204:3,10,19
205:5,6,11,14
207:8,9
**trainings**
131:18 191:20
**transcribed**
233:10 264:12
**transcript**
17:12 264:14
265:6,20 267:5
267:8
**transcription**
264:13

**transition**
28:16 65:13
66:23,25 67:15
91:17 94:12
106:23 107:19
156:20
**transitioned**
28:6 65:1
138:7
**translation**
6:11
**transplant** 9:18
249:11,14
250:1,8 251:4
253:11,12,15
**travel** 22:9,10
**traveled** 116:10
**treat** 68:8
**treated** 68:2
72:8,9 101:16
102:15 103:16
173:6 193:7
259:22 260:15
260:15,18
261:13 262:7
262:16
**treatment**
72:20 82:17
92:4 94:1
104:2,3 161:19
163:12
**trial** 7:11
**tried** 78:19
**trinet** 243:10
243:16 244:12

**true** 15:11,22
40:7 59:14
78:11 148:2
172:14 180:20
264:14 267:8
**truth** 4:7,7,8
8:3 206:12
264:10,10,11
**try** 123:1 140:3
**trying** 8:22
17:16 28:2
47:14 55:19
73:11 78:1,9
78:10 79:17
91:18 93:9
95:21 98:12,14
98:17 99:4
100:2 109:20
123:3 124:8
128:16 131:12
139:4 172:13
175:3 180:17
183:2 195:17
197:7,11
200:23 201:8
201:18,21
202:13 206:19
206:20 221:1
241:25 254:4,4
254:10
**ts** 1:7
**turn** 16:18
24:10 230:17
**turner** 27:13

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[two - unprofessional]**

| | | | |
|---|---|---|---|
| **two** 13:22 29:1 | 220:5 259:6 | **undermining** | 69:13 73:1 |
| 29:3,18 53:14 | **uh** 8:17,17 | 107:8,14 | 80:13,20 81:1 |
| 65:19 83:10 | 202:21 203:15 | **understand** | 83:12 85:3 |
| 98:24 118:10 | **ui** 11:21 141:19 | 7:24 8:6 9:2 | 86:15 96:9 |
| 119:25 130:13 | 150:14 168:8 | 13:23 14:11 | 114:10 116:7 |
| 132:25 133:2,4 | 169:25 170:3 | 19:2 37:12 | 125:4 127:22 |
| 134:7 135:20 | 182:6,9 197:22 | 55:18 56:21,22 | 146:23 157:17 |
| 139:14 140:17 | 223:10,12 | 70:17 77:24 | 177:1,8 179:1 |
| 146:7 147:8,20 | 230:2,4 236:1 | 83:10 94:25 | 179:8 185:14 |
| 148:6 164:13 | 238:5,22,22 | 97:21 116:21 | 238:19 259:8 |
| 166:2 175:25 | 239:21 247:14 | 117:12 121:7 | **unemployment** |
| 176:5 182:18 | 255:24,25 | 129:21 141:15 | 10:10 17:12 |
| 189:9 193:18 | **ul** 88:13 | 154:19 178:1 | 30:9,16,19,25 |
| 197:12 200:23 | **ultimately** 74:9 | 179:5 196:19 | 31:12,16,22 |
| 206:2,2 207:11 | 220:23 | 199:25 200:22 | 170:4 223:22 |
| 232:25 234:16 | **unable** 105:7 | 201:8,18 | 224:5,9,10,12 |
| 256:25 261:15 | **unannounced** | 206:18,19 | 224:23 230:7 |
| **typewrite** | 77:8,21 | 208:18,21 | 238:20,25 |
| 151:3 | **uncomfortable** | 220:24 221:2 | 239:14 243:1 |
| **typewritten** | 73:21 181:17 | 231:18 255:20 | 247:17 254:6 |
| 150:24 151:1 | 183:15,17 | 256:18 | 256:5 |
| **typically** 5:7 | **under** 7:25 | **understanding** | **unexpected** |
| 15:8 89:18 | 14:8 54:9 | 30:18 56:17,24 | 130:10 |
| **typo** 148:5 | 83:13,14,20 | 68:16 87:18,22 | **unfairly** 249:21 |
| 209:10 233:1 | 141:18 150:14 | 100:9 113:16 | 253:17 |
| | 154:3 167:21 | 113:20 131:17 | **unfortunate** |
| **u** | 171:23 172:10 | 165:1 167:10 | 215:9 |
| **uald** 88:13,21 | 189:13,13 | 167:18 177:20 | **unfortunately** |
| 89:4,23,25 | 199:21 231:11 | 199:4 202:20 | 160:1 |
| 109:4 110:8 | 250:24 251:16 | **understood** 9:3 | **unique** 73:19 |
| 111:21 112:4,6 | 257:4 264:9 | 9:8 40:11 | **united** 1:1 |
| 160:2 161:12 | **undermine** | 44:18 52:18 | **university** |
| 162:5 163:9 | 107:10 | 53:5 54:6 | 34:25 35:8 |
| 168:23 198:22 | **undermined** | 56:22 57:5 | **unprofessional** |
| 199:19 202:12 | 108:11 | 61:24 64:3,6 | 108:10 |
| 214:17 218:24 | | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[unruffled - want]**

