APRIL L. HOLLINGSWORTH (Bar No. 9391)
WHITNEY NELSON (Bar No. 16919)
EMMA WOOD (Bar No. 20421)
**HOLLINGSWORTH LAW OFFICE, LLC**
HC 63 Box 8715
Duchesne, UT 84021
Telephone: 801-415-9909
april@aprilhollingsworthlaw.com
whitney@aprilhollingsworthlaw.com
emma@aprilhollingsworthlaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **ELIZABETH GRAHAM,**<br><br>    Plaintiff,<br><br>vs.<br><br>**BRISTOL HOSPICE HOLDINGS, INC.,**<br><br>    Defendant. | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR TO REDUCE DAMAGES AWARD**<br><br>Case No. 2:21-cv-00754<br><br>Judge Ted Stewart<br>Chief Magistrate Judge Dustin B. Pead |

Plaintiff Elizabeth Graham, by and through her undersigned counsel, hereby submits this Opposition to Defendant's Renewed Motion for Judgment as a Matter of Law or to Reduce Damages Award. For the reasons stated herein, the court should deny Defendant's Motion.

## ARGUMENT

Judgment as a matter of law is only appropriate when "the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Deters v. Equifax Credit Information Services, Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (internal quotation marks and citations omitted). In deciding a motion for judgment as a matter of law, the

court does "not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." *Id*. Additionally, the court should "consider the evidence, and any inferences drawn therefrom in favor of . . . the non-moving party." *Id*.

**I.    DEFENDANT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON GRAHAM'S RETALIATION CLAIM.**

In order to succeed on her retaliation claim, Graham had to prove "(1) she engaged in protected activity under federal law by complaining about discrimination in the workplace; (2) Defendant subjected Plaintiff to adverse employment action; and (3) the adverse action was taken because of her protected activity." ECF No. 89 at 2 (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000)). Defendant's characterization of the evidence presented at trial improperly draws inferences in favor of Defendant and omits much of the evidence presented at trial that supports the jury's finding of retaliation. Viewing the evidence as a whole, a reasonable jury could find, and did find, that Bristol's termination of Graham would not have occurred but for Graham's protected activities.

As this court has already acknowledged, Graham testified that in early 2018, she supported a coworker's Charge of Discrimination. *Id*. Graham testified she met with Wertz in February of 2018 about the coworker's Charge, and Wertz appeared angry when Graham supported the allegation. *Id*. As this court noted, the jury could infer from this "that Ms. Wertz was hostile toward complaints of discrimination and retaliation." ECF No. 89 at 4. Graham then filed her own Charge of Discrimination on March 5, 2018. *Id*.; Trial Ex. 6. Graham and Wertz testified they attended mediation regarding Graham's Charge in April of 2018 but did not resolve it. Graham testified that after the mediation, she approached Wertz and offered to withdraw her Charge if they could move forward amicably. Graham testified Wertz agreed, and based on that understanding, Graham withdrew her Charge of Discrimination. Trial Ex. 7.

2

Defendant incorrectly argues that Graham's withdrawal of her Charge "supports the conclusion that Graham's Charge had no bearing on the discharge." ECF No. 97 at 4-5. The EEOC did not complete the withdrawal and notify the parties of it until June 7, 2018. Trial. Ex. 8. Graham testified that in late June, after the EEOC notified the parties of the withdrawal, she was on a work trip in Hawaii. Graham was terminated on July 13, 2018, soon after she returned to the office. Trial Ex. 3. The jury could have believed that the Charge influenced the termination, as once it was withdrawn and Graham returned to the office, Bristol had an opportunity to retaliate against Graham with her Charge no longer pending, and Wertz "waited to exact [her] retaliation at an opportune time." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009).

Defendant's motion incorrectly suggests the jury was required to believe Wertz's stated reasons for terminating Graham because there is no direct evidence refuting them. Of course, circumstantial evidence is often the only way of proving an illegal motive, because most employers know not to admit to, for instance, terminating an employee for a retaliatory motive. See, e.g., *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99-100 (2003). The circumstantial evidence in this case provided strong evidence of Wertz's retaliatory motive. For instance, the termination was contrary to Bristol's policies and practices. As the court noted in its initial denial of Defendant's Rule 50 motion, Graham testified that, in her experience, "Bristol Hospice normally followed their progressive discipline policy" and "the type of allegations lodged against her would not typically result in immediate termination." ECF No. 89 at 3. Bristol's policies identified "the minimum conduct and behavior" expected of employees and warned, "Repeated failure to meet these expectations or failure to meet several of them over time may lead to disciplinary action, up to and including termination of employment." Trial Ex. 9 at GRAHAM 345. And while Bristol occasionally skipped to immediate termination, evidence presented at

