Ryan B. Frazier (9007)
Jonathan M. Burt (16794)
**KIRTON | McCONKIE**
2600 W. Executive Parkway, Suite 400
Lehi, Utah 84043
Telephone: 801-426-2100
Email: rfrazier@kmclaw.com
        jburt@kmclaw.com

*Attorneys for Defendant Bristol Hospice Holdings, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ELIZABETH GRAHAM,<br><br>        Plaintiff,<br><br>v.<br><br>BRISTOL HOSPICE HOLDINGS, INC.,<br><br>        Defendant. | **DEFENDANT'S REPLY SUPPORTING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR TO REDUCE DAMAGES AWARD**<br><br>Civil Case No.: 2:21-cv-00754-TS-DBP<br>District Judge: Ted Stewart<br>Magistrate Judge: Dustin B. Pead |

### REPLY INTRODUCTION

Bristol's Rule 50(b) and Rule 59 Motion for Judgment as a Matter of Law or to Reduce Damages Award, ECF 97, ("Motion") should be granted because (1) Graham failed to prove but-for causation on her retaliation claim, (2) the jury's punitive damage award is grossly excessive, and (3) at a minimum, Title VII's damage caps in 42 U.S.C. § 1981a apply to reduce the award.

Plaintiff's arguments in her Opposition to the Motion, ECF 100 ("Opp'n" or "Opposition") do not alter these conclusions. First, her circumstantial evidence of causation is insufficient under the controlling law. Second, her arguments regarding punitive damages are ill

1

founded and ignore the passion and prejudice evident in the jury's award. Finally, Plaintiff concedes that Title VII's damages cap applies to the combined sum of compensatory and punitive damages in this case.

## **ARGUMENT**

**I.      JUDGMENT AS A MATTER OF LAW FOR BRISTOL IS WARRANTED AS GRAHAM DID NOT PRESENT SUFFICENT EVIDENCE TO SUPPORT THE JURY VERDICT THAT BRISTOL IS LIABLE FOR RETALIATION.**

Graham failed to prove but-for causation on her retaliation claim as a matter of law. Title VII requires "but for" causation between the plaintiff's protected activity and adverse employment action. *Walkingstick Dixon v. Okla. ex rel. Reg. Univ. Sys. of Okla. Bd.*, 125 F.4th 1321, 1339 (10th Cir. 2025). To satisfy this "but for" causation requirement, Graham had to offer "proof that the unlawful retaliation ***would not have occurred in the absence of the alleged wrongful action*** or actions of the employer." *Univ. of Texas SW Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (emphasis added).

As admitted by Graham, there is no direct evidence linking Graham's termination with any protected activity. *See* Opp'n 3, ECF 100. And Graham's circumstantial evidence of causation is weak, even when viewed in the light most favorable to her. *See Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262 (10th Cir. 2000).

*First*, Graham speculates that the jury ***could infer*** that "Ms. Wertz was hostile toward complaints of discrimination" because she appeared angry when Graham supported a co-worker's charge in early 2018. Opp'n 2, ECF 100. Yet the temporal proximity between these two events is too attenuated to support but-for causation. *See, e.g.*, *Hanson v. Colorado Judicail Dep't*, 564 Fed. App'x 916, 920 (10th Cir. 2014) (holding four-month period between employee's complaint and her termination did not permit inference of retaliation); *Wagner v.*

*Bank of Am. Corp.*, 571 Fed. App'x 698, 701 (10th Cir. 2014) (holding timing of termination was insufficient to establish wrongful discharge).  This is so "particularly in light of the undisputed events that occurred in the interim." *Wagner*, 571 Fed. App'x at 701.

Here, it is undisputed that in the interim between Graham's protected activity in February and March 2018 and her termination four months later in July 2018, (1) Graham voluntarily withdrew her charge of discrimination, (2) Wertz and Graham's working relationship returned to normal, and (3) Graham did not experience any adverse action related to her pay, job assignments, or other terms and conditions of her employment.  Wertz testified that she saw charges of discrimination as opportunities to work through issues with employees, and Graham did not dispute this or offer any evidence that Wertz treated her differently.

*Next*, Graham contends that causation is circumstantially supported by Bristol's alleged failure to follow progressive discipline.  Opp'n 3, ECF 100.  But this too fails.  "When, as here, progressive discipline is entirely discretionary, and the employer did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext." *Rutledge v. Board of County Commissioners of Johnson County*, No. 22-3081, 2023 WL 4618335, at *5 (10th Cir. July 19, 2023).  In other words, when the employer's disciplinary policy is discretionary, "***no reasonable jury*** could find that the [employer's] failure to use progressive discipline shows [discrimination or retaliation]." *Id.* (emphasis added).