| | | | |
|---|---|---|---|
| unruffled | 265:15 | verify 265:9 | 161:25 209:13 |

unruffled
161:16
unusual 170:23
171:20 199:21
upcoming
156:8,10 157:2
176:12
updating
134:22
ups 167:19
upset 59:21
70:25 72:18,23
urinate 71:5
use 12:13 16:12
47:11 93:13,15
213:15
used 47:12,12
47:13,13,13
49:3,5 103:14
138:5,6 265:20
userra 152:2,6
153:8
using 20:5
47:18 49:19
73:25 94:13
105:8 106:2
138:10
usual 171:20
usually 152:7
utah 1:2,20 2:5
2:10 36:5,13
96:11 116:10
116:22 219:19
238:17 242:25
259:15 264:2

**v**

v 1:6 265:4
266:1 267:1
vacation 92:10
171:8
variance
231:21 232:17
233:4,23 240:6
240:8 244:2
245:9,10
variation 38:13
various 47:8
veracity 15:19
verbal 59:19
80:2 88:7,11
143:21 154:7
163:24 166:3
171:24 183:17
187:17 188:5
191:19 193:4,5
193:22 194:14
195:11 207:7
211:24 260:8
verbally 8:12
144:2 145:20
148:18 186:7
188:19 194:12
196:25 198:7
204:13
verbatim
109:16
verge 83:18
verification
15:9,13

verify 265:9
veritext 1:13
265:14,23
veritext.com
265:15
versions 80:5
versus 182:7
victim 75:9,15
view 135:8
157:10 158:19
180:20 188:10
191:22 192:2
196:23 211:18
226:16,17,18
violation 165:8
violations
259:17
virtually 49:5
vision 42:14
119:20 133:13
visit 126:9,9,11
129:13 142:11
142:13 144:18
147:25 156:11
157:8 188:23
voluntarily
182:10,15
225:9,11
volunteer
33:12,20
volunteering
182:4
vp 90:14 114:1
114:6 156:16
158:7,18

**w**

w 234:3,4,5
235:19 236:6
237:15,20
242:8 244:9
246:21,22
wage 29:3,4
31:21 51:9
52:3,5,11
247:25 254:9
wages 31:18
221:19 227:4,5
230:8 231:1,11
234:2 237:14
237:19 239:6
240:2 241:14
244:24
wait 140:8
waived 264:21
walk 82:19
walked 130:16
159:7 160:13
161:5 207:4
walking 79:6
want 16:12,18
16:23 40:21
87:2 90:6,6
126:19,21
143:17,18
152:9,13,14
153:6 175:18
175:24 208:5
221:13 226:4
229:19 246:23