trial showed such instances included "improper supervisor and employee relations, incidents of blatant sexual harassment, and an incident in which nurses were giving recreational enemas at a facility owned by Bristol Hospice." ECF No. 89 at 3. The jury could have found that the circumstances surrounding Graham's termination did not rise to a level that warranted immediate termination, as the court has already found it could. This is particularly so since Graham's performance reviews were positive. Trial Ex. 5. There was no evidence that Graham was a problem employee prior to her termination that would support Wertz's failure to follow the progressive discipline policy. Thus, Wertz's departure from the progressive discipline policy provides a basis for a jury to infer that the stated reasons for Graham's termination were pretext to hide a retaliatory motive. *Kendrick,* 220 F.3d at 1230.

Additionally, Wertz testified, and Bristol's policies stated, that it was important to get both sides of the story when conducting an investigation. Trial Ex. 10. Furthermore, Wertz testified that it was important to document complaints and investigations—a fairly obvious statement from a director of human resources and one supported by the policies. *Id*. But Graham was not made aware of or given an opportunity to respond to the allegations against her. And Wertz testified that she did not have anything in writing supporting the reasons she terminated Graham at the time she decided to terminate her. These inconsistencies between the process applied to Graham's termination and the way Bristol (and any reasonable employer) typically conducts investigations also indicate pretext and support the jury's finding of retaliation.

Defendant's argument that the evidence showed Wertz "genuinely believed that Graham did not train Myers and then that Graham lied about that fact" is not supported by the evidence at trial. First, it is the jury, not the Defendant, who determines the credibility of witnesses, and there was much evidence from which the jury could decide Wertz's claims about her "genuine belief"

were not credible. For example, Wertz testified Graham had never lied to her before or given her a reason not to believe her. To the contrary, the person Wertz claimed to believe, Ms. Myers, was a complete stranger to her. Further, it is undisputed that Graham emailed Wertz a summary of the training she conducted with Myers. Trial Ex. 16. Wertz did not obtain a statement from Myers refuting Graham's summary until Wertz was preparing to oppose Graham's claim for unemployment benefits, further casting doubt on Wertz's purported "genuine belief" that Graham did not conduct the training at issue. Perhaps most significantly, Wertz's credibility was diminished by evidence that Graham took four pages of notes regarding the training she conducted with Myers (Trial Ex. 17), which Graham testified she provided to Wertz, as was her practice. Wertz testified at trial that she had not seen those notes, but she was impeached with her own testimony to the Department of Workforce Services in which she questioned whether Graham had "gone page by page" through a brochure (see Trial Ex. 19 at 35), which was language directly from Graham's four pages of notes (see Trial Ex. 17 at 2). This testimony demonstrated Wertz lied under oath in her testimony to the jury about not receiving Graham's extensive notes about the training. From any of this evidence, the jury could have found Wertz did not "genuinely believe" Graham did not train Myers and, therefore, Bristol's stated reasons for terminating Graham were untrue.

As for Myers' testimony in support of Bristol's position, she testified that although she was not employed by Bristol, she became a board member of the Bristol Hospice Foundation in 2022 or 2023. The jury could have determined that Myers' testimony was not reliable because she has an interest in supporting Bristol Hospice's narrative.

Defendant's argument that the jury's decision based on circumstantial evidence was purely "speculative" misunderstands the import of the evidence presented in this case. In

discrediting Wertz, including the legitimacy of the processes she applied to Graham's termination and her stated reasons for the termination, Graham provided a basis for the jury to find retaliation. See, e.g., *Doebele v. Sprint/United Mgmt. Co.,* 342 F.3d 1117, 1135-36 (10th Cir. 2003) (explaining a plaintiff does not have to present evidence of a discriminatory motive, as "the fact of pretext alone may allow the inference of discrimination"); *Miller v. Eby Realty Group LLC,* 396 F.3d 1105, 1113-14 (10th Cir. 2005) ("The employer is in the best position to explain its actions, and when it chooses to lie about its reasons for terminating an employee it runs the risk that the lie will lead the jury to draw an adverse inference" (internal cites omitted)).

Here, there is ample evidence of pretext, including: Wertz did not follow the progressive discipline policy when terminating Graham, even though she normally did; Graham didn't have any prior written discipline; her performance had been good before her termination; Wertz had no reason to believe Graham lied to her about training Myers; Graham did train Myers, and provided evidence of this to Wertz, who denied at trial having received it; and Graham was not even notified of the allegations against her, let alone given an opportunity to refute them prior to her termination. Collectively, these facts indicate Wertz was simply looking for an excuse, however flimsy, to retaliate against Graham at the first opportunity once her Charge of Discrimination was no longer pending. Here, the evidence of pretext shows retaliation.