It was undisputed at trial that Bristol's policies did not mandate progressive discipline—it was entirely discretionary.  Plaintiff's own evidence submitted with her Opposition confirms this.  *See* Pl.'s Exs. 9 & 10, ECF 101-6 and 101-7.  Bristol's handbook contains a "Corrective Action and Discipline" policy that provides:

> An employee whose conduct, actions or performance violates or conflicts with Bristol's policies, work rules, Employee Handbook, or core values may be

3

disciplined or terminated immediately and without warning.  Bristol deals with all issues on a case-by-case basis.  ***Nothing in this Handbook should be construed as a promise of specific treatment in a given situation.***

Pl.'s Ex. 9, ECF 101-6, pageID 2115 (emphasis added).   And Bristol's separate Corrective Action Guideline similarly provides that "[t]here are times when the seriousness of the violation may not fall within a progressive disciplinary process" and "[c]ertain acts of misconduct may lead to immediate termination of an employee and progressive discipline will not apply."  Pl.'s Ex. 10, ECF 101-7, pageID 2127, 2129.   Thus, Bristol's progressive discipline policy was discretionary, and Bristol could proceed directly to termination in its sole discretion.

Further, the evidence at trial showed that Graham's misconduct fell squarely within the category of ***immediately terminable offenses***, including insubordination and knowingly making false oral or written statements. Pl.'s Ex. 9, ECF 101-6, page ID 2117–18. These acts alone were sufficient to terminate Graham's employment without following progressive discipline under the policy. The fact that Graham's performance reviews were generally positive is immaterial. Bristol's corrective action policies do not limit termination to only employees with repeated negative performance evaluations. Contrary to Graham's assertion, there was no departure from Bristol's disciplinary policies, and, thus, no basis for a jury to infer retaliatory intent.

*Next*, Graham contends that Wertz' investigation was somehow inadequate because she was not given an opportunity to respond to the allegations against her.  Opp'n 4, ECF 100.  This is mistaken.  A failure to conduct a fair investigation may support an inference of retaliation, but "an employer may ordinarily 'defeat the inference' … by 'simply asking an employee for his [or her] version of events.'"  *Rutledge*, 2023 WL 4618335, at *8 (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006)).  Wertz did exactly that.  After hearing from Faith Myers that Graham had not completed the assigned training, Wertz asked Graham to provide her a list of the training she had done.  That is, Wertz specifically asked Plaintiff for her

4

version of events.  Pl.'s Ex. 16, ECF 101-8.  Plaintiff admitted that she was asked to explain the training she had purportedly provided.  Though Plaintiff appears to fault Wertz for not specifically confronting her with the information that she had lied, Wertz had good reason to withhold this information as part of an unbiased investigation.  Wertz wanted Graham's unfiltered response to the training she had provided, rather than revised history.  Moreover, once Wertz determined that Graham had misrepresented what she had done, it would have been futile to continue asking her for her side of the story.  When it comes to lies, once is enough.

*Next*, Graham attempts to cast doubt on Wertz' credibility and her testimony as to why she believed Myers over Graham. Opp'n 5, ECF 100.  Wertz' decision to credit Myers over Graham was entirely reasonable. Though Wertz and Myers did not have previous history together, the attendant circumstances suggested to Wertz that Myers had no reason to lie. Myers[1] did not have an existing relationship with Graham, and there was no evidence that Myers had motive to lie to Wertz about the fact Graham had not trained her.  And Plaintiff's assertion that Wertz did not obtain a statement from Myers refuting Graham's summary until opposing Graham's claim for unemployment is contradicted by the evidence.  Myers' written statement is dated July 12, 2018, and Myers testified that she prepared it that day and not in response to any claim for unemployment compensation as argued by Plaintiff.  *See* Def.'s Trial Ex. D.[2]  While it is within the province of the jury to weigh credibility, the evidence overwhelmingly supported

---

[1] Myers was the only witness at trial without an interest or stake in the outcome. She participated pursuant to a Subpoena, and she testified that she appeared and testified reluctantly. Both at trial and in her Opposition, Graham attempted to assail Myers' credibility by arguing that she is a member of the Bristol Hospice Foundation (the "Foundation") board. (Opp'n 5, ECF 100.) However, Myers testified that the Foundation and Bristol (the defendant) are separate, independent entities – one being a for profit business and the other a charitable organization. That testimony was undisputed.

[2] Graham also accuses Wertz of lying under oath about not seeing four pages of notes that Graham allegedly took regarding the training she conducted, but Graham's evidence falls far short of establishing that Wertz committed perjury. The unemployment hearing was held in August 2018. During that hearing, Wertz ostensibly references the notes that Graham had submitted as part of the hearing.  There is no evidence that Graham provided the notes directly to Wertz as she asserted.  Moreover, the inability to remember trivial details from eight years ago does not establish that Wertz lied under oath.