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[want - wertz]**

259:4 260:3
263:7,9
**wanted** 23:4
73:12 78:11,16
109:2 118:19
118:20 127:21
127:24 129:1
130:2,2,9
131:24 139:22
140:4,13
149:15,16
156:10 174:1
194:23
**wants** 130:18
**warning**
163:24,25
220:18 222:10
259:18
**warnings** 166:3
166:3 171:24
171:24 193:5
260:7,8
**warren** 114:2
114:16,18,19
117:20 120:3
122:25 124:2
127:21,25
128:16 129:1
129:12 141:7
141:24 156:16
158:7,17 161:1
180:23 185:14
185:15,23
188:25 220:22
221:4

**warren's**
184:24
**waste** 227:3
**way** 28:10
30:23 55:2
57:23 59:17,20
60:17 69:20
71:8,9 72:16
94:21 95:8
97:6 101:14
109:10 124:17
133:7 153:1
170:8 173:6
182:1 203:19
206:6 217:19
222:12 224:19
226:10 234:8
238:18 252:6
254:20 256:12
257:4,5 262:7
**ways** 259:13
262:16
**wear** 212:17
**wearing** 71:12
71:13
**week** 248:13
**weeks** 248:14
**weight** 212:11
250:16,19
251:8 254:3
**wellness** 41:2,5
41:10,11,14
**went** 10:7,8
11:17 17:8,8,9
17:11,14,24

19:1 29:11
42:23 53:23
57:21 78:22,23
79:1,25 80:17
82:10 109:4,9
109:13 113:24
118:20,21
119:7,16,16,18
119:22,22
121:3,4 122:17
125:20 126:18
130:14,20
131:9,25 132:6
132:6,7,10,11
132:12,14,20
133:11,14,16
133:21 134:13
134:14,19
136:3 137:24
138:14 139:20
140:1,5 141:2
141:3 143:14
144:1 148:17
148:18 152:6
152:11 153:7
163:8 164:4,9
172:24 183:24
184:19 193:3
196:5 224:1
250:9 251:13
254:7 257:6
**wertz** 3:13 22:6
22:7 23:11
44:11,25 57:11
58:3,15 59:16

60:16 63:12,21
64:3 65:6,18
66:11 67:14,15
67:22 69:14
70:21 73:20,21
74:15 76:4,5
76:22 80:17
86:2 87:4,5,25
88:16 90:16
94:19 95:25
96:12 97:17
98:18 100:8
103:20,25
104:9,11 105:8
107:10 108:16
109:13 110:13
110:17 111:14
115:12 122:15
126:13 127:1
141:5 143:22
144:16,22
148:12 150:16
151:17 154:2
154:24 155:5
159:12,16,17
159:23 166:15
170:21 178:2
178:11 179:2,9
179:21,23
180:1,4,9,19,25
181:9,12,19,21
182:1,3 183:7
184:22 185:4,6
185:13 186:13
189:13,23,23

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[wertz - working]**

190:5,9,16,16
190:24 191:10
191:16,18
192:2 198:21
200:16 201:3,6
201:9,19
202:11,14
203:5,20 204:1
204:15 205:7
205:17 206:23
209:14,18
215:15 220:1
220:17,21,23
221:3,10
**wertz's** 171:6
**whatnot** 250:18
**whatsoever**
57:24 155:12
155:23 194:12
205:22 259:18
**white** 65:1
230:18
**whitney** 2:13
**wife** 22:20
**wig** 71:10
**wise** 252:20
**withdrawing**
160:3 198:22
**withheld** 23:22
23:24
**witness** 4:6
15:10 54:23
70:3 74:24
75:2,3 79:3
115:4 117:24

175:12 191:15
198:11 202:21
234:16 258:12
264:9 265:8,10
265:12,19
**witnessed** 69:1
**witnesses**
223:14 225:3
227:23
**woman** 95:19
97:24 100:22
101:1,14,24
102:7 103:14
211:18
**women** 99:1,4
100:8,18,19
102:11,12,22
102:24,25
103:1,4,6,10,15
103:21 104:2,8
105:17 211:19
212:10,13,16
**women's** 95:17
214:10
**wondering**
66:12 76:13
**word** 106:2
189:8
**words** 12:14
13:6 37:13
43:2 59:24
93:4,7 97:6
98:20,24
103:14 185:12
190:6 206:13