Although she was not required to, Graham also provided evidence of retaliatory motive, through testimony that Wertz was angered by Graham's support of a coworker's Charge of Discrimination, and that shortly after Graham the EEOC effected withdrawal of Graham's Charge of Discrimination, Wertz terminated her employment. In sum, viewing the evidence in the light most favorable to Graham, it does not point only towards Bristol's narrative, so judgment as a matter of law for Defendant is inappropriate.

## II.   DEFENDANT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PUNITIVE DAMAGES.

Defendant also argues it is entitled to judgment as a matter of law on the punitive damages award because "Graham failed to present sufficient evidence that Wertz or Bristol were aware that their actions would violate federal law." ECF No. 97 at 6. However, that is not the standard by which an award of punitive damages is analyzed; rather, it is whether the employer acted with malice or reckless indifference to an employee's federally protected rights. *Id*. at 5-6. As this court has already acknowledged, "a punitive damages claim can proceed when a reasonable jury could find that discrimination and/or retaliation motivated the employer's decision to terminate the plaintiff and there is evidence presented that the employer knew the requirements of Title VII." ECF No. 89 at 5 (citing *Flitton v. Primary Residential Mortg.*, 238 F. App'x 410, 420 (10th Cir. 2007); *EEOC v. Heartway Corp.*, 466 F.3d 1156, 1169 (10th Cir. 2006); *McGinnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1137-38 (10th Cir. 2006)).

The jury found Bristol retaliated against Graham for engaging in protected activity. And evidence was presented to show that the decision-maker, Wertz, knew well the requirements of Title VII. Wertz testified that "as the Executive Vice President of Human Resources, she oversaw discipline of employees and made sure that Bristol Hospice policies and the law were followed." ECF No. 89 at 5-6. Thus, the evidence at trial met the standard for awarding punitive damages.

Defendant also argues that the court erred by not providing the jury with an instruction on the *Kolstad* good-faith defense. The Tenth Circuit has made clear that the *Kolstad* good-faith defense is not applicable in cases "premised on a theory of direct liability." *Deters*, 202 F.3d at 1271. Specifically, the "defense is negated by a showing of direct malice or reckless indifference to federally protected rights of the plaintiff, by [the employee] who was designated by the company as the final decision-making authority responsible for implementing the company anti-

discrimination policy." ECF No. 89 at 6 (quoting *Deters*, 202 F.3d at 1271). Here, Wertz was responsible for implementing Bristol Hospice's anti-discrimination/retaliation policies. *Id*. And Wertz had final decision-making authority regarding terminating employees. *Id*. Furthermore, Graham testified that Bristol's CEO was present at the meeting in which she was terminated, and when asked directly, he approved of her termination. This was therefore a case of direct liability, and the *Kolstad* good-faith defense did not apply.

### III.    REMITITUR BEYOND THE STATUTORY DAMAGES CAP IS NOT APPROPRIATE.

Defendant argues that the amount of punitive damages awarded by the jury is constitutionally excessive and therefore warrants reduction or a new trial. In doing so, Defendant asks the court to first determine whether remitter or a new trial is appropriate, before applying the damage cap. However, in determining excessiveness of punitive damages, the case law indicates that the court should apply the statutory cap first. "Section 1981a establishes a regime whereby the jury will set the damages, without reference to the statutory cap. Then, if the damages awarded exceed the relevant limit, the district court shall reduce the amount so that it conforms to the statutory cap. The statutory cap is not the limit of a damages spectrum, within which the judge might recalibrate the award given by the jury." *Deters*, 202 F.3d at 1273; *see also Millazzo v. Universal Traffic Service, Inc.*, 289 F.Supp.2d 1251, 1255 (D. Colo. 2003) ("though the Tenth Circuit has not squarely addressed the issue, cases in the Tenth Circuit that have considered these two issues together have first applied the statutory cap, then considered the constitutional challenge."); *Jones v. Rent-A-Center, Inc.*, 281 F.Supp.2d 1277, 1287-90 (D. Kan. 2003) (applying the statutory cap before analyzing the excessiveness of the damages).