5

Bristol.  Wertz' explanation was reasonable, and Myers was able to corroborate that no training or note taking had taken place.  There is no evidence that Wertz did not honestly believe that Graham had been untruthful. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (noting a court's role "isn't to ask whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs.").

## II.   GRAHAM'S NON-ECONOMIC DAMAGES SHOULD BE SET ASIDE OR SUBSTANTIALLY REDUCED.

### A.   Graham Failed to Present Sufficient Evidence To Support the Jury's Punitive Damages Award.

Punitive damages require proof of "malice or reckless indifference"; they are not available in plain vanilla retaliation suits.  42 U.S.C. § 1981(a)(b)(1); *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1201 (10th Cir. 2015).  Malice and reckless indifference are shown when the employer acts "in the face of a perceived risk that its actions would violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535–36 (1999).

Plaintiff contends that because Wertz "knew well the requirements of Title VII," the fact that the jury found Bristol retaliated against Graham *ipso facto* supports punitive damages.  This confuses the standard for punitive damages.  The Supreme Court has clarified that to be subjected to punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Kolstad*, 527 U.S. at 536.  Under this standard, "[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability." *Id.*  Most often, punitive damages are justified based on the "evil intent" of the defendant. *Id.*

The mere fact of retaliation—which Bristol disputes in any event, *see infra* Part I—does not automatically impose punitive damages liability. Under the circumstances, Wertz did not have reason to believe that terminating Graham's employment for insubordination would violate federal law. As explained, by that time, Graham and Wertz had attended a mediation, Graham voluntarily offered to withdraw her charge, and the working relationship between Graham and Wertz had returned to normal. Moreover, months had passed between February and March 2018, when Graham had engaged in protected activity, and the termination of her employment. There was no perceived risk that terminating Graham in July for insubordination would violate federal law. Relatedly, there is no evidence of "evil intent." Wertz testified that she was familiar with Title VII, had dealt with charges of discrimination many times from many employees, and viewed such charges in a constructive way. This all falls short of malice or reckless indifference.

In addition, the jury should have been permitted to consider the good-faith defense articulated in *Kolstad*. Under *Kolstad*, an employer may not be vicariously liable for punitive damages for the decisions of managerial agents where those decisions are contrary to the employer's good-faith efforts to comply with Title VII. 527 U.S. 526, 544 (1999). "[G]iving punitive damages protection to employers who make good-faith efforts to prevent discrimination in the workplace accomplishes Title VII's objective of motivating employers to detect and deter Title VII violations." *Id.* at 546.

There is overwhelming evidence of Bristol's good-faith efforts to comply with Title VII. It has extensive anti-retaliation policies. Employees, including Plaintiff, were informed and educated about those policies. And Debra Wertz testified regarding specific instances where these policies were enforced.

7

Plaintiff contends that the *Kolstad* good-faith defense is inapplicable because this is a case of "direct liability." Opp'n at 7. She relies on *Deters*, 202 F.3d 1262 (10th Cir. 2000), in support, but that case is distinguishable. First, *Deters* concerned a supervisor who turned a blind eye to egregious sexual harassment.[3] On the facts of that case, the Tenth Circuit held the *Kolstad* defense was "negated" by a showing of the supervisor's complete abdication of his role as the company's anti-discrimination leader. It did not hold that the *Kolstad* defense is categorically unavailable when an executive or human resources professional makes an employment decision. That would rob the *Kolstad* defense of its power, which would contradict the purposes of Title VII. It is also nowhere found in *Kolstad*'s holding, which contrary to Plaintiff's argument admits of no exceptions for "final decision makers."

Further, Wertz testified that while she was the head of HR, she did not have "final decision-making authority." She participated in an executive team involved in implementing Bristol's anti-retaliation policies. There are cases in which a good-faith defense is "negated" by evidence of an individual's malice or reckless indifference, but this is not one of them. Bristol engaged in good-faith efforts to comply with Title VII, and it would be unfair to impose liability for punitive damages given the facts of this case merely because Wertz was the HR director.

**B.    The Punitive Damages Award Amount Should be Substantially Reduced or a New Trial Should Be Granted.**

Plaintiff makes no attempt to defend the jury's $5,000,000 punitive damages award. Instead, she contends that in determining excessiveness, the Court should apply the statutory cap in §1981a before analyzing the ratio between punitive and compensatory damages. Opp'n 7, ECF 100. Simply ignoring the jury's award, however, does not make it go away. It also misapprehends the import of Bristol's argument.

---

[3] Sexual harassment claims have their own unique rules on vicarious vs. direct liability that are not applicable in retaliation cases. *See Deters*, 202 F.3d at 1270 n.3; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, (1998)).