234:14
**wore** 213:6
**work** 20:21
25:17,18,23
36:11 44:6
45:21 46:25
51:6,7 61:2
82:22 90:18,22
91:2,24 92:3
93:2,4,9,16,20
93:23 94:3,14
107:9,10,14
108:12,12
109:20 110:24
110:25 122:17
136:21 138:25
139:2 160:11
165:5 185:8
187:12,17,25
188:6 189:12
193:23 209:12
210:5,15 214:3
222:19 242:17
248:7,13
250:15 251:21
260:25 262:8,9
**worked** 18:5
19:17 20:9
38:22 41:14
42:13 43:10
49:9,10 50:17
57:14 111:13
138:23 210:6
215:20 236:9
248:9 257:2

**worker** 18:8
19:7 20:12
72:3,5 100:12
178:6,20
**worker's**
121:14 131:13
177:15
**workers** 17:15
18:5,18,18
19:17 20:2
35:24 36:4,5
36:12 41:4
45:9,11,13,17
46:3 85:9,19
103:17 114:9
117:16 128:12
130:23,23,24
132:14 137:23
137:24 138:5
138:12,18
139:13 145:25
146:4 147:14
148:9 156:14
157:25 173:18
182:22 184:18
187:25
**workforce**
238:17,23
242:25 247:8
**working** 21:1
22:14 28:13,14
30:15 34:17
37:19 41:6
45:16 47:5
61:7 63:11

Page 65

**[working - zoumadakis's]**

64:12 77:15
83:12 116:25
137:19 138:14
141:4 165:25
173:15 186:21
215:10,12,13
217:10,17,25
218:2 228:13
230:13 232:13
240:12,14,18
251:20 262:25
**workplace**
96:24
**works** 215:7
216:2,3 218:10
**workshops**
36:16
**worrisome**
250:19
**wrap** 175:10
208:7
**wrapping**
115:15
**write** 96:14
167:19
**writing** 137:3
188:20 194:13
**written** 11:23
14:7,15 59:19
88:11 163:25
166:3 171:24
180:10,11
183:17 187:17
188:5 193:5,22
194:14 260:7

**wrong** 234:13
249:19
**wrongful** 219:4
**wrote** 169:24
170:18 180:7
182:1 183:21
184:1 218:16

---
**x**
---

**x** 3:1,5 264:20
**xavier** 35:1,3,5

---
**y**
---

**yeah** 12:17
13:13 21:15
28:18 29:10
30:10,13 31:14
31:14 33:12
35:17 36:10,11
38:2 46:8
47:23 49:6
50:1 51:3,6,10
51:10,10,16
52:9 54:13,23
58:13 60:24
72:4 73:5
74:18 75:5,16
76:5 77:5
80:25 83:9
87:6 89:21
90:2 91:4,8
101:7 103:4
104:16 111:20
116:5,13
117:23 119:13
125:11 129:4

140:9 141:9
146:6,12
147:22 148:6
149:12 151:4
151:21 159:14
162:7 174:12
174:25 175:2
180:13 216:15
223:14 228:20
229:15 231:17
232:21 233:6
233:23 234:12
235:7 239:4
240:7 243:7
244:2 246:18
247:13 248:10
248:11,16
252:21 256:16
262:13
**year** 22:15 28:7
35:4 37:25
47:1,2 53:10
67:2,7 91:10
91:17 92:25
109:8 122:8
171:14 174:2
186:22 228:13
230:15,19
235:24 236:9
239:19 241:10
241:11 242:8
246:3 248:14
255:1,3 257:22
**yearly** 246:19

**years** 104:18
166:2 167:1
192:5 193:19
207:12 229:12
250:9 253:12
**yep** 56:23
231:7 240:24
246:21
**york** 115:10,17
**youngest**
186:20

---
**z**
---

**z** 4:22
**zealand** 6:16
**zero** 153:21
155:10 161:4
189:20
**zoumadakis**
45:5 214:15
216:8
**zoumadakis's**
251:21

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.