"Only when an award would shock the judicial conscience, and constitute a denial of justice, for example because it would result in financial ruin of the defendant or constitute a

disproportionately large percentage of a defendant's net worth, will [the court] reduce the award below the statutory cap." *Deters,* 202 F.3d at 1273 (cleaned up, internal citations omitted). Here, the jury awarded Graham $75,000 in compensatory damages and $5,000,000 in punitive damages. After applying the $300,000 damage cap in 42 U.S.C. § 1981a(b)(3), punitive damages are effectively $225,000. Defendant has not argued and cannot possibly show that such an amount would result in financial ruin or constitute a disproportionately large percentage of its net worth. It is arguably not even enough to "punish and deter." *Id.* Thus, according to *Deters,* reduction beyond that amount would be inappropriate.

Further, the $225,000 punitive damages award is not constitutionally excessive. Defendant makes the conclusory claim that Graham "did not present evidence of a substantial degree of reprehensible conduct," without providing any supporting evidence or caselaw. In *Gore*, which Bristol cites for the "guideposts" to be considered, the Court analyzed several factors in determining reprehensibility that are relevant here, including whether the harm was "purely economic in nature," the defendant's "indifference or reckless disregard for the health and safety of others," the "financial vulnerability" of the plaintiff, and whether the defendant "repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 576-77 (1996). All these factors support the punitive damages award here. The harm to Graham was not purely economic, as demonstrated by the jury's award of emotional distress damages, and Graham was financially vulnerable because she was an employee of Bristol. Further, as explained above, Bristol's director of human resources, who was well-trained on Title VII and wrote the company's policies, retaliated against Graham by manufacturing a reason to terminate her at the first opportunity after Graham withdrew her Charge of Discrimination, ignored the policies she wrote in failing to follow

progressive discipline or even ask Graham about the allegations she relied on to terminate her, and lied in court about not having evidence that Graham actually did the training Wertz claimed she did not do. Further, there was testimony that other women had complained about the treatment they were subjected to by Sandy Dayton and Wertz, and the behavior continued. This indicates a high "degree of reprehensibility of the defendant's conduct, which is "perhaps the most important" factor in determining "the reasonableness of a punitive damages award."

Next, Defendant's argument that the ratio of punitive damages to compensatory damages requires reduction or a new trial, is not supported by the case law. As mentioned above, the excessiveness of damages should be determined after application of the damage cap. Thus, the ratio is actually 3:1 (not including the additional economic damages still to be decided) which is entirely appropriate and weighs in support of the punitive damages award under the second guidepost. *See Deters*, 202 F.3d at 1273 (upholding a ratio of 59:1—$5,000 compensatory damages and $295,000 punitive damages, as reduced to conform with the damage cap).

Furthermore, the purpose of the guideposts outlined in *Gore* are to ensure "fair notice both that the certain conduct will subject [a defendant] to punishment, and the possible severity of the punishment that may be imposed." *Id*. at 1272. In *Deters,* the Tenth Circuit explained the defendant employer in that case "certainly had notice that it could be subject to punitive damages for involvement in discriminatory practices with malice or reckless indifference to an individual's federally protected rights, by virtue of the plain language of Title VII itself." *Id*.; *see also Jones*, 281 F.Supp.2d at 1288, in which the court explained:

> [I]t is important to note that defendant had notice that it could be subjected to punitive damages at the statutory maximum 'for involvement in discriminatory practices with malice or with reckless indifference to an individual's federally protected rights, by virtue of the plain language of Title VII itself.' . . .  This distinguishes the jury's finding of reprehensibility in this case from punitive damages awards in other cases, [including

*Gore*], in which the potential liability arose from tort or fraud claims that are not similarly curtailed by statute.

Here, Bristol was clearly on notice of its obligations under Title VII, and the $225,000 punitive damages award will not ruin Bristol financially. Therefore, neither remittitur beyond applying the damages cap nor a new trial is warranted.

**CONCLUSION**

Because there was sufficient evidence presented at trial for a jury to find Bristol hospice liable for retaliation and punitive damages; Defendant was not entitled to the *Kolstad* good-faith defense; and the punitive damages award is not unconstitutionally excessive after applying the damage cap, the court should DENY Defendant's motion for judgment as a matter of law or a new trial in its entirety.

DATED this 26th day of March, 2026.

**HOLLINGSWORTH LAW OFFICE, LLC**

/s/ April L. Hollingsworth
April L. Hollingsworth
Whitney Nelson
Emma Wood
*Attorneys for Plaintiff*

11

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of March, 2026, a copy of **PLAINTIFF'S**

**OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A**

**MATTER OF LAW OR TO REDUCE DAMAGES AWARD** was served, via the courts

electronic filing system, on the following:

Ryan B. Frazier
Jonathan M. Burt
**KIRTON | McCONKIE**
rfrazier@kmclaw.com
jburt@kmclaw.com

/s/ April L. Hollingsworth