4904-2204-6621.v1

As explained in *Millazzo v. Universal Traffic Service, Inc.*, 289 F. Supp. 2d 1251, 1256 (D. Colo. 2003), "[w]here a verdict is excessive against the weight of the evidence, the court may order a *remittitur* or direct that there be a new trial if plaintiff refuses to accept it." *Id.* However,

> One limitation on the use of remittitur remains. ***It is not proper if the verdict was the result of passion and prejudice***, since prejudice may have infected the decision of the jury on liability, as well as on damages. In those instances a complete new trial is required.

*Id.* (emphasis added) (quoting 11 Charles Alan Wright et al., Federal Practice and Procedure § 2815 (2d ed. 1995)).

The court's opinion in *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014), is instructive. There, the jury awarded $20 million in punitive damages, which the district court reduced to $4 million. In "exercise[ing] relatively stringent control over the size of punitive awards," the Second Circuit explained:

> Imposing extensive punitive damages on top of [intangible emotional distress awards] stacks one attempt to monetize highly offensive behavior, which effort is necessarily to some extent visceral, upon another. … Our commitment to reducing arbitrariness in damages awards, reigning in excessiveness, and ensuring some degree of proportionality thus weighs in favor of enforcing a tighter relationship between the harm suffered and the punishment imposed.

*Id.* at 164–66. In reviewing the specific punitive damage award in that case, the court noted that "punitive awards for workplace discrimination rarely exceed $1.5 million" and that a "$5 million punitive damages award that [was] four times higher than the underlying compensation [appeared] to be excessive by comparison." *Id.* at 166. Accordingly, the court vacated an award of punitive damages and remanded for a remittitur or new trial.

Here, the jury's $5,000,000 punitive award is nearly 67 times greater than its $75,000 compensatory award. Such punitive awards "rarely exceed $1.5 million," even in the most egregious cases. Yet the jury awarded more than three times that amount in this run-of-the-mill retaliation case in which employer and employee have conflicting versions of events. There was

9

no evidence supporting an unusually high punitive damage award.  Indeed, the jury's award is *ten times* what Plaintiff asked for in closing argument.

Based on the lack of evidence of egregious or reprehensible conduct, the relatively small amount of compensatory damages, and the large disparity between compensatory damages and punitive damages, it appears that the jury's award was arbitrary and the result of passion and prejudice. Because prejudice may have infected the jury's decision on liability, it is not appropriate to simply ignore it in favor of the damages cap. 11 Charles Alan Wright et al., Federal Practice and Procedure § 2815.

Rather, in these circumstances, the Court should throw out the punitive damage award or order a new trial.  At a minimum, Bristol suggests that a ratio of punitive damages to compensatory damages of 1:1 is appropriate, and the Court should therefore reduce the punitive damages award to $75,000.

### III.    GRAHAM'S NON-ECONOMIC DAMAGES SHOULD BE REDUCED BECAUSE THEY ARE SUBJECT TO TITLE VII'S DAMAGES CAP.

Graham does not dispute that the Title VII damage caps apply to the combined sum of her compensatory and punitive damages.  42 U.S.C. § 1981a(b)(3); *McInerney v. United Air Lines, Inc.*, 463 Fed. App'x 709, 724 (10th Cir. 2011).  At a minimum and if the punitive damages award is not set aside entirely, reduced to $75,000, or a new trial is not granted, the Court must apply the $300,000 damages cap.

<strong><u>CONCLUSION</u></strong>

For these reasons, Bristol respectfully requests that the Court grant judgment as a matter of law in favor of Bristol and dismiss Graham's retaliation claim. In addition, the jury's punitive damages award should be thrown out or reduced, or a new trial should be granted. Finally, at a

10

minimum, both the compensatory and punitive damages should be reduced to $300,000 combined pursuant to the damages cap of 42 U.S.C. § 1981a(b)(3).

Respectfully submitted this 9th day of April 2026.

KIRTON McCONKIE

*/s/ Ryan B. Frazier*
Ryan B. Frazier
Jonathan M. Burt

## WORD COUNT CERTIFICATION

I, Ryan Frazier, certify that this **DEFENDANT'S REPLY SUPPORTING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR TO REDUCE DAMAGES AWARD** contains 3,094 words of a 3,100 limit and complies with DUCivR 7-1(a)(4).

*/s/ Ryan B. Frazier*
Ryan B. Frazier

11

4904-2204-6621.v1

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of April, 2026, I caused a true and correct copy of the foregoing **DEFENDANT'S REPLY SUPPORTING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR TO REDUCE DAMAGES AWARD** to be served via CM/ECF upon the following:

April L. Hollingsworth
april@aprilhollingsworthlaw.com

Whitney Nelson
whitney@aprilhollingsworthlaw.com

Emma Wood
emma@aprilhollingsworthlaw.com


/s/ Marjorie Mackey
Legal Assistant

4904-2204-6621.